**SIMPSON THACHER & BARTLETT LLP**

425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Bryce L. Friedman
Sarah E. Phillips

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 286-6443
Christopher F. Graham
Sarah H. Morrissey

*Counsel for Adjusted Debtor and Plaintiff Suffolk Regional*
*Off-Track Betting Corporation*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,<br><br>                         Adjusted Debtor. | Chapter 9<br>Case No. 12-43503-CEC |
| SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,<br><br>*Plaintiff,*<br><br>*v.*<br><br>DELAWARE NORTH COMPANIES, INC., DELAWARE NORTH COMPANIES GAMING & ENTERTAINMENT, INC., DNC GAMING MANAGEMENT IN SUFFOLK, LLC, and DELAWARE NORTH ISLANDIA PROPERTIES, LLC,<br><br>*Defendants.* | A.P. No. 19-_____<br><br>(Jury Trial Demanded)<br><br>**<u>COMPLAINT</u>** |

## **NATURE OF THE ACTION**

1.    This is an action to stop Defendants ("Delaware North") from treating "Jake's 58 Hotel & Casino" in Islandia, New York as a pot of money to enrich its owners at the expense of Suffolk County and the State of New York.  In 2013, Suffolk Regional Off-Track Betting Corporation ("Suffolk OTB") appointed Delaware North to manage Suffolk OTB's new video lottery terminal ("VLT") gaming facility.  Since then, Delaware North has intentionally abused its position of trust to enrich itself.

2.    Jake's 58 is one of New York's most successful gaming facilities.  Since opening, "Jake's 58 Casino" has generated more than $210 million for New York State and millions more for Suffolk County and Suffolk OTB's creditors.  Hundreds of millions of dollars of VLT revenue have passed through Delaware North's hands.  But, at every opportunity Delaware North has diverted money due to the State and County to its own hotel and other businesses. Delaware North's secret business plan for Jake's 58 is simple:  Costs are charged to Suffolk OTB's "Jake's 58 Casino" so that Delaware North's "Jake's 58 Hotel & Restaurant" can make money.

3.    Delaware North implements this scheme by paying itself out of Suffolk OTB's bank accounts for bogus expenses.  So, when Delaware North needed a kitchen for its hotel, it charged Suffolk OTB for the equipment and build-out.  When the hotel needs elevator maintenance, security systems or a front desk, Delaware North charges Suffolk OTB.  When Delaware North cannot fill its hotel's guest rooms, it charges Suffolk OTB for hotel stays it gives away for "free."  Delaware North's treatment of the gaming facility as a piggy bank is manifest by its management's decision to name it "Jake's 58" after themselves—the Jacobs family that controls Delaware North.

4.      Suffolk OTB has uncovered at least the following instances of Delaware North's knowing and intentional bad faith conduct and malfeasance:  (i) paying itself millions of dollars in construction costs for Delaware North's hotel and restaurant; (ii) overcharging Suffolk OTB hundreds of thousands of dollars in rent by inflating the square footage of the VLT gaming facility and paying itself the inflated amount from Suffolk OTB's bank accounts; (iii) willfully miscalculating Suffolk OTB's share of utilities and paying itself the inflated amount from Suffolk OTB's bank accounts; (iv) incurring tens of thousands of dollars in fines issued by the New York State Gaming Commission (the "Gaming Commission"), while putting Suffolk OTB's gaming license at risk due to repeated regulatory violations; (v) falsely claiming ownership of trademarks and service marks for "Jake's 58" in applications to the United States Patent and Trademark Office despite those trademarks and service marks belonging exclusively to Suffolk OTB; and (vi) using Suffolk OTB's annual marketing budget as a slush fund to compensate itself from Suffolk OTB's funds for hotel rooms it cannot fill with paying guests. Suffolk OTB believes that a full accounting will prove the existence of additional unlawfully diverted funds and misconduct.

5.      Suffolk OTB reluctantly brings this action because when it presses Delaware North for information about its spending, Delaware North stonewalls.  When Suffolk OTB asked Delaware North to return control of the bank accounts and accounts payable function to Suffolk OTB so that Suffolk OTB can put a stop to the unlawful spending, Delaware North refused. Suffolk OTB has no choice but to seek the Court's help to remedy Delaware North's self-dealing and abuse of its position of trust.

6.      Suffolk OTB seeks damages due to Delaware North's knowing, intentional and bad faith pattern of enriching itself at Suffolk OTB's expense, for violations of the New York

False Claims Act, breaches of contract, breaches of fiduciary duty and because Delaware North has been unjustly enriched at the expense of Suffolk OTB, its creditors and the people of New York and Suffolk County.  Through this action, Suffolk OTB seeks entry of a judgment against Defendants awarding damages in excess of $5,000,000, punitive damages, equitable relief, attorneys' fees, and a declaration that Suffolk OTB may terminate Delaware North's management of Jake's 58 Casino for cause.

### JURISDICTION AND VENUE

7.      This is an adversary proceeding brought pursuant to Rule 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334.

9.      This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(O), 11 U.S.C. § 945(a) and 11 U.S.C. § 1142(b) because the underlying controversy and its outcome directly affect the ability of the Plaintiff to complete adjustment of the debtor-creditor responsibilities and its ability to perform under its Confirmed Plan (as defined *infra*).

10.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) because this adversary proceeding is related to Suffolk OTB's Chapter 9 bankruptcy proceeding, *In re: Suffolk Regional Off-Track Betting Corp.*, Case No. 12-43503 (CEC), currently pending before this Court.  The outcome of this action may alter Suffolk OTB's rights, liabilities, options, or freedom of action in a way that impacts the Confirmed Plan.  Specifically, this action brings claims relating to Defendants' development, operation and management of the VLT gaming facility that is important to the success of the Confirmed Plan, and seeks relief against Defendants for improperly diminishing the net gaming revenues flowing to Suffolk OTB for the repayment of its prepetition creditors pursuant to the "waterfall plan" confirmed by this Court.

11.     Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409 because Suffolk OTB's principal place of business is within the Eastern District of New York and because this adversary proceeding relates to Suffolk OTB's Chapter 9 bankruptcy proceeding currently pending before this Court.

## PARTIES

12.     Plaintiff, Suffolk Regional Off-Track Betting Corporation ("Suffolk OTB"), is a New York public benefit corporation, with its principal place of business at 425 Oser Avenue, Suite 2, Hauppauge, New York 11788.

13.     Defendant, Delaware North Companies, Inc. ("DNC") is a Delaware business corporation with its principal executive office at 250 Delaware Avenue, Buffalo, New York, 14202.

14.     Defendant, Delaware North Companies Gaming & Entertainment, Inc. ("Delaware North Gaming") is a Delaware business corporation with its principal executive office at 250 Delaware Avenue, Buffalo, New York, 14202.  Delaware North Gaming is a wholly owned subsidiary of DNC.

15.     Defendant, DNC Gaming Management in Suffolk, LLC ("Delaware North Manager" or "Manager") is a New York limited liability company with a registered agent of Cogency Global Inc., 10 E. 40th Street, 10th Floor, New York, New York 10016.  Delaware North Gaming is the sole member of Delaware North Manager.

16.     Defendant, Delaware North Islandia Properties, LLC ("Delaware North Properties") is a Delaware limited liability company with its principal place of business at 250 Delaware Avenue, Buffalo, New York, 14202.  Delaware North Gaming is also the sole member of Delaware North Properties.

## STATEMENT OF FACTS

### Suffolk OTB Plans To Operate A VLT Gaming Facility
### As A Cornerstone Of Its Business Plan

17.     Suffolk OTB is one of five remaining off-track betting corporations created by the State of New York to generate revenues for the State and local governments, promote the horse racing industry and suppress illegal bookmakers.  Since 1975, Suffolk OTB's operations have directly contributed hundreds of millions of dollars to the State and local governments.  Pursuant to the statutes governing Suffolk OTB's operations, the bulk of Suffolk OTB's gaming revenue from VLTs and the off-track pari-mutuel wagering activities it offers is distributed to the State of New York (including for public education), Suffolk County, various other local government entities, and the State's horse racing industry.

18.     Though Suffolk OTB generates significant amounts of money each year, its statutory obligations to distribute these funds for the benefit of New Yorkers leaves it with limited ability to retain funds for its own operations.  In 2006, Suffolk OTB was experiencing financial difficulties caused primarily by a challenged local economy, increased operating costs, a nationwide decline in horse-race wagering, and competition with other gaming entities.  Suffolk OTB's operating deficits were $3.5 million in 2007 and increased to $5.1 million in 2011.  On May 11, 2012, Suffolk OTB filed a petition for relief under Chapter 9 of the Bankruptcy Code in this Court.

