# EXHIBIT 1

# AMENDED AND RESTATED
# DEVELOPMENT AND MANAGEMENT SERVICES AGREEMENT

among

## SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,

## DNC GAMING MANAGEMENT IN SUFFOLK, LLC,

and

## DELAWARE NORTH COMPANIES GAMING & ENTERTAINMENT, INC.

Dated May 24, 2016

TABLE OF CONTENTS

**ARTICLE I: DEFINITIONS**    2
1.01   Definitions    2
1.02   References and Interpretations    14
**ARTICLE II: EXCLUSIVE MANAGEMENT RIGHTS**    15
2.01   Exclusive Management Rights    15
2.02   Exclusive Rights Payment    15
**ARTICLE III: MANAGER'S COMMITMENT TO LEND, SALE OF
BROOKHAVEN PROPERTY, PURCHASE OF SITE, REAPYMENT OF FIRST
LOAN NOTE AND LEASE OF SITE**    15
3.01   First Loan    15
3.02   Collateral Security for First Loan    16
3.03   Purchase of Facility to House Gaming Facility and Lease to Suffolk OTB    16
3.04   Sale of Brookhaven Property    16
3.05   Manager's Rights of First Refusal on the Brookhaven Property    16
3.06   Application of Proceeds of Brookhaven Property    17
3.07   Working Capital and Leasehold Improvements Loan    17
     3.07.1 Operating Requirements during term of Working Capital and Leasehold
     Improvements Loan    18
3.08   Intentionally Omitted    18
3.09   Collateral Security for Working Capital and Leasehold Improvement Loans    18
3.10   Guarantee of Funding of the Working Capital and Leasehold Improvement Loan    19
3.11   Bankruptcy Court Approval of the Loans    19
3.12   Cancellation of Second Loan Note    19
**ARTICLE IV: DEVELOPMENT AND PRE-OPENING ACTIVITIES**    19
4.01   Preparation of the Project Concept    19
4.02   Development of the Gaming Facility    20
4.03   Development Support to be Provided by the Manager    20
     4.03.1 Development Budget    20
     4.03.2 Construction Responsibility of the Manager    21
     4.03.3 Technical Assistance and Support    21
4.04   Pre-Opening Activities    22
     4.04.1 Preparation of the Operating Plan    22
     4.04.2 Organization, Training, Advertising and Promotion    23
     4.04.3 Pre-Opening Budget    23
     4.04.4 Pre-Opening Expense Reimbursement    24
     4.04.5 Repayment of Pre-Opening Budget Costs and Expenses    24
**ARTICLE V: RESPONSIBILITIES OF THE MANAGER AFTER THE
COMMENCEMENT DATE**    24
5.01   Duties of the Manager    24
5.02   Specific Responsibilities of the Manager    25
5.03   No Liability for Certain Violations    26
5.04   Provision of Working Capital    27

| | | |
|---|---|---:|
| 5.05 | Operating Budgets and Capital Renewals Budgets | 27 |
| | 5.05.1 Preparation of the Budgets | 27 |
| | 5.05.2 Review of the Budgets | 27 |
| | 5.05.3 Approval of the Budgets | 27 |
| | 5.05.4 Performance under the Operating Budget | 28 |
| | 5.05.5 Capital Renewals Reserve | 29 |
| | 5.05.6 Compliance with the Capital Renewals Budget | 30 |
| **ARTICLE VI: OTHER OPERATING RIGHTS AND RESPONSIBILITIES OF SUFFOLK OTB AND THE MANAGER** | | **30** |
| 6.01 | Ownership of the Gaming Facility and the Gross Revenues | 30 |
| 6.02 | Authority and Responsibilities of Suffolk OTB and the Manager | 30 |
| | 6.02.1 Collection of Gross Revenues | 31 |
| | 6.02.2 Payment of Amounts Owed to the Gaming Commission and Other Charges | 31 |
| | 6.02.3 Payment for Capital Renewals | 31 |
| | 6.02.4 Employment of Personnel | 31 |
| | 6.02.5 Labor Relations | 31 |
| | 6.02.6 Marketing and Advertising | 32 |
| | 6.02.7 Maintenance and Repair | 32 |
| | 6.02.8 Utility Services | 32 |
| | 6.02.9 Security | 32 |
| | 6.02.10 Licenses and Permits | 32 |
| | 6.02.11 Contracts and Leases | 33 |
| | 6.02.12 Compliance with Building Loan Agreement, Notes, Mortgages, Lease and Security Agreements | 33 |
| | 6.02.13 Legal Requirements | 33 |
| | 6.02.14 Legal Proceedings | 33 |
| **ARTICLE VII: ACCOUNTING AND CASH MANAGEMENT** | | **34** |
| 7.01 | Bank Accounts | 34 |
| 7.02 | Collection and Disbursement of Funds | 34 |
| | 7.02.1 Deposit of Gross Revenues | 34 |
| | 7.02.2 Payment of Amounts Owed under the Gaming Law | 34 |
| | 7.02.3 Collection of Gross Revenues | 34 |
| 7.03 | Guarantee of the Minimum Annual Distribution | 36 |
| 7.04 | Financial Statements | 37 |
| 7.05 | Books of Account | 37 |
| **ARTICLE VIII: MANAGEMENT FEES AND REIMBURSEMENT OF EXPENSES** | | **38** |
| 8.01 | Management Fees | 38 |
| 8.02 | Payment of Management Fees | 39 |
| 8.03 | Annual Reconciliation | 39 |
| 8.04 | Reimbursement of Expenses | 39 |
| **ARTICLE IX: INSURANCE** | | **40** |
| 9.01 | Insurance Coverage During the Construction Phase | 40 |
| 9.02 | Insurance Coverage After the Completion of Construction | 40 |

| | | |
|---|---|---|
| 9.03 | Responsibility to Maintain Insurance | 41 |
| 9.04 | General Requirements | 41 |
| 9.05 | Policies and Endorsements | 41 |
| | 9.05.1 Policies | 41 |
| | 9.05.2 Endorsements | 41 |
| | 9.05.3 Named Insureds | 42 |
| | 9.05.4 Evidence of Insurance | 42 |
| | 9.05.5 Waiver of Liability | 42 |
| **ARTICLE X: TRADE NAMES, CONFIDENTIAL INFORMATION, AND NON-SOLICITATION** | | 42 |
| 10.01 | Intentionally Omitted | 42 |
| 10.02 | Trade Names, Trademarks and Service Marks | 42 |
| 10.03 | Confidential Information | 43 |
| 10.04 | Restriction on Employee Solicitation | 44 |
| 10.05 | Access to Information | 44 |
| **ARTICLE XI: REPRESENTATIVES OF THE PARTIES** | | 44 |
| 11.01 | Designation of Representatives | 44 |
| **ARTICLE XII: TERM OF AGREEMENT** | | 45 |
| 12.01 | Term of the Agreement | 45 |
| 12.02 | Extension of the Term | 45 |
| 12.03 | Termination by Suffolk OTB for Cause | 45 |
| 12.04 | Termination by the Manager for Cause | 46 |
| 12.05 | Effect of Termination and Consequences of a Default | 48 |
| 12.06 | Effect of Termination Upon Manager's Default or in the Event of Non-Renewal | 48 |
| 12.07 | Effect of Termination Upon Suffolk OTB's Default | 49 |
| 12.08 | Extraordinary Events | 49 |
| **ARTICLE XIII: RESTRICTION ON COMPETITIVE ACTIVITIES** | | 49 |
| 13.01 | Restriction on Competitive Activities | 49 |
| 13.02 | Equitable Relief | 49 |
| **ARTICLE XIV: WARRANTIES, REPRESENTATIONS, AND ADDITIONAL COVENANTS OF THE PARTIES** | | 50 |
| 14.01 | Representations and Warranties of Suffolk OTB | 50 |
| 14.02 | Representations and Warranties of the Manager and DNC Gaming | 52 |
| 14.03 | Additional Affirmative Covenants of the Parties | 54 |
| | 14.03.1 Compliance with Laws | 54 |
| | 14.03.2 Filing of Reports | 54 |
| | 14.03.3 Further Assurances | 54 |
| | 14.03.4 Future Acts | 55 |
| | 14.03.5 Notice of Litigation | 55 |
| | 14.03.6 Procurement Lobbying | 55 |
| | 14.03.7 Non-Discrimination in Services | 55 |
| | 14.03.8 No Waiver | 56 |
| | 14.03.9 Cooperation on Claims | 56 |
| **ARTICLE XV: INDEMNIFICATION** | | 56 |
| 15.01 | Indemnification of the Manager | 56 |

| | | |
|---|---|---|
| 15.02 | Indemnification of Suffolk OTB | 57 |
| 15.03 | Indemnified Parties | 57 |
| 15.04 | Survival | 57 |
| **ARTICLE XVI: MISCELLANEOUS PROVISIONS** | | 57 |
| 16.01 | Manager as Independent Contractor and Agent for Suffolk OTB | 57 |
| 16.02 | Preparation of Agreement | 57 |
| 16.03 | Costs and Expenses | 57 |
| 16.04 | Survival | 57 |
| 16.05 | Entire Agreement; No Collateral Representations | 58 |
| 16.06 | No Oral Modification or Waiver | 58 |
| 16.07 | Remedies Cumulative | 58 |
| 16.08 | Severability | 58 |
| 16.09 | No Third Party Beneficiaries | 59 |
| 16.10 | No Reliance on Prior Representations | 59 |
| 16.11 | Headings | 59 |
| 16.12 | Applicable Law and Venue | 59 |
| 16.13 | Waiver of Trial by Jury | 59 |
| 16.14 | Notices | 59 |
| 16.15 | Assignment and Delegation; Successors and Assigns | 60 |
| | 16.15.1 General Restriction of Assignment | 60 |
| | 16.15.2 Assignment or Delegation by the Manager | 60 |
| | 16.15.3 Effect of Assignment or Delegation | 60 |
| 16.16 | Calculating Time Periods | 61 |
| 16.17 | Counterparts | 61 |
| 16.18 | Electronically Transmitted Documents | 61 |
| 16.19 | Intentionally Omitted | 61 |
| 16.20 | Gaming Commission Approval | 61 |

## DEVELOPMENT AND
## MANAGEMENT SERVICES AGREEMENT

THIS AMENDED AND RESTATED DEVELOPMENT AND MANAGEMENT SERVICES AGREEMENT (the "Agreement") is made as of May 24, 2016, by and between SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 425 Oser Avenue, Suite 2, Hauppauge, New York 11788 ("Suffolk OTB"); DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company having its principal office and place of business located at 250 Delaware Avenue, Buffalo, New York 14202 (the "Manager"), and DELAWARE NORTH COMPANIES GAMING & ENTERTAINMENT, INC., a Delaware corporation also having its principal office and place of business located at 250 Delaware Avenue, Buffalo, New York 14202 ("DNC Gaming").  DNC Gaming is the sole member of the Manager and is entering into this Agreement solely for the purpose of guaranteeing (i) the Manager's commitment to advance the Working Capital and Leasehold Improvements Loan described in Section 3.07 of this Agreement, and (ii) the payment of the Minimum Annual Distribution to Suffolk OTB described in Section 7.02.3(b) of this Agreement.

## RECITALS:

WHEREAS, the Upstate New York Gaming Economic Development Act of 2013 gives Suffolk OTB the authority, pursuant to Section 1617-a of the New York Tax Law, to conduct a video lottery machine gaming business at one of its branch simulcast wagering establishments or simulcast theaters located in Suffolk County, New York; and

WHEREAS, on August 8, 2013, Suffolk OTB issued a Request for Proposals (the "RFP") for the engagement of a qualified firm to assess the feasibility of where best to locate the video lottery gaming business in Suffolk County and to offer the best alternatives to develop, operate, maintain and manage the Gaming Facility; and

WHEREAS, after reviewing the many proposals received in response to the RFP and participating in numerous presentations, Suffolk OTB has selected the Manager to provide management and consulting services in connection with the development and operation of the Business at the Gaming Facility, and Manager has agreed to provide financing for the construction and opening of the Gaming Facility, upon the terms and conditions set forth in this Agreement;

WHEREAS, DNC Gaming, the Manager's parent company, has extensive experience and expertise in the management of video lottery gaming operations, food service facilities, retail stores and related customer hospitality businesses, and the Manager was formed and organized to provide the benefit of such experience and expertise to Suffolk OTB;

WHEREAS, Suffolk OTB, the Manager and DNC Gaming entered into a Development and Management Services Agreement dated March 7, 2014 (the "First DMS Agreement") and

the First DMS Agreement and the associated building construction loan documents attached thereto were approved by Order of the Bankruptcy Court dated April 17, 2014; and

WHEREAS, Suffolk OTB, the Manager and DNC Gaming desire to amend and restate the First DMS Agreement in its entirety to reflect certain revised terms agreed upon by such parties;

NOW, THEREFORE, in view of the Recitals and in consideration of the mutual promises and covenants contained herein, the First DMS Agreement is hereby amended and restated in its entirety as follows:

## AGREEMENT:

## ARTICLE I
## DEFINITIONS

1.01    Definitions.  The following capitalized terms and phrases used in this Agreement will have the meanings specified in this Article I.  Terms defined in context throughout this Agreement and not included in this Section 1.01 shall have the meanings ascribed to them in the Sections in which they are defined:

Affiliate(s).  With respect to any entity, an "Affiliate" is a natural person or firm, corporation, partnership, association, trust, limited liability company, or other entity which directly or indirectly Controls, is Controlled by, or is under common Control with, the subject entity.

Agreement.  The "Agreement" means this Amended and Restated Development and Management Services Agreement and any modifications or extensions thereto, together with all of the exhibits to this Amended and Restated Development and Management Services Agreement.

Audited Statements.  The "Audited Statements" means the financial statements of the Business prepared for each Operating Year by the independent certified public accountants retained by Suffolk OTB pursuant to Section 7.04 of this Agreement.

Bank Accounts.  References to the "Bank Accounts" mean the bank accounts established by Suffolk OTB pursuant to Section 7.01 of this Agreement for the deposit of the receipts derived from the Business, and from which bank accounts money will be disbursed to pay the Expenses and the other amounts specified in Section 7.02.3 hereof.

Bankruptcy Court and Bankruptcy Case.  The "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of New York, The "Bankruptcy Case" means the Chapter 9 bankruptcy reorganization proceeding titled *In re Suffolk Regional Off-Track Betting Corporation*, Case No. 1-12-43503-CEC, filed on May 11, 2012. The Bankruptcy Court has retained limited jurisdiction over Suffolk OTB pursuant to the Plan.  The Plan became effective

2

on October 30, 2014.

Brookhaven Property. Means the property located at 440 South Service Road, Medford, New York, 11763, also known as 440 Long Island Expressway Drive South, Brookhaven, New York, also known as 440 Expressway Drive, Brookhaven, New York, also known as Long Island Avenue, Medford, New York 11763, and as more particularly described in the Mortgage and the New Mortgage.

Brookhaven Sale Offer. Has the meaning set forth in Section 3.05.

Business. Any reference to the "Business" means all of the following activities: (i) the conduct of the video lottery gaming business and the operation of the Video Lottery Machines by Suffolk OTB; (ii) any and all other casino-style gambling or other gaming activities in which the Suffolk OTB may lawfully engage; and (iii) the operation of automated teller machines located in the Gaming Facility to the extent maintained at Suffolk OTB's cost. However, the "Business" does not include any of the business activities within the definition of the "Excluded Business" or the "DNC Retained Business."

Capital Renewals. The phrase "Capital Renewals" refers to the items of replaced Equipment, major repairs and remodeling to the Gaming Facility and other capital investment projects, all as reflected in the Capital Renewals Budget.

Capital Renewals Account. The "Capital Renewals Account" is the Bank Account to be established by Suffolk OTB for the holding of the Capital Renewals Reserve pursuant to Section 5.05.5 of this Agreement.

Capital Renewals Budget. The "Capital Renewals Budget" refers to the budget of anticipated capital expenditures for the Business to be prepared, reviewed and approved on an annual basis, as more particularly described in Section 5.05.1(b) of this Agreement.

Capital Renewals Reserve. The "Capital Renewals Reserve" is the cash amount to be accumulated each year by Suffolk OTB pursuant to Section 5.05.5 of this Agreement for the purpose of making Capital Renewals.

Commencement Date. The "Commencement Date" refers to the date when all of the following conditions have been satisfied: (i) any operational Video Lottery Machines are installed; (ii) all licenses, permits and approvals required for the conduct of the Business are obtained; and (iii) the Gaming Facility is opened to the general public with any Video Lottery Machines at the Gaming Facility.

Common Areas. The "Common Areas" are all portions of the Gaming Facility to be utilized by both the Manager in connection with the operation of the Business and by Suffolk OTB in connection with the operation of the Excluded Business, such areas to include, without limitation, driveways, entrances and exits, restrooms, elevators and escalators, service corridors, alleys, sign frontage and parking areas (which parking areas may be used by Gaming Facility

patrons).

Control.  "Control" (including the terms "controlled by" and "under common control with") with respect to the relationship between or among two or more business entities, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a business entity, whether through the ownership of voting securities, by contract or otherwise, including without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such business entity.

Default or Event of Default.  A "Default" or an "Event of Default" is any occurrence that, with the giving of notice, the passage of time, or both, gives rise to the right by a party to terminate this Agreement in the manner described in Section 12.03 or Section 12.04 of this Agreement.

Deficiency Note.  Has the meaning set forth in Section 3.06.

Design Documents.  The "Design Documents" are the plans, layouts, specifications, drawings and designs for the Gaming Facility, including development design plans and specifications and final construction documents, together with any substantial changes therein or departures from such plans, layouts, specifications, drawings and designs.

Development Budget.  The "Development Budget" refers to the estimated budget of the total anticipated Development Costs.

Development Costs.  The "Development Costs" are the costs (i) to design, construct, furnish and equip the Gaming Facility and the Common Areas which serve the Gaming Facility; (ii) to fund the initial working capital requirements (including the operating cage cash bankroll) of the Business at the Gaming Facility; (iii) to provide the Gaming Commission Bond; and (iv) to account for the interest expense relating to the First Loan, the First Loan Note (and/or the Deficiency Note if applicable) and the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note which accrues during the period of time prior to the Full Facility Opening Date.

DNC Gaming.  "DNC Gaming" means Delaware North Companies Gaming & Entertainment, Inc., a Delaware corporation, and its successors and assigns.

DNC Retained Business.  "DNC Retained Business" means any activities other than those constituting that Business, including, without limitation: (i) the sale of food, beverages (both alcoholic and non alcoholic) and other refreshments from fixed concession stands, in-room dining, food courts, banquet rooms, buffets, restaurants, bars, booths, kiosks, mobile stands, and vending machines and any other food service functions including those conducted at or from the Gaming Facility; (ii) the provision of lodging and all services related to lodging; (iii) the provision of valet parking services and other parking revenue; (iv) the operation of automatic teller machines and cash dispensing machines, other than those located in the Gaming Facility

which are maintained at Suffolk OTB's expense; (v) rental, license or lease of convention rooms, meeting rooms and group facilities; (vi) catering and event services; (vii) the sale of retail merchandise; and (viii) the provision of tours and travel services.