19.     On July 30, 2013, the State of New York authorized Suffolk OTB to operate a VLT gaming facility with 1,000 VLTs in Suffolk County.  (N.Y. Tax Law § 1617–a(a)(4)).  On August 8, 2013, Suffolk OTB issued a Request for Proposals (the "RFP") for an agent to locate, develop, and operate a VLT gaming facility.  Suffolk OTB believed a VLT gaming facility

would allow it to satisfy its prepetition debts and generate revenue for the future to the benefit of New York State public education and the people of Suffolk County.

**Delaware North Promises To Work With Suffolk OTB To Benefit The Public**

20.     DNC and Delaware North Gaming submitted a proposal in response to Suffolk OTB's RFP on September 20, 2013.  DNC and its wholly-owned subsidiary Delaware North Gaming are closely-held private companies controlled by the Jacobs family, with roots in Buffalo, New York.  The companies operate in the hospitality industry, offering lodging and food and beverage concessions at venues such as stadiums, entertainment complexes, national parks, airports and casinos.  Delaware North Gaming has the reputation of being a leading regional gaming operator.  In its proposal, Delaware North Gaming touted its expertise at working in public-private partnerships in New York to achieve the "ultimate goal" of delivering maximum funding to public education.  Delaware North Gaming promised Suffolk OTB that it would deliver a first-class VLT facility on-time and on-budget, proclaiming that it would consider New York State public education as a stakeholder on par with its own private shareholders (the Jacobs family) if selected by Suffolk OTB.

21.     After duly considering multiple responses to its RFP, Suffolk OTB selected DNC and Delaware North Gaming to develop and operate its VLT facility.  DNC and Delaware North Gaming then formed Defendant Delaware North Manager.  Delaware North Gaming is the sole member of Delaware North Manager, which was created as a local alter-ego of DNC and Delaware North Gaming for the purposes of developing and operating Suffolk OTB's VLT gaming facility.

22.     Upon its acceptance of the Delaware North proposal, Suffolk OTB entered into a principal-agent relationship with Delaware North and placed Delaware North in a position of trust and confidence to act faithfully on its behalf in developing and operating its VLT gaming

facility. The VLT facility was Suffolk OTB's path to solvency and repaying its creditors, as well as the cornerstone to fulfilling Suffolk OTB's mandate to generate revenue for the benefit of State and County residents.

23.    On March 7, 2014, Suffolk OTB and Defendants Delaware North Gaming and Delaware North Manager entered into a Development and Management Services Agreement (the "Original DMS Agreement"), which this Court approved in April 2014. Under the Original DMS Agreement, Delaware North Manager agreed to loan Suffolk OTB approximately $65 million dollars to purchase, develop and open a VLT gaming facility in Medford, New York as Suffolk OTB's agent. As collateral for its loan, Delaware North Manager held a mortgage on the proposed site of the Medford VLT gaming facility.

24.    With Delaware North as its agent and fiduciary, on September 11, 2014, Suffolk OTB filed a second amended plan for the adjustment of Suffolk OTB's debts and a second amended disclosure statement. This Court confirmed Suffolk OTB's second amended plan after a hearing on October 22, 2014 (the "Confirmed Plan"). The Confirmed Plan provides for Suffolk OTB to construct and operate a VLT gaming facility. The facility was expected to open in Medford, New York (the "Medford VLT Facility"). Pursuant to the Confirmed Plan, Suffolk OTB was to repay its unsecured creditors from the net revenue generated by the Medford VLT Facility.

**The Medford VLT Facility Hits Roadblocks And Delaware North Hatches Its Scheme**

25.    Efforts to open the Medford VLT Facility were hampered when the Town of Brookhaven refused to accept and act on Suffolk OTB's application for a building permit. This obstacle compounded Suffolk OTB's financial challenges because not only was it unable to pay its prepetition creditors, it could not service the loan from Delaware North Manager which was secured by the Medford property. Delaware North saw Suffolk OTB's financial distress as an

opportunity to squeeze Suffolk OTB, own the property in which the VLT gaming facility would operate, and build its own separate hospitality business.

26.     Delaware North Manager, acting at the direction of DNC and Delaware North Gaming, created its alter ego Delaware North Properties for the sole purpose of purchasing an alternative location for a VLT gaming facility at the Marriott Hotel located at 3635 Express Drive North, Islandia, New York, 11749 (the "Islandia Property").  Delaware North's goal was to reconfigure the Parties' deal so that Delaware North, not Suffolk OTB, would reap the benefits of owning the VLT gaming facility property.  Knowing Suffolk OTB wanted to open the VLT gaming facility as quickly and efficiently as possible, Delaware North required adjustments to the terms of the Original DMS Agreement, ones unfavorable to Suffolk OTB.  Delaware North also purchased the Islandia Property to force Suffolk OTB to become its tenant under unfavorable terms in order to subsidize Delaware North's private hotel business.

**Suffolk OTB And Delaware North Enter Into**
**The Amended DMS Agreement And Lease Agreement**

27.     With the threat of not making payroll hanging over its head, and no other practical option, on May 24, 2016, Suffolk OTB entered into the Amended and Restated Development and Management Services Agreement ("DMS Agreement") with Delaware North Gaming and Delaware North Manager.  The DMS Agreement provided for the main floor, mezzanine and basement of the Marriott hotel to be retrofitted as a VLT gaming facility (the "VLT Facility") managed by Delaware North Manager.  Delaware North became the sole owners of the hotel and food and beverage business at the Islandia Property.

28.     In a status report dated April 20, 2016, Suffolk OTB filed a letter advising the Bankruptcy Court that Suffolk OTB sought to modify the proposed location of the VLT gaming facility from Medford, New York to the Islandia, New York location.  The Bankruptcy Court

held a status hearing on April 27, 2016 that included a discussion of Suffolk OTB's plans as set

forth in the April 20, 2016 status letter.  On May 27, 2016, Suffolk OTB filed an additional letter

advising the Bankruptcy Court that it entered into the amended DMS Agreement to facilitate the

change of venue and enclosing a copy of the executed amended DMS Agreement.

29.     Despite the fact that Suffolk OTB was to bear all the expenses related to the

construction and development of the VLT Facility, the DMS Agreement provided that "all legal

and equitable interest in the Gaming Facility and the improvements made thereto from time to

time will belong exclusively to [Defendant Delaware North Manager] or one of its Affiliates."

(DMS Agreement § 6.01).

30.     The DMS Agreement sets forth Delaware North's responsibilities with respect to

the development and management of the VLT Facility and the apportionment of costs between

the parties thereto.  Significantly, the DMS Agreement provides, "[i]n the performance of its

duties as the manager of the Business, the Manager will act solely as the agent of Suffolk OTB"

and that "the performance of all activities by the Manager pursuant to this Agreement will be on

behalf of Suffolk OTB and for its exclusive account and benefit[.]"  (DMS Agreement §§ 16.01;

5.01).

31.     The DMS Agreement also provides that the Manager agrees to cooperate with

Suffolk OTB so that Delaware North's exercise of its authority as Suffolk OTB's agent is

"consistent with the current annual Operating Budget, and [is] also consistent with practices in

gaming facilities reasonably comparable to the Gaming Facility."  (DMS Agreement § 5.01).

32.     In addition, Delaware North Manager is required to act at all times in a manner

consistent with "Manager Standards," defined in the DMS Agreement as "standards of diligence

and professional management consistent with that which is customary and usual with respect to

the video lottery gaming industry . . . and such other standards as are required under applicable law."  (DMS Agreement §§ 1.01; 5.01).

33.     On August 12, 2016, the Islandia Village Board approved Delaware North Properties' special permit to allow Delaware North Properties to operate the VLT Facility on the Islandia Property.  Construction on the VLT Facility began in September 2016.

34.     On December 20, 2016, as construction of the VLT Facility progressed, Suffolk OTB and Delaware North Properties executed a Lease Agreement (the "Lease Agreement") by which Suffolk OTB leased the portion of Islandia Property to be used for the VLT Facility under the terms of the DMS Agreement.

35.     From the time construction on the VLT Facility began, through its initial opening in February 2017 with 250 VLTs, to its grand opening on June 1, 2017 with 1,000 VLTs, through to the present day, Delaware North has operated under a bad faith business plan whereby Suffolk OTB shoulders as many costs as possible while Delaware North reaps as much profit as possible, at the expense of Suffolk OTB, the State and County.

**Delaware North Overcharges Suffolk OTB Millions In Construction Costs**

36.     Pursuant to the DMS Agreement, Delaware North Manager is responsible for carrying out all aspects of the construction and development of the VLT Facility as Suffolk OTB's agent.  (*See, e.g.*, DMS Agreement Article IV; §§ 16.01, 16.03).  The Manager's development responsibilities included the creation of a Development Budget (reflecting the total costs to design, construct, furnish and equip the VLT Facility and common areas which serve the VLT Facility) and a Pre-Opening Budget (reflecting the costs and expenses incurred prior to the day the VLT Facility is fully opened to the public).  (DMS Agreement §§ 4.02; 4.04).  Delaware North Manager is required to "review the Development Budget with Suffolk OTB" and "attempt

to address any issues or concerns raised by Suffolk OTB with respect to the Development

Budget." (DMS Agreement § 4.03.1).