EBITDAM.  The acronym "EBITDAM" means the net income of the Business before the deduction of interest, taxes, depreciation, amortization and management fees, calculated in accordance with generally accepted accounting principles.  In determining "EBITDAM", the Gross Revenues derived from the conduct of the Business will be reduced by the amounts paid or accrued for the Expenses of the Business, provided, that, despite being included in the definition of Expenses, the following items shall not reduce Gross Revenues or be included in the calculation of EBITDAM: (i) rent, additional rent and other payments from Suffolk OTB to Manager or one of its Affiliates pursuant to the Lease; and (ii) all Host Fees.  "EBITDAM" will be determined in a manner consistent with the pro forma EBITDAM statement attached hereto as Exhibit A and made a part hereof.

Equipment.  The "Equipment" refers to all furniture, furnishings, fixtures, machines and equipment located at the Gaming Facility and used in connection with the conduct of the Business all of which, except for the Video Lottery Machines, shall be owned by Suffolk OTB. Included within the definition of "Equipment" are (i) all equipment relating to the operation of the Video Lottery Machines (exclusive of the Video Lottery Machines themselves, which will be owned by the State of New York); (ii) all computer and communications equipment and software required for the conduct of the Business; (iii) all money counting equipment, safes, automatic teller machines and cash dispensing machines located in the Gaming Facility to the extent maintained at Suffolk OTB's cost; (iv) all display cabinets, counters, wrap stands and shelving; (v) all inventory control, register and point-of-sale equipment; (vi) all security and surveillance equipment for the Gaming Facility; (viii) all personal computers and computer servers for the Gaming Facility; (viii) all telephones and telecommunications equipment for the Gaming Facility; and (ix) all other fixtures, furniture, furnishings, decorations, signage and equipment used in the conduct of the Business at the Gaming Facility.

Excluded Business.  The "Excluded Business" refers to the importation of simulcast racing signals from thoroughbred and standardbred racetracks, the acceptance of wagers on such simulcast races, and all other aspects of the pari-mutuel wagering business to be conducted by Suffolk OTB at the Gaming Facility, to the extent permitted by applicable Legal Requirements.

Exclusive Rights Payment.  The "Exclusive Rights Payment" is the amount payable by the Manager to Suffolk OTB for the exclusive management rights granted to the Manager pursuant to Article II of this Agreement, which is more particularly described in Section 2.02 of this Agreement.

Expenses.  Except as noted elsewhere in this Agreement, any reference to "Expenses" means the following costs and expenses incurred in connection with the management and operation of the Business or associated with the maintenance and upkeep of the Gaming Facility:

(a)    The total employment costs of the employees of Suffolk OTB who work in the

Business, and the total employment costs of the Senior Management Team which supervise the Business, such total payroll costs to include (i) salaries and wages paid; (ii) social security, unemployment and other taxes paid; (iii) health and welfare and other reasonable employee fringe benefits and pensions (or other retirement benefits); and (iv) reasonable bonus payments to the Senior Management Team and other select employees of the Business, to the extent such bonuses are approved by Suffolk OTB and the Manager in the annual Operating Budgets;

(b)     General and administrative expenses of the Business, general facility cleaning, laundry and trash removal expenses, employee hiring and training expenses, the cost of marketing and promoting the Business  (after taking into account marketing allowance monies received by the Business pursuant to Section 1612 of the New York Tax Law, or any successor statute), costs associated with the operation and maintenance of automatic teller machines and cash dispensing machines at the Gaming Facility which are maintained at Suffolk OTB's cost, and routine repairs, maintenance and minor alterations to the Gaming Facility to the extent not included in Capital Renewals;

(c)     The Business' proportionate share of the cost of all utility services (including without limitation, heat, telephone, cable, satellite, data and wire (excluding cable, satellite, date and wire required to operate the Excluded Business), air conditioning, light, power, water and sewage treatment and disposal) received at the Gaming Facility and the services of cleaning and removing snow from parking lots, driveways and walkways and other portions of the Common Areas, with such costs to be equitably apportioned between the Business, the Excluded Business and the DNC Retained Business and between the parties hereto (based upon metering, usage, the relative amount of square footage in the Gaming Facility devoted to either the Business or the Excluded Business, or any other basis mutually agreed upon by Suffolk OTB and the Manager);

(d)     The cost of gaming supplies, cleaning supplies, stationery, uniforms, fuel and other consumable items used or sold in connection with the Business;

(e)     To the extent not included in Capital Renewals, the cost of acquiring or leasing the Equipment, and the cost of replacing the Equipment when damaged beyond repair or rendered obsolete;

(f)     The amount of any accounts receivable with respect to the Business that is deemed to be uncollectible, or in the alternative, a reasonable reserve for doubtful accounts receivable established by mutual agreement of Suffolk OTB and the Manager in the preparation of the annual Operating Budgets;

(g)     The fees and expenses of independent accountants, independent legal counsel, and other independent professional advisors agreed upon by Suffolk OTB and the Manager;

(h)     The fees and expenses of independent technical, operational and other consultants, experts, and advisors for specified services in connection with non-routine work required by the Business, to the extent included in the Operating Budgets or otherwise agreed upon by Suffolk OTB and the Manager;

(i)    The handling and service charges, taxes and other fees imposed by third parties in connection with the purchase of goods;

(j)    The amount of out-of-pocket costs and other disbursements incurred by the Manager which are to be reimbursed by Suffolk OTB pursuant to Section 4.05 or Section 8.04 of this Agreement;

(k)    The costs and expenses of operating computer and communication systems used by the Business;

(l)    Insurance premium expenses and deductibles associated with the insurance coverages described in Section 9.02 of this Agreement;

(m)    Any taxes, duties, levies, assessments, fees or other charges of any nature that are imposed on or assessed against the Business, the Gaming Facility or the Equipment, or are otherwise related to any agreement between Suffolk OTB and the Manager or to the management, operation or promotion of the Business by the State of New York or any political subdivision thereof pursuant to the Gaming Laws (including without limitation, all taxes, fees, governmental charges and assessments, purse and breeders' supplements, and other amounts required by the Gaming Law to be paid to the Gaming Commission or others from the revenues generated by the Video Lottery Machines, after taking into account any legally permitted reductions in such amounts that Suffolk OTB is able to obtain through negotiation or otherwise); provided however, excluded from treatment as an Expense will be any income or franchise tax, duty, levy, assessment, fee or other charge of any nature imposed on the Business, Suffolk OTB or the Manager, and any tax, duty, levy, assessment, fee or other charge of any nature payable on account of gain from the sale or transfer of the Gaming Facility, any part thereof, or the Equipment;

(n)    The costs and expenses of obtaining and maintaining operating licenses, permits, and other government authorizations and approvals;

(o)    Such other costs and expenses as are specifically provided for elsewhere in this Agreement or in any approved annual Operating Budget, or are otherwise approved by Suffolk OTB as being reasonably necessary for the management and operation of the Business or the maintenance and upkeep of the Gaming Facility;

(p)    Half of all Host Fees (or whatever percentage of Host Fees are allocated to Suffolk OTB in an extension term as described in Section 12.02 or upon termination as described in Section 12.05);

(q)    Rent payments, additional rent, common area and all other costs, expenses and charges (including for common area maintenance or other shared expenses) payable by Suffolk OTB pursuant to the Lease to the Manager or one of its Affiliates;

(r)    The costs and expenses relating to paying mortgage recording fees in connection with the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note; and

(s)    The Business' proportionate share, as set forth in each annual Operating Budget (based upon usage, the relative amount of square footage in the Gaming Facility devoted to either the Business or the Excluded Business, or any other basis agreed upon by Suffolk OTB and the Manager), of the salaries and other compensation expense of hourly staff personnel employed on-site at the Gaming Facility by either Suffolk OTB or the Manager, who provide services to both the Business and the Excluded Business (and exclusive of the headquarters personnel of Suffolk OTB and the Manager), such as any member of the accounting staff, the facilities maintenance staff and the security personnel who are not exclusively assigned to the Business or the Excluded Business.

Development Costs, Capital Renewals and any cost relating to the depreciation or amortization of capital items incurred by the Business will not be included within the definition of "Expenses" for purposes of this Agreement.

Extension Term.  Has the meaning set forth in Section 12.02 of this Agreement.

Extraordinary Event.  An "Extraordinary Event" is: (i) acts of nature without the interference of any human agency (including hurricanes, typhoons, tornados, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); (ii) fires and explosions caused wholly or in part by human agency other than by the party whose performance is being prevented; (iii) acts of war, attack, invasion, or other acts of hostility by foreign enemies; (iv) civil war, rebellion, revolution, insurrection or usurpation of sovereign power; (v) riots or other civil commotion; (vi) terrorism (including hijacking, sabotage, bombing, murder, assault and kidnapping); (vii) strikes or similar labor disturbances; (viii) lack of availability of critical materials or supplies; (ix) action or inaction of governmental authorities having jurisdiction over Business; and (x) any other events beyond the reasonable control of Suffolk OTB or the Manager.

First Loan.  The "First Loan" refers to the credit facility made available by the Manager to Suffolk OTB as described in Section 3.01 of this Agreement.

First Loan Note.  The "First Loan Note" refers to the note issued pursuant to the credit facility made available by the Manager to Suffolk OTB as described in Section 3.01 of this Agreement.  The "First Loan Note" is attached as Exhibit D hereto and is made a part hereof.

Gaming Commission.  The "Gaming Commission" means the New York Gaming Commission, the New York Lottery, or any successor New York State government agency charged with responsibility for supervision and oversight of the video lottery gaming industry.

Gaming Commission Bond.  The "Gaming Commission Bond" refers to the bond, surety

agreement or letter of credit in favor of the Gaming Commission which is required by law or regulation to be obtained and maintained in order to secure the State of New York from any monetary loss relating to the video lottery gaming activities of Suffolk OTB or the Manager.

Gaming Facility.  The "Gaming Facility" means the area of the Site which when built to completion and furnished, will house Video Lottery Machines and will be used for the conduct of the Business and to house the Excluded Business.  The "Gaming Facility" is comprised of: (i) the gaming floor where all of the Video Lottery Machines will be located; (ii) the Business customer reception and membership areas; (iii) the cash cages, money count rooms, armored car areas and other secure areas used in connection with the Business; (iv) the security and surveillance rooms relating to the Business; (v) the Business employee change rooms and break rooms; (vi) the sales offices, administrative offices and record-keeping rooms used in connection with the conduct of the Business; (vii) the Common Areas; and (viii) the horse race simulcasting areas, pari-mutual wagering areas, administrative offices, record rooms and money rooms utilized by Suffolk OTB in connection with its conduct of the Excluded Business.  Any subsequent expansion, replacement or relocation of the Gaming Facility will also be deemed to constitute the "Gaming Facility" for all purposes under this Agreement.

Gaming Law.  The "Gaming Law" means those provisions of the New York Tax Law (including without limitation, Sections 1612 and 1617-a of the New York Tax Law) which authorize and regulate the conduct of video lottery gaming at pari-mutuel racetracks and certain off-track betting facilities in the State of New York, the regulations adopted by the Gaming Commission with respect to video lottery gaming, and any modification, amendment or replacement thereof.

Full Facility Opening Date.  The Full Facility Opening Date means the date on which the Gaming Facility is substantially complete; (ii) between 950 and 1,000 Video Lottery Machines installed; (iii) all licenses and permits required for the conduct of the Business are obtained; and (iv) the Gaming Facility is opened to the general public.

Gross Revenues.  The phrase "Gross Revenues" refers to the gross amount of all revenues and receipts of every kind (whether from cash or credit transactions), determined on an accrual basis, derived by Suffolk OTB from goods sold, services performed or other commercial activities conducted in connection with the Business (including without limitation, the Net Gaming Revenue), together with any proceeds from business interruption insurance or other "loss of income" insurance.  However, "Gross Revenues" does not include: (i) tips, service charges, or gratuities received by employees of the Business; (ii) proceeds from the sale or refinancing (including by means of a sale/leaseback transaction) of the Gaming Facility, any portion thereof, or the Equipment; (iii) proceeds under property loss, casualty or general liability insurance policies (other than the business interruption insurance to the extent such proceeds relate to the Business); (iv) the gross receipts realized by subtenants and licensees; (v) excise, sales or use taxes or similar charges collected directly from patrons or included as part of the sales price of any goods or services; or (vi) revenues from the Excluded Business.

Host Fees. Means all host fees or other payments, costs, charges, levies, assessments,

contributions or expenses to any government entity or directed by any government entity or official, including but not limited to costs associated with the design, development or construction of any community projects or improvements (whether paid to a governmental entity or any third party) in each year of the Initial Term and each year of any Extension Term or each year of operation of the Business at the Site by OTB after termination of this Agreement (to the extent permitted by this Agreement), including, without limitation, for athletic facilities or fields or other community purposes which are incurred by Manager, DNC Gaming or Suffolk OTB or any of their Affiliates.

Lease.  Means the lease to be entered into upon the commencement of construction at the Site between Manager or one of its Affiliates and Suffolk OTB for the lease of the Gaming Facility, substantially in the form which will be attached hereto as Exhibit G upon completion of the negotiation of the Lease.

Legal Requirements.  The "Legal Requirements" are all public laws, statutes, ordinances, judgments, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of all governmental authorities which now or hereafter are applicable to the Business or the Gaming Facility, including those legal requirements relating to zoning, building, public safety, environment and health, and the terms and conditions of employment of the management and staff of the Business.

Management Fee.  The "Management Fee" refers to the amount payable by Suffolk OTB to the Manager for its services hereunder pursuant to Section 8.01 of this Agreement.

Manager.  The "Manager" is DNC Gaming Management in Suffolk, LLC, a New York limited liability company, and its successors and assigns.

Manager Standards.  "Manager Standards" means, collectively, standards of diligence and professional management consistent with that which is customary and usual with respect to the video lottery gaming industry, taking into account the physical characteristics of the Gaming Facility and the nature of its market, the best standards and procedures employed at the Manager's other locations in New York State, and such other standards as are required under applicable law.

Manager's Election Notice.  Has the meaning set forth in Section 3.05.

Maturity Date.  The "Maturity Date" of the First Loan, the First Loan Note, the Deficiency Note (if executed), the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and The Project Development and Gaming Facility Bankroll Loan Note will be the earlier of (i) the tenth (10th) anniversary of the Full Facility Opening Date, or (ii) thirty (30) days after the date of termination of this Agreement; or; (iii) at the option of Manager following the occurrence of an Event of Default.

Minimum Annual Distribution.  The "Minimum Annual Distribution" is the amount to be distributed to Suffolk OTB after the payment or provision for Expenses but before payment of

the Management Fee, repayment of the First Loan and First Loan Note, repayment of the Deficiency Note, repayment of the Working Capital and the Leasehold Improvements Loan (and the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note) and funding of the Capital Reserve, as provided in Section 7.02.3 of this Agreement.

Monthly Statements. The "Monthly Statements" are the statements of income and expense which will reflect the monthly results of operation of the Business, to be prepared by the Manager on a monthly basis pursuant to Section 7.04 hereof.

Mortgage and Building Loan Agreement. The "Mortgage" and "Building Loan Agreement" refers to the security documents delivered by Suffolk OTB to the Manager as described in Section 3.02 of this Agreement in order to create a lien against Suffolk OTB's ownership interest in the Brookhaven Property in favor of the Manager for the purpose of securing repayment of the First Loan and the First Loan Note (or the Deficiency Note, if any). The lien created by the "Mortgage" and "Building Loan Agreement" will not be subject or subordinate to any other mortgage lien, security interest or encumbrance. The "Mortgage" and "Building Loan Agreement" are set forth in Exhibits B and C attached hereto and made a part hereof.

Net Gaming Revenue. The phrase "Net Gaming Revenue" means the total amount wagered on the Video Lottery Machines or other casino-style gambling activities in which Suffolk OTB may lawfully engage (other than the Excluded Business) by patrons of the Gaming Facility (excluding the amount of promotional non-cash "free play" wagered by those patrons), reduced by the sum of all winnings and prizes paid to players of the Video Lottery Machines.

New Mortgage. Refers to the collateral security documents delivered by Suffolk OTB to the Manager in order to create a lien against Suffolk OTB's ownership interest in its real property in favor of the Manager for the purpose of securing repayment of the First Loan, the First Loan Note, the Deficiency Note, if any, the Working Capital and the Leasehold Improvements Loan (and the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note). The lien created by the New Mortgage will not be subject or subordinate to any other mortgage lien, security interest or encumbrance. The New Mortgage shall be substantially in the form as set forth in Exhibit M attached hereto and made a part hereof.

Operating Budget. The "Operating Budget" refers to the budget of income and expense for the Business to be prepared by the Manager on an annual basis, as more particularly described in Section 5.05.1 of this Agreement.

Operating Plan. The "Operating Plan" refers to the operating policies, procedures and internal controls for the conduct of the Business to be prepared by the Manager pursuant to Section 4.04.1 of this Agreement. The "Operating Plan" will include: (i) a description of the job titles and job functions of all employees of the Business; (ii) procedures for security; (iii) procedures for collecting, securing, transporting and depositing the revenues generated by the Business; (iv) general accounting and internal controls procedures; (v) marketing and advertising plans; and (vi) such other tasks as are necessary to conduct the Business in a proper and

professional manner in compliance with New York law.

Operating Year. An "Operating Year" generally refers to each fiscal year of operation of the Business. The first Operating Year will begin on the Commencement Date and will continue through December 31st of the year in which the Gaming Facility is first opened to the general public. Thereafter, each Operating Year will commence on January 1st of each year and will continue through December 31st of the year, except that the final Operating Year will continue through the date that is the twentieth (20th) anniversary of the Full Facility Opening Date (unless this Agreement is either extended or terminated earlier in the manner provided herein).

Performance Criteria. The "Performance Criteria" are the quantitative and qualitative performance objectives for the Business and the Gaming Facility set forth in Exhibit F to this Agreement which, if achieved by the Manager, will entitle the Manager to continue to provide services to Suffolk OTB for an Extension Term, as contemplated in Section 12.02 hereof.

Plan. Means the Second Amended Plan for the Adjustment of Debts of Suffolk Regional Off-Track Betting Corporation dated September 11, 2014 and, the Bankruptcy Court's Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Plan for the Adjustment of Debts of Suffolk Regional Off-Track Betting Corporation dated October 30, 20914.

Planning Consultants. Means the architecture, construction management and property development firms selected by Manager.

Pre-Opening Budget. The "Pre-Opening Budget" is the budget of costs and expenses to be incurred during the Pre-Opening Period, which will be prepared by the Manager pursuant to Section 4.04.3 of this Agreement.

Pre-Opening Period. The "Pre-Opening Period" means the period of time from the date of execution of this Agreement to the Full Facility Opening Date.

Project Development and Gaming Facility Bankroll Loan Note. The "Project Development and Gaming Facility Bankroll Loan Note" refers to the credit facility made available by the Manager to Suffolk OTB as described in Section 3.07 of this Agreement. The "Project Development and Gaming Facility Bankroll Loan Note" is attached as Exhibit J hereto and is made a part hereof.