37.     The DMS Agreement provides that Delaware North is responsible for all costs

relating solely to its hotel and food and beverage business at the Islandia Property, while Suffolk

OTB is ultimately responsible for all costs relating to the VLT Facility and common areas that

serve it. (DMS Agreement §§•1.01 ("DNC Retained Business"); 4.02; 4.04). Though Delaware

North is directly receiving the benefits of all capital improvements made to the VLT Facility at

Suffolk OTB's expense, Delaware North Manager proceeded to flagrantly abuse its position of

trust by charging Suffolk OTB for millions of dollars in construction costs related solely to the

improvement of Delaware North's hotel, not the VLT Facility.

38.     These false charges included at least the following:

a)      From June–September 2017, Delaware North knowingly and/or recklessly

submitted a series of claims to Suffolk OTB for hundreds of thousands of

dollars to construct a brand new kitchen to service its hotel and restaurant

business at the Islandia Property. Because Delaware North's retention of

all food service functions at the Islandia Property was a core component of

the DMS Agreement and well understood between the Parties, Delaware

North's repeated charges for construction of the new kitchen were not an

accident.

b)      In April–May 2017, Delaware North knowingly and/or recklessly

submitted a series of claims to Suffolk OTB for hundreds of thousands of

dollars to upgrade the hotel's HVAC system.

c)      In December 2016, February 2017 and April 2017, Delaware North knowingly and/or recklessly submitted at least three claims to Suffolk OTB for tens of thousands of dollars for elevator upgrades and repairs, despite the fact that the VLT gaming floor occupies only the basement, first floor and mezzanine levels of the property.

d)      In August 2017, Delaware North knowingly and/or recklessly submitted a claim to Suffolk OTB for tens of thousands of dollars for the replacement of air conditioning units in guest rooms on the tenth floor of the hotel.

e)      In May 2017, Delaware North knowingly and/or recklessly submitted a claim to Suffolk OTB for thousands of dollars for new security cameras on the tenth floor of the hotel.

f)      In May–April, 2017, Delaware North knowingly and/or recklessly submitted at least two claims to Suffolk OTB totaling thousands of dollars for construction costs relating to its provision of valet parking services, which Delaware North Manager is required to pay for under the DMS Agreement.  In addition, though the valet parking business at Jake's 58 is Delaware North's under the DMS Agreement, from May 2017–August 2019, Delaware North knowingly and/or recklessly submitted a series of claims to Suffolk OTB totaling over $1.5 million for the payment of costs associated with Delaware North's valet parking business.

g)      In June 2017, Delaware North knowingly and/or recklessly submitted a claim to Suffolk OTB for thousands of dollars to upgrade the hotel check-in desk.

39.     Delaware North made false records and/or statements that were material to Suffolk OTB's approval and payment of the false construction charges, including, *inter alia*, development and concept plans for the VLT Facility, descriptions of construction costs and reconciliations of the construction expenses Delaware North Manager charged to Suffolk OTB. These false records and statements falsely certified that the goods and services to be provided were in compliance with the DMS Agreement, and Delaware North knowingly failed to disclose its material noncompliance with the same.

40.     For months, Suffolk OTB requested time and again to see the construction records that would reveal the basis of Delaware North's claims for payment.  Suffolk OTB is entitled to such records under the DMS Agreement, but Delaware North refused to provide them, without justification.

41.     When Suffolk OTB engaged independent auditors and a construction consultant to review the construction costs, Delaware North reluctantly granted Suffolk OTB access to some records of expenses Delaware North charged to Suffolk OTB.  These records revealed part of Delaware North's efforts to enrich itself at the expense of Suffolk OTB, the State and County.

42.     In all, Suffolk OTB's auditors and consultant uncovered at least 92 erroneous change orders (copies of which have been identified to Delaware North) representing millions of dollars in overcharges submitted to and charged to Suffolk OTB by Delaware North, contrary to its false certification of compliance with the DMS Agreement and the law.  These claims reveal a pattern and practice whereby Delaware North knowingly and/or recklessly charged Suffolk OTB for construction costs solely related to its hotel and other business.

43.     When confronted with these blatant overcharges and false claims, Delaware North, after months of haggling, will sometimes admit a "mistake."  These false claims are no

mistake.  One hundred percent of the false charges identified by Suffolk OTB's independent auditors and consultant in the limited and self-selected material Delaware North gave them access to favored Delaware North.  This underscores the knowing and/or reckless nature of Delaware North's conduct.  Indeed, Suffolk OTB did not locate one single charge erroneously billed to Delaware North instead of Suffolk OTB—every single allocation favored Delaware North.  These overcharges and claims detailed herein are the tip of the iceberg.

44.     This pattern and practice violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

45.     Discovery and/or an accounting will reveal additional overcharges and false claims Delaware North submitted to Suffolk OTB in connection with the development of Jake's 58.

### Delaware North Falsely Claims Ownership of Suffolk OTB's Trademarks and Service Marks

46.     After Delaware North purchased the Islandia Property, Delaware North applied to register at least nine trademarks and/or service marks related to "Jake's 58" with the United States Patent and Trademark Office ("PTO"), falsely stating that Delaware North Properties owns such marks.  This is a breach of the DMS Agreement, which provides that "[o]wnership in the Marks [defined as "trade names, trademarks and service marks"] will, for all purposes, belong exclusively to Suffolk OTB."  (DMS Agreement § 10.02).

47.     At least one of Delaware North's false applications resulted in the PTO granting Delaware North a registered trademark for "Jake's 58" covering "entertainment services, namely, casino gambling" on October 17, 2017.  At Delaware North's behest and based on its

false statements to the PTO, this trademark, U.S. Reg. No. 5,310,168 lists Delaware North

Properties as owner of the mark.  Delaware North obtained this trademark on the basis of its

knowingly false statement to the PTO that "the applicant [Delaware North Islandia Properties,

LLC] is the owner of the trademark/service mark sought to be registered."  At no point did

Delaware North inform Suffolk OTB that it had filed for, or obtained, a registered trademark for

Jake's 58 in connection with casino gambling in Delaware North's own name.

48.     Delaware North made additional false claims of ownership over "Jake's 58"-

related Marks in at least eight other applications for registration of trademarks and service marks

to the PTO, as specified below:

> a)     Delaware North filed with the PTO an application for registration of a
>
> trademark for "Jake's 58" covering "jewelry" pursuant to 15 U.S.C. §
>
> 1051(b), in which it falsely stated that Delaware North Properties was the
>
> owner of the mark.  Delaware North then filed for five extensions of the
>
> deadline to file a statement of use in order to complete the application,
>
> each time affirming that "to the best of the signatory's knowledge and
>
> belief, no other persons . . . have the right to use the mark in commerce."
>
> b)     Delaware North filed with the PTO an application for registration of a
>
> trademark for "Jake's 58" covering "housewares and glass" pursuant to 15
>
> U.S.C. § 1051(b), in which it falsely stated that Delaware North Properties
>
> was the owner of the mark.  Delaware North then filed for five extensions
>
> of the deadline to file a statement of use in order to complete the
>
> application, each time affirming that "to the best of the signatory's

knowledge and belief, no other persons . . . have the right to use the mark
in commerce."

c)      Delaware North filed with the PTO an application for registration of a
service mark for "Jake's 58" covering "advertising and business," namely
the "administration of a customer loyalty program" pursuant to 15 U.S.C.
§ 1051(b), in which it falsely stated that Delaware North Properties was
the owner of the mark.  Delaware North then filed for four extensions of
the deadline to file a statement of use in order to complete the application,
each time falsely affirming that "to the best of the signatory's knowledge
and belief, no other persons . . . have the right to use the mark in
commerce."

d)      Delaware North filed with the PTO an application for registration of a
trademark for "Jake's 58" covering "clothing" pursuant to 15 U.S.C. §
1051(b), in which it falsely stated that Delaware North Properties was the
owner of the mark.  Delaware North then filed for five extensions of the
deadline to file a statement of use in order to complete the application,
each time falsely affirming that "to the best of the signatory's knowledge
and belief, no other persons . . . have the right to use the mark in
commerce."

e)      Delaware North filed with the PTO an application for registration of a
trademark for "Jake's 58" covering "toys and sporting goods" pursuant to
15 U.S.C. § 1051(b), in which it falsely stated that Delaware North
Properties was the owner of the mark.  Delaware North then filed for five

extensions of the deadline to file a statement of use in order to complete the application, each time falsely affirming that "to the best of the signatory's knowledge and belief, no other persons . . . have the right to use the mark in commerce."

f)      Delaware North filed with the PTO an application for registration of a trademark for "Jake's 58" covering "leather goods" pursuant to 15 U.S.C. § 1051(b), in which it falsely stated that Delaware North Properties was the owner of the mark.  Delaware North then filed for five extensions of the deadline to file a statement of use in order to complete the application, each time falsely affirming that "to the best of the signatory's knowledge and belief, no other persons . . . have the right to use the mark in commerce."

g)      Delaware North filed with the PTO an application for registration of a service mark for "Jake's 58" covering "education and entertainment" including "gambling services" and "providing casino services featuring a casino players rewards program" pursuant to 15 U.S.C. § 1051(b), in which it falsely stated that Delaware North Properties was the owner of the mark.  Delaware North then filed for four extensions of the deadline to file a statement of use in order to complete the application, each time falsely affirming that "to the best of the signatory's knowledge and belief, no other persons . . . have the right to use the mark in commerce."  On August 9, 2019, Delaware North filed a statement of use in connection with the application for this service mark in order to complete its

application for registration by the PTO, falsely stating that "the applicant
is the owner of the mark sought to be registered."