Second Security Agreement. The "Second Security Agreement" refers to the collateral security document to be delivered by Suffolk OTB to the Manager pursuant to Section 3.09 of this Agreement in order to create a lien in favor of the Manager against the collateral as described in the Second Security Agreement attached hereto as Exhibit J and made a part hereof. The Second Security Agreement is entered into for the purpose of securing repayment of all obligations of Suffolk OTB to the Manager including, but not limited to obligations arising out of the First Loan, the First Loan Note, the Deficiency Note, if any, the Working Capital and Leasehold Improvements Loan (and the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note). The lien created by the Second Security

Agreement will not be subject or subordinate to any other security interest or encumbrance other than those created by the Security Agreement in favor of Manager.

Security Agreement. The "Security Agreement" refers to the collateral security document delivered by Suffolk OTB to the Manager described in Section 3.02 of this Agreement in order to create a lien in favor of the Manager against the tangible and intangible personal property utilized in connection with the operation of the Business for the purpose of securing repayment of the First Loan, the First Loan Note (and, if executed, the Deficiency Note). The lien created by the "Security Agreement" will not be subject or subordinate to any other security interest or encumbrance. The Security Agreement, as amended will be as set forth in Exhibit E attached hereto and made a part hereof.

Senior Management Team. The "Senior Management Team" refers to the employees of the Manager who will serve as the on-site senior management team of the Business, consisting of a General Manager, a Senior Director of Operations, a Senior Director of Finance, a Senior Director of Marketing, a Senior Director of Human Resources, a Director of Gaming, and a Director of Food & Beverage Services. Any obligations of the Senior Management Team under this Agreement will be obligations of the Manager.

Site. Means the building and land selected by Manager and owned by Manager or one of its Affiliates which Manager and Suffolk OTB mutually agree to which will house the Gaming Facility or the operation of the Business.

Suffolk OTB. Any reference to "Suffolk OTB" means the Suffolk Regional Off-Track Betting Corporation, a New York public benefit corporation, and its successors and assigns.

Termination Payment. Reference to the "Termination Payment" means the lump sum amount payable by Suffolk OTB to the Manager in the event that the Manager terminates this Agreement as a result of an Event of Default by Suffolk OTB pursuant to Section 12.04 of this Agreement. The "Termination Payment" will be calculated in the following manner.

    (i)    The parties will mutually determine the amount of the future monthly payments to which the Manager is entitled as follows:

        (a)    If the effective date of termination of this Agreement occurs prior to the first (1st) anniversary of the Commencement Date, each monthly payment will be equal to the average monthly Management Fee projected to be payable by Suffolk OTB as reflected in the Operating Budget prepared by the Manager and approved by Suffolk OTB for the first (1st) Operating Year; or

        (b)    If the effective date of the termination of this Agreement occurs on or after the first (1st) anniversary of the Commencement Date, the monthly payment will be equal to the average monthly

Management Fees earned by the Manager during the twelve (12) month period of time immediately preceding the effective date of termination of this Agreement.

(ii) On or before the effective date of termination of this Agreement, and subject to the provisions of Section 12.04 of this Agreement, Suffolk OTB will pay to the Manager a Termination Payment equal to the sum of the present values (using a five percent (5%) discount rate) of each of the monthly payments determined above for the period from the effective date of termination through to the expiration date of this Agreement (including any Extension Term to which the Manager is entitled pursuant to Section 12.02 hereof).

Video Lottery Machines. The "Video Lottery Machines" are all of the gaming machines, terminals, electronic gaming tables and other devices, and any associated equipment, authorized under the Gaming Law for operation at the Gaming Facility, together with any upgrades, modifications and replacements to such machines, terminals, electronic gaming tables, devices and associated equipment.

Working Capital Advance. A "Working Capital Advance" is a temporary advance of money by the Manager to Suffolk OTB to fund a working capital shortfall experienced by the Business, as described in Section 5.04 of this Agreement.

Working Capital and Leasehold Improvements Loan. The "Working Capital and Leasehold Improvements Loan" refers to the credit facility made available by the Manager to Suffolk OTB as described in Section 3.07 of this Agreement.

2016 Working Capital Loan Note. The "2016 Working Capital Loan Note" refers to the credit facility made available by the Manager to Suffolk OTB as described in Section 3.07 of this Agreement. The "2016 Working Capital Loan Note" is attached as Exhibit I hereto and is made a part hereof.

1.02    References and Interpretations. References to this Agreement will include the exhibits attached hereto and all amendments or renewals thereof. Unless expressly stated to the contrary, reference in this Agreement to any article or section includes all subsections thereof. Any exhibit referenced in this Agreement will be construed to be incorporated in this Agreement by such reference. All references to dollars mean the lawful currency of the United States of America. Any reference to statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned. The words "herein," "hereof," "hereunder," "hereinafter" and words of similar import refer to this Agreement as a whole and not to any particular article, section or subsection hereof. The terms "include" and "including" will each be construed as if followed by the phrase "without being limited to." This Agreement will be interpreted without interpreting any provision in favor of or against either party by reason of the drafting of the provision.

## ARTICLE II
## EXCLUSIVE MANAGEMENT RIGHTS

2.01    <u>Exclusive Management Rights</u>.  During the term of this Agreement, the Manager will have the exclusive right to provide management services to Suffolk OTB in connection with its operation of the Business at any location.  Suffolk OTB agrees to provide the employees and agents of the Manager and its Affiliates with unrestricted access to the Gaming Facility and the Common Areas during the term of this Agreement so that the Manager can perform its duties described herein.  Suffolk OTB will not engage in the Business except in accordance with the terms of this Agreement, and other than the conduct by Suffolk OTB of the Excluded Business at the Gaming Facility, Suffolk OTB will not lease, license or permit the use of any part of the Gaming Facility to anyone other than the Manager in connection with its performance of the management services described herein.  The parties expressly understand and agree that the terms of this Agreement, and the rights and responsibilities of the Manager set forth herein, only apply to the Business.  Suffolk OTB retains the exclusive right to manage and operate the Excluded Business. If this Agreement is extended, the Lease shall also be extended. In the event that, during the Initial Term or any Extension Term of this Agreement, any governmental entity, town, village, county or municipality in which the Site is located does not grant or terminates the special use or other permit that allows the Gaming Facility to operate at the Site at any time, then Manager shall retain the exclusive right to manage the business at another Site in accordance with the terms of this Agreement.

2.02    <u>Exclusive Rights Payment</u>.  In consideration for the exclusive rights given by Suffolk OTB to the Manager pursuant to this Article II, the Manager agreed to pay Suffolk OTB an Exclusive Rights Payment of Two Million Dollars ($2,000,000).  In lieu of payment of the Exclusive Rights Payment, Manager forgave a Two Million Dollar ($2,000,000) loan from Manager to Suffolk OTB.

## ARTICLE III
## MANAGER'S COMMITMENT TO LEND, SALE OF BROOKHAVEN PROPERTY, PURCHASE OF SITE, REPAYMENT OF FIRST LOAN NOTE AND LEASE OF SITE

3.01    <u>First Loan</u>.  Upon the terms and subject to the conditions of Article III of the First DMS Agreement and the First Loan Note attached hereto as Exhibit D, the Manager advanced funds to Suffolk OTB solely for the purpose of financing the costs identified in the Development Budget and the Pre-Opening Budget (the "First Loan"), and Suffolk OTB had the right to borrow such funds from the Manager, from time to time in the manner and to the extent provided in the Building Loan Agreement.  Notwithstanding the foregoing, prior to the Bankruptcy Court's confirmation of Suffolk OTB's Plan of Adjustment in the Bankruptcy Case, any advances under the First Loan by the Manager or DNC Gaming were at the sole discretion of the Manager.  The First Loan and the First Loan Note will be amortized in the manner described in Section 7.02.3 of this Agreement (which shall superseede the provisions set forth in Section 5 of the First Loan Note regarding repayment and amortization), and in any event will be due and repayable to the Manager in full in accordance with the provisions set forth in Section 3.06, or on the Maturity

Date, whichever is earlier.  As of April 29, 2016 the parties agree that the principal and interest outstanding under the First Loan Note is Fourteen Million Seven Hundred Twenty Seven Thousand Eight Hundred and Forty One Dollars and Thirty One Cents ($14,727,841.31).

3.02    Collateral Security for First Loan.  As collateral security for repayment of the First Loan and the First Loan Note, Suffolk OTB executed and delivered to the Manager (i) a mortgage against the Brookhaven Property and an associated building loan agreement (the "Mortgage" and the "Building Loan Agreement") attached hereto Exhibits B and C and made a part hereof; and (ii) a security agreement, as amended, attached hereto as Exhibit E and made a part hereof (the "Security Agreement") and financing statements, which granted to the Manager a blanket security interest in all of the tangible and intangible personal property used in connection with the Business.  Other than the liens granted to the Manager by Suffolk OTB pursuant to the Mortgage, the Building Loan Agreement the Security Agreement and the New Mortgage and the Second Security Agreement, the Gaming Facility, the personal property associated therewith and any Equipment owned by Suffolk OTB will not be subject to any mortgage lien, security interest or encumbrance.

3.03    Purchase of Facility to House Gaming Facility and Lease to Suffolk OTB.  The Manager or one of its Affiliates shall select, and Manager and Suffolk OTB shall mutually agree on, a Site.  Manager or an Affiliate of Manager also plans to conduct the DNC Retained Business at the Site.  The Manager shall purchase the Site on the terms and conditions negotiated by Manager in its sole discretion.  The Manager or one of its Affiliates shall lease to Suffolk OTB, on terms and conditions set forth in the Lease, in substantially in the form which will be attached hereto as Exhibit G, a portion of the Site (as detailed in the Lease) to operate the Gaming Facility.

3.04    Sale of Brookhaven Property.  Suffolk OTB shall, immediately upon the execution of this Agreement, market the Brookhaven Property for sale.  In the event that Suffolk OTB has not procured an acceptable offer from a party to purchase the Brookhaven Property within thirty (30) days after it is listed for sale, Manager reserves the right to prescribe the realtor and marketing plan for the sale of such property.

3.05    Manager's Rights of First Refusal on the Brookhaven Property.  In the event that a third party makes an offer to purchase the Brookhaven Property which Suffolk OTB wants to accept, Suffolk OTB shall cause the terms of the proposed sale to be reduced to writing and shall promptly notify the Manager of Suffolk OTB's desire to accept same (the "Brookhaven Sale Offer").  The Manger shall have the first option to purchase (itself or through one of its Affiliates) the Brookhaven Property.  At any time within twenty (20) days after receipt by the Manager of the Brookhaven Sale Offer, the Manager may elect to purchase the Brookhaven Property for the same price as set forth in the Brookhaven Sale Offer and shall give written notice of such election to Suffolk OTB ("Manager's Election Notice").  If the Manager fails to deliver the Manager's Election Notice within twenty (20) days after Manager's receipt of the Brookhaven Sale Offer, then Suffolk OTB may consummate the sale

of the Brookhaven Property on the terms set forth in the Brookhaven Sale Offer with the third party set forth therein.

3.06    Application of Proceeds of Brookhaven Property. Upon the sale of the Brookhaven Property, all net proceeds shall be applied first to the outstanding principal and interest balance of the First Loan and First Loan Note on the date of payment (the parties acknowledge that the principal and interest outstanding as of April 29, 2016 was Fourteen Million Seven Hundred Twenty Seven Thousand Eight Hundred and Forty One Dollars and Thirty One Cents ($14,727,841.31)). If the net proceeds from the sale of the Brookhaven Property exceed the principal and interest of the First Loan and the First Loan Note, the surplus will then be applied to reduce the amount outstanding under the Working Capital and Leasehold Improvements Loan, first applied to reduce the principal and interest outstanding under the 2016 Working Capital Loan Note and to the extent there is still a surplus, then applied to reduce the principal and interest outstanding under the Product Development and Gaming Facility Bankroll Loan Note. If the First Loan Note is not paid in full with the net proceeds from the sale of the Brookhaven Property, then the First Loan and the First Loan Note will be amended and restated to reflect the deficiency balance (the First Loan and the First Loan Note as amended and restated will be referred to as the "Deficiency Note"). The Deficiency Note shall be in the form attached hereto as Exhibit L and made a part hereof. The Deficiency Note will be subject to the interest rate set forth in the Project Development and Gaming Facility Bankroll Loan as of the date of the Deficiency Note. The interest rate will be subject to cumulative annual increases on each anniversary of the date of the Deficiency Note equal to three-quarters of one percent (0.75%) until the outstanding principal amount has been paid in full; provided, however, that at no time will the interest rate of the Deficiency Note exceed seven percent (7.0%). The Deficiency Note may be repaid in full by Suffolk OTB at any time, without premium or penalty and will be amortized in the manner described in Section 7.02.3 of this Agreement, and in any event will be due and repayable to the Manager in full on the Maturity Date.

3.07    Working Capital and Leasehold Improvements Loan. Upon the terms and subject to the conditions set forth in the Working Capital and Leasehold Improvements Loan attached hereto as Exhibit H and made a part hereof (the "Working Capital and Leasehold Improvements Loan") and the associated 2016 Working Capital Loan Note and Project Development and Gaming Facility Bankroll Loan Note attached hereto as Exhibits I and J and made a part hereof, the Manager agrees to advance funds (whether by direct payment by Manager which is then borrowed against the applicable note or by request of Suffolk OTB to draw on the applicable note) and Suffolk OTB will have the right to borrow such funds from the Manager from time to time, as follows: (a) Two Million Five Hundred Thousand Dollars ($2,500,000), to Suffolk OTB for working capital requirements of Suffolk OTB; and (b) up to Thirty Nine Million Dollars ($39,000,000) to pay for leasehold improvements to the Gaming Facility, to finance the costs identified in the Development Budget and to fund the Gaming Facility's bankroll (up to $5,000,000) at the Gaming Facility. Notwithstanding the foregoing, prior to the submission of this Agreement to the Bankruptcy Court any advances under the Working Capital and Leasehold Improvements Loan (and the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note) by the Manger or DNC Gaming pursuant to Section 3.10 below will be at the sole discretion of the Manager. In

the event that the cost of the leasehold improvements (as approved by Manager) plus up to Five Million Dollars ($5,000,000) in Gaming Facility bankroll loans exceed Thirty Nine Million Dollars ($39,000,000), the Manager and Suffolk OTB shall amend the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note solely to provide for an increased loan amount, on the same terms and conditions set forth in the Project Development and Gaming Facility Bankroll Loan Note, which covers the costs of the leasehold improvements approved by Manager with the consent of Suffolk OTB which consent shall not be unreasonably withheld. The Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note will be amortized in the manner described in Section 7.02.3 of this Agreement, and in any event will be due and repayable to the Manager in full on the Maturity Date.

3.07.01 <u>Operating Requirements during term of Working Capital and Leasehold Improvements Loan</u>.

(a)     Suffolk OTB shall provide Manager with an analysis of its actual sources and uses of cash for the year ended December 31, 2015 by month and a projection of its sources and uses of cash, by month, for the year ending December 31, 2016 (the "Operating Plan").

(b)     The Operating Plan for 2016 and for each subsequent calendar year that the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note or the Product Development and Gaming Facility Bankroll Loan Note is outstanding must demonstrate significant improvement and will be subject to review by Manager. Suffolk OTB shall provide a draft annual Operating Plan to Manager at lease sixty (60) days prior to the end of the preceding calendar year, and Manager and Suffolk OTB will meet promptly thereafter to mutually resolve any issues of disagreement raised by such draft Operating Plan for final approval by the Board of Suffolk OTB.

3.08    <u>Intentionally Omitted</u>

3.09    <u>Collateral Security for Working Capital and Leasehold Improvements Loan</u>. As collateral security for repayment of the Working Capital and the Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note, Suffolk OTB will execute and deliver to the Manager a security agreement and financing statements (the "Second Security Agreement") in the form of Exhibit K attached hereto and made a part hereof, which grants to the Manager a blanket security interest in all assets of Suffolk OTB including fixtures, tangible and intangible personal property and real property, including but not limited to dedicated cash flows from the Gaming Facility and racing operations. Other than the liens granted to the Manager by Suffolk OTB pursuant to the Mortgage, the Building Loan Agreement the Security Agreement and the Second Security

Agreement, the Gaming Facility and the personal property associated therewith will not be subject to any mortgage lien, security interest or encumbrance.

3.10    Guarantee of Funding of the Working Capital and Leasehold Improvements Loan. DNC Gaming hereby guarantees the obligation of the Manager to advance the Working Capital and Leasehold Improvements Loan funds subject to all of the terms of this Article III and the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note, and agrees to make such advances from its own funds if the Manager fails to make any advance thereunder within three (3) business days after the Manager has been provided by Suffolk OTB with a written request for an advance.

3.11    Bankruptcy Court Approval of the Loans. The First DMS Agreement and the associated building construction loan was previously approved by the Bankruptcy Court by order dated April 17, 2014. The Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note will be filed with the Bankruptcy Court by Suffolk OTB for informational purposes. Should any party object or otherwise dispute, by filing a motion or pleading in the Bankruptcy Court or any other court (an "Objection"), Suffolk OTB's authority to enter into this Agreement and the loan documents associated herewith; the validity of the transaction or the indebtedness associated therewith, the Manager will have the ability to refuse any further requests for funds, notwithstanding the terms of this Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note, until such time as the Objection is resolved to the Manager's satisfaction.

3.12    Cancellation of Second Loan Note. Upon the execution of this Agreement, the Note dated October 30, 2014 in an amount up to $11,400,000 which has a balance of zero dollars ($0) shall be cancelled and funds shall no longer be available to Suffolk OTB thereunder.

## ARTICLE IV
## DEVELOPMENT AND PRE-OPENING ACTIVITIES

4.01    Preparation of the Project Concept. Promptly following the purchase of the Site, the Manager and the Planning Consultants will prepare draft versions of the following Gaming Facility concept development documents: (i) conceptual site plans and floor plans in which the uses, layouts, amenities and the overall character of the Gaming Facility are considered; (ii) a Development Budget with sources and uses of funds; and (iii) a detailed development schedule and phasing plan which identifies the critical activities and important milestones for all deliverables required to complete each phase of the design and construction work (the "Construction Master Activity Schedule"). This information will be assembled by the Manager into a second draft report (the "Concept Analysis"). All costs associated with the continued retention of the Planning Consultants for the preparation of the Concept Analysis will be paid by the Manager by advancing funds pursuant to the Project Development and Gaming Facility Bankroll Loan Note and shall ultimately be the expense of Suffolk OTB.