49.    Each of the above referenced Marks are intended for use in connection with the
operation of the VLT Facility and/or the Islandia Property, including for use in connection with
the promotion and marketing of the VLT Facility.  Delaware North, despite being bound to act
faithfully as Suffolk OTB's agent and manager, did not inform Suffolk OTB that it had applied
to register any of the above-referenced Marks, or that it had falsely declared Delaware North
Properties the owner of such Marks to the PTO.  Delaware North did not attempt to correct its
false claim of ownership over the Marks, such as by executing an assignment of the Marks to
Suffolk OTB or otherwise amending its filings to the PTO to reflect that Suffolk OTB is the
owner of the Marks.

50.    Delaware North's actions in falsely claiming Delaware North Properties is owner
of the Marks are no mistake.  Its bad faith conduct is confirmed by the fact that on August 19,
2019—*after* Delaware North became aware that Suffolk OTB desired to end its relationship with
Delaware North and shortly before the filing of this lawsuit, Delaware North quietly filed an
application for registration of an additional service mark—again falsely listing Delaware North
Properties as owner—for use of "Jake's 58" in connection with "online gambling, gaming and
betting services" and "providing a gaming website featuring sports betting."

51.    Neither Delaware North nor Suffolk OTB are currently licensed to engage in
online gaming ventures in New York State; nor did Suffolk OTB ever direct Delaware North to
file any applications for registrations of trademarks using "Jake's 58" in connection with online
gaming ventures.  Through its false application to register a "Jake's 58" service mark for use in
online gaming ventures with Delaware North Properties as owner, Delaware North is continuing

its bad faith pattern of unlawfully extracting assets belonging to a public benefit company for its own enrichment.  Specifically, Delaware North intends to misappropriate the name "Jake's 58" for its own use and profit in online gaming ventures separate and apart from the VLT Facility and the Islandia Property, and/or attempt to force Suffolk OTB to pay licensing fees for use of a service mark that belongs to Suffolk OTB.

52.    By applying to register the Marks in Delaware North Properties' name, Delaware North made false statements regarding ownership of the trademarks to the PTO.  In order to complete each of the applications, Delaware North nevertheless declared "that all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true" notwithstanding the PTO's warning that "willful false statements and the like may jeopardize the validity of the application or submission or any resulting registration."

53.    Each of Delaware North's false statements and claims of ownership to the PTO in connection with its applications for registration of the Marks are a breach of section 10.02 of the DMS Agreement and constitute grounds for termination of the DMS Agreement by Suffolk OTB for cause pursuant to section 12.03, including fraud, malfeasance, gross negligence, material misrepresentations in connection with the operation of the business, and a material failure to "perform or observe any provision of" the DMS Agreement.  Delaware North's conduct is also a breach of the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

### Delaware North Overcharges Suffolk OTB For Rent

54.    On December 20, 2016, Suffolk OTB and Defendant Delaware North Properties executed the Lease Agreement for the VLT Facility.  Whereas Suffolk OTB had previously

intended to be the owner of a VLT facility in Medford, it was now Delaware North's tenant at the VLT Facility in Islandia.

55.     Under the Lease Agreement, Suffolk OTB leased only the portion of the Islandia Property required for the operation of the VLT Facility and contributed an apportioned share to common area maintenance charges.  As a start, the Lease Agreement says the leased premises is "space consisting of approximately 59,764 useable square feet . . . together with the right to use, in common with Landlord and others, all areas of the Property that are used or available for non-exclusive use by all tenants, owners and occupants. . . ."  (Lease Agreement ¶ 1).  Delaware North calculated 59,764 square feet prior to construction of the VLT Facility when the premises were still used as a hotel ballroom and swimming pool area.

56.     Delaware North is required to calculate Suffolk OTB's monthly "base rent" by multiplying the square footage Suffolk OTB is "then occupying" by a set price per square foot. (Lease Agreement ¶ 5(a)).  Suffolk OTB is only responsible to pay rent for the square footage it actually occupies each month, to account for the fact that when Suffolk OTB first began paying rent, the VLT Facility had not yet been fully developed and Suffolk OTB was not occupying the entirety of the leased premises.

57.     No common area square footage is to be included the calculation of "base rent" under the Lease Agreement.  (Lease Agreement ¶ 5(f) ("All amounts due or payable hereunder, other than Base Rent will be referred to as 'Additional Rent'"); Lease Agreement ¶ 6(d) (including "Common Area Expenses" as "Additional Rent" separate from Base Rent)).

58.     The Lease Agreement provides for the price per square foot to increase from $25.00 during the development phase to $67.50 after the VLT Facility is fully open to the public and has reached a net gaming revenue threshold of $164,250,000 during any annual operating

year.  (Lease Agreement ¶ 5).  However, after the VLT Facility fully opened to the public, the

Lease Agreement guaranteed Delaware North a minimum annual rent based on the VLT

Facility's net gaming revenues, ranging from $2,231,250 to $3,750,250.

59.     Prior to the full opening of the VLT Facility, Delaware North knowingly and/or

recklessly miscalculated the square footage and overcharged Suffolk OTB.  Specifically, from

March 31, 2017–May 21, 2017, Delaware North charged Suffolk OTB base rent on 35,687

square feet when Suffolk OTB occupied, at most, 27,796 square feet.

60.     The President and General Manager of Delaware North Manager and Senior

Director of Operations of Delaware North Manager have acknowledged that the square footage

from which Delaware North calculated base rent prior to the VLT Facility's full opening in June

2017 was incorrect.  Yet Delaware North has refused without justification to reimburse OTB for

the overcharged rent in breach of its duties to Suffolk OTB and the Lease Agreement.

61.     Once the VLT Facility was fully open, from June 1, 2017 through the present,

Suffolk OTB actually occupied no more than 57,488 square feet of the VLT Facility.  This

square footage was determined through measurements conducted by Suffolk OTB once the VLT

Facility was completed, with input from members of Delaware North Manager's senior

management team.

62.     Notwithstanding that the VLT Facility occupies at most only 57,488 square feet,

Delaware North knowingly and/or recklessly overcharged Suffolk OTB for 61,724 square feet.

63.     In all, Delaware North knowingly and/or recklessly overcharged Suffolk OTB

every month from March 2017 to the present.  Each month since March 2017, Delaware North

made a false claim by debiting a rent charge from Suffolk OTB's General Disbursements

account (which Delaware North controls) and paid itself.  Delaware North then sent Suffolk

OTB a monthly "invoice" falsely stating the amount of rent due based on compliance with the Lease Agreement, which amount Delaware North had already debited from Suffolk OTB's account.

64.     Delaware North's pattern and practice of knowingly and/or recklessly overcharging Suffolk OTB for rent violates the New York False Claims Act; is a breach of the Lease Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

**Delaware North Bills Suffolk OTB For Utilities That Service Delaware North's Hotel**

65.     Along with the rent, Delaware North also made false claims to Suffolk OTB for utility charges of its hotel.  This is another example of Delaware North's efforts to skim from Suffolk OTB, the State and the County until it is caught.

66.     Under the DMS Agreement, Suffolk OTB is responsible for "the Business' proportionate share of the cost of all utility services (including without limitation . . . air conditioning, light, power, water, and sewage treatment and disposal) . . . with such costs to be equitably apportioned . . . based upon metering, usage, [or] the relative amount of square footage in the Gaming Facility . . . ."  (DMS Agreement § 1.01 "Expenses (c)").

67.     In June 2017, when the VLT Facility was fully open, Delaware North calculated that Suffolk OTB's apportioned share of the common area utilities "at full capacity" would be 16.1%.  Delaware North presented Suffolk OTB with the figures underlying its calculations of Suffolk OTB's apportioned share of the utilities with its June 2017 rent invoice.  Delaware North later adjusted this percentage to 13.76% and presented Suffolk OTB with the figures underlying its new calculation with its October 2017 invoice.

68.     Beginning in March 2018, Delaware North inexplicably but knowingly and/or recklessly ratcheted Suffolk OTB's share of the sewage charges up to 50% and began charging Suffolk OTB accordingly.  This increase represents a false inflation of nearly four times Suffolk OTB's actual share of the sewage costs.