4.02    Development of the Gaming Facility.  After acquisition of the Site and subject to obtaining the approval of the Gaming Commission and any other government agency having jurisdiction over the construction of the Gaming Facility, the Manager will undertake the construction and furnishing of the Gaming Facility.  The architecture firm, other design professionals and the construction management firm included among the Planning Consultants will prepare the final designs and plans for the Gaming Facility (the "Design Documents"), and will be responsible for performance of the construction work under the Manager's supervision. Manager will be responsible for the payment of all Development Costs related to the design, development, construction and furnishing of the Gaming Facility, by advancing funds pursuant to the Project Development and Gaming Facility Bankroll Loan Note which shall ultimately be the expense of Suffolk OTB, including without limitation; (i) the purchase and installation of the initial Equipment; and (ii) all costs required to finish the interior of the Gaming Facility and to provide an attractive venue for the customers of the Business (including without limitation, all gaming-related theme designs and decor, signage, interior walls, carpeting, security and surveillance systems, and other interior features required by law or good business practice for the conduct of video lottery gaming).  The parties understand and acknowledge that the general contractor or construction manager retained to perform the work of constructing the Gaming Facility will be required to provide Manager with a payment and performance bond to secure the completion of such work.  All elements of the buildings and other structures and all wiring, terminals, and other improvements made or installed in connection with the construction and furnishing of the Gaming Facility and all other elements of the Gaming Facility will be the sole property of DNC Gaming. All Equipment will be the property of Suffolk OTB.  Detailed, written status reports will be prepared by the Manager and distributed to all parties on a regular basis, and in any event no less frequently than twice per month.

4.03    Development Support to be Provided by the Manager.  The Manager will provide the following services to Suffolk OTB in connection with the design, development, construction and furnishing of the Gaming Facility in a manner consistent with the Manager Standards:

4.03.1  Development Budget.  As noted above, the Manager will prepare a budget reflecting the total anticipated cost of developing the Gaming Facility (the "Development Budget"), including all construction costs, "soft" costs (such as legal, accounting, architectural, engineering, theme creation, and other pre-construction expenses), costs of acquiring the Equipment and otherwise furnishing and equipping the Gaming Facility, initial inventories, pre-opening expenses, and a projection of working capital requirements.  Without limiting the generality of the foregoing, the Manager will prepare budgets for the purchase of the Equipment and inventories of salable or consumable items and supplies for the Business, will make available the Manager's personnel and contacts for purchasing of such items, will provide Suffolk OTB with the benefit of discounts available to the Manager under national purchasing contracts where possible, and will recommend the firms from which such items may be purchased (to the extent permissible by law).  The Manager will review the Development Budget with Suffolk OTB and will attempt to address any issues or concerns raised by Suffolk OTB with respect to the Development Budget.  Suffolk OTB understands and acknowledges that the Development

Budget will only be an estimate, and that the Manager has not made any representation, warranty or guarantee that the total cost of constructing the Gaming Facility will fall within such budget.

4.03.2  Construction Responsibility of the Manager.  During the construction of the Gaming Facility, the Manager will supervise the performance of the work by the independent construction manager or general contractor retained to build the Gaming Facility, and will pay specific attention to those portions of the Design Documents which, in the reasonable opinion of the Manager, would materially affect its ability to manage the Business, such as (i) the layout of the gaming floor area; (ii) the layout, design and equipping of the kitchens and food service areas; and (iii) the mechanical and electrical systems, the public circulation system (including elevators and escalators), public safety systems, all security systems (including surveillance and security communication systems), the telephone system, the computer hardware other computer systems, and the signage for the Business (including outdoor signs).

4.03.3  Technical Assistance and Support.  In addition to the general assistance and support described in Section 4.03.2 above, during the development and construction of the Gaming Facility, the Manager agrees to:

(a)     Provide the technical personnel required to enable the prompt commencement and prosecution of the services to be provided by the Manager;

(b)     Prepare, review and comment on the schedule for the design, construction and completion of the Gaming Facility and the associated schedule for site inspections;

(c)     Update the Development Budget;

(d)     Attend design meetings with such frequency as is reasonably necessary to advance the development and completion of the Gaming Facility;

(e)     Provide services relating to the development of design and operating criteria for the Gaming Facility;

(f)     Determine layout planning for administrative office and back-of-house areas for incorporation into the Design Documents by the independent design consultants;

(g)     Determine, review reports and studies prepared by the architects and other design consultants engaged in the design of the Gaming Facility;

(h)     Determine, review and make recommendations as to the type, location and extent of all security and surveillance systems being considered for the Gaming Facility;

(i)     Determine and make recommendations as to the type and location of all telephone, paging and other communications equipment being considered for the Gaming Facility;

(j)     Assist the architectural and other design firms in the preparation of specifications, equipment schedules, diagrams, drawings and other data required to solicit proposals from qualified vendors and contractors to furnish and install the Equipment;

(k)     Coordinate with the Gaming Commission with regard to the selection, delivery and installation of the Video Lottery Machines;

(l)     Approve Design Documents at phases of design to be agreed upon in accordance with the overall development schedule;

(m)     Monitor and update the development and construction schedule during execution of the work;

(n)     Conduct a series of general (but not exhaustive) site observations during the construction of the Gaming Facility in accordance with the agreed upon on-site visit schedule;

(o)     Conduct a site observation trip prior to turnover by the general contractor or construction manager to verify compliance of the completed work with the Design Documents;

(p)     Review and comment on those portions of the Development Budget which relate to the layout, decoration and furnishing of the Gaming Facility and the Common Areas; and

(q)     As the agent for Suffolk OTB, implement all purchasing functions related to the Business in order to take advantage of national purchasing programs available to the Manager (to the extent permissible by law).

4.04    Pre-Opening Activities.  At or near the completion of construction of the Gaming Facility, the Manager will provide Suffolk OTB with the following pre-opening services in a manner consistent with the Manager Standards:

4.04.1 Preparation of the Operating Plan.  At least sixty (60) days prior to the Commencement Date, the Manager will present Suffolk OTB with a draft of the Operating Plan for the Business, setting forth in detail the Manager's recommendations as

to the manner in which the Business is to be conducted. The Operating Plan will give full consideration to any business strategies and methods of operation suggested by Suffolk OTB. Within ten (10) business days after providing Suffolk OTB with an initial draft of the Operating Plan, representatives of the Manager and Suffolk OTB will meet to discuss any comments and suggested changes to the Operating Plan made by Suffolk OTB, and the Manager will respond to any questions that Suffolk OTB may have with respect to the Operating Plan. Within ten (10) business days thereafter, the Manager will provide Suffolk OTB with a final version of the Operating Plan which takes into account the comments and concerns of Suffolk OTB, to the fullest extent reasonably possible. Following approval of the Operating Plan by the Manager and Suffolk OTB, the Manager will take all steps necessary to assist Suffolk OTB in implementing the Operating Plan.

4.04.2 <u>Organization, Training, Advertising and Promotion</u>. In order to prepare the Business for full operation, the Manager will also render the following services to Suffolk OTB during the Pre-Opening Period:

(a)     Development of programs to advertise, market and promote the Gaming Facility, and undertake to secure and assist Suffolk OTB in consummating arrangements with third party vendors required to support the Business;

(b)     Recruitment and training of the initial employees of the Business, using such training programs and other training techniques as the Manager deems advisable;

(c)     Preparation of the program for the opening festivities for the Gaming Facility; and

(d)     Development of the Gaming Facility's internal controls and procedures in accordance with the Operating Plan.

4.04.3 <u>Pre-Opening Budget</u>. At least one hundred and twenty (120) days prior to the Commencement Date, the Manager will provide Suffolk OTB with a pre-opening budget (the "Pre-Opening Budget") covering (i) payroll expenses to be incurred with respect to the employees of the Business during the Pre-Opening Period; (ii) the employee training program; (iii) the advertising, marketing and promotion program to be conducted with respect to the Business during the Pre-Opening Period; (iv) the opening festivities; and (v) all other pre-opening costs and expenses that can be reasonably anticipated. Suffolk OTB understands and acknowledges that the Pre-Opening Budget will only be an estimate, and that the Manager has not made any representation, warranty or guarantee that the total amount of such costs that will be incurred in the Pre-Opening Period will fall within such budget. All pre-opening costs and expenses will be borne by Suffolk OTB, and when practicable, will be billed to and paid directly by Suffolk OTB, it being understood that some of such costs and expenses may in the first instance be paid by the Manager, in which case the Manager will be entitled to reimbursement under the Section 4.04.5 and Section 7.02.3.

4.04.4 <u>Pre-Opening Expense Reimbursement</u>. The Manager acknowledges and agrees that its services and assistance to Suffolk OTB during the period before the Commencement Date will be provided in consideration for the Management Fees payable to the Manager after the Commencement Date, and that no separate charge will be assessed by the Manager for such development and pre-opening services. However, the Manager will be reimbursed by Suffolk OTB for the reasonable out-of-pocket expenses incurred by the Manager in rendering such assistance and consultation during the Pre-Opening Period, including without limitation, (i) reasonable out-of-pocket travel and lodging expenses incurred by employees of the Manager and its Affiliates who travel to the Gaming Facility to assist in the design, development and operation of the Business; (ii) other than the expense of retaining the Planning Consultants (whose services will be paid for by the Manager), the expenses incurred in retaining third party professionals and other service providers; and (iii) any of the other costs and expenses for which Suffolk OTB is made responsible by the express language of Section 4.03 or 4.04 of this Agreement.

4.04.5 <u>Repayment of Pre-Opening Budget Costs and Expenses</u>. In the event that Manager incurs charges for Pre-Opening Budget costs or expenses as described in Section 4.04.3 and 4.04.4, such charges and expenses shall bear interest at the rate of 5% and shall be repaid by Suffolk OTB in accordance with this Section 4.04.5 and Section 7.02.3. The payments for any such charges, expenses and interest shall be made in equal monthly installments beginning on the three month anniversary of the Full Facility Opening Date and ending on the two year anniversary of the Commencement Date. Notwithstanding the foregoing, Suffolk OTB may make larger payments or prepay the amount outstanding at any time.

## ARTICLE V
## RESPONSIBILITIES OF THE MANAGER
## AFTER THE COMMENCEMENT DATE

5.01 <u>Duties of the Manager</u>. Suffolk OTB hereby grants to the Manager the sole and exclusive right to manage the day-to-day operations of the Business on behalf of Suffolk OTB during the term of this Agreement. Except as otherwise specified in this Agreement, Suffolk OTB grants to the Manager the full scope of authority necessary to perform its obligations under this Agreement. In connection therewith, the Manager will have the authority and responsibility, subject to the provisions of this Agreement and the rules and regulations of the Gaming Commission, to (i) determine the operating policy, standards of operation, quality of service, maintenance and physical appearance of the Gaming Facility and any other matters affecting the operation and management of the Business; (ii) supervise and direct all phases of advertising, marketing and promotion for the Business, provided that the Manager's directives will be consistent with the advertising and marketing expenditures set forth in the current annual Operating Budget; and (iii) carry out all programs contemplated by the Operating Budget and Capital Renewals Budgets hereafter described in Section 5.05. The Manager shall manage and

operate the Gaming Facility in a manner consistent with the Manager Standards in all respects. The performance of all activities by the Manager pursuant to this Agreement will be on behalf of Suffolk OTB and for its exclusive account and benefit except for the benefits provided to Manager pursuant to this Agreement. Suffolk OTB agrees to reasonably cooperate with the Manager so that the Manager is able to carry out its duties hereunder, including without limitation, any assistance from Suffolk OTB that the Manager might need in connection with the obtaining of all licenses, permits and approvals required for the operation of the Business. The Manager agrees to reasonably cooperate with Suffolk OTB so that the directives of the Manager in exercising the authority described above are consistent with the current annual Operating Budget, and are also consistent with practices in gaming facilities reasonably comparable to the Gaming Facility.

5.02    Specific Responsibilities of the Manager. From and after the Commencement Date, the Manager will use its reasonable best efforts to perform its management and supervisory duties with respect to the Business, including the following specific duties:

(a)    To supervise the employees of Suffolk OTB in the conduct of the day-to-day operations of the Business, including without limitation, supervisions of the collection and deposit of all Gross Revenues received from operation of the Business and the payment of all of the Expenses of the Business;

(b)    To oversee the employees of Suffolk OTB, or third party vendors and service providers, in connection with the general administration, management and operation of the Business, including without limitation, arranging for (i) water, heat, light and other utility services; (ii) recurring services such as trash removal, pest extermination, decorating, gardening, laundry, telephone service, snow removal and any other customary and commercially reasonable contracts or services; (iii) purchases contemplated by this Agreement using reasonable best efforts to obtain provisions in such contracts and purchases which are beneficial to the operation of the Business (it being understood that the Manager will provide Suffolk OTB with the benefit of discounts available to the Manager under national purchasing contracts to the extent permissible by law); (iv) marketing and promotional programs or services; (v) personnel services; (vi) accounting, bookkeeping and cash management services, and (vii) security services; it being understood that the Manager will not contract with any Affiliate of the Manager in order to obtain any of the third party support services described in this Agreement unless the Manager first obtains the written consent of Suffolk OTB;

(c)    To advise and assist Suffolk OTB in the negotiation or termination of contracts, the recovery of possession of property, and to otherwise assist in enforcing all the rights of Suffolk OTB with respect to any contract or dispute related to the Business, and in connection with the prosecution by Suffolk OTB of legal actions against third parties or the determination of when to settle, compromise or release any such actions or suits;

(d)     To supervise the employees of Suffolk OTB in maintaining the Gaming Facility in a good state of repair and condition, and to ensure that ordinary repairs, alterations and improvements to the Gaming Facility are made, including advising Suffolk OTB of the necessity and estimated cost of such maintenance and repairs;

(e)     To recommend and oversee the replacement or substitution of the Equipment and other furnishings located in the Gaming Facility as the same are damaged, destroyed or become obsolete, or as is otherwise necessary to the successful operation of the Business;

(f)     To assist Suffolk OTB in obtaining and maintaining all licenses, permits, and other government authorizations and approvals required for the conduct of the Business;

(g)     To supervise the employees of Suffolk OTB in making all statutory payments required under the Gaming Law that relate to the operation of the Video Lottery Machines;

(h)     To promptly notify Suffolk OTB of any personal injury, property damage or other claim occurring on, or claimed by any party with respect to, the Gaming Facility, and to promptly forward to Suffolk OTB any summons, subpoena or other legal document served upon the Manager relating to actual or alleged potential liability of Suffolk OTB or the Manager (whether or not in connection with the Gaming Facility or the operation of the Business);

(i)     To assist Suffolk OTB in making all reasonable efforts to prevent violations of, and otherwise comply with, the provisions of any Legal Requirements applicable to the use and occupancy of the Gaming Facility or the conduct of the Business;

(j)     To supervise the employees of Suffolk OTB in their performance of all financial reporting functions with respect to the Business and in their maintaining of the licenses, permits, authorizations, approvals and insurance coverages required for the Business or as contemplated by this Agreement; and

(k)     To assist Suffolk OTB in making appropriate security arrangements for the operation of the Business.

5.03    No Liability for Certain Violations. The Manager assumes no liability whatsoever for any acts or omissions of Suffolk OTB. Notwithstanding the foregoing, the Manager will be responsible for all violations of applicable Legal Requirements which arise as a direct result of any act or omission by the Manager or others acting under or through the Manager, and the Manager will indemnify and hold Suffolk OTB harmless from and against any and all claims, fines, costs, fees and expenses arising in respect to any of such matters for which the Manager is responsible.

5.04  Provision of Working Capital.  In the event that the Business incurs a temporary shortfall in cash working capital (an excess of non-cash current assets over current liabilities) due to a delay in cash receipts, the Manager will advance to the Business an amount sufficient to fund the working capital shortfall up to the maximum amount of One Hundred Thousand Dollars ($100,000) which shall bear interest at the rate of 5% (a "Working Capital Advance").  Each Working Capital Advance made by the Manager will be repaid to it in the manner described in Section 7.02.3 of this Agreement.

5.05    Operating Budgets and Capital Renewals Budgets.  The Manager will prepare an Operating Budget and a Capital Renewals Budget covering the prospective operations of the Business for each Operating Year, for review and approval by Suffolk OTB in accordance with the provisions of this Section 5.05.

5.05.1  Preparation of the Budgets.  The Manager will submit to Suffolk OTB, not less than forty-five (45) days in advance of the first Operating Year and by November 15th prior to each subsequent Operating Year, the following forecasts and budgets for such prospective Operating Year:

(a)    A forecast composed of an estimate of profit and loss by month, an estimated cash flow projection by month, and a forecast of the operations of the Business by department (collectively the "Operating Budget"); and

(b)    A budget covering estimated Capital Renewals which indicates in reasonable detail the replacements of, or additions to, the Equipment, major repairs and remodeling to the Gaming Facility, and the nature of other special projects recommended by the Manager (the "Capital Renewals Budget").

5.05.2  Review of the Budgets.  In connection with its annual submission of the Operating Budget and the Capital Renewals Budget, representatives of the Manager will meet with representatives of Suffolk OTB to have an in-depth discussion thereof, including a comparison of such budgets with the previous year's performance of the Business, a discussion of marketing strategies, identification of potential markets, and the proposed expenditures contained in the Capital Renewals Budget.

5.05.3  Approval of the Budgets.  The Operating Budget and the Capital Renewals Budget will be subject to the written approval of Suffolk OTB, it being contemplated that each such Operating Budget and Capital Renewals Budget will be agreed upon by the parties within thirty (30) days after the submission of the same by the Manager to Suffolk OTB.  If Suffolk OTB fails to submit written objections to the Operating Budget and the Capital Renewals Budget to the Manager within such thirty (30) day period of time, then Suffolk OTB will be deemed to have approved the same.  In case of a dispute with regard to any Operating Budget, then pending the resolution of such dispute, the Manager will continue to manage the Business in accordance with the standards set forth herein and

will make expenditures which are contemplated by and consistent with the Operating Budget proposed by the Manager for such Operating Year; provided however, that, the maximum approved amount of such expenditures will be equal to (a) the aggregate of all items set forth in the Operating Budget which are not disputed by Suffolk OTB, plus (b) with respect to all items in the Operating Budget which are disputed or objected to by Suffolk OTB, one hundred and five percent (105%) of the amount allocated to such item(s) in the Operating Budget for the immediately preceding Operating Year.  In case of a dispute with regard to any Capital Renewals Budget, then pending the resolution of such dispute, the Manager will be entitled to make expenditures for Capital Renewals during the then current Operating Year up to the amount to be deposited for such Operating Year in the Capital Renewals Reserve described in Section 5.05.5 below. Suffolk OTB will act reasonably and exercise prudent business judgment in approving or disapproving each portion of the Operating Budget and the Capital Renewals Budget, and will act in a manner that will permit the continued functioning and operation of the Business.

5.05.4  Performance under the Operating Budget.  The Manager will use commercially reasonable efforts to achieve the results set forth in the Operating Budget with respect to any Operating Year; provided however, that Suffolk OTB acknowledges each Operating Budget is a composition of estimates, and therefore, the Manager cannot guarantee or warrant that the actual operation of the Business for any Operating Year will be as set forth in the Operating Budget for such Operating Year.  During each Operating Year, the Manager will also use commercially reasonable efforts to operate the Business within the approved Operating Budget (subject, in the case of any disputed items, to the provisions of Section 5.05.3).  Notwithstanding the foregoing, Suffolk OTB understands and agrees as follows:

(a)     Expenses related to reinvestment in and rewarding of the customers of the Business provided in the Operating Budget for any Operating Year will vary based on the number of patrons served by the Business, and accordingly, to the extent that patronage of the Gaming Facility or the Net Gaming Revenue for any Operating Year exceeds the patronage and revenue projections in the approved Operating Budget for such Operating Year, such approved Operating Budget will be deemed to include corresponding increases in such variable expenses.