69.     Each month, from March 2018 through March 2019, Delaware North made a false claim by debiting a rent charge from Suffolk OTB's General Disbursements account (which Delaware North controls) and paid itself.  Delaware North then sent Suffolk OTB a monthly "invoice" falsely stating the percentage of sewage charges due, which it had already debited. The sewage portion of the monthly rent charges was a single line item on a large spreadsheet of utility charges presented to Suffolk OTB with the rent bill.

70.     In or about April 2019, around the time Suffolk OTB confronted Delaware North with the findings of its independent auditor regarding certain overcharges, Delaware North reverted back to charging Suffolk OTB 13.76% of the sewage charges.

71.     In total, Delaware North falsely charged Suffolk OTB tens of thousands of dollars in sewer utilities.  To date, Delaware North has not credited Suffolk OTB for the false utility charges it caused Suffolk OTB to pay to Delaware North.

72.     Delaware North's pattern and practice of knowingly and/or recklessly overcharging Suffolk OTB for utilities violates the New York False Claims Act; is a breach of the Lease Agreement, the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

## Delaware North Uses Suffolk OTB's
## <u>Marketing Money To Pay Itself For Empty Hotel Rooms</u>

73.     Delaware North has also structured Suffolk OTB's marketing programs to generate a multimillion dollar windfall of cash for Delaware North's hotel business, at the expense of Suffolk OTB, the State and the County.

74.     Over 80% of Jake's 58 customers live within 20 miles of the facility, with 46% living within 10 miles.  As a result, many hotel rooms are left empty on any given night—so much so that Delaware North stopped opening the hotel restaurant for breakfast.  Delaware North does not want to lose money on these empty rooms, so it offers customers free-play vouchers along with a complimentary hotel room as part of a marketing program.  By offering these complimentary items as part of a marketing program, Delaware North has paid itself for the "cost" of otherwise empty hotel rooms out of Suffolk OTB's Gaming Commission-approved marketing allowance.

75.     Pursuant to the DMS Agreement, Delaware North administers the Gaming Commission-approved marketing allowance.  The allowance is intended to be used on programs that will incentivize customers to play for extended periods of time.  Approved marketing expenses, including complimentary hotel rooms, will then be "reimbursed" from the funds generated each day by Suffolk OTB's VLTs.  Prior to April 2019, these marketing funds were "use it or lose it," meaning Delaware North only receives the allowance money if it "spends" the marketing funds.  Otherwise, the funds would go to a public purpose.  After April 2019, unspent marketing funds became part of Suffolk OTB's surplus to distribute to creditors and the County.

76.     Delaware North devotes an outsized portion of the VLT Facility's marketing allowance to giving away "free" hotel rooms in order to line its own pockets at the expense of public funds.  When the customer accepts, Delaware North pays itself roughly $150 for the

"cost" of the room from Suffolk OTB's marketing funds, diminishing the funds otherwise available to the State.  In 2018, Delaware North paid itself $7.3 million for "complimentary" rooms, which exceeded the original budget for complimentary rooms by $4.8 million or 194%. In the first eight months of 2019, Delaware North has already paid itself $6.07 million, for complimentary rooms, which exceeds the 2019 budget for such rooms by $1.78 million or 41.5%.

77.     Delaware North knows that giving away hotel rooms does not drive increased revenue to the VLT Facility.  So, Delaware North began offering guests who accept "free" hotel rooms a $50 free-play voucher upon check-in and another upon check-out.

78.     Jake's 58 customers who receive "free" hotel rooms do not generally spend the night at the hotel.  Instead, they claim and play their $50 free-play voucher upon check-in before heading home to the comfort of their own beds.  Some then also return in the morning to claim and play their check-out voucher.  As a result, the State is spending $100 in gaming vouchers, plus $150 per complimentary hotel room, to achieve the same "marketing" benefit the vouchers alone would have achieved for the VLT Facility.  This "marketing" program simply provides a windfall to Delaware North's hotel business, with no corresponding benefit to the VLT Facility and to the detriment of the State and County.

79.     Of course, Delaware North did not obtain Suffolk OTB's prior approval before instituting these "marketing" programs in breach of section 6.02.6 of the DMS Agreement, which requires such approval.

80.     When Suffolk OTB demanded records and data related to the efficacy of the "free" hotel room program, Delaware North was not transparent, and has refused to provide

useable requested data related to the program and its impact on the VLT Facility and Suffolk OTB.

81.    Such records will show that the VLT Facility's customers live near Jake's 58, that far more customers check into the hotel than check out (indicating they are not actually using the room but do use the free-play vouchers), and that customers would prefer other incentives such as free-play vouchers or prizes over free hotel rooms, none of which would enrich Delaware North at Suffolk OTB's and the taxpayers' expense.

82.    Delaware North's pattern and practice of knowingly and/or recklessly using Suffolk OTB's marketing funds to pay itself for empty hotel rooms violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

**Delaware North Incurs Gaming Commission Fines And Refuses To Pay Them**

83.    Section 5.01 of the DMS Agreement requires Delaware North Manager to act at all times in a manner consistent with "Manager Standards," defined in the DMS Agreement as "standards of diligence and professional management consistent with that which is customary and usual with respect to the video lottery gaming industry . . . and such other standards as are required under applicable law."

84.    The DMS Agreement further provides that a "specific responsibili[ty]" of the Manager is to "supervise the employees of Suffolk OTB in the conduct of the day-to-day operations of the Business" including "oversee[ing] the employees of Suffolk OTB . . . in connection with . . . security services."  (DMS Agreement §§ 5.02(a) and (b)).  In addition, the Manager is bound to "assist Suffolk OTB in making all reasonable efforts to prevent violations of, and otherwise comply with, the provisions of any Legal Requirements applicable to the use

and occupancy of the Gaming Facility or the conduct of the Business" including the applicable Gaming Commission Rules and Regulations.  (DMS Agreement § 5.02(i)).

85.     The Gaming Commission promulgates Rules and Regulations governing the operation of the VLT Facility.  For example, Section 5117.1 of the Gaming Regulations for Video Lottery Gaming assigns fines for video gaming agents who allow persons under the age of eighteen to play games in a VLT facility or be present on the gaming floor.  9 NYCRR § 5117.1. The Gaming Commission pays itself for any fines directly from the VLT Facility's daily gaming revenues.

86.     Delaware North Manager, though its senior management team, has failed to operate the VLT Facility in accord with the Manager Standards, or adequately supervise the employees of Suffolk OTB.  Under Delaware North Manager's watch, the VLT Facility incurred at least three underage gaming violations within a one year period.  Delaware North Manager refused to take responsibility for the violations, despite its clear responsibility as Manager under the DMS Agreement to prevent such violations and properly supervise the VLT Facility and the VLT Facility's employees.

87.     Specifically:

    a)      On April 9, 2018, $31,000 was included in Suffolk OTB's daily remittance to the Gaming Commission, reflecting two fines for underage gaming:  a $26,000 fine for a minor who placed a wager on the gaming floor and a $5,000 fine for another minor who was present on the VLT Facility floor.

b)      On August 22, 2018, $10,000 was included in Suffolk OTB's daily

remittance to the Gaming Commission, reflecting a fine for a second

violation within a year for a minor present on the VLT Facility floor.

c)      On March 7, 2019, $25,000 was included in Suffolk OTB's daily

remittance to the Gaming Commission, reflecting a fine for a third

violation within a year for a minor present on the VLT Facility floor.

d)      Discovery and/or an accounting will reveal the existence of additional

Gaming Commission fines incurred under Delaware North's watch.  To

date, Delaware North has refused to grant Suffolk OTB access to a full

record of Gaming Commission fines.

88.      These recurring violations are a direct result of Delaware North Manager's

reckless supervision of the VLT Facility and its employees, which has put both Suffolk OTB and

the Manager at risk for Gaming Commission penalties including the revocation or suspension of

gaming licenses.

89.      Section 5.03 of the DMS Agreement provides that the "Manager will be

responsible for all violations of applicable Legal Requirements [including Gaming Commission

Rules and Regulations] which arise as a direct result of any act or omission by the Manager or

others acting under or through the Manager, and the Manager will indemnify and hold Suffolk

OTB harmless from and against any and all claims, fines, costs, fees and expenses arising in

respect to any of such matters . . . ."

90.      To date, Delaware North Manager, acting at the direction of Delaware North

Gaming, has refused to indemnify Suffolk OTB for the Gaming Commission fines in breach of

the DMS Agreement.

91.     Delaware North's pattern and practice of knowingly and/or recklessly incurring Gaming Commission fines on Suffolk OTB's behalf and refusing to indemnify Suffolk OTB for those fines violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the local taxpayers.

**Delaware North Conceals Its Self-Dealing From Suffolk OTB In Bad Faith**

92.     At every turn, Delaware North Manager, acting at the direction and for the benefit of Delaware North Gaming, has obfuscated and willfully blocked Suffolk OTB's access to records.  Delaware North's refusal to be transparent about its development and operation of the VLT Facility speaks volumes and is a breach of both the DMS Agreement and its duties as Suffolk OTB's agent to act transparently, loyally and in good faith.