(b)     The amount of certain Expenses such as real estate taxes, utilities, insurance premiums, license and permit fees, and charges assessed by lawyers, accountants and other professional advisers or provided for in contracts and leases entered into by Suffolk OTB with parties other than the Manager and its Affiliates are not within the ability of the Manager to control.  All of such uncontrollable Expenses will be paid without regard to the estimated amounts provided with respect thereto in the approved Operating Budget for any Operating Year.

(c)     If any expenditures are required on an emergency basis to avoid damage to the Gaming Facility or injury to persons or property, the Manager may direct the payment of such amounts as may reasonably be required to avoid or mitigate such damage or injury, even if the amounts of such expenditures are not specified in, or are not within the amounts provided for in, the approved Operating Budget for the Operating Year in question. The Manager will notify Suffolk OTB as promptly as reasonably possible of the making any such expenditures.

(d)     If any expenditures are required to comply with any Legal Requirements or to cure or prevent any violation thereof, the Manager may direct the payment of such amounts as may be necessary to comply with such Legal Requirements or to remove or prevent the violation thereof even if the amounts of such expenditures are not specified in, or are not within the amounts provided for in, the approved Operating Budget for the Operating Year in question.

(e)     The Manager will have the right from time to time during each Operating Year to propose modifications to the approved Operating Budget and the Capital Renewals Budget then in effect based on actual operations during the elapsed portion of the Operating Year in question. Any such modification will be based on the judgment of the Manager as to what will transpire during the remainder of such Operating Year, and such modifications will be subject to the approval of Suffolk OTB.

5.05.5  Capital Renewals Reserve. From the Gross Revenues produced by the operation of the Business, or with funds otherwise provided by Suffolk OTB, the Manager will assist Suffolk OTB in the establishment and maintenance of a cash reserve (the "Capital Renewals Reserve") for Capital Renewals. Monthly deposits in an amount reflected in the Capital Renewals Budget approved by Suffolk OTB and the Manager will be made by Suffolk OTB to the Capital Renewals Reserve concurrently with the delivery by the Manager of the Monthly Statements described in Section 7.04 hereof. The Capital Renewals Reserve will be maintained in an interest-bearing account (the "Capital Renewals Account") at a banking institution to be selected by Suffolk OTB, and all amounts held in the Capital Renewals Account will at all times remain the property of Suffolk OTB. Interest earned on the Capital Renewals Reserve will be added to the Capital Renewals Reserve but will not be credited against amounts required to be deposited to the Capital Renewals Account pursuant to this Section 5.05.5. The Capital Renewals Account will be used solely for the purpose of paying for Capital Renewals. Any amounts remaining in the Capital Renewals Account at the end of each Operating Year will be carried forward until fully spent or this Agreement expires or is terminated as provided herein, but such amounts as are carried forward will not be credited against required contributions to the Capital Renewals Reserve for any subsequent Operating Year. Any funds remaining in the Capital Renewals Account at the expiration or termination of this Agreement will be disbursed to Suffolk OTB. It is understood that the

amounts to be reserved for Capital Renewals under this Section 5.05.5 are minimums and do not represent the amounts which may be required in later years to keep the Gaming Facility in the best possible operating condition and, accordingly, the parties recognize that the Capital Renewals Budgets in future years may call for expenditures in excess of the amounts being reserved under this Section 5.05.5.

5.05.6  Compliance with the Capital Renewals Budget.  The Manager will at all times comply with the applicable Capital Renewals Budget for the current Operating Year and will not deviate in any substantial respect therefrom; provided, however, that the Manager will be entitled to reallocate the amount budgeted with respect to any item in such Capital Renewals Budget to another item budgeted therein, so long as the total amount of expenditures authorized in the Capital Renewals Budget is not exceeded. Notwithstanding the foregoing, the Manager will be entitled to make additional expenditures not authorized under the then applicable Capital Renewals Budget in case of emergencies arising out of fire or any other casualty or in order to comply with any applicable Legal Requirements. If the Manager at any time determines that expenditures are required to be made on an emergency basis pursuant to Subsection 5.05.4(c), the Manager may make such expenditures out of the Capital Renewals Reserve. Subject to the availability of sufficient amounts in the Capital Renewals Reserve or funds otherwise provided by Suffolk OTB, the Manager will arrange for the completion of all Capital Renewals approved by Suffolk OTB in the Capital Renewals Budget for the Operating Year to which it applies.  The lack of sufficient monies in the Capital Renewals Reserve will not limit the obligation of Suffolk OTB to make Capital Renewals required to maintain the Gaming Facility in an attractive condition or to provide funds sufficient (in addition to the amounts in the Capital Renewals Reserve) to enable the Manager to complete and pay for all Capital Renewals provided for in an approved Capital Renewals Budget.

## ARTICLE VI
## OTHER OPERATING RIGHTS AND
## RESPONSIBILITIES OF SUFFOLK OTB AND THE MANAGER

6.01    Ownership of the Gaming Facility and the Gross Revenues.  All legal and equitable interest in the Gaming Facility and the improvements made thereto from time to time will belong exclusively to the Manager or one of its Affiliates. Subject to the obligation of Suffolk OTB to pay the Expenses, the principal and interest on the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note and the Management Fees when due as described in Section 7.02.3 of this Agreement and the terms of the Security Agreement and the Second Security Agreement, Suffolk OTB retains the exclusive right to receive and retain all of the Gross Revenues of the Business.

6.02    Authority and Responsibilities of Suffolk OTB and the Manager.  Suffolk OTB and the Manager will have the following authority and responsibilities with respect to the conduct of the Business:

6.02.1  Collection of Gross Revenues.  The Manager, as agent for Suffolk OTB, will collect all of the Gross Revenues realized from the conduct of the Business.

6.02.2  Payment of Amounts Owed to the Gaming Commission and Other Charges.  The Manager, as agent for Suffolk OTB, will (i) collect and remit to the Gaming Commission and other third parties all statutory payments required under the Gaming Law; (ii) promptly pay all Expenses incurred in the operation of the Business; and (iii) pay when due all taxes and other government charges and assessments incurred in connection with the Business, or which pertain to the ownership, use and occupation of the Gaming Facility.

6.02.3  Payment for Capital Renewals.  Suffolk OTB will be responsible for the payment of all Capital Renewals.  Such Capital Renewals, and the depreciation or amortization with respect thereto, will not be considered Expenses for purposes of this Agreement.

6.02.4  Employment of Personnel.  Subject to the prior approval of Suffolk OTB (which approval will not be unreasonably withheld), the Manager will designate and be the employer of the members of the Senior Management Team.  The Manager will perform its day-to-day management, supervision and oversight responsibilities at the Gaming Facility under this Agreement through its designated Senior Management Team.  In the event that Suffolk OTB raises any objection to the conduct or performance of any member of the Senior Management Team, the Manager agrees to replace that manager with a new manager as soon as is reasonably possible (and in any event within 90 days), with such new manager to again be subject to the prior consent of Suffolk OTB (which consent will not be unreasonably withheld).  The members of the Senior Management Team will be placed on the Manager's payroll (with the cost of their employment to be reimbursed to the Manager as an Expense), and all other employees of the Business will be placed on the payroll of Suffolk OTB (with the cost of their employment to likewise be treated as an Expense).  The middle management and staff employees of the Business will be employed by Suffolk OTB and will be supervised and directed in the performance of their day-to-day duties by the Senior Management Team.  Suffolk OTB agrees to implement the reasonable recommendations of the Senior Management Team with respect to the hiring, promotion and discharge of the middle management and staff employees who work in the Business.

6.02.5  Labor Relations.  The Senior Management Team, working in concert with Suffolk OTB, will control and be responsible for all negotiations with any labor union relating to the collective bargaining agreement between Suffolk OTB and its employees in the Business, with the wage and employee benefit cost of such hourly employees to be reflected in the annual Operating Budgets to be agreed upon by the parties.  The Senior Management Team will be responsible for ensuring compliance by the Business with the terms of any collective bargaining agreement that may apply to the employees of the Business.

6.02.6 <u>Marketing and Advertising</u>. Subject to the prior approval of Suffolk OTB (which approval will not be unreasonably withheld), the Senior Management Team will implement the marketing, advertising and promotional programs for the Business developed by the Manager and any third party marketing consultants that may be retained to promote the Business, provided the expenditures for such programs are within the limits contained in the current Operating Budget. The annual Operating Budgets will establish the cost of complimentary items provided to patrons of the Gaming Facility in connection with the promotion of the Business.

6.02.7 <u>Maintenance and Repair</u>. The Senior Management Team will be responsible for the maintenance, repair and upkeep of those portions of the Gaming Facility not covered by the Capital Renewals Budget so that the Gaming Facility is maintained as an attractive venue for video lottery gaming. The Capital Renewals Budget is only contemplated to provide for the maintenance of those portions of the Gaming Facility where the Business will be conducted (and any signage related to the Business), and not for maintenance and repairs required in the Common Areas or elsewhere at the Gaming Facility where the Excluded Business is conducted.

6.02.8 <u>Utility Services</u>. The Senior Management Team will arrange with local utility companies for the delivery and hook-up of electricity, heat, lighting, natural gas, water, sewer, telephone and other utility services required for the operation of the Business. The utility charges in connection with the Excluded Business shall be the sole responsibility of Suffolk OTB and the utility charges in connection with the DNC Retained Business shall be the sole responsibility of Manager. The Parties agree to install separate utility meters if possible and otherwise to equitably apportion utility charges, between the Parties, based on usage utility charges of the Business, the Excluded Business and the DNC Retained Business.

6.02.9 <u>Security</u>. The Senior Management Team will supervise all surveillance systems and security personnel required by any Legal Requirements, or otherwise consistent with good business practices, for the operation of the Business. The cost of surveillance systems which do not relate exclusively to the Business and security personnel not exclusively working for the Business will be allocated between the Business, the Excluded Business and the DNC Retained Business in an equitable manner, and such cost allocation will be set forth in each annual Operating Budget.

6.02.10 <u>Licenses and Permits</u>. Suffolk OTB will apply for, and use its commercially reasonable bests effort to obtain and maintain, all licenses, permits, authorizations and approvals required for the operation of the Business, including without limitation, all licenses, permits, approvals and authorizations required for (i) the conduct of pari-mutuel wagering operations at the Gaming Facility; and (ii) the conduct of video lottery gaming operations at the Gaming Facility. The Manager will provide reasonable assistance to Suffolk OTB in its application for and maintenance of such licenses, permits, authorizations and approvals, to the extent agreed upon by the parties. Suffolk

OTB agrees to execute and deliver any and all applications and other documents and to provide all disclosures of information to governmental agencies as are be reasonably required, and the Manager agrees to cooperate with Suffolk OTB in all reasonable respects in applying for, obtaining and maintaining such licenses, permits, approvals and authorizations, including without limitation, providing information requested by any governmental agency having jurisdiction over the operations of the Business as to the employees, directors or owners of the Manager or any Affiliate of the Manager.

6.02.11  Contracts and Leases. The Senior Management Team will recommend to Suffolk OTB, for its consideration and approval, all contracts for goods or services required by the Business, and any leases for Equipment used in the Business that are not purchased outright and owned by Suffolk OTB (to the extent permissible by law).

6.02.12  Compliance with Building Loan Agreement, Notes, Mortgages, Lease and Security Agreements. Suffolk OTB will use its commercially reasonable best efforts to comply with all applicable covenants and provisions of the First Loan Note, the First Loan, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement and pay when due the principal and interest due as reflected by the terms of this Agreement the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the Mortgage, the New Mortgage, the Lease, the Building Loan Agreement, the Security Agreement, the Second Security Agreement, Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note.

6.02.13  Legal Requirements. The Senior Management Team will assist Suffolk OTB to do, or cause to be done, all such acts and things in and about the Gaming Facility as will be reasonably necessary to comply with all Legal Requirements (including the Gaming Law) and the terms of all insurance policies contemplated in Article IX of this Agreement. The Manager will cooperate with Suffolk OTB in this respect and will notify Suffolk OTB of any violation of such Legal Requirements with respect to which the Manager receives written notice or otherwise obtains actual notice.

6.02.14  Legal Proceedings. Based on the recommendations of the Senior Management Team, Suffolk OTB will institute and diligently pursue any and all legal actions or proceedings to collect revenues, charges, rent or other income derived from the operation of the Business, or to terminate any contract or lease. Suffolk OTB will take appropriate steps to challenge, protest, appeal and litigate to final decision in any appropriate court or forum any action or proposed action in which Suffolk OTB is a party and which would result in the suspension of the Business or would materially and adversely impact the revenues or expenses of the Business.

**ARTICLE VII**
**ACCOUNTING AND CASH MANAGEMENT**

7.01    Bank Accounts.  Suffolk OTB will select a bank or banks (collectively, the "Bank") to receive and maintain the Gross Revenues generated by the operation of the Business. All amounts realized from the conduct of the Business will be deposited at least once daily (or at such other frequency as Suffolk OTB and the Manager will mutually establish) into one or more accounts at the Bank established by Suffolk OTB (the "Bank Accounts").  Payment of all Expenses, Management Fees and other amounts owing to Manager or its Affiliates under Section 7.02.3 will be made by Suffolk OTB from the Bank Accounts by check or wire transfer.

7.02    Collection and Disbursement of Funds.  The funds generated by the operation of the Business will be dealt with as follows:

7.02.1  Deposit of Gross Revenues.  At least once each day (or with such other frequency as Suffolk OTB and the Manager mutually establish), the Manager will arrange for the deposit of all amounts realized from the conduct of the Business into the Bank Accounts established in accordance with Section 7.01.  The Manager will arrange for a bonded transportation service to effectuate the safe transportation of the receipts of the Business to the Bank, and the cost of such transportation service will be an Expense.

7.02.2  Payment of Amounts Owed under the Gaming Law.  The Manager will arrange for the transfer of the amount realized from the operation of the Video Lottery Machines which, after the payment of winnings and prizes to customers, is required to be remitted to the Gaming Commission or any other third party in accordance with the Gaming Law, with such frequency as is set forth in the Gaming Law or in any other Legal Requirements.

7.02.3  Application of Gross Revenues.  The Gross Revenues realized by Suffolk OTB from the conduct of the Business will be applied and paid on a monthly basis as follows:

(a)     First, to the payment of, or provision for, all Expenses incurred or anticipated to be incurred in connection with the Business;

(b)     Second, to the payment of a distribution to Suffolk OTB in the amount Four Million Dollars ($4,000,000) during the first twelve months following the Full Facility Opening Date, and in the amount of Six Million Dollars ($6,000,000) during each subsequent twelve month period thereafter, which will be payable in equal monthly installments within twenty (20) days after the end of the month (the "Minimum Annual Distribution");

(c)     Intentionally Omitted.

34

(d)     Fourth, to the payment of the monthly Management Fee described in Section 8.01 of this Agreement;

(e)     Fifth, beginning on the three month anniversary of the Full Facility Opening Date, to the reimbursement to the Manager of any pre-opening costs or expenses made by it pursuant to Section 4.04.3 or Section 4.04.4;

(f)     Sixth, to the reimbursement to the Manager of any Working Capital Advances made by it pursuant to Section 5.04 of this Agreement;

(g)     Seventh, to the reimbursement to DNC Gaming of any payments of the Minimum Annual Distribution made by it pursuant to the payment guarantee in Section 7.03 of this Agreement; provided however, that DNC Gaming will not be reimbursed for any payment of the Minimum Annual Distribution made by it which has been outstanding for a period of more than twelve (12) months;

(h)     Eighth, to the monthly payment of any accrued and unpaid interest with respect to the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Note, and the Project Development and Gaming Facility Bankroll Loan Note as described in the terms of such loans and notes;

(i)     Ninth, to the funding of the Capital Renewals Reserve to the extent required in Section 5.05.5 of this Agreement;

(j)     Thereafter, any remaining amount of Gross Revenues not required to meet the foregoing Expenses, Minimum Annual Distributions, accrued interest charges with respect to the Loan, Management Fees and Capital Renewals Reserve payments (such remaining amount being hereafter referred to as the "Residual Cash Flow") will be applied on a monthly basis in the following manner:

    (i)     During the first twenty-four (24) months following the Commencement Date, seventy percent (70%) of the Residual Cash Flow will be applied in the following order: (1) to repayment of the principal amount of the First Loan, the First Loan Note and the Deficiency Note (if same has been executed) until the First Loan and Deficiency Note have been fully repaid; and if the entire principal amount of the First Loan, the First Loan Note and the Deficiency Note has been fully repaid; then (2) to repayment of the principal amount of the Working Capital and Leasehold Improvements Loan evidenced by the 2016 Working Capital Loan Note until such amount has been fully repaid; and if the entire principal amount of the Working Capital and Leasehold

Improvements Loan evidenced by the 2016 Working Capital Loan Note has been repaid; then (3) to repayment of the principal amount of the Working Capital and Leasehold Improvements Loan evidenced by the Project Development and Gaming Facility Bankroll Loan Note until such amount has been fully repaid; and

(ii)     Commencing with the twenty-fifth (25th) month after the Commencement Date, seventy-five percent (75%) of the Residual Cash Flow will be applied in the following order: (1) to repayment of the principal amount of the First Loan, the First Loan Note and the Deficiency Note (if same has been executed) until the First Loan and Deficiency Note have been fully repaid; and if the entire principal amount of the First Loan, the First Loan Note and the Deficiency Note has been fully repaid; then (2) to repayment of the principal amount of the Working Capital and Leasehold Improvements Loan evidenced by the 2016 Working Capital Loan Note until such amount has been fully repaid; and if the entire principal amount of the Working Capital and Leasehold Improvements Loan evidenced by the 2016 Working Capital Loan Note has been repaid; then (3) to repayment of the principal amount of the Working Capital and Leasehold Improvements Loan evidenced by the Project Development and Gaming Facility Bankroll Loan Note until such amount has been fully repaid; and

(iii)    After repayment in full of the principal amount of the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and the Leasehold Improvements Loan as evidenced by the 2016 Working Capital Loan Note and the Project Development and Gaming Facility Bankroll Loan Note, one hundred percent (100%) of the Residual Cash Flow will be paid to Suffolk OTB.

In the event that for any month the Gross Revenues are insufficient to fund full payment of the obligations described in subsections (c), (d), (e), (f), (g), (h) and (i) above, the accrued but unpaid portion of those obligations will be carried forward on a month-by-month basis (and in the same priority of payment as set forth above) until the Gross Revenues are sufficient to fund the full payment of both the current amounts described in subsections (a) and (b) above and the accrued obligations described in subsections (c), (d), (e), (f), (g), (h) and (i); subject however, with respect to subsection (g), to the twelve-month accrual limitation period provided for therein.

7.03    Guarantee of the Minimum Annual Distribution.  In the event that the Gross Revenues realized by Suffolk OTB from the conduct of the Business are insufficient to provide for payment of the full amount of any Minimum Annual Distribution provided in Section 7.02.3(b) above, DNC Gaming guarantees payment of any such deficiency in the Minimum

Annual Distribution, subject to all of the terms of this Article VII, and agrees to advance such deficiency from its own funds within three (3) business days after the Manager has been provided by Suffolk OTB with a written request for an advance.