93.     Section 7.05 of the DMS Agreement provides that "Suffolk OTB will have unrestricted access to the records of the daily operations of the Business and the right to inspect, examine and copy all such books and supporting business records" as well as "the right . . . to perform such special or independent audits of all financial records relating to the Business as it determines to be appropriate."

94.     Delaware North's pattern and practice of concealment involve at least the following representative examples of Delaware North's efforts to keep Suffolk OTB in the dark about the operations of its own VLT Facility:

a)      In connection with the construction and development of the VLT Facility, Delaware North refused for months to provide Suffolk OTB with records necessary to piece together the millions of dollars charged to Suffolk OTB.  To date, Delaware North has not provided complete records.  When Suffolk OTB, with its independent auditors, finally prevailed in obtaining

29

some invoices Delaware North charged Suffolk OTB for, Delaware North next refused for a period of time to provide the change orders necessary for Suffolk OTB to piece together what the invoices were for.

b)      When Suffolk OTB inquired about a charge for approximately $650,000 in legal fees Delaware North had paid out of Suffolk OTB's bank accounts, Delaware North refused to provide the legal bills or an explanation for the charges.

c)      When Suffolk OTB began to question Delaware North's use of the marketing allowance as a slush fund to pay itself for hotel rooms it could not fill with paying guests as outlined in Paragraphs 73–82 above, Delaware North refused to grant Suffolk OTB access to records and data.

95.    Delaware North also sought to keep the wool pulled over Suffolk OTB's eyes by refusing to deliver the 2019 Operating Budget to OTB until the eleventh hour so that Suffolk OTB would be unable to meaningfully review it before it was submitted to the Gaming Commission (a deadline that cannot be missed without penalties).

96.    Pursuant to section 5.05.1 of the DMS Agreement, Delaware North Manager was to deliver the 2019 Operating Budget to Suffolk OTB by November 15, 2018.  Delaware North Manager did not deliver the 2019 Operating Budget in its final form until December 10, 2018, nearly a month late and the day before a scheduled meeting to approve the budget for submission to the Gaming Commission.  Delaware North Manager's materially late delivery was a bad faith, intentional breach of the DMS Agreement.

97.    Delaware North's willful disregard of the contractual deadline was intended to cram the budget down Suffolk OTB's throat and prevent Suffolk OTB from discovering Delaware North's self-dealing and other violations of law.

**Delaware North Has Blocked Suffolk OTB's Effort To Stop The Fraud
Being Perpetrated On The Taxpayers By Blocking Suffolk OTB
From Control Of The Accounts Payable Function**

98.    As Delaware North Manager's principal, Suffolk OTB has broad power over the scope of authority granted to its agent, including the ability to revoke such authority.  Deeply concerned about the pattern of self-dealing and bad faith actions Delaware North Manager has taken with respect to Suffolk OTB's funds, Suffolk OTB demanded that Delaware North Manager cede control of the VLT Facility's accounts payable function.  Suffolk OTB believes that if it paid the bills, Delaware North's fraud would be halted in its tracks.

99.    Delaware North refused to relinquish the Manager's control of the accounts payable function.  This is because control over the accounts payable function is the means through which Delaware North has perpetrated its knowing and/or reckless campaign of overcharging Suffolk OTB and making false claims at every turn.  If Delaware North were to lose control over the accounts payable function, it would no longer be able to debit Suffolk OTB's General Disbursements account at will, for false charges, in order to profit its private hotel business at taxpayers' expense.

**AS AND FOR A FIRST CAUSE OF ACTION
(NEW YORK FALSE CLAIMS ACT, N.Y. Fin. Law § 187 *et seq.*)**

100.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

101.    Suffolk OTB brings a claim against Delaware North Gaming, Delaware North Manager and Delaware North Properties for violations of the New York State False Claims Act, N.Y. Fin. Law § 187 *et seq.*

102.    Suffolk OTB, a public benefit corporation is a "local government" as defined by the New York False Claims Act, N.Y. Fin. Law § 188(6).

103.    Suffolk OTB has the authority to bring civil actions on its own behalf to recover damages it has sustained as a result of Defendants' violations of the New York False Claims Act, N.Y. Fin. Law § 190(1).

104.    Defendants have, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval to Suffolk OTB, in violation of N.Y. Fin. Law § 189(a).  These false claims for payment include (but are not limited to) hundreds of charges related to construction costs, rent and utility payments.

105.    Defendants have, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be used, false records or statements that were material to Suffolk OTB's approval or payment of false claims, in violation of N.Y. Fin. Law § 189(b).

a)    Specifically, for every instance in which Delaware North submitted false records or statements, in the form of reconciliations, invoices or other documents reflecting overcharges to Suffolk OTB, such false records or statements included either (i) an express false certification that Delaware North was in compliance with its contractual obligations under the DMS Agreement and the law; or (ii) specific representations from Delaware North about the nature of the overcharges, in which Delaware North

knowingly failed to disclose its noncompliance with its contractual

requirements under the DMS Agreement and the law.

106.    Defendants have possession, custody or control of property or money used, or to

be used by Suffolk OTB and have knowingly delivered, or caused to be delivered, less than all of

that money or property in violation of N.Y. Fin. Law § 189(d).

      a)      Specifically, through Delaware North's possession, custody and control

over Suffolk OTB's bank accounts and other money and/or property

belonging to Suffolk OTB, Delaware North, by overcharging Suffolk OTB

for construction costs, rent and utilities, using Suffolk OTB's marketing

funds to pay itself for empty hotel rooms, and failing to indemnify Suffolk

OTB for Gaming Commission fines incurred on its watch, has knowingly

delivered or caused to be delivered, less than all of Suffolk OTB's money

and/or property.

107.    Defendants have, in reckless disregard or deliberate ignorance of the truth or

falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to Suffolk OTB, a local government, in violation of N.Y. Fin. Law § 189(g).

108.    Suffolk OTB, unaware of the falsity of the claims and/or statements made by

Defendants, and in reliance on the accuracy of these claims and/or statements, has paid, and may

continue to pay, millions of dollars of false claims to Defendants.

109.    Had Suffolk OTB known that the claims and/or statements presented to it by

Defendants were false, Suffolk OTB would not have paid those claims.

110.    As a result of Defendants' actions, as set forth above, Suffolk OTB has been, and may continue to be, damaged in an amount to be determined at trial.

111.    Defendants are liable to Suffolk OTB for treble damages, in an amount to be determined at trial, and for a $12,000 penalty for each false claim presented, as well as an award of costs and attorneys' fees pursuant to N.Y. Fin. Law § 187 *et seq*.

## AS AND FOR A SECOND CAUSE OF ACTION
### (BREACH OF DMS AGREEMENT)

112.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

113.    Suffolk OTB brings a claim against Delaware North Gaming and Delaware North Manager for breach of the DMS Agreement.

114.    The DMS Agreement constitutes a valid contract between Suffolk OTB and Defendants Delaware North Gaming and Delaware North Manager, which Suffolk OTB performed its obligations under, and Defendants Delaware North Gaming and Delaware North Manager breached by, *inter alia*:

    a)    failing to act as Suffolk OTB's agent for Suffolk OTB's exclusive benefit pursuant to sections 5.01 and 16.01 of the DMS Agreement;

    b)    failing to manage the VLT Facility in accord with Manager Standards as defined by the DMS Agreement, pursuant to section 5.01 of the DMS Agreement;

    c)    charging Suffolk OTB for construction charges and valet parking services relating to the "DNC Retained Business" as defined by the DMS Agreement, in violation of sections 4.02 and 4.04 of the DMS Agreement;

    d)    applying or causing an affiliate to apply to register trademarks, service marks and/or trade names for "Jake's 58" that falsely claim Delaware

North Properties is the owner of such trademarks, service marks and/or trade names in violation of section 10.02 of the DMS Agreement;

e)    failing to supervise Suffolk OTB employees pursuant to section 5.02 of the DMS Agreement;

f)    refusing to reimburse Suffolk OTB for Gaming Commission fines pursuant to section 5.03 of the DMS Agreement;

g)    failing to implement the marketing, advertising and promotional programs within the limits contained in the current Operating Budget as required by section 6.02.6 of the DMS Agreement;

h)    repeatedly failing to obtain Suffolk OTB's consent, agreement and input as required pursuant to the DMS Agreement;

i)    delivering the 2019 annual Operating Budget past the contractual deadline in violation of section 5.05.1 of the DMS Agreement; and

j)    repeatedly refusing to grant Suffolk OTB its rightful access to the records of the Business pursuant to section 7.05 of the DMS Agreement.