7.04    Financial Statements.  The Manager will prepare income and expense statements on a monthly basis which reflect the results of operation of the Business, supplemented by (i) a statement reflecting the Gross Gaming Revenue and EBITDAM of the Business; and (ii) a calculation of the Management Fee to which the Manager is entitled for such month (the "Monthly Statements").  Each Monthly Statement will be provided to Suffolk OTB by the Manager on or before the twentieth (20th) day following the end of the month to which such Monthly Statement relates.  If the Gaming Commission requires monthly reports, then the Monthly Statements will be in the same format as is prescribed by the Gaming Commission, provided such format discloses information sufficient to allow computation of the Management Fee.  In addition, Suffolk OTB will direct its firm of independent certified public accountants to provide Suffolk OTB and the Manager with audited financial statements of the financial condition and results of operation of the Business within ninety (90) days after the close of each Operating Year (the "Audited Statements").  The Audited Statements will include balance sheets, income and expense statements setting forth in reasonable detail all Gross Gaming Revenue, Net Gaming Revenue, Gross Revenue and Expenses, statements of changes in cash position, footnote disclosures as appropriate, a computation of EBITDAM, a computation of the Management Fees payable to the Manager for the Operating Year, and any other schedules as may be required in connection with proper auditing and financial reporting requirements.  After the first full year of operations, the Monthly Statements will be prepared to reflect comparative results with the same month of the prior year, and the Audited Statements will include and compare results with the prior Operating Year.

7.05    Books of Account.  The Manager will maintain accurate books and records which reflect the financial activity of the Business in conformity with generally accepted accounting principles consistently applied, with such books and records to be maintained on a financial reporting system selected by the Manager for use in connection with the conduct of the Business. The books of account will reflect the detailed day-to-day operations of the Business and will utilize accounting systems and procedures which, at a minimum, (i) include a system of internal accounting controls; (ii) permit the preparation of financial statements in accordance with generally accepted accounting principles; (iii) are susceptible to audit; and (iv) permit the calculation and payment of Management Fees and expense reimbursements to the Manager in accordance with the terms of this Agreement.  Such books of account will be maintained at the Gaming Facility and will be retained for a minimum period of seven (7) years, and duly authorized representatives of Suffolk OTB will have unrestricted access to the records of the daily operations of the Business and the right to inspect, examine and copy all such books and supporting business records.  Suffolk OTB will also have the right, at its sole cost and expense, to perform such special or independent audits of all financial records relating to the Business as it determines to be appropriate.

## ARTICLE VIII
## MANAGEMENT FEES AND
## REIMBURSEMENT OF EXPENSES

8.01    <u>Management Fees</u>. In consideration for the management services to be provided by the Manager pursuant to this Agreement, Suffolk OTB will pay a Management Fee to the Manager as follows:

(a)    During the period prior to installation and operation of 950-1,000 Video Lottery Machines authorized for the Gaming Facility, the Management Fee shall be equal to the sum of (i) one and three-quarters percent (1.75%) of the Net Gaming Revenue produced by the Video Lottery Machines; plus (ii) five percent (5%) of the EBITDAM realized by the Business.

(b)    Beginning on the date that 950-1,000 Video Lottery Machines are in operation at the Gamily Facility, the Management Fee shall be equal to the sum of (i) two percent (2%) of the Net Gaming Revenue produced by the Video Lottery Machines; plus (ii) five percent (5%) of the EBITDAM realized by the Business.

(c)    If the Net Gaming Revenue reaches a threshold of One Hundred Fifty One Million Four Hundred Seventy Five Thousand Dollars ($151,475,000.00) during any Operating Year, the Management Fee shall be increased to the sum of (i) Two and one-quarter percent (2.25%) of the Net Gaming Revenue produced by the Video Lottery Machines; plus (ii) five percent (5%) of the EBITDAM realized by the Business; effective as of the date that the Net Gaming Revenue reaches such threshold forward.

(d)    If the Net Gaming Revenue reaches a threshold of One Hundred Sixty Four Million Two Hundred Fifty Thousand Dollars ($164,250,000.00) during any Operating Year, the Management Fee shall be increased to the sum of (i) Two and one-half percent (2.50%) of the Net Gaming Revenue produced by the Video Lottery Machines; plus (ii) five percent (5%) of the EBITDAM realized by the Business; effective as of the date that the Net Gaming Revenue reaches such threshold forward.

(e)    If, after reaching this threshold in any Operating Year, the Net Gaming Revenue falls below One Hundred Sixty Four Million Two Hundred Fifty Thousand Dollars ($164,250,000.00) in any subsequent Operating Year, the Management Fee will be reset to the sum of (i) Two and one-quarter percent (2.25%) of the Net Gaming Revenue produced by the Video Lottery Machines, plus (ii) 5% of the EBITDAM realized by the Business in the next operating year.

(f)    If, after reaching this threshold in any Operating Year, the Net Gaming

Revenue falls below One Hundred Fifty One Million Four Hundred Seventy Five Thousand Dollars ($151,475,000.00) in any subsequent Operating Year, the Management Fee will be reset to the sum of (i) Two percent (2%) of the Net Gaming Revenue produced by the Video Lottery Machines, plus (ii) 5% of the EBITDAM realized by the Business in the next operating year.

At no time after the full 950-1,000 Video Lottery Machines are placed in operation shall the Management Fee be below Two percent (2%) of the Net Gaming Revenue produced by the Video Lottery Machines, plus (ii) 5% of the EBITDAM realized by the Business.

8.02    Payment of Management Fees.  Management Fees will not accrue or be payable with respect to any services provided by the Manager prior to the Commencement Date.  The liability of Suffolk OTB to make payment of Management Fees will begin on the Commencement Date.  After the Commencement Date and subject to the provisions of Section 7.02.3 hereof, Management Fees will be payable by Suffolk OTB on or before the twentieth (20th) day following the end of the month to which such Management Fees relate, and will be remitted to the Manager following receipt of the Monthly Statement for such month prepared in accordance with Section 7.04 of this Agreement.  The parties recognize that the monthly computations of the Management Fee may take into account estimates of certain Expenses which may not be finalized until the Audited Statements for the applicable Operating Year have been prepared.  The Management Fee will therefore be subject to reconciliation in the manner provided in Section 8.03 below.

8.03    Annual Reconciliation.  Within ten (10) days after the receipt by Suffolk OTB and the Manager of the Audited Statements for an Operating Year, Suffolk OTB or the Manager, as applicable, will make any adjusting payment required in order to reconcile the amount of Management Fees received by the Manager during the course of the Operating Year with the amount determined to be actually payable to Manager based on the Audited Statements.  To the extent that the Manager has not received the full amount of Management Fees payable by Suffolk OTB for such Operating Year, the accrued amount of such Management Fees will be carried over to the next monthly period and will be payable in accordance with the provisions of Section 7.02.3 of this Agreement.  To the extent that the total Management Fees actually paid by Suffolk OTB during such Operating Year exceed the amount of Management Fees which should have been paid, the Manager will immediately refund to Suffolk OTB such excess amount.

8.04    Reimbursement of Expenses.  Suffolk OTB will reimburse all reasonable out-of-pocket expenses incurred by the Manager in providing the development and management services described in this Agreement, including without limitation, any (i) reasonable out-of-pocket travel and lodging expenses incurred by employees of the Manager and its Affiliates who travel to the Gaming Facility to assist in the operation of the Gaming Facility; (ii) from and after the Commencement Date, the payroll cost of the supervisory, support and training personnel of the Manager and its Affiliates who are based at the Gaming Facility for one week or longer with the prior consent of Suffolk OTB (which consent will not be unreasonably withheld), it being understood that such reimbursement will not apply to any executive and senior management personnel of the Manager and its Affiliates located outside of Suffolk County (even if based at

the Gaming Facility for longer than one week), (iii) expenses incurred in retaining third party professionals and other service providers, subject to the prior approval of Suffolk OTB, and (iv) the salary, benefits and payroll costs of the Manager's on-site general manager and other management team members, subject to the limits provided in the annual Operating Budgets. In no event will Suffolk OTB be required to reimburse the Manager or its Affiliates for any of their normal general and administrative expenses, or any costs associated with their employees who are not based at the Gaming Facility except to the extent expressly described above.

## ARTICLE IX
## INSURANCE

9.01    <u>Insurance Coverage During the Construction Phase</u>.  During the construction of the Gaming Facility, Manager will obtain (at Suffolk OTB's expense), or will cause its contractor to obtain for Manager's benefit, builders risk insurance, on an "all risk" basis (including the risk of collapse) and on a non-reporting form, for the full replacement value covering the interests of Manager and its Affiliates in all work incorporated into the Gaming Facility, all material and equipment on or about the Gaming Facility, and all new construction and remodeling with respect to the Gaming Facility.  All material and equipment in any off-site storage location intended for permanent use in the Gaming Facility, or incident to the construction thereof, will be insured on an "all risk" basis as soon as the same is delivered to such off-site locations.  The cost of the insurance required pursuant to this Section 9.01 will be a Development Cost.  The Manager is responsible for insuring any equipment or other property it brings to the Gaming Facility which is not intended to be incorporated into the construction of the Gaming Facility at its cost.

9.02    <u>Insurance Coverage After the Completion of Construction</u>.  The following insurance will be secured and maintained by Suffolk OTB (with the Manager's assistance) at all times after the completion of construction of the Gaming Facility:

(a)    Property insurance provided by an all risk policy form, including coverage for the perils of fire, windstorm, flood, earthquake and other risks covered by extended coverage endorsements on the Gaming Facility and contents in an amount equal to the full replacement value thereof;

(b)    Business interruption insurance provided by an all risk policy form, including business interruption resulting from the perils of fire, windstorm, flood, earthquake and other risks covered by extended coverage endorsements for full recovery of the net profits and continuing expenses of the Business for the entire period of any such business interruption;

(c)    Insurance against loss from accidental damage to, or from the explosion of, boilers, electrical apparatus, air conditioning systems, including refrigeration and heating apparatus, pressure vessels and pressure pipes in an amount equal to the full replacement value of such items;

(d)      Commercial general liability, commercial automobile liability insurance including coverage for owned, non-owned and leased automobiles, garage keepers liability, products and completed operations, contractual liability, and liquor liability in an amount not less than $1,000,000.00 per occurrence in primary coverage and $10,000,000.00 in umbrella coverage, for a total of $11,000,000.00 in liability coverage;

(e)      Comprehensive crime insurance in an amount equal to not less than $5,000,000.00;

(f)      Workers' compensation providing statutory benefits and employers' liability insurance in an amount not less than $1,000,000.00 each accident, $1,000,000.00 each disease policy limit and $1,000,000.00 each disease - each employee; and

(g)      Employment practices liability insurance in the amount of $1,000,000.00 per claim.

9.03    Responsibility to Maintain Insurance.  From and after the Commencement Date, Suffolk OTB will procure and maintain the insurance policies described in Section 9.02 above, and the cost of such insurance will be treated as an Expense for purposes of this Agreement.

9.04    General Requirements.  All policies of insurance will be written on an "occurrence" basis, if possible, and if any policy is written on a "claims made" basis, then such policy must, if possible, be continued in effect for a three (3) year period following the expiration or early termination of this Agreement.

9.05    Policies and Endorsements.  The following provisions will apply to the policies of insurance to be maintained during the term of this Agreement:

9.05.1  Policies.  All insurance provided for under Section 9.02 will be affected by policies issued by insurance companies of good reputation and of sound and adequate financial responsibility.  Suffolk OTB will deliver to the Manager certificates of insurance with respect to all of the policies of insurance so procured, including existing, additional and renewal policies, and in the case of insurance about to expire, will deliver certificates of insurance with respect to the renewal policies to the other party not less than thirty (30) days after the respective dates of expiration.

9.05.2  Endorsements.  All policies of insurance provided for under this Article IX will provide that (a) such policy will not be canceled or materially changed without at least thirty (30) days prior written notice to Suffolk OTB and the Manager, and (b) no act or omission of Suffolk OTB or the Manager (or any of its Affiliates) will affect the obligation of the insurer to pay the full amount of any loss sustained.  All insurance policies procured pursuant to Section 9.02 will also contain an endorsement to the effect

41

that such insurance is primary to any similar insurance maintained by the Manager or its Affiliates.

9.05.3 <u>Named Insureds</u>. All policies of insurance required under clauses (a) through (g) of Section 9.02 (excluding clause (f), which will be carried in the name of Suffolk OTB only) will indicate that Suffolk OTB and the Manager (and any Affiliate of Manager who owns the Site) are the named insureds. Losses thereunder will be payable to the parties as their respective interests may appear. All insurance policies required in clauses (a) through (g) (but excluding clause (f)) of Section 9.02 will name the respective Affiliates of Suffolk OTB and the Manager, and the directors, officers, agents and employees of Suffolk OTB, the Manager and each of their Affiliates, as additional insureds.

9.05.4 <u>Evidence of Insurance</u>. As soon as practicable prior to the effective date of the applicable coverages, Suffolk OTB will provide the Manager with binders evidencing that the applicable insurance requirements of this Agreement have been satisfied and, as soon as practicable thereafter, will provide true and complete copies of policies for such insurance. As soon as practicable prior to the expiration date of each such policy, Suffolk OTB will provide the Manager with binders evidencing renewal of existing or acquisition of new coverages. True and complete copies of renewed or new policies or certificates of insurance will be provided by Suffolk OTB to the Manager as soon as practicable after renewed or new coverages become effective.

9.05.5 <u>Waiver of Liability</u>. Neither Suffolk OTB nor the Manager will assert against the other, and each party hereby waives with respect to the other party, or against any other entity or person named as additional insureds on any policies carried under this Article IX, any claims for any losses, damages, liability or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to property arising out of the ownership, development, construction, completion, operation or maintenance of the Gaming Facility, to the extent that the same are covered by the insurance required under this Article IX. Each policy of insurance will contain a specific waiver of subrogation reflecting the terms of this Section 9.05.5, and a provision to the effect that the existence of the preceding waiver will not affect the validity of any such policy or the obligation of the insurer to pay the full amount of any loss sustained.

## ARTICLE X
## TRADE NAMES, CONFIDENTIAL INFORMATION,
## AND NON-SOLICITATION

10.01   Intentionally Omitted

10.02   <u>Trade Names, Trademarks and Service Marks</u>. Prior to the Commencement Date, Suffolk OTB and the Manager will determine the trade names, trademarks and service marks (the "Marks") to be used in connection with the operation of the Business. The Manager will arrange

for the purchase and installation of signage throughout the Gaming Facility which makes use of the Marks, with such signage and its placement to be subject to the consent of Suffolk OTB (which consent will not be unreasonably withheld), and the Marks will be used in connection with the promotion and marketing of the Business. The costs of purchasing and installing such signage and the costs of promoting and marketing the Business will be treated as Expenses for purposes of this Agreement. Ownership of the Marks will, for all purposes, belong exclusively to Suffolk OTB.

10.03   Confidential Information. In the course of the Manager's performance under this Agreement, the Manager will have access to Suffolk OTB's most sensitive and most valuable proprietary information, without regard to form, that is valuable to Suffolk OTB and is not generally known by the public or competitors of Suffolk OTB, including lists (whether or not in writing) of the current or potential customers of the Gaming Facility; lists of and other information about the executives and employees of Suffolk OTB; financial information pertaining to the Business (whether or not in writing) that has not been released to the public by Suffolk OTB; price lists and pricing policies of Suffolk OTB; contracts and contractual relations of Suffolk OTB with its customers and suppliers; future business plans of Suffolk OTB; marketing, credit and customer data generated by the Manager in connection with its duties hereunder; and trade secrets or other information of Suffolk OTB which are not commonly known by or available to the public and which information (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively the "Proprietary Information"). "Proprietary Information" also includes any information or data described above which Suffolk OTB obtains from another party and which Suffolk OTB treats as proprietary or designates as a trade secret or confidential information whether or not owned or developed by Suffolk. However, "Proprietary Information " does not refer to or include, and none of the obligations and restrictions set forth in this Section 10.03 apply to, any information provided to or otherwise now or hereafter possessed by the Manager which (i) was or hereafter becomes generally available to the public other than as a result of the disclosure of such information by the Manager; (ii) was available, or becomes available, to Manager on a non-confidential basis, but only if the source of such information is not bound by a confidentiality agreement with Suffolk OTB, or is not otherwise prohibited from transmitting the information to the Manager by a contractual, legal, fiduciary or other obligation; or (iii) was independently developed by the Manager without reference to the Proprietary Information.

To protect the Proprietary Information, the Manager agrees to hold the Proprietary Information in confidence and to refrain from disclosing the Proprietary Information to any third party other than (i) as required by the Gaming Commission; (ii) as required by any other government agency having jurisdiction over the Business or the use and operation of the Gaming Facility; or (iii) as otherwise expressly required by any Legal Requirements applicable to either party hereto. Except in the performance of its services for Suffolk OTB hereunder, the Manager will not at any time use, disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer the Proprietary Information or any portion thereof. In the event of termination of this Agreement, the Manager will return to Suffolk OTB all of the Proprietary

Information. The Manager will have no right to use, sell, transfer, convey, assign, license, or otherwise benefit from the Proprietary Information, and the Proprietary Information will be Suffolk OTB's sole and exclusive property.

Notwithstanding the foregoing, Suffolk OTB acknowledges that certain gaming and pari-mutuel racing licenses are currently issued to and held by Affiliates of the Manager, and that the Affiliates of the Manager may, in the future, apply for additional gaming licenses. Accordingly, certain Legal Requirements may require the Affiliates of the Manager to disclose private or otherwise confidential information about Suffolk OTB or the operations of the Business. Suffolk OTB hereby consents to such disclosure as long as the same, in each instance, is approved, in advance and in writing, by Suffolk OTB. Suffolk OTB further agrees to refrain from any action which may affect the licenses issued to the Affiliates of the Manager, so long as the same will not unduly interfere with Suffolk OTB's operation of the Business or the Excluded Business at the Gaming Facility.

10.04   Restriction on Employee Solicitation. Each of the parties agrees to refrain from soliciting the employment of, or hiring or otherwise retaining the service of, the employees of the other party hereto or such parties' Affiliates during the term of this Agreement and for a period of twenty-four (24) months after the expiration or termination of this Agreement, without first obtaining the consent of the other party, which consent may be withheld for any reason whatsoever at the sole and absolute discretion of the party from which consent is being sought. Notwithstanding the foregoing, if the Manager has had the unimpeded right to provide the management services specified in this Agreement and to receive the compensation specified herein for the ten-year Initial Term specified in Section 12.01 and any Extension Term to which the Manager is entitled under 12.02 (if applicable), then Suffolk OTB will have the right, exercisable in its sole and absolute discretion and without the Manager's consent, to employ and retain any members of the Senior Management Team effective upon the expiration of the Extension Term (or upon expiration of the Initial Term if there is no Extension Term).

10.05   Access to Information. Subject to any legal restrictions and the requirements of the Gaming Commission, Manager will have access, without charge, to the Gaming Facility player database for general marketing purposes, including, without limitation, the marketing of its affiliated companies.