115.    In addition to the above breaches of the DMS Agreement, Delaware North Gaming and Manager breached the covenant of good faith and fair dealing inherent in the DMS Agreement, which includes all promises Suffolk OTB would reasonably understand to be included in order to effectuate its intentions and preserve its reasonable expectations.

a)    At all relevant times, Delaware North Manager was required to develop and operate the VLT Facility in good faith and for the exclusive benefit of Suffolk OTB.

b)      Suffolk OTB's expectation that Delaware North Manager, acting at the

direction of, and pursuant to the expertise of Delaware North Gaming,

would develop and operate the VLT Facility in good faith is not only

reasonable and implied, it was reinforced by express contractual

provisions in the DMS Agreement as outlined above.

c)      Delaware North Gaming and Delaware North Manager's breaches of the

covenant of good faith and fair dealing included at least the following:

failing to act for the exclusive benefit of Suffolk OTB, exercising their

managerial and operational duties to enrich themselves and their affiliates

at the expense of Suffolk OTB, charging Suffolk OTB for improvements

to their private business, misappropriating trademarks, service marks

and/or trade names belonging exclusively to Suffolk OTB, refusing to pay

Gaming Commission fines incurred on their watch, misappropriating the

marketing budget to enrich their private hotel business, refusing Suffolk

OTB access to books and records related to its own VLT Facility and/or

otherwise exercising their discretion against the best interests of Suffolk

OTB.

116.    Suffolk OTB has been damaged as a result of Defendants Delaware North

Gaming and Delaware North Manager's repeated breaches of their obligations under the DMS

Agreement.

117.    Defendants Delaware North Gaming and Delaware North Manager's breaches of

the DMS Agreement caused Suffolk OTB's expenses to be improperly inflated, directly reducing

the revenues available to Suffolk OTB to pay its unsecured creditors pursuant to the Confirmed

Plan and to remit funds to the people of Suffolk County.

## AS AND FOR A THIRD CAUSE OF ACTION
### (BREACH OF LEASE AGREEMENT)

118.     Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

119.     Suffolk OTB brings a claim against Defendant Delaware North Properties for

breach of the Lease Agreement.

120.     The Lease Agreement is a valid contract between Suffolk OTB and Defendant

Delaware North Properties, which Suffolk OTB performed its obligations under, and Defendant

Delaware North Properties, acting through the Manager and at the direction of Delaware North

Gaming, breached by, *inter alia*, charging Suffolk OTB rent for square footage it was not then

occupying; charging Suffolk OTB for rent beyond the useable square footage leased to Suffolk

OTB under the contract; impermissibly including the square footage of shared spaces in the

calculation of Suffolk OTB's base rent; and overcharging Suffolk OTB for utilities.

121.     Delaware North Properties also breached the covenant of good faith and fair

dealing inherent in the Lease Agreement by, *inter alia*, failing to accurately calculate the square

footage of the VLT Facility in order to extract additional rent and utility costs from Suffolk OTB

in bad faith.

122.     Suffolk OTB has suffered damages as a result of Defendant Delaware North

Properties' repeated breach of the Lease Agreement.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

123.     Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

124.     Suffolk OTB brings a claim for breach of fiduciary duty against Defendant

Delaware North Manager.

125.    As evidenced by the DMS Agreement and the Parties' course of dealing, Suffolk OTB and Delaware North Manager entered into a principal-agent relationship with respect to Defendant Delaware North Manager's managerial duties in relation to the VLT Facility.  Suffolk OTB placed Delaware North Manager in a position of confidence, entrusting it with control of its money and property.

126.    As Suffolk OTB's agent with respect to the VLT Facility, Delaware North Manager owed a fiduciary duty to Suffolk OTB.

127.    Delaware North Manager, as agent, breached the fiduciary duty it owed to Suffolk OTB, as principal, by, *inter alia*, failing to act for the exclusive benefit of Suffolk OTB; exercising its managerial duties to enrich itself and its affiliates at the expense of Suffolk OTB; misappropriating trademarks, service marks and/or trade names belonging exclusively to Suffolk OTB; failing to manage the VLT Facility in accord with Manager Standards as defined in the DMS Agreement; breaching the terms of the DMS and Lease Agreements; overcharging Suffolk OTB for improvements to its private business; failing to accurately allocate square footage calculations resulting in Suffolk OTB being overcharged for rent and utilities in connection with the VLT Facility; refusing to pay Gaming Commission fines incurred on its watch; using Suffolk OTB's marketing budget to enrich it and its affiliates' private hotel business; refusing to relinquish control of the Accounts Payable function; refusing Suffolk OTB access to books and records; and/or otherwise exercising its discretion against the best interests of Suffolk OTB and/or acting in a manner that Delaware North Manager knew or should have known Suffolk OTB did not authorize Delaware North Manager to so act.

128.    As a direct result of the foregoing breaches, Suffolk OTB has suffered damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

129.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

130.    Suffolk OTB brings a claim for aiding and abetting breach of fiduciary duty against Defendants DNC, Delaware North Gaming and Delaware North Properties.

131.    As outlined above, Defendant Delaware North Manager breached the fiduciary duties it owed to Suffolk OTB by virtue of its position as Suffolk OTB's agent.

132.    Defendants DNC, Delaware North Gaming and Delaware North Properties knowingly induced and participated in Defendant Delaware North Manager's breach of its fiduciary duties to Suffolk OTB by, *inter alia*:

  a)    inducing Suffolk OTB to accept Delaware North Gaming's proposal in response to Suffolk OTB's RFP by touting its expertise and desire to contribute to New York State public education, and inducing Suffolk OTB to place each of the Defendants in a position of trust and confidence with respect to Suffolk OTB's money and property;

  b)    forming Delaware North Manager as the vehicle through which DNC and Delaware North Gaming promised in the DMS Agreement to "provide the benefit" of their "expertise and experience" in the gaming industry to Suffolk OTB;

  c)    entering into the DMS Agreement (as to Delaware North Gaming) and the Lease Agreement incorporated therein (as to Delaware North Properties), which created the framework for Delaware North Manager's fiduciary obligations to Suffolk OTB and were the means through which Delaware North Manager breached those fiduciary obligations;

d)      knowingly receiving the benefit of falsely inflated rent and improvements to the Islandia Property as a result of Manager's pattern and practice of overcharging Suffolk OTB in bad faith;

e)      falsely claiming ownership, and/or causing an affiliate to falsely claim ownership to the PTO of trademarks, service marks and/or trade names that belong exclusively to Suffolk OTB and misappropriating such trademarks, service marks and/or trade names;

f)      as to Delaware North Gaming, inducing Manager's breach of its fiduciary obligations by acting as Manager's guarantor under the DMS Agreement and directing every aspect of Manager's performance of its duties under the DMS Agreement, including, *inter alia*, Manager's misuse of marketing funds to pay itself for empty hotel rooms; Manager's misappropriation of trademarks, service marks and/or trade names belonging exclusively to Suffolk OTB; Manager's failure to run the VLT Facility in accord with Manager Standards; Manager's failure to abide by Gaming Commission regulations with respect to minors on the VLT Facility gaming floor; and Manager's pattern and practice of charging Suffolk OTB for construction charges related to its private hotel business;

g)      as to Delaware North Gaming, participating in Manager's breach of its fiduciary duties through Delaware North Gaming's management, which has refused to return monies falsely debited from Suffolk OTB's bank accounts, including overcharges for construction costs, rent and utilities, and an improper claim for legal fees;

h)      as to Delaware North Gaming, participating in Manager's breach of its fiduciary duties though Delaware North Gaming's management, which has refused in bad faith to provide Suffolk OTB with access to books and records that would reveal the extent of Manager's bad faith expenditures of Suffolk OTB's funds;

i)      as to Delaware North Properties, purchasing the Islandia Property and causing Suffolk OTB to become its tenant under the Lease Agreement, which was the instrumentality through which Suffolk OTB was falsely charged for rent and utilities; and

j)      as to Delaware North Properties, knowingly participating in the false calculation of square footage for purposes of charging Suffolk OTB false rent and false utility charges.

133.    As a direct result of the foregoing, Suffolk OTB has suffered damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

134.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

135.    Suffolk OTB brings a claim for unjust enrichment against all Defendants.

136.    At all relevant times, Suffolk OTB expected that Delaware North would develop and operate the VLT Facility in good faith and for the exclusive benefit of Suffolk OTB.

137.    In the performance of its duties to develop and operate the VLT Facility, Delaware North acted in bad faith by, *inter alia*, falsely billing Suffolk OTB for construction costs Suffolk OTB did not owe; misappropriating trademarks, service marks and/or trade names belonging exclusively to Suffolk OTB; overcharging Suffolk OTB for rent based on square footage that Suffolk OTB did not occupy; overcharging Suffolk OTB for utilities; refusing to

reimburse Suffolk OTB for Gaming Commission fines that Delaware North incurred on its watch and was required to pay; and misappropriating Suffolk OTB's marketing funds to profit its hotel business.

138.    Delaware North, through the wrongful and bad faith conduct described above, has been unjustly enriched at the expense of Suffolk OTB.