## ARTICLE XI
## REPRESENTATIVES OF THE PARTIES

11.01   Designation of Representatives. Each of Suffolk OTB and the Manager will designate one representative and one alternate representative to act in the event the primary representative is unavailable or refuses to act within a reasonable time. Such representative will act as the primary contact person of such party during the performance of this Agreement, and will administer such party's obligations under this Agreement. The representatives of Suffolk OTB and the Manager will meet regularly throughout the term of this Agreement, with such frequency as may reasonably be determined by Suffolk OTB and the Manager to be necessary.

## ARTICLE XII
## TERM OF AGREEMENT

12.01    Term of the Agreement.    Subject to earlier termination as provided below, the initial term of this Agreement (the "Initial Term") will commence as of the date of its execution, and will continue until the twentieth (20th) anniversary of the Full Facility Opening Date.

12.02    Extension of the Term.    Provided that the Performance Criteria set forth in Exhibit F of this Agreement are satisfied, the term of this Agreement may be extended by Manager for three (3) additional consecutive periods of ten (10) years each after the expiration of the Initial Term (the "Extension Term"). Not less than twelve (12) months prior to the expiration of the Initial Term or any Extension Term, representatives of Suffolk OTB will meet with representatives of the Manager to attempt to negotiate the Extension Term on conditions mutually acceptable to the parties.    In the event that the parties fail to negotiate such a mutually acceptable extension to the term of this Agreement within three (3) months prior to the expiration of the then current term, then provided that the Manager has achieved the Performance Criteria described in Exhibit F hereto, the Manager will have the right, exercisable by written notice given to Suffolk OTB, to cause the term of this Agreement to continue for an Extension Term; provided however, that (i) the Manager will not be required to pay any additional amount as an Exclusive Rights Payment or to make any additional loan; (ii) the annual Management Fee will be reduced to the sum of one percent (1%) of the Net Gaming Revenue produced by the Video Lottery Machines, plus three percent (3%) of the EBITDAM realized by the Business; (iii) in the event that the Manager exercises its right to extend the term of this Agreement pursuant to this Section 12.02, Suffolk OTB shall per responsible for 100% of the Host Fees which shall be treated as an Expense; (iv) the Lease will automatically extend for as long as this Agreement is extended; and (v) Suffolk OTB will not be required to further extend the term of this Agreement beyond the 3 additional consecutive periods described in this Section 12.02.

12.03    Termination by Suffolk OTB for Cause.    Suffolk OTB may terminate its obligation to retain and pay for the services of the Manager pursuant to this Agreement by written notice to the Manager upon the occurrence of any of the following events ("Events of Default"):

(a)    ·If the Manager fails, in a material manner, `to perform or observe any provision of this Agreement to be performed or observed by the Manager, and further fails to cure such default within fifteen (15) business days after the receipt of written notice of default from Suffolk OTB, which notice will state the nature of the default in reasonable detail. Notwithstanding the foregoing, if the default is of such a nature that it cannot reasonably be cured within such fifteen (15) day period, then the default will be deemed to have been timely cured if the Manager commences a cure within such fifteen (15) days, and thereafter diligently prosecutes such cure and completely cures such default within a reasonable period of time.

(b)    If the Manager files a voluntary petition in bankruptcy, or if there is filed against the Manager any involuntary bankruptcy petition or other insolvency proceeding initiated by the Manager's creditors, which involuntary filing is not dismissed within sixty (60) days after it is filed.

(c)    If any supervisory employee of Manager commits any fraud, malfeasance, gross negligence, material misrepresentation in connection with the operation of the Business, unless within five (5) business days after written notice from Suffolk OTB, the Manager terminates the employment of such supervisory employee at the Gaming Facility and makes Suffolk OTB whole with respect to any direct out-of-pocket loss caused by such employee.

(d)    If any state or federal court or other governmental agency having jurisdiction over the Business or over the Manager (i) suspends or revokes any gaming license held by the Manager; or (ii) orders Suffolk OTB to discontinue the retention of the Manager pursuant to this Agreement; or (iii) advises Suffolk OTB that its authority to operate the Business will be suspended or revoked unless the affiliation between Suffolk OTB and the Manager is terminated.  Suffolk OTB will promptly give the Manager written notice of any order or advisory directive received by Suffolk OTB which compels or recommends the termination of this Agreement, and the Manager will be entitled to contest such action to the fullest extent permitted by law before such termination becomes effective. Notwithstanding the foregoing sentence, Suffolk OTB may suspend performance of the Manager's services hereunder as well as the obligation to pay for such services during the pendency of any such contest, unless the Manager obtains an order from a court of competent jurisdiction staying application of the order or directive of the court or government agency which issued such order or directive.

Should any of the foregoing conditions exist, then Suffolk OTB will have the right to terminate the Manager's employment under this Agreement by written notice to the Manager given at any time following the occurrence of such event and the expiration of any applicable grace period specified above, and this Agreement will terminate upon the date specified therein, which date will be not less than thirty (30) days nor more than seventy-five (75) days after the date of the giving of such final notice of termination unless a court or governmental agency requires earlier termination of the Manager's services in accordance with the provisions of Section 12.03(d) hereof.

12.04  Termination by the Manager for Cause.  The Manager may terminate its obligation to continue to perform its obligations set forth in this Agreement by written notice to Suffolk OTB upon the occurrence of any of the following events ("Events of Default"):

(a)    If Suffolk OTB fails to pay the Management Fees on a monthly basis when due pursuant to Section 7.02.3 hereof, and such failure continues for fifteen (15) days after receipt of notice of default from the Manager.

(b)    If Suffolk OTB fails, in a material manner, to perform or observe any other provision of this Agreement to be performed or observed by Suffolk OTB, and further fails to cure such default within fifteen (15) business days after the receipt of written notice of default from the Manager, which notice will state the nature of the default in reasonable detail.  Notwithstanding the foregoing, if the default is of such a nature that it cannot reasonably be cured within such fifteen (15) day period, then the default will be deemed to have been timely cured if Suffolk OTB commences a cure within such fifteen (15) days, and thereafter diligently prosecutes such cure and completely cures such default within a reasonable period of time.

(c)    Except in connection with the pending Bankruptcy Case, if Suffolk OTB files a voluntary petition in bankruptcy, or if there is filed against Suffolk OTB any involuntary bankruptcy petition or other insolvency proceeding initiated by the creditors of Suffolk OTB, which involuntary filing is not dismissed within sixty (60) days after it is filed.

(d)    If Suffolk OTB defaults under the terms of the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Product Development and Gaming Facility Bankroll Loan Note, the Mortgage, the Building Loan Agreement, the Lease, the New Mortgage and such default is not cured within the time frame contemplated by such document.  For the avoidance of doubt, the default of Suffolk OTB pursuant to the terms of one of the above agreements shall be deemed a default by Suffolk OTB under the terms of all of the Agreements.

(e)    If the Gaming Commission does not approve this Agreement.

(f)    If the Gaming Commission or any governmental entity, town, county, municipality or legislative body having authority over the Gaming Facility or the location of the Site, at any time during the Initial Term or any extension thereof gives notice that the transactions contemplated hereby are not in compliance with such party's requirements, which, if capable of being cured, are not cured within the time frame set forth in the written notice of violation.

(g)    In the event that, during the Initial Term or any Extension of this Agreement, any governmental entity, town, village, county or municipality in which the Site is located does not grant or terminates the special use or other permit that allows the Gaming Facility to operate at the Site at any time.

Should any of the foregoing conditions exist, then the Manager will have the right to terminate this Agreement by written notice to Suffolk OTB given at any time following the occurrence of such event and the expiration of any applicable grace period specified above, and this Agreement will terminate upon the date specified therein, which date will be not less than thirty (30) days nor more than seventy-five (75) days after the date of the giving of such final

notice of termination. In the event that this Agreement is terminated by the Manager pursuant to this Section 12.04, Suffolk OTB will pay the Termination Payment to the Manager in accordance with the provisions of Section 12.05 hereof. In the event of a default by Suffolk OTB pursuant to this Section 12.04(d), which is not cured as provided in the terms of the agreement under which the default occurred, all amounts of principal and interest due and owing by Suffolk OTB to Manager pursuant to the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note and the Product Development and Gaming Facility Bankroll Loan Note shall be immediately due and payable to Manager.

12.05   <u>Effect of Termination and Consequences of a Default</u>.   Upon the termination of this Agreement by either party, the principal amount of the First Loan, the First Loan Note, the Deficiency Note, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note or the Product Development and Gaming Facility Bankroll Loan Note remaining unpaid (together with accrued interest and other amounts payable pursuant to any of the above loans and notes) will be immediately payable to the Manager in full by Suffolk OTB. In addition, no other obligation of either Suffolk OTB or the Manager to pay any amount or perform any duty which became accrued prior to the date of termination will expire or be released as a result of the termination of this Agreement, and such obligation will only be satisfied when the same has been fully paid or performed. In the event of termination of this Agreement by Suffolk OTB pursuant to the provisions of Section 12.03 hereof, Suffolk OTB will have the right to recover all direct out-of-pocket costs incurred by Suffolk OTB as a result of the Manager's Default. In the event of termination of this Agreement by the Manager pursuant to the provisions of Section 12.04 hereof, the Manager will have the right to recover all direct out-of-pocket costs incurred by the Manager as a result of the Default by Suffolk OTB, plus the Termination Payment. Notwithstanding the use of the phrase "termination of this Agreement" any termination will affect only the parties' respective duties of performance after the effective date of termination, and the terms of this Agreement will continue to govern (i) the damages recoverable and other remedies available to an aggrieved party in the event of a Default, and (ii) the respective rights and obligations of the parties as to matters arising prior to the effective date of termination. In the event of termination of this Agreement for any reason, if Suffolk OTB continues to operate the Business at the Site, Suffolk OTB shall be responsible for One Hundred Percent 100% of the Host Fees for all subsequent years and shall reimburse Manager for any Host Fees that Manager is required to pay going forward, provided that if termination occurs after Host Fees have been paid by Manager for the year in which this Agreement is terminated, then Suffolk OTB shall also reimburse Manager for the pro rata portion of the Host Fees for the number of months left in the year of termination of this Agreement.

12.06   <u>Effect of Termination Upon Manager's Default or in the Event of Non-Renewal</u>. In the event that Manager elects not to renew this Agreement or is not entitled to renew this Agreement due to a failure to meet the Performance Standards set forth on Exhibit F attached hereto or if Suffolk OTB terminates this Agreement pursuant to Section 12.03, Suffolk OTB shall have the option to, but shall not be required to continue the then current Lease term (or extend the Lease term as provided therein), provided, however that Suffolk OTB shall manage the Business itself and shall not be entitled to retain the services of a third party manager. In

addition to the rights of Suffolk OTB in the foregoing sentence, under such circumstances, Suffolk OTB may elect to make an offer to Manager to purchase the Site, provided, however, that Manager can decide whether or not to sell the Site to Suffolk OTB in its sole discretion.

12.07  <u>Effect of Termination Upon Suffolk OTB's Default</u>. In the event that Manager terminates this Agreement pursuant to Section 12.04, Manager shall have the option to, but shall not be required to terminate the Lease, provided, however, that if Manager does not terminate the Lease, Suffolk OTB shall manage the Business itself and shall not be entitled to retain the services of a third party manager.

12.08  <u>Extraordinary Events</u>.  Notwithstanding any provision of this Agreement to the contrary, if the failure of Suffolk OTB or the Manager to conform to, keep, perform, fulfill or satisfy any representation, warranty, covenant, undertaking, obligation, standard, test, or condition set forth in this Agreement is caused in whole or in part by one or more Extraordinary Events, then such failure will not constitute an Event of Default or a Default under this Agreement, and such failure will be excused for as long as the failure is caused in whole or in part by such Extraordinary Event.  In order to have any failure by a party be excused pursuant to this Section 12.06, the party claiming that an Extraordinary Event caused such failure must notify the other party within sixty (60) days after the Extraordinary Event first begins to affect performance under or other compliance with the terms of this Agreement.

# ARTICLE XIII
## RESTRICTION ON COMPETITIVE ACTIVITIES

13.01  <u>Restriction on Competitive Activities</u>.  During the term of this Agreement, (i) each of Suffolk OTB, the Manager and DNC Gaming agree to refrain from directly or indirectly, for its own account or as agent, consultant, advisor or shareholder of any corporation or other business entity, or as a member of any firm or otherwise, anywhere within the Counties of Suffolk and Nassau, New York, engage or attempt to engage in any business activity which is the same as, substantially similar to or directly competitive with the Business; and (ii) each of the Manager and DNC Gaming further agree to refrain from directly or indirectly, for its own account or as agent, consultant, advisor or shareholder of any corporation or other business entity, or as a member of any firm or otherwise, anywhere within the Counties of Suffolk and Nassau, New York, engage or attempt to engage in any business activity which is the same as, substantially similar to or directly competitive with Suffolk OTB's pari-mutuel wagering business. Each of Suffolk OTB and the Manager acknowledges and agrees that the foregoing limitations and restrictive covenants are reasonable and properly required for the protection of the business and affairs of Suffolk OTB and the Manager, and in the event any such limitation is found to be unreasonable by a court of competent jurisdiction, each of Suffolk OTB and the Manager agrees and submits to the reduction of either said territorial or time limitation, or both, to such an area or period as the court may determine to be reasonable.

13.02  <u>Equitable Relief</u>. Each of Suffolk OTB and the Manager acknowledges that the other party hereto will suffer damages incapable of ascertainment in the event that the provisions of Section 13.01 are breached and that such other party will be irreparably damaged in the event

that the provisions of Section 13.01 are not enforced. Therefore, should any dispute arise with respect to the breach or threatened breach of Section 13.01 of this Agreement, each of Suffolk OTB and the Manager agrees and consents that, in addition to any and all other remedies available to the party injured by such breach or threatened breach, an injunction, restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach or threatened breach of Section 13.01 of this Agreement. The parties to this Agreement agree not to urge in any such action that an adequate remedy exists at law.

**ARTICLE XIV**
**WARRANTIES, REPRESENTATIONS,**
**AND ADDITIONAL COVENANTS OF THE PARTIES**

14.01    Representations and Warranties of Suffolk OTB.  As an inducement to the Manager to execute this Agreement, Suffolk OTB represents, warrants and covenants to the Manager the truth and accuracy of the matters set forth in this Section 14.01.

(a)    Suffolk OTB is duly organized, validly existing and in good standing under the laws of the State of New York, is duly qualified to conduct business in the State of New York, and has full power, authority and legal right to execute, perform and timely observe all of the provisions of this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement and the agreements and instruments contemplated thereby or delivered pursuant thereto, which are to be performed or observed by Suffolk OTB. The execution, delivery and performance of this Agreement, the First Loan, the First Loan Note, the Deficiency Note the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement and the agreements and instruments contemplated thereby or delivered pursuant thereto by Suffolk OTB have been duly authorized by all necessary action on the part of Suffolk OTB.

(b)    Subject to the satisfaction of the contingencies set forth in Sections 16.19 and 16.20 hereof, this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement and the agreements and instruments contemplated thereby or delivered pursuant thereto constitute valid and binding obligations of Suffolk OTB and do not and will not constitute a breach of or default under any of the organizational and governing documents of Suffolk OTB or the terms, conditions or provisions of any law, order, rule,

regulation, judgment, decree, loan agreement, mortgage, or other agreement or instrument to which Suffolk OTB is a party or by which it or any substantial portion of its assets (including the Gaming Facility) is bound or affected.

(c)     No approval of any third party other than the Gaming Commission (including any ground lessor or the holder of any Mortgage) that has not been obtained prior to the execution of this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement and the agreements and instruments contemplated thereby or delivered pursuant thereto is required in connection with the execution and performance of such agreements, documents and instruments by Suffolk OTB.

(d)     Suffolk OTB will, at its own expense, maintain in full force and effect throughout the term of this Agreement the legal existence of Suffolk OTB and the rights required for it timely to observe and perform all of the terms and conditions of this Agreement.

(e)     Suffolk OTB holds (or will hold prior to the Commencement Date) and will cooperate with the Manager in maintaining from and after the Commencement Date all permits, licenses, authorizations and approvals necessary to the ownership and operation of the Business in accordance with the terms of the Agreement, the Operating Plan and any applicable Legal Requirements.

(f)     There is no litigation or proceeding pending or threatened against Suffolk OTB that seeks to prevent the parties from entering into this Agreement.

(g)     Suffolk OTB is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party which default would individually or in the aggregate have a material adverse effect upon Suffolk OTB's ability to perform its obligations under this Agreement, nor is Suffolk OTB in violation of any terms of any order, writ, judgment, injunction, decree, statute, rule or regulation to which Suffolk OTB is subject which violation would individually or in the aggregate have a material adverse effect upon Suffolk OTB's ability to perform its obligations under this Agreement.

(h)     To the best of its knowledge, Suffolk OTB has complied with and is in compliance in all material respects with all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, judgments, orders and decrees applicable to Suffolk OTB or its assets, business or operations, and there does not exist any valid basis for any claim of default under or violation of any statute law, ordinance, regulation, rule, judgment, order or decree which default or violation

would individually or in the aggregate have a material adverse effect upon Suffolk OTB.

(i)　　No representation or warranty contained herein by or on behalf of Suffolk OTB contains or will contain an untrue statement of material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

14.02　Representations and Warranties of the Manager and DNC Gaming.  As an inducement to Suffolk OTB to execute this Agreement, the Manager and DNC Gaming represent, warrant and covenant to Suffolk OTB the truth and accuracy of the matters set forth in this Section 14.02.

(a)　　The Manager is duly organized, validly existing and in good standing under the laws of the State of New York, is duly qualified to conduct business in the State of New York, and has full power, authority and legal right to execute, perform and timely observe all of the provisions of this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement, and the agreements and instruments contemplated thereby or delivered pursuant thereto, which are to be performed or observed by the Manager.  DNC Gaming is duly organized, validly existing and in good standing under the laws of the State of Delaware, is duly qualified to conduct business in the State of New York, and has full power, authority and legal right to execute, perform and timely observe all of the provisions of this Agreement and the agreements and instruments contemplated thereby or delivered pursuant thereto, which are to be performed or observed by the DNC Gaming.  The execution, delivery and performance of this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement, and the agreements and instruments contemplated thereby or delivered pursuant thereto by the Manager or DNC Gaming, as the case may be, have been duly authorized by all necessary action on the part of the Manager and DNC Gaming.

(b)　　Subject to the satisfaction of the contingencies set forth in Sections 16.19 and 16.20 hereof, this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement, and the

agreements and instruments contemplated thereby or delivered pursuant thereto constitute valid and binding obligations of the Manager and DNC Gaming, as applicable, and do not and will not constitute a breach of or default under any of the organizational and governing documents of the Manager or DNC Gaming or the terms, conditions or provisions of any law, order, rule, regulation, judgment, decree, agreement or instrument to which the Manager or DNC Gaming is a party or by which either of them or any substantial portion of their assets is bound or affected.

(c)     No approval of any third party other than the Gaming Commission that has not been obtained prior to the execution of this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement, and the agreements and instruments contemplated thereby or delivered pursuant thereto is required in connection with the execution and performance of such agreements, documents and instrument by the Manager and DNC Gaming.