139.    In equity and good conscience, it would be unjust and inequitable to permit Defendants to enrich themselves at the expense of Suffolk OTB.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(PIERCING OF THE CORPORATE VEIL)**

140.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

141.    Defendants Delaware North Manager and Delaware North Properties are alter-egos of Defendants DNC and Delaware North Gaming, which exercise complete dominion over Delaware North Manager and Delaware North Properties.  Specifically:

a)    DNC and Delaware North Gaming have fully overlapping executive officers and senior management.

b)    Delaware North Manager and Delaware North Properties are corporate entities created by Delaware North Gaming, at the direction and for the benefit of, DNC and Delaware North Gaming, solely for purposes of discharging managerial duties with respect to the VLT Facility.

c)    Delaware North Gaming is a wholly owned subsidiary of DNC, and Delaware North Gaming is the sole member of Delaware North Manager and Delaware North Properties.

d)    In Delaware North Gaming's response to Suffolk OTB's RFP it stated, "Delaware North Gaming and parent company DNC are the only entities

participating as key team members in connection with the RFP response"
and "[services will be performed out of the 'to be established' local unit as
appropriate[.]"

e)      As outlined in the DMS Agreement, Delaware North Manager was created
        solely as a vehicle through which Delaware North Gaming would use its
        experience and "expertise" to operate the VLT Facility:  "[Delaware North
        Gaming], the Manager's parent company, has extensive experience and
        expertise in the management of video lottery gaming operations . . . and
        the *Manager was formed and organized to provide the benefit of such
        experience and expertise* to Suffolk OTB."  (emphasis added).

f)      Defendants all have the same address as their principal place of business.

g)      Section 16.14 of the DMS Agreement provides the same contact person
        for both Delaware North Gaming and the Manager to receive "all notices,
        requests, consents, approvals or other communications" regarding the
        DMS Agreement.

h)      Delaware North Gaming, through its President, has acted as the Manager's
        representative and speaks for the Manager in connection with disputes
        between Suffolk OTB and Delaware North Manager regarding the DMS
        Agreement, including the disputes that are the subject of this lawsuit.

142.    The corporate fiction of Defendants Delaware North Manager and Delaware
North Properties should be disregarded because Defendants Delaware North Manager and
Delaware North Properties were organized and operated as a mere tool and business conduit of
Defendants DNC and Delaware North Gaming.

143.    Defendants should all be treated as one entity to prevent Defendant DNC and DNC Gaming from using the corporate fiction as a tool to perpetrate the scheme of unlawful conduct outlined in Paragraphs 1–99 above.

144.    The corporate structure should not shield DNC and Delaware North Gaming from liability for the unlawful conduct outlined above, which resulted in injury to Suffolk OTB.

145.    Defendants' rampant misuse of funds belonging to a public benefit corporation necessitates disregarding the existence of Delaware North Manager and Delaware North Properties as separate entities.

146.    Therefore, the corporate veil of Delaware North Manager and Delaware North Properties must be pierced to provide that all Defendants are jointly and severally liable to Plaintiff for any damages recovered against Delaware North Manager and Delaware North Properties.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**(DECLARATORY RELIEF:
TERMINATION OF THE DMS AGREEMENT FOR CAUSE)**

147.    Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

148.    Pursuant to Section 12.03 of the DMS Agreement, Suffolk OTB may terminate its obligation to retain and pay for the services of the Manager upon the occurrence of an "Event of Default."

149.    On October 7, 2019 Suffolk OTB provided the Manager with notice of events of default.

150.    An actual and justiciable controversy now exists between the Parties regarding the status of the DMS Agreement, as the events outlined above demonstrate that Suffolk OTB has cause to terminate the DMS Agreement based on the existence of one or more events of default by the Manager.

151. The Manager's conduct as outlined in Paragraphs 1–99 above constitutes an Event of Default pursuant to Section 12.03(a) of the DMS Agreement in that the Manager has failed, in a material manner, to perform or observe numerous provisions of the DMS Agreement and the Manager has failed to cure, or commence a cure of such default within 15 days.

152. The Manager's conduct as outlined in Paragraphs 1–99 above constitutes an Event of Default pursuant to Section 12.03(c) of the DMS Agreement in that supervisory employees of the Manager, including the Manager's Senior Management Team (as defined in the DMS Agreement) have committed fraud, malfeasance, gross negligence or material misrepresentations in connection with the operation of the VLT Facility and the Manager has failed to terminate the employment of such supervisory employees, including the Senior Management Team, and make Suffolk OTB whole with respect to direct out-of-pocket losses caused by such supervisory employees, including the Senior Management Team, within 5 business days after written notice from Suffolk OTB.

153. Suffolk OTB, accordingly, is entitled to a declaration that (i) events of default pursuant to section 12.03 of the DMS Agreement have occurred and (ii) as a result of such events of default, Suffolk OTB may terminate the Manager's employment under the DMS Agreement and may terminate its obligation to retain and pay for the services of the Manager.

154. Suffolk OTB is also entitled to a court order directing Suffolk OTB to discontinue the retention of the Manager pursuant to DMS Agreement § 12.03(d)(ii) as a result of the events of default.

## AS AND FOR A NINTH CAUSE OF ACTION
### (AN ACCOUNTING)

155. Suffolk OTB incorporates Paragraphs 1–99 by reference as if fully stated herein.

156. Suffolk OTB seeks an accounting from Delaware North Manager.

157.    As Suffolk OTB's agent, Delaware North Manager owes Suffolk OTB a fiduciary duty.

158.    As Suffolk OTB's agent, Delaware North Manager was entrusted with the money and property of Suffolk OTB for the purpose of developing and operating the VLT Facility.

159.    Delaware North Manager breached its fiduciary duties with respect to the money and property Suffolk OTB entrusted to it as outlined above in Paragraphs 1–99, including by, *inter alia*, failing to act for the exclusive benefit of Suffolk OTB; exercising its managerial duties to enrich itself and its affiliates at the expense of Suffolk OTB; submitting false claims for payment to Suffolk OTB; charging Suffolk OTB for improvements to its private business; overcharging Suffolk OTB for rent and utilities in connection with the VLT Facility; refusing to pay Gaming Commission fines incurred on its watch; misappropriating the marketing budget to enrich it and its affiliates' private hotel business; misappropriating trademarks, service marks and/or trade names belonging exclusively to Suffolk OTB; refusing Suffolk OTB access to books and records; and/or otherwise exercising its discretion against the best interests of Suffolk OTB.

160.    Suffolk OTB has requested a full accounting related to VLT Facility and the Manager has refused to grant such an accounting.  The limited information Suffolk OTB has received from Delaware North Manager is grossly insufficient and does not enable Suffolk OTB to determine the extent of Delaware North's unlawful use of Suffolk OTB's money and property.

161.    Suffolk OTB, as principal, is therefore entitled to a complete and detailed accounting of funds collected and expended by Delaware North Manager on its behalf with respect to the VLT Facility.

162.    Suffolk OTB has no adequate remedy at law with respect to its need for an accounting.

## JURY DEMAND

163.     Plaintiff respectfully demands a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Suffolk OTB respectfully requests the entry of a judgment:

(1)     awarding damages to Suffolk OTB in the amount of three times the damages it has sustained, plus a civil penalty of $12,000 for each violation of the New York False Claims Act, plus interest, as provided by N.Y. Fin. Law § 187 *et seq*. with respect to Count 1;

(2)     awarding damages to Suffolk OTB, in an amount to be proven at trial, plus interest, with respect to Counts 2–7;

(3)     declaring that (i) events of default pursuant to section 12.03 of the DMS Agreement have occurred and (ii) as a result of such events of default, Suffolk OTB may terminate the Manager's employment under the DMS Agreement and may terminate any obligation to retain and pay for the services of the Manager;

(4)     ordering Suffolk OTB to discontinue the retention of the Manager pursuant to DMS Agreement § 12.03(d)(ii);

(5)     granting Suffolk OTB an accounting and ordering Defendants to allow Suffolk OTB unfettered access to all books and records relating to the VLT Facility upon request;

(6)     awarding all direct out-of-pocket losses, attorneys' fees and costs to Suffolk OTB; and

(7)     granting such other relief as this Court may deem just and proper.


Dated: October 7, 2019

SIMPSON THACHER & BARTLETT LLP


By:    /s/ Bryce L. Friedman
        Bryce L. Friedman
        Sarah E. Phillips
        425 Lexington Avenue
        New York, New York 10017
        Telephone: (212) 455-2000


ECKERT SEAMANS CHERIN
& MELLOTT, LLC


By:    /s/ Christopher F. Graham
        Christopher F. Graham
        Sarah H. Morrissey
        10 Bank Street, Suite 700
        White Plains, New York 10606
        Telephone: (914) 286-6443

        *Counsel for Adjusted Debtor and Plaintiff*
        *Suffolk Regional Off-Track Betting*
        *Corporation*