(d)     Each of the Manager and DNC Gaming will, at its own expense, maintain in full force and effect throughout the term of this Agreement its legal existence and the rights required for it timely to observe and perform all of the terms and conditions of this Agreement.

(e)     The Manager holds (or will hold prior to the Commencement Date) and will cooperate with Suffolk OTB in maintaining from and after the Commencement Date all permits, licenses, authorizations and approvals necessary to the management of the Business in accordance with the terms of the Agreement, the Operating Plan and any applicable Legal Requirements.

(f)     There is no litigation or proceeding pending or threatened against the Manager or DNC Gaming that seeks to prevent the parties from entering into this Agreement.

(g)     Neither the Manager nor DNC Gaming is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party which default would individually or in the aggregate have a material adverse effect upon the ability of the Manager or DNC Gaming to perform its obligations under this Agreement, nor is the Manager or DNC Gaming in violation of any terms of any order, writ, judgment, injunction, decree, statute, rule or regulation to which the Manager or DNC Gaming is subject which violation would individually or in the aggregate have a material adverse effect upon the ability of the Manager or DNC Gaming to perform its obligations under this Agreement.

(h)    To the best of their knowledge, each of the Manager and DNC Gaming has complied with and is in compliance in all material respects with all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, judgments, orders and decrees applicable to the Manager or DNC Gaming, or their respective assets, businesses or operations, and there does not exist any valid basis for any claim of default under or violation of any statute law, ordinance, regulation, rule, judgment, order or decree which default or violation would individually or in the aggregate have a material adverse effect upon the Manager or DNC Gaming.

(i)    No representation or warranty contained herein by or on behalf of the Manager or DNC Gaming contains or will contain an untrue statement of material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.

14.03    Additional Affirmative Covenants of the Parties. Suffolk OTB and the Manager further covenant and agree as follows:

14.03.1    Compliance with Laws. Each of Suffolk OTB and the Manager agree to comply with all applicable laws, ordinances, orders and regulations, and to deliver to the other party hereto copies of any notices of violations of law, ordinances, orders and regulations, that are issued by any governmental authority having jurisdiction over the construction and ownership of the Gaming Facility and the operation of the Business. Each of Suffolk OTB and the Manager will use its commercially reasonable best efforts to obtain and maintain any necessary licenses, permits, authorizations and approvals required by it for the conduct of the Business in the manner contemplated in this Agreement, and to assist the other party hereto when reasonably requested in obtaining and maintaining any licenses, permits, authorizations and approvals required by such other party. Without limiting the generality of the foregoing, the parties mutually agree to exert commercially reasonable best efforts to obtain from the Gaming Commission all required approvals to this Agreement and Suffolk OTB's retention of the Manager's services pursuant hereto.

14.03.2    Filing of Reports. Each of Suffolk OTB and the Manager will promptly and timely file any and all filings, reports, certificates and applications with governmental agencies which are necessary or appropriate for the parties to operate the Business in the manner contemplated by this Agreement.

14.03.3    Further Assurances. Each of Suffolk OTB and the Manager will execute and deliver from time to time, promptly after any reasonable request therefor made by the other party hereto, any and all instruments, agreements and documents necessary, and will take such other action, as the other party may reasonably deem necessary or desirable to accomplish the purposes and intent of this Agreement. It is the understanding and intention of the parties that operation of the Business will conform to and comply with all applicable gaming statutes in the State of New York. The parties agree to execute such additional amendments or agreements to cause this Agreement and the Note, Mortgage,

the Building Loan Agreement, the Security Agreement, and the agreements and instruments contemplated thereby, to conform to any requirements of New York law as either party may determine to be necessary in order to give effect to the spirit and intent of this Agreement.

14.03.4  Future Acts.  Each of Suffolk OTB and the Manager agrees to refrain from entering into any agreements with any third party which will materially interfere with the performance by either Suffolk OTB or the Manager of its duties specified in this Agreement.  Each of Suffolk OTB and the Manager further agree not to take any other action which will or would be likely to adversely affect (i) the operation of the Business in the manner contemplated by this Agreement, (ii) the ability of Suffolk OTB or the Manager to perform its obligations hereunder, (iii) the rights of Suffolk OTB or the Manager under this Agreement, the First Loan, the First Loan Note, the Deficiency Note, the Mortgage, the Building Loan Agreement, the Security Agreement, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, the Lease, the New Mortgage and the Second Security Agreement.  Suffolk OTB also will defend and maintain its fee title interest to the Gaming Facility.

14.03.5  Notice of Litigation.  Each of Suffolk OTB and the Manager will provide the other party hereto with notice of any pending, threatened or contemplated action, suit or proceeding before or by any court or any federal, state or local governmental authority or agency which may result in any material adverse change in the condition (financial or otherwise), business or prospects of the transactions proposed herein or might materially adversely affect any of the property or assets to be constructed or managed in connection with this Agreement.

14.03.6  Procurement Lobbying.  To the extent this Agreement is a "procurement contract" as defined by State Finance Law Sections 139-j and 139-k, by signing this Agreement the Manager certifies and affirms that all disclosures previously made by the Manager to Suffolk OTB in accordance with State Finance Law Sections 139-j and 139-k were complete, true and accurate.  In the event such certification is found to be intentionally false or intentionally incomplete, Suffolk OTB may terminate this Agreement by providing written notification to the Manager in accordance with the terms of this Agreement.

14.03.7  Non-Discrimination in Services.  To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Manager will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, sexual orientation, age, disability, genetic predisposition or carrier status, or marital status.  Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the

State of New York, the Manager agrees that neither it nor its subcontractors will, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law then, in accordance with Section 239 of the Labor Law, the Manager agrees that neither it nor its subcontractors will by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. The Manager is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 of the Labor Law as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.

14.03.8  No Waiver. It shall not be construed that any failure or forbearance of Suffolk OTB to enforce any provision of this Agreement in any particular instance or instances is a waiver of that provision. Such provision will remain in full force and effect, notwithstanding any such failure or forbearance by Suffolk OTB.

14.03.9  Cooperation on Claims. The Manager and Suffolk OTB will render diligently to each other, without compensation, any and all reasonable cooperation that may be required to defend the other party, its employees and designated representatives against any third party claim, demand or action that may be brought against the other party, or its employees or designated representatives, arising out of or in connection with this Agreement.

## ARTICLE XV
## INDEMNIFICATION

15.01  Indemnification of the Manager. Suffolk OTB will indemnify, defend and hold the Manager harmless from and against any and all claims, demands, actions (including enforcement proceedings initiated by any government agency), penalties, suits and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and disbursements and any other amounts that the Manager is required to pay to third parties in connection with such matters, but excluding consequential damages sustained by the Manager) that the Manager may have alleged against it incur, become responsible for or pay out by reason of, or to the extent caused by, (i) an Event of Default by Suffolk OTB as described in Section 12.04 of this Agreement; (ii) the contamination of or any adverse effects on the environment with respect to the Gaming Facility as the result of an event occurring after the date of this Agreement unless caused by the negligence or intentional act of an employee of the Manager; (iii) the breach by Suffolk OTB of any of its warranties or representations set forth in this Agreement; or (iv) claims arising under contracts or agreements entered into between Suffolk OTB and third parties in accordance with the terms of this Agreement.

15.02   Indemnification of Suffolk OTB.  The Manager will indemnify, defend and hold Suffolk OTB harmless from and against any and all claims, demands, actions (including enforcement proceedings initiated by any government agency), penalties, suits and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and disbursements and any other amounts that Suffolk OTB is required to pay to third parties in connection with such matters, but excluding consequential damages sustained by Suffolk OTB) that Suffolk OTB may have alleged against it, incur, become responsible for or pay out by reason of, or to the extent caused by, (i) the negligence, willful misconduct or deliberate acts of the Manager or its on-site management team; (ii) an Event of Default by the Manager as described in Section 12.03 of this Agreement; (iii) a breach by the Manager of any of its warranties or representations under this Agreement, or (iv) the contamination of or any adverse effects on the environment with respect to the Gaming Facility as the result of an event occurring after the date of this Agreement, to the extent caused by the negligence or intentional act of an employee of the Manager;.

15.03   Indemnified Parties.  The indemnities contained in this Article XV will run to the benefit of the Manager, Suffolk OTB, and their respective Affiliates and the directors, partners, members, managers, officers and employees of the Manager and Suffolk OTB.

15.04   Survival.  The provisions of this Article XV will survive any cancellation, termination or expiration of this Agreement and will remain in full force and effect until such time as the applicable statute of limitation will cut off all demands, claims, actions, damages, losses, liabilities or expenses which are the subject of this Article XV.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.01   Manager as Independent Contractor and Agent for Suffolk OTB.  In the performance of its duties as the manager of the Business, the Manager will act solely as the agent of Suffolk OTB.  Nothing in this Agreement will constitute or be construed to create a partnership, joint venture or joint employer relationship between the Manager and Suffolk OTB, and the Manager will be an independent contractor of Suffolk OTB.

16.02   Preparation of Agreement.  Each of Suffolk OTB and the Manager acknowledges that it received the advice of separate legal counsel in the negotiation of this Agreement, and that the terms of the transactions contemplated by this Agreement are fair and reasonable.  Each of Suffolk OTB and the Manager agrees that no conflict, omission or ambiguity in this Agreement, nor the interpretation of this Agreement, will be construed against either party on the basis that such party was responsible for the drafting of this Agreement.

16.03   Costs and Expenses.  Except as expressly set forth in this Agreement, each party will pay all legal and other costs and expenses incurred by it in negotiating this Agreement and in complying with such party's covenants, agreements and conditions contained herein.

16.04   Survival.  All of the representations and warranties set forth in this Agreement will survive the execution and delivery of this Agreement. The rights and obligations that each

party has upon termination of this Agreement including but not limited to those set forth in Section 12.05 regarding payment of Host Fees by Suffolk OTB after termination shall survive termination of this Agreement, Section 12.06, Section 12.07 and Section 15.04.

16.05    Entire Agreement; No Collateral Representations.  This Agreement, the First Loan, the First Loan Note, the Deficiency Note (if executed), the Lease, the Working Capital and Leasehold Improvements Loan, the 2016 Working Capital Loan Note, The Project Development and Gaming Facility Bankroll Loan Note, The Second Security Agreement and the New Mortgage, the Mortgage, the Building Loan Agreement, the Security Agreement, and the agreements and documents, certificates and instruments referred to therein or executed in connection therewith are the final, complete and exclusive statement of the parties' agreement with respect to the subject matter hereof and supersede any other prior or contemporaneous agreements, memoranda, proposals, commitments, assurances, communications, discussions, promises, representations, understandings, conduct, courses of dealing, or warranties of any kind, whether oral or written (collectively and severally, the "prior agreements").  Any such prior agreements are of no force or effect.  In the event of a conflict between the terms of the First Loan Note and this Agreement, the provisions of this Agreement shall control.

16.06    No Oral Modification or Waiver.  This Agreement may not be varied, supplemented or contradicted by evidence of prior agreements, or by evidence of subsequent oral agreements.  Neither this Agreement nor any of its terms or provisions may be amended, modified, supplemented, augmented, rescinded, discharged or terminated (other than by performance), except by a written instrument signed by all of the parties to this Agreement.  No waiver of any breach or other nonperformance of any term or provision of this Agreement, and no extension of time for performance of any act or obligation, or of any right granted under this Agreement, will be effective and binding unless such waiver or extension will be in a written instrument signed by each party from which such consent or waiver is required.  No written waiver of any breach will be deemed a waiver or relinquishment of any other or further breach.  No forbearance by a party in seeking a remedy for any noncompliance or breach by another party will be deemed to be a waiver by the forbearing party of its rights and remedies with respect to such noncompliance or breach, unless such waiver will be in a written instrument signed by the forbearing party.

16.07    Remedies Cumulative.  The remedies of each party under this Agreement are cumulative and, except as otherwise herein provided, will not exclude any other remedies to which such party may be lawfully entitled.  Without limiting the generality of the foregoing, each of Suffolk OTB and the Manager will have the right to equitable relief, including an injunction, a restraining order or an order of specific performance, to enforce the provisions of this Agreement

16.08    Severability.  If any term or provision of this Agreement or the application thereof to any person or circumstance is, to any extent, be determined to be invalid, illegal or unenforceable under present or future laws, then (a) the performance of the offending term or provision (but only to the extent its application is invalid, illegal or unenforceable) will be excused as if it had never been incorporated into this Agreement, and, in lieu of such excused provision, there will be added a provision as similar in terms and amount to such excused

provision as may be possible and be legal, valid and enforceable; and (b) the remainder of this Agreement will not be affected thereby, and will continue in full force and effect to the fullest legal extent.

16.09    No Third Party Beneficiaries.  Other than the rights and remedies conferred on the Affiliate of Manager which is the Landlord under the Lease or the purchaser of the Site, Nothing contained in this Agreement will confer any rights or remedies on any person or entity other than the parties hereto and their respective successors and assigns, if any; nor will anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement; nor will any provision of this Agreement give any third person any right of subrogation or action over or against any party to this Agreement.

16.10    No Reliance on Prior Representations.  Each of Suffolk OTB and the Manager acknowledges and agrees that there are no oral representations or promises which has induced such party to change its position to its detriment, to partially perform, or to part with value in reliance upon such representation or promise.

16.11    Headings.  The headings used in this Agreement are for convenience of reference only, and will not be used in construing or interpreting the scope or intent of this Agreement or any provision hereof.  References to this Agreement will include all amendments or renewals thereof.

16.12    Applicable Law and Venue.  This Agreement and the rights and remedies of each party arising out of or relating to this Agreement (including, without limitation, equitable remedies) will (with the exception of any applicable federal laws) be solely governed by, interpreted under, and construed and enforced in accordance with the substantive laws of the State of New York without regard to the conflicts of law principles, and Title 11 of the U.S. Code to the extent applicable.  This Agreement was made, and its obligations are to be performed, wholly within the State of New York.  Suffolk OTB and the Manager agree that the New York State Supreme Court in Suffolk County will be the venue for all proceedings brought for the enforcement of this Agreement.

16.13    Waiver of Trial by Jury.  EACH PARTY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION WITH REGARD TO OR ARISING UNDER THIS AGREEMENT.

16.14    Notices.  Unless otherwise specifically provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (collectively, "notices") required or permitted hereunder, will be in writing, and will be given by: (i) personal delivery (which form of notice will be deemed to have been given upon delivery), (ii) by private airborne/overnight delivery service (which forms of notice will be deemed to have been given upon confirmed delivery by the delivery agency), or (iii) by mailing in the United States mail by registered or certified mail, return receipt requested, postage prepaid (which forms of notice will be deemed to have been given upon the third (3rd) day following the date mailed. Notices will be addressed at the addresses first set forth below, or to such other address as the party will have

specified in a writing delivered to the other parties in accordance with this paragraph. Notice to another address will nevertheless constitute effective notice if it is established that such notice was actually received by the party for whom it was intended.

| To Suffolk OTB: | To the Manager or DNC Gaming: |
|---|---|
| Suffolk Regional Off-Track Betting Corporation<br>425 Oser Avenue, Suite 2<br>Hauppauge, New York 11788<br>Attention: President & General Counsel | Delaware North Companies Gaming & Entertainment, Inc.<br>250 Delaware Avenue<br>Buffalo, New York 14202<br>Attention: General Counsel |

16.15    Assignment and Delegation; Successors and Assigns.  The following provisions will govern the assignment by Suffolk OTB or the Manager of its rights, or the delegation by Suffolk OTB or the Manager of its duties, provided for in this Agreement.

16.15.1    General Restriction of Assignment.  Except as provided in this Section 16.15, neither party may assign its rights nor delegate the performance of its obligations under this Agreement.  Any purported assignment or delegation in violation of the terms of this Section will be null and void.

16.15.2    Assignment or Delegation by the Manager.  The Manager acknowledges that it has been selected to act as manager of the Business on account of its specific experience and capabilities, and accordingly, the Manager will not be entitled to delegate performance of its duties and obligations hereunder without the prior written consent of Suffolk OTB, which consent may be withheld by Suffolk OTB in its sole and unfettered discretion.  Notwithstanding the foregoing, (i) the Manager may, so long as it is not then in default, assign and delegate its rights and obligations under this Agreement to any of its Affiliates provided that the Manager guarantees and remains liable for performance of all obligations hereunder notwithstanding such assignment; and (ii) the Manager will have the right to assign or pledge its right to receive Management Fees pursuant to this Agreement.  Any change in the equity ownership of the Manager which results in DNC Gaming or its Affiliates no longer owning at least fifty percent (50%) of the membership equity interests of the Manager or no longer having Control over the Manager will be deemed an assignment for purpose of this Agreement.

16.15.3    Effect of Assignment or Delegation.  Each and every representation, warranty, covenant, condition and provision of this Agreement will be binding upon and will inure to the benefit of such party and its respective successors and permitted assigns, including without limitation any successor (whether direct or indirect, or by merger, consolidation, conversion, purchase of assets, purchase of securities or otherwise).  No assignment or delegation of all or any part of this Agreement will relieve the assignor or delegator of primary and direct responsibility and liability for the performance by such assignor or delegator of its obligations set forth in this Agreement.  In the event of such

an assignment or delegation, the assignor or delegator will be jointly and severally liable with the assignee or delegatee for the performance of such obligations.

16.16  Calculating Time Periods.  When calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day on calculating such period will be excluded.  If the last day of such period is not a business day, the period in question will end on the next business day.

16.17  Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument, binding on all parties hereto.  Any signature page of this Agreement may be detached from any counterpart of this Agreement and reattached to any other counterpart of this Agreement which is identical in all material respects.  Any counterpart that is signed by all parties may be introduced into evidence in any action or proceeding without having to produce or account for the other counterparts.  The existence of this Agreement may also be established by introducing into evidence a number of separately signed counterparts which collectively contain the signatures of all parties, and which are otherwise identical in all material respects.

16.18  Electronically Transmitted Documents.  If a copy or counterpart of this Agreement is originally executed and such copy or counterpart is thereafter transmitted electronically by facsimile or similar device, such facsimile document will for all purposes be treated as if manually signed by the party whose facsimile signature appears.

16.19  Intentionally Omitted

16.20  Gaming Commission Approval.  This Agreement is binding and enforceable on Suffolk OTB and the Manager when executed.  Promptly following the parties' execution and delivery of this Agreement, Suffolk OTB and the Manager will file with the Gaming Commission (i) a complete copy of this Agreement and the Exhibits hereto; (ii) the Design Documents and such other information and documentation as the Gaming Commission requires as a condition to its approval of the design and construction of the Gaming Facility; and (iii) all entity and personal gaming license applications and supporting documentation from Suffolk OTB, the Manager and their respective employees that is required by the Gaming Commission for the grant of licenses to the parties and their employees to engage in the Business.

126492.10

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION

By: _____

Philip C. Nolan, President

DNC GAMING MANAGEMENT IN SUFFOLK, LLC

By: _____

E. Brian Hansberry, President

DELAWARE NORTH COMPANIES GAMING & ENTERTAINMENT, INC.

By: _____

E. Brian Hansberry, President

[Signature page to Amended and Restated Development and Management Services Agreement]