# LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Example of the Calculation of Earnings before Interest, Taxes, Depreciation, Amortization and Management Fees |
| Exhibit B | The Mortgage |
| Exhibit C | The Building Loan Agreement |
| Exhibit D | The First Loan Note |
| Exhibit E | The Security Agreement |
| Exhibit F | The Performance Criteria |
| Exhibit G | The Lease |
| Exhibit H | The Working Capital and Leasehold Improvements Loan |
| Exhibit I | The 2016 Working Capital Loan Note |
| Exhibit J | The Project Development and Gaming Facility Bankroll Loan Note |
| Exhibit K | The Second Security Agreement |
| Exhibit L | The Deficiency Note |
| Exhibit M | The New Mortgage |

## EXHIBIT A

Example of the Calculation of Earnings before Interest, Taxes, Depreciation, Amortization and Management Fees

**Exhibit A**

**Pro Forma Income Statement**
**EBITDAM Calculation**

|  |  | $ |
|---|---|---|
| Net Gaming Revenue |  |  |
| Other Revenues |  |  |
| **Gross Revenues** | A |  |
|  |  |  |
| **Operating Expenses** |  |  |
| New York State share of Net Gaming Revenues (tax) |  |  |
| Purse share of Net Gaming Revenues |  |  |
| Payroll (Including taxes and benefits) |  |  |
| Marketing costs (net of marketing allowance) |  |  |
| Gaming controllable costs and operating expenses |  |  |
| Facilities and maintenance costs |  |  |
| General and administration costs |  |  |
| **Total Expenses** | B | - |
|  |  |  |
| **EBITDAM (1)** | A minus B | - |

(1) EBITDAM represents earnings before interest, income taxes, depreciation, amortization and management fees.

EXHIBIT B

Mortgage

### MORTGAGE
### (Building Loan)

THIS MORTGAGE (this "Mortgage") is made the 30th day of October, 2014, between SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 5 Davids Drive, Hauppauge, New York 11788 (the "Mortgagor"), and DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company having its principal office and place of business located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Mortgagee").

WITNESSETH, to secure the payment of an indebtedness in the principal sum of up to SEVENTY-SIX MILLION FOUR HUNDRED THOUSAND DOLLARS ($76,400,000.00), lawful money of the United States, together with interest thereon, evidenced by, and to be repaid according to, certain notes, secured hereby, made and delivered by the Mortgagor to the Mortgagee and bearing even date herewith (collectively the "Notes"), the Mortgagor hereby mortgages to Mortgagee as continuing and collateral security for the payment of any and all indebtedness, liabilities and obligations now existing or which may hereafter arise by reason of the Notes, this Mortgage or any amendments, renewals, extensions, modifications or substitutions of the Notes or this Mortgage (collectively the "Indebtedness"), the premises described on the attached Exhibit A;

TOGETHER, with all buildings, structures and other improvements now or hereafter erected, constructed or situated upon said premises, and all fixtures and other personal property now or hereafter affixed to, or used in connection with, said premises, and any and all replacements thereof and additions thereto, all of which will be deemed to be and remain and form a part of said premises and are covered by the lien of this Mortgage (said premises, buildings, structures, other improvements, fixtures and equipment and other personal property being collectively referred to in this Mortgage as the "Premises");

TOGETHER with all strips and gores of land adjoining or abutting the Premises;

TOGETHER with all tenements, hereditaments and appurtenances and all the estate and rights of the Mortgagor in and to the Premises;

TOGETHER with all awards heretofore or hereafter made by any federal, state, county, municipal or other governmental authority, or by whomsoever made in any condemnation or eminent domain proceedings whatsoever, to the present or subsequent owners of the Premises or any portion thereof, for the acquisition for public purposes of the Premises or any portion thereof or any interest therein or any use thereof, or for consequential damages on account thereof, including, but not limited to, any award for any change of grade of streets affecting the Premises or any portion thereof and any award for any damage to the Premises or any portion hereof or any interest therein or any use thereof.

THE MORTGAGOR COVENANTS WITH THE MORTGAGEE AS FOLLOWS:

1.     <u>Pay Indebtedness</u>. The Mortgagor will pay the Indebtedness as hereinbefore provided.

2.     <u>Warranty of Title</u>. The Mortgagor represents and warrants to the Mortgagee that the Mortgagor has good and marketable title in fee simple absolute to the Premises, free of all mortgages,

liens, security interests, adverse claims or other encumbrances, except for (i) the lien of any mortgage or security interest in the Premises given by the Mortgagor to the Mortgagee, and (ii) any encumbrances, tax assessment or other charge or lien which the Mortgagee agrees may be imposed upon the Premises.

3.      Insurance. The Mortgagor will comply with the insurance requirements set forth in that certain Development and Management Services Agreement among the Mortgagor, the Mortgagee and Delaware North Companies Gaming & Entertainment, Inc. dated March 7, 2014, as amended and supplemented by a Letter Agreement between the Mortgagor and the Mortgagee dated October 9, 2014 (collectively, the "Development and Management Services Agreement"). The Mortgagor hereby assigns and will deliver to the Mortgagee each policy pursuant to which any such insurance is provided. The acceptance by the Mortgagee of such policies from the Mortgagor will not be deemed or construed as an approval by the Mortgagee of the form, sufficiency or amount of such insurance. The Mortgagee does not in any way represent that such insurance, whether in scope or coverage or limits of coverage, is adequate or sufficient to protect the business or interest of the Mortgagor. In the event of the foreclosure of this Mortgage, or a transfer of title to the Premises in extinguishment of the Indebtedness, all right, title and interest of the Mortgagor in and to any such policies then in force will pass to the purchaser or grantee of the Premises. The proceeds of any such insurance shall be held by or on behalf of the Mortgagee and, provided no Event of Default has occurred and is continuing, shall be disbursed to the Mortgagor to be used for restoration of the Premises; provided that if an Event of Default has occurred and is continuing, the Mortgagee may retain and apply the proceeds of any such insurance in satisfaction or reduction of the Indebtedness, whether or not then due and payable, or for any other purpose satisfactory to the Mortgagee, without affecting the lien of this Mortgage for the full amount of the Indebtedness before the making of such payment.

4.      Alterations, Demolition or Removal. Except to the extent permitted in that certain Building Loan Agreement between the Mortgagee and the Mortgagor (which is more particularly described in Section 33 below), no building, structure, other improvement, fixture or equipment or other personal property constituting any portion of the Premises will be removed, demolished or substantially altered without the prior written consent of the Mortgagee, which consent will not be unreasonably withheld, conditioned or delayed.

5.      Waste and Change in Use. The Mortgagor will not commit any waste on the Premises or make any change in the use of the Premises which may in any way materially increase any ordinary fire, environmental or other risk arising out of its construction or operation.

6.      Maintenance, Repairs, and Casualty Losses. The Mortgagor will keep and maintain all buildings, structures, other improvements, fixtures and equipment and other personal property constituting any portion of the Premises and the sidewalks and curbs abutting the Premises in good order and in a rentable and tenantable condition and state of repair. In the event that the Premises or any portion thereof is damaged or destroyed by fire or any other casualty, the Mortgagor will immediately notify the Mortgagee. Regarding any covered loss, each insurance company is authorized and directed to make payment of such loss directly to the Mortgagee, and such proceeds will be applied in the manner provided in Section 3 above.

7.      Taxes and Assessments. The Mortgagor will pay all taxes, general and special assessments and other governmental impositions with respect to the Premises before the end of any applicable grace period.

8.    Leases.  Pursuant to the provisions of Section 291-f of the New York Real Property Law, the Mortgagor will not (i) enter into, amend, cancel, abridge, terminate, or otherwise modify any lease of the Premises or of any portion thereof; or (ii) accept any prepayment of installments of rent to become due thereunder for more than one month in advance, without the prior written consent of the Mortgagee. The Mortgagor will not make any new lease in place of or any lease renewal or extension of any lease of the Premises or any portion thereof (other than those that the Mortgagor as landlord may be required to grant by the terms of an existing lease) without the prior written consent of the Mortgagee. Upon request by the Mortgagee, the Mortgagor will promptly furnish to the Mortgagee a written statement containing the names and mailing addresses of all lessees of the Premises or of any portion thereof, the terms of their respective leases, the space occupied and the rentals payable thereunder and copies of their respective leases and will cooperate in effecting delivery of notice of this covenant to each affected lessee.

9.    No Transfer.  Without the Mortgagee's prior written consent, the Mortgagor will not sell, convey or transfer the Premises or any portion thereof or any interest therein or contract to do so.

10.    Compliance with Laws.  The Mortgagor represents and warrants to the Mortgagee that (i) the buildings, structures and other improvements now constituting any portion of the Premises or hereinafter constructed are and will be in material compliance with all applicable statutes, regulations and other laws (including, without limitation, all applicable zoning, environmental, building, fire and health codes and ordinances, including without limitation, the Americans With Disabilities Act of 1990, as amended), and all applicable deed restrictions, if any; and (ii) such compliance is based solely upon the Mortgagor's ownership of the Premises and not upon title to or interest in any other property. The Mortgagor will materially comply with (or cause material compliance with) all statutes, regulations and other laws (including all applicable zoning, building, fire and health codes and ordinances, and the Americans With Disabilities Act of 1990, as amended), all other requirements of all government authorities having jurisdiction over or with respect to the Premises or any portion thereof or the use or occupation thereof, and with all applicable deed restrictions, if any; provided, however, that the Mortgagor may postpone such compliance if and so long as the validity or legality of any such requirement or restriction is contested by the Mortgagor, with diligence and in good faith, by appropriate legal proceedings and the Mortgagee is satisfied that such non-compliance will not impair or adversely affect the value of its security.

11.    Lien Law Trust Fund Covenant.  The Mortgagor covenants that it will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund in accordance with Section 13 of the New York Lien Law, to be applied first for the purpose of paying the cost for any improvement to the Premises before using any part of such advances for any other purpose.

12.    Application of Condemnation Awards.  In the event of the condemnation or taking of any portion of the Premises as a result of any exercise of the power of eminent domain, the Mortgagor will immediately notify the Mortgagee. The Mortgagor consents and agrees that the Mortgagee may retain and apply the proceeds of any award by a condemning authority in satisfaction or reduction of the Indebtedness, whether or not then due and payable, or it may pay the same, wholly or in part, to the Mortgagor for the restoration or alteration of the Premises or for any other purpose satisfactory to the Mortgagee, without affecting the lien of this Mortgage for the full amount of the Indebtedness before the making of such payment. In the event of the condemnation or taking by eminent domain of the Premises or any portion thereof, the Mortgagee will not be limited to the interest paid on the award by the condemning authority, but will be entitled to receive out of the award interest on the

Indebtedness in accordance with its terms.

13.     Default.   An "Event of Default" occurs or exists for purposes of this Mortgage if (a) the Mortgagor defaults in the payment when due (subject to any expressly provided grace periods), whether by acceleration or otherwise, of any part of the Indebtedness or any other amount owed under the Note; (b) the Mortgagor defaults in the performance when due of any obligation other than an obligation to pay money, that is now or hereafter owing by the Mortgagor to the Mortgagee, whether under this Mortgage or any other agreement or instrument delivered by the Mortgagor to the Mortgagee, and such default is not remedied within ten (10) days after the Mortgagor's receipt of written notice thereof; (c) the Mortgagor sells, assigns or otherwise transfers or disposes of all or substantially all of the Mortgagor's assets, makes or permits a fraudulent transfer or fraudulent conveyance of any of the Mortgagor's assets, makes any bulk sale, sends any notice of any intended bulk sale, fails to pay, withhold or collect any tax as required by any statute, regulation or other law, has served or filed against the Mortgagor or against any of the Mortgagor's assets any attachment, levy, tax lien, warrant or similar lien, or has entered against the Mortgagor or against any of the Mortgagor's assets any judgment, order or award of any court, agency or other governmental authority or arbitrator, which is not removed by the Mortgagor within sixty (60) days after the Mortgagor's receipt of written notice thereof; (d) the Mortgagor has any receiver, trustee, liquidator, sequestrator or custodian of the Mortgagor or of any of the Mortgagor's assets appointed, makes any assignment for the benefit of creditors, or commences or has commenced against the Mortgagor (unless such case commenced against the Mortgagor is dismissed within sixty (60) days after the Mortgagor's receipt of written notice thereof) any case or other proceeding pursuant to any bankruptcy law or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of, or for the settlement of claims against, the Mortgagor other than the Mortgagor's Chapter 9 bankruptcy reorganization proceeding which is currently pending in the United States Bankruptcy Court for the Eastern District of New York in the case entitled *In re Suffolk Regional Off-Track Betting Corporation, Case No. 1-12-43503-CEC*, filed on May 11, 2012; (e) any representation or warranty made in this Mortgage, or any other representation or warranty heretofore or hereafter made to the Mortgagee by or on behalf of the Mortgagor, proves as of the date of such representation or warranty to have been incorrect or misleading in any material respect; or (f) there occurs any loss, theft, destruction, or any substantial damage to, the Premises not covered by insurance.

14.     Remedies of the Mortgagee following a Default.   Upon the happening of any Event of Default, all of the Indebtedness will, at the option of the Mortgagee, become immediately due and payable, the Mortgagee will have the right to perform any of the duties of the Mortgagor set forth in this Mortgage at the Mortgagor's expense, and the Mortgagee will have the right to foreclose the lien of this Mortgage and to exercise any and all other rights and remedies available to it pursuant to in this Mortgage or under New York law, as the same may from time to time be in effect. All rights and remedies of the Mortgagee pursuant to this Mortgage or otherwise will be cumulative, and no such right or remedy will be exclusive of any other such right or remedy. No single or partial exercise by the Mortgagee of any such right or remedy will preclude any other or further exercise thereof, or any exercise by the Mortgagee of any other right or remedy.

15.     Procedural Requirements.   The Mortgagor waives, without notice, each act and other thing upon which, but for such waiver, any of the Mortgagor's obligations pursuant to this Mortgage or any right or remedy of the Mortgagee Party pursuant to this Mortgage or otherwise would or might be conditioned. Without limiting the generality of the preceding sentence, no such obligation, right or remedy will be conditioned upon, and such waiver will apply to, any demand, presentment or protest, notice of nonpayment, notice of protest, or any other matter.

16.     Assignment of Leases and Rents. The Mortgagor hereby assigns to the Mortgagee all existing and future leases of the Premises or any portion thereof (including, but not limited to, any amendments, renewals, extensions or modifications thereof) and the rents, issues and profits of the Premises including without limitation accounts receivable for the use or occupancy of the Premises (collectively, the "Accounts"), as further security for the payment of the Indebtedness, and the Mortgagor grants to the Mortgagee the right to enter upon and to take possession of the Premises for the purpose of collecting the same and to let the Premises or any portion thereof, and, after payment of each cost and expense (including, but not limited to, each fee and disbursement of counsel to the Mortgagee) incurred by the Mortgagee in such entry and collection, to apply the remainder of the same to the Indebtedness, without affecting its right to maintain any action theretofore instituted, or to bring any action thereafter, to enforce the payment of the Indebtedness. In the event the Mortgagee exercises such rights, it will not thereby be deemed a mortgagee in possession, and it will not in any way be made liable for any act or omission relating to the exercise of such rights. This assignment and grant will continue in effect until the Indebtedness is fully paid. The Mortgagor will not assign such leases, rents, issues or profits or any interest therein or grant any similar rights to any other person without the Mortgagee's prior written consent. Notwithstanding the foregoing, the Mortgagee hereby waives the right to enter upon and to take possession of the Premises for the purposes of collecting said rents, issues and profits, and the Mortgagor will be entitled to collect the same, until the occurrence or existence of any Event of Default, but such right of the Mortgagor will be automatically revoked upon the occurrence or existence of any Event of Default.

17.     Appointment of a Receiver. In addition to any other remedy, upon the occurrence of any Event of Default the Mortgagee, in any action to foreclose this Mortgage, will be entitled to the appointment of a receiver of the rents, issues and profits of the Premises without notice or demand and without regard to the adequacy of any security for the Indebtedness or the solvency or insolvency of any person liable for the payment thereof.

18.     Authorization and Power of Attorney. From and after an Event of Default, the Mortgagee is irrevocably and unconditionally authorized to take, and the Mortgagor irrevocably and unconditionally appoints the Mortgagee as the attorney-in-fact of the Mortgagor, with full power of substitution and of revocation, to take, in the name of such Mortgagor or otherwise and at the sole option of the Mortgagee, each action relating to the Premises or any portion thereof that, subject to this Mortgage, the Mortgagor could take in the same manner, to the same extent and with the same effect as if the Mortgagor were to take such action; provided, however, that the Mortgagee will not have the right pursuant to such authorization or as such attorney-in-fact to sell or otherwise dispose of the Premises or any portion thereof. Such power of attorney is coupled with an interest in favor of the Mortgagee, and will not be terminated or otherwise affected by the liquidation, winding up or dissolution of the Mortgagor.

19.     Non-Judicial Foreclosure. In addition to all other remedies herein and at law or in equity, upon the occurrence of an Event of Default the Mortgagee will have the right to sell the Premises pursuant to Article 14 of the New York Real Property Actions and Proceedings Law, or any successor statute to said Article 14.

20.     Expenses. The Mortgagor will pay to the Mortgagee on demand all reasonable costs and expenses actually incurred by the Mortgagee in connection with the Indebtedness, including without limitation, the costs of performing any obligation of the Mortgagor pursuant to this Mortgage and the costs of collection (including without limitation, reasonable attorneys' fees and

disbursements). Each such cost and expense will constitute part of the Indebtedness and will be secured by this Mortgage, and may be added to the judgment in any suit brought by the Mortgagee against the Mortgagor on this Mortgage.

21.    Estoppel Statement. Upon request by the Mortgagee, the Mortgagor will furnish to the Mortgagee, within fifteen (15) days of the Mortgagee's request, a written statement duly acknowledged of the amount of the Indebtedness and whether any offsets or defenses exist against the Indebtedness.

22.    Right to Inspect and Examine. Upon request by the Mortgagee, the Mortgagor will, upon reasonable notice, permit the Mortgagee and each officer, employee, accountant, attorney and other agent of the Mortgagee to enter and inspect the Premises and to examine, audit, copy and extract each record of the Mortgagor relating to the Premises or any portion thereof.

23.    Covenants to Run with the Land. The covenants contained in this Mortgage will run with the land and bind the Mortgagor, each legal representative, successor and assign of the Mortgagor, and each subsequent owner, encumbrancer, tenant and subtenant of the Premises or any portion thereof, and will inure to the benefit of, and be enforceable by, the Mortgagee and each successor and assign of the Mortgagee.

24.    Term of Mortgage. This Mortgage will remain in effect until the advances secured by this Mortgage and all interest and expenses payable by the Mortgagor pursuant to the terms of the Note have been repaid in full, or until this Mortgage is discharged or terminated by the Mortgagee in writing.

25.    Course of Dealing, Delay and Waiver. No course of dealing or other conduct heretofore pursued, accepted or acquiesced in by the Mortgagee will operate as a waiver of any right or remedy of the Mortgagee under this Mortgage. No delay by the Mortgagee in exercising any such right or remedy will operate as a waiver thereof or of any other right or remedy of the Mortgagee. No waiver by the Mortgagee of any such right or remedy will be effective unless made in a writing duly executed by the Mortgagee and specifically referring to such waiver. No waiver by the Mortgagee on any one occasion of any such right or remedy will operate as a waiver thereof or of any other such right or remedy on any future occasion.

26.    Governing Law. This Mortgage and the transactions evidenced hereby will be construed under the internal laws of the State of New York.

27.    Notices. All notices, requests, demands, directions and other communications which may or are required to be given, served or sent under this Mortgage or under applicable law will be in writing and will be deemed to have been properly given or sent if (i) mailed by registered or certified mail, with postage prepaid, return receipt requested; or (ii) sent by Federal Express or similar courier service, and addressed to the applicable party at the address stated above, or, as to each party, at such other address as will be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section; or (iii) delivered by personal delivery to an officer of the Mortgagor or Mortgagee. All such notices, requests, demands, directions and other communications will, when mailed in the manner specified in (i) above be effective three (3) business days after being so mailed, when sent in the manner specified in (ii) above be effective one (1) business day after being so sent, and when delivered in the manner specified in (iii) above be effective when delivered..

28.    Severability. Whenever possible, each provision of this Mortgage will be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision is prohibited by or invalid under such law, it will be deemed modified to conform to the minimum requirements of such law, or if for any reason such provision is not deemed so modified, it will be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other provision of this Mortgage being prohibited or invalid.

29.    Waiver of Trial by Jury. THE MORTGAGOR AND THE MORTGAGEE HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE MORTGAGOR OR THE MORTGAGEE MAY HAVE IN ANY ACTION OR PROCEEDING AT LAW OR IN EQUITY IN CONNECTION WITH THIS MORTGAGE OR THE TRANSACTIONS RELATED THERETO.

30.    Entire Agreement. This Mortgage contains the entire understanding and agreement between the Mortgagor and the Mortgagee with respect to the subject matter of this Mortgage, and supersedes each course of conduct heretofore pursued, accepted or acquiesced in, and each oral and written agreement and representation heretofore made, by the Mortgagee with respect thereto, whether or not relied or acted upon. This Mortgage is binding upon the parties hereto and their respective successors and permitted assigns. No variation or modification of this Mortgage will be binding unless it is in writing and is signed by the both the Mortgagor and the Mortgagee.

31.    Property Not Improved by Residential Dwellings. This Mortgage covers property not to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separate cooking facilities.

32.    Amount Secured by this Mortgage. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS MORTGAGE AT THE TIME OF EXECUTION OR WHICH UNDER ANY CONTINGENCY MAY HEREAFTER BECOME SECURED HEREBY AT ANY TIME IS SEVENTY-SIX MILLION FOUR HUNDRED THOUSAND DOLLARS AND NO/100 ($76,400,000.00) PROVIDED THAT SUCH LIMITATION SHALL NOT LIMIT THE SECURITY OF THIS SECURITY INSTRUMENT WITH RESPECT TO (I) INTEREST ON THE AFORESAID MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS, (II) SUMS TO PAY TAXES, (III) SUMS TO PAY PREMIUMS ON INSURANCE POLICIES COVERING THE PROPERTY, (IV) EXPENSES INCURRED AFTER AN EVENT OF DEFAULT IN UPHOLDING OR ENFORCING THE LIEN OF THIS SECURITY INSTRUMENT, INCLUDING, BUT NOT LIMITED TO, THE EXPENSES OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS SECURITY INSTRUMENT, (V) ANY AMOUNT, COSTS OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, AND (VI) ANY OTHER AMOUNT SECURED BY THIS SECURITY INSTRUMENT WHICH, IF NOT LIMITED BY SUCH LIMITATION, WOULD NOT INCREASE THE AMOUNT OF MORTGAGE RECORDING TAXES, IF ANY, PAYABLE WITH RESPECT TO THIS MORTGAGE.

33.    Building Loan Agreement. This is a building loan mortgage, the proceeds of which are loaned for purposes of financing the construction of certain improvements on the Premises. This Mortgage is subject to all of the terms and conditions of a certain Building Loan Contract, dated as of the date hereof, by and between Mortgagor and Mortgagee ("Building Loan Contract"), which

Building Loan Contract and all of the terms and conditions thereof are hereby incorporated herein by reference.

IN WITNESS WHEREOF, this Mortgage has been duly executed by the Mortgagor as of the day and year first above written.

SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION

By _Philip C. Lulea_ PRES.
                                    Title

STATE OF NEW YORK          )
                           )    SS.:
COUNTY OF SUFFOLK          )

On the _30_ day of _October_ , 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared _Philp Nolan_ , known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the _President_ of Suffolk Regional Off-Track Betting Corporation, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

_____
Notary Public MICHAEL HARRISON
Notary Public, State of New York
No. 01HA5025220
Qualified In Suffolk County
Commission Expires March 21, 20 _18_

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PREMISES

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING AT MEDFORD, TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF LONG ISLAND AVENUE DISTANT 290.17 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF LONG ISLAND AVENUE AND THE WESTERLY SIDE OF OREGON AVENUE, SAID POINT ALSO BEING WHERE THE DIVISION LINE BETWEEN THE LANDS HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU INTERSECTS THE NORTHERLY SIDE OF LONG ISLAND AVENUE;

RUNNING THENCE SOUTH 82° 51' 40" WEST ALONG THE NORTHERLY SIDE OF LONG ISLAND AVENUE, 1233.64 FEET TO THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK;

THENCE NORTH 4° 47' 37" WEST ALONG SAID LAST MENTIONED LAND 1359.24 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) SAID POINT ALSO BEING WHERE THE DIVISION LINE OF THE PREMISES HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK, FORMERLY OF JOHN A. BOWNAN INTERSECTS THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST ALONG THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) 154.42 FEET TO THE STATE OF NEW YORK RECHARGE BASIN;

THENCE SOUTH 4° 35' 04" EAST ALONG THE STATE OF NEW YORK RECHARGE BASIN 368.51 FEET;

THENCE NORTH 84° 20' 34" EAST STILL ALONG THE STATE OF NEW YORK RECHARGE BASIN .02 FEET;

THENCE NORTH 84° 21' 15" EAST 241.87 FEET;

THENCE NORTH 7° 55' 35" EAST 308.09 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST 783.30 FEET TO THE LAND NOW OR FORMERLY OF EDWARD BERNACKI, JR.;

THENCE SOUTH 5° 08' 20" EAST PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWARD BERNACKI, JR., PARTIALLY ALONG THE WESTERLY TERMINUS OF ROBINSON AVENUE AND PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU, 1052.74 FEET TO THE NORTHERLY SIDE OF LONG ISLAND AVENUE AT THE POINT OR PLACE OF BEGINNING.

EXCEPTING THEREFROM ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK, STATE OF NEW YORK FOR HIGHWAY PURPOSES, ADJACENT TO THE SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AS SHOWN ON A MAP AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY BOUNDARY OF THE EXISTING SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AT THE INTERSECTION OF THE SAID BOUNDARY

WITH THE DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE WEST AND THE LANDS OF EDWARD BERNACKI, JR., REPUTED OWNER ON THE EAST;

THENCE SOUTH 05° 08' 20" EAST ALONG SAID DIVISION LINE 14.32 FEET TO A POINT;

THENCE NORTH 83° 00' 00" WEST THROUGH THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER, 786.54 FEET TO A POINT ON THE DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE EAST AND THE LANDS OF STATE OF NEW YORK, REPUTED OWNER ON THE WEST;

THENCE NORTH 07° 55' 48" EAST ALONG SAID DIVISION LINE 14.00 FEET TO ITS INTERSECTION WITH THE SOUTHERLY BOUNDARY OF SAID EXISTING ROAD;

THENCE SOUTH 83° 00' 00" EAST ALONG THE LAST MENTIONED SOUTHERLY BOUNDARY 783.30 FEET TO THE POINT OF BEGINNING.

TOGETHER with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

# EXHIBIT C

Building Loan Agreement

## BUILDING LOAN CONTRACT

THIS BUILDING LOAN CONTRACT (this "Agreement") is made the 30th day of October, 2014, between SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 5 Davids Drive, Hauppauge, New York 11788 (the "Borrower"), and DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company having its principal office and place of business located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Lender").

### WITNESSETH:

WHEREAS, the Borrower has applied to the Lender for a loan of up to SIXTY-FIVE MILLION AND 00/100 DOLLARS ($65,000,000.00) (the "First Loan"), and for a supplemental loan (if and to the extent needed) of up to ELEVEN MILLION FOUR HUNDRED THOUSAND DOLLARS ($11,400,000.00) (the "Second Loan"; together with the First Loan, collectively the "Loans"), to fund the Borrower's design, development, construction and furnishing of a new video lottery gaming facility in Suffolk County, New York (the "Gaming Facility"), being new money to be disbursed pursuant hereto, all of which is evidenced by the promissory notes (the "Notes"), the mortgage (the "Mortgage") and the security agreement (the "Security Agreement") of the Borrower, duly executed, acknowledged and delivered to the Lender before the making of any advance, for the payment of said amount or so much thereof as will at any time and from time to time be advanced by the holder of the Notes, the Mortgage and the Security Agreement, with interest upon each amount so advanced from the day when such advance was made to the date of payment, according to the terms of the Notes, the Mortgage and the Security Agreement; and

WHEREAS, the Mortgage and Security Agreement will grant to the Lender a first priority lien against the Borrower's premises described on Schedule A, together with the hereinafter defined Improvement to be made thereon, the appurtenances thereto, all estate and rights of the Borrower in and to said real property, and all fixtures and items of personal property now or hereafter affixed to or located at said real property (the "Premises");

WHEREAS, the Borrower has expressly covenanted and does hereby covenant to erect on the Premises a video lottery gaming facility for the operation of approximately 1,000 terminals according to plans and specifications approved by the Lender and the governmental agencies having jurisdiction with respect thereto (the "Improvement");

NOW, THEREFORE, in consideration of the mutual covenants and commitments herein and in the Notes, the Mortgage and the Security Agreement, and in accordance with the provisions of the Lien Law of the State of New York, it is agreed between the parties as follows:

1.     Construction of the Improvement. The Borrower covenants to construct the Improvement on the Premises in a manner consistent with the terms and conditions of that certain Development and Management Services Agreement between the Borrower, the Lender and Delaware North Companies Gaming & Entertainment, Inc. dated March 7, 2014, as amended and supplemented by a Letter Agreement between the Borrower and the Lender dated October 9, 2014 (collectively, the "Development and Management Services Agreement") and the plans and specifications for the Improvement specified therein (the "Design Documents"). The Design Documents will be subject to the written approval of both the Borrower and the Lender, and no changes or amendments to the

Design Documents will be made without first obtaining the written approval of both the Borrower and the Lender.

       2.      First Priority Lien . The Notes, the Mortgage and the Security Agreement will be duly executed and acknowledged by all persons necessary to grant to the Lender a valid first priority lien on the Premises and the Improvement for the advances to be made by the Lender, free and clear of all other liens, encumbrances and defects except those (if any) to which the Lender has expressly agreed to take subject to or which the Lender may hereafter waive. It is expressly understood and agreed that the buildings, site improvements and every fixture and other item of personal property owned by the Borrower now or hereafter constituting part of the Improvement or otherwise located upon the Premises (but excluding the video lottery terminals owned by the State of New York and the Borrower's personal property used in the Excluded Business which is not affixed to the Premises) will form part of the Premises and the Improvement, and will be covered by and subject to the lien of the Mortgage and the Security Agreement given to secure the advances herein provided for.

       3.      Advances. Advances under this Agreement, which will be secured by the Mortgage and Security Agreement, will be made on the date of the acquisition of the Premises to finance the acquisition thereof, during the construction of the Improvement on a monthly basis, or at such other intervals as the Lender and the Borrower mutually determine, based upon (i) the value of the land, equipment, labor and materials integrated into and forming a part of the Improvement as evidenced by signed and notarized applications for payment executed by the Borrower's general contractor or construction manager and by the Borrower's architect on AIA Form G702, or such other payment certification instrument as may be approved by the Lender; and (ii) costs incurred by architects, engineers and other service providers in connection with the design of the Improvement. Prior to each advance (other than the advance to acquire the Premises), the Lender may require that its inspector verify the status of the work undertaken to complete the Improvement. The Lender may make any advance by drawing a check or otherwise making payment to the order of, in its sole discretion, any of (i) the Borrower; (ii) the Borrower's architect; (iii) the Borrower's general contractor or construction manager; (iv) the other contractors, subcontractors, materialmen and suppliers involved in the design, construction or furnishing of the Improvement, as designated by the Borrower; or (v) any combination of the foregoing. Following the completion of construction of the Improvement and the Lender's receipt of such final as-built drawings, lien waivers, applications for payment, certificates of occupancy and other documentation as the Lender reasonably requests, the Lender and the Borrower will jointly determine (i) the initial amount of working capital required for the Borrower's conduct of its video lottery gaming business at the Premises, and (ii) the cost of obtaining a bond in favor of the New York Gaming Commission to secure the Borrower's performance of its obligations to the Gaming Commission. The Lender will then make an advance under this Agreement to fund any obligations associated with the construction and furnishing of the Improvement, and such working capital and bonding costs, through the date of opening of the Gaming Facility (the "Project Completion Advance"). Thereafter, the Lender will continue to make advances hereunder to fund the payment of invoices for costs contemplated by the Development Budget or the Pre-Opening Budget and such other invoices approved by the Borrower and the Lender for costs associated with the design, construction or furnishing of the Improvement, in each case, which are submitted after the Project Completion Advance. Notwithstanding the foregoing, (i) prior to confirmation of the Borrower's Plan of Adjustment by the United States Bankruptcy Court for the Eastern District of New York (which has jurisdiction over the Borrower in the Chapter 9 bankruptcy reorganization proceeding titled *In re Suffolk Regional Off-Track Betting Corporation*, Case No. 1-12-43503-CEC, filed on May 11, 2012), any advances under this Agreement will be at the sole discretion of the Lender, and (ii) in no event will the sum of the advances under the First Loan for construction,

2

working capital and bonding costs, and the interest with respect to such advances that accrued during the Construction Period (as defined in the Notes), exceed Sixty-Five Million Dollars ($65,000,000.00), and (iii) in no event will the sum of the advances under the Second Loan for construction, working capital and bonding costs, and the interest with respect to such advances that accrued during the Construction Period, exceed Eleven Million Four Hundred Thousand Dollars ($11,400,000.00); provided, however, that in the event that the amount of interest that accrued during the Construction Period is in excess of $2,000,000, the Lender agrees that the maximum permitted amount of the Second Loan shall be increased by the amount of such excess.

4.     Expenses.  The Lender may deduct from any advance to be made by it under this Agreement any amount necessary for the payment of (i) any expenses relating to the examination of the title to the Premises and title search run-downs; (ii) any encumbrance, tax, assessment or other charge or lien upon the Premises existing at any time, whether before or after the making of said advance, unless the Lender has agreed to such encumbrance, tax assessment or other charge or lien; and (iii) any other amounts relating to the costs of the Improvement, and all sums so applied will be deemed advances under this Agreement and will be treated as such for purposes of the Notes, the Mortgage and the Security Agreement.

5.     Lien Law Trust Fund Covenant.  The Borrower covenants that it will receive the advances to be made hereunder, and will hold the right to receive such advances, as a trust fund under Section 13 of the New York Lien Law, to be applied first for the purpose of paying the cost of the Improvement before using any part of such advances for any other purpose.

6.     Conditions to Advances.  The Lender agrees to make the foregoing advances, and the Borrower agrees to take said advances, upon the terms and conditions above set forth and also subject to the following terms and conditions:

(a)     The Borrower, at the time fixed for the delivery of the Notes, the Mortgage and the Security Agreement, will pay the charges and costs for the initial examination of the title to the Premises, title insurance in favor of the Lender, a survey of the Premises, the mortgage tax (if applicable), and all the recording and filing fees with respect to this Agreement, the Mortgage, and the Security Agreement and any associated financing statements.

(b)     Before any advance, the Borrower will bear the expense of having the tax and title searches continued to show that there are no liens or encumbrances against the Premises or the Improvement except for the lien created in favor of the Lender by the Mortgage and the Security Agreement and those liens (if any) which the Lender has expressly agreed to take subject to or which the Lender may hereafter waive.

(c)     Before the final advance hereunder, at the Lender's request, the Borrower will bear the expense of furnishing an as-built survey showing the status of the Improvement made on the Premises as of such date.

(d)     The Borrower will obtain and maintain builders' risk insurance and other insurance coverages on the Premises and the Improvement in such amounts as are specified in the Development and Management Services Agreement.

(e)     The Lender may cause an advance (or any part thereof) to be made directly to a party

retained to provide goods and services for the completion of the Improvement, and may assign this Agreement and the Notes, the Mortgage and the Security Agreement to an affiliate of the Lender, but no such assignment will release the Lender from its obligation to lend the full amount committed if any such assignee defaults in making any advance hereunder.

(f)     The Borrower agrees that the construction of the Improvement will be completed in a good and workmanlike manner and will materially conform to all applicable laws, ordinances, codes, rules, regulations or specifications of any government agency having jurisdiction over the Improvement or the business operations to be conducted by the Borrower upon the Premises, including without limitation, the New York Gaming Commission and the New York Office of General Services.

(g)     The Lender may require three (3) business days notice in writing from the Borrower, accompanied by the supporting documentation referenced above, before an advance is required to be made.

(h)     For construction-related advances, the Lender will have received a completed AIA Form G702 as required by Section 3 above. Notwithstanding the foregoing, the Lender may make a partial advance if the Lender believes it is advisable to do so even if such construction to the date when the advance is requested is not substantially in accordance with the Design Documents, and any such partial advance will be deemed to have been made pursuant to this Agreement but no such partial advance will be deemed an approval or acceptance by the Lender of the work theretofore done.

(i)     If the construction of the Improvement is at any time discontinued or not prosecuted with diligence in the reasonable judgment of the Lender, or if the Borrower breaches any of its obligations under this Agreement, the Notes, the Mortgage, the Security Agreement, or the Development and Management Services Agreement, the Lender may purchase materials and employ workmen to complete and protect the Improvement so that the same will not suffer from deterioration in value. For the purpose of exercising the rights, powers and privileges granted to the Lender in this subparagraph, the Borrower irrevocably constitutes and appoints the Lender as the Borrower's attorney-in-fact, with full power of substitution, to execute and deliver any instruments and perform any acts referred to in this subparagraph in the name of and on behalf of the Borrower. All the sums so expended will be deemed advances to the Borrower, will be secured by the Mortgage and the Security Agreement, and may be applied, at the option of the Lender, to any advances thereafter becoming due.

7.     Default.  The Borrower agrees not to do any act or thing prohibited by the terms of this Agreement, and it is further agreed that in any of the following events (individually, an "Event of Default") all obligations on the part of the Lender to make the Loans, or to make any further advance will, if the Lender so elects, cease and terminate, and the Notes, Mortgage and Security Agreement will, at the option of the Lender, become immediately due and payable (but the Lender may make advances without waiving its right to demand payment of the Notes, Mortgage or Security Agreement or its other remedies or becoming liable to make any further advances):

(a)     If the conditions to lending described in Section 3.05 of the Development and Management Services Agreement are not satisfied, or if any of the defaults specified

in Section 3.06 of the Development and Management Services Agreement has occurred and not been corrected within the cure period specified therein (if such a cure period is specified);

(b)  If the Mortgage does not give to the Lender a first lien on the Premises and the Improvement for the advances made by the Lender pursuant to this Agreement, subject to no other liens, encumbrances and defects except for the lien created in favor of the Lender by the Mortgage and Security Agreement and those liens (if any) to which the Lender has expressly agreed to take subject to or which the Lender may hereafter waive, and the Borrower fails to remedy such condition within thirty (30) days after receipt of written notice from the Lender;

(c)  If the Security Agreement does not give to the Lender a first lien on the fixtures and other item of personal property now or hereafter constituting part of the Improvement or otherwise located upon the Premises for the advances made by the Lender pursuant to this Agreement, subject to no other liens, encumbrances and defects except for the lien created in favor of the Lender by the Mortgage and Security Agreement, and those liens (if any) to which the Lender has expressly agreed to take subject to or which the Lender may hereafter waive, and the Borrower fails to remedy such condition within thirty (30) days after receipt of written notice from the Lender;

(d)  If the Borrower assigns this Agreement, any of advances received by it, or any interest therein, or if the Premises is conveyed or encumbered by any person or business entity other than the Lender without the consent of the Lender;

(e)  If the Borrower fails to comply with any of the covenants or fails to perform any of its obligations set forth in this Agreement or in the Notes, the Mortgage, the Security Agreement, or the Development and Management Services Agreement and such failure or default continues beyond any applicable cure period;

(f)  If any materials, fixtures or items of equipment used in the construction of the Improvement, or otherwise attached to the Improvement, are not purchased so that the ownership thereof will vest in the Borrower free from all encumbrances after their delivery to the Premises, or if the Borrower grants a security interest in any such item (however, this provision does not apply to the video lottery terminals, which will be owned by the State of New York);

(g)  If the Borrower does not construct the Improvement in all material respects in accordance with Design Documents in the form approved by the Lender and the government agencies having jurisdiction with respect thereto, and the Borrower fails to remedy such condition within thirty (30) days after receipt of written notice from the Lender (or if such condition cannot be remedied within thirty (30) days, the Borrower fails to commence its remedy within such thirty (30) day period or thereafter fails to diligently pursue the completion of such remedy);

(h)  If the Borrower does not permit the Lender's representatives to enter upon the Premises for the purpose of inspecting the Improvement at all reasonable times, and the Borrower fails to permit such representatives to access the Premises within ten (10) days of the Borrower's receipt of written notice from the Lender;

(i)     If construction of the Improvement is suspended, discontinued, or not carried on with reasonable diligence, and the Borrower fails to remedy such condition within thirty (30) days of receipt of written notice from the Lender (or if such condition cannot be remedied within thirty (30) days, the Borrower fails to commence its remedy with such thirty (30) day period or thereafter fails to diligently pursue the completion of such remedy);

(j)     If the Borrower fails to comply with any requirement of the governmental agencies having jurisdiction over the construction and furnishing of the Premises within the time period required by the applicable governmental agency, if such failure would have a material adverse effect on the Premises, the Lender's security interest therein, or the Borrower's business conducted (or to be conducted) upon the Premises; or

(k)     If the Borrower does not disclose to the Lender, within ten (10) days after written demand therefor, the names of all persons with whom the Borrower contracted for the construction of the Improvement or the furnishing of materials for the Improvement, or fails to assign, within fifteen (15) days after the Lender's written request, any written contracts for the construction of the Improvement.

8.     Remedies After a Default.  Upon the occurrence of an Event of Default, the Lender may exercise any or all of the following rights and remedies as it desires, in its sole discretion:

(a)     The obligation of the Lender to make advances to the Borrower pursuant to this Agreement will, if Lender so elects, cease and terminate;

(b)     At the option of the Lender, all amounts outstanding under the Notes, including interest and expenses specified in the Notes, will, at the option of the Lender, become immediately due and payable;

(c)     The Lender may decide to make further advances for the construction or preservation of the Improvement without waiving its right to demand payment in full under the Notes or to exercise any other rights or remedies available to the Lender, and without becoming thereafter liable to make any additional advances.

(d)     The Lender may complete the Improvement in accordance with the Design Documents, subject to changes to the Design Documents as the Lender may deem appropriate, and the Lender may take any action to preserve and protect the Improvement at the risk, cost and expense of the Borrower;

(e)     By written notice given to the Borrower after an Event of Default, the Lender may take the Borrower's place and assume the Borrower's rights under its agreements with third parties for the design, construction and furnishing of the Improvement, and the Borrower hereby prospectively assigns to the Lender all of its rights under such agreements effective as of the date of the Borrower's receipt of such written notice;

(f)     The Lender may complete the Improvement and hire any architects, contractors, sub-contractors, suppliers and laborers to perform any work in connection with the completion of the Improvement; and

(g)    The Lender may avail itself of all rights and remedies available to the Lender under the Notes, the Mortgage, the Security Agreement, the Development and Management Services Agreement, together with any other rights and remedies available to the Lender at law or in equity.

9.    Other Loan Documents. The Borrower and the Lender agree, on behalf of themselves and their respective legal representatives, successors and permitted assigns, that the Notes, the Mortgage and the Security Agreement executed and delivered by the Borrower are subject to all the conditions, stipulations, agreements and covenants contained in this Agreement to the same extent and effect as if fully set forth and made a part of the Notes, the Mortgage and the Security Agreement.

10.    Section 22 Lien Law Affidavit. A true statement under oath, verified by the Borrower as required by Section 22 of the Lien Law, is attached hereto as Schedule B and made a part hereof.

11.    Notice of Lending. Attached hereto as Schedule C and made a part hereof is a Notice of Lending executed by the Lender and intended to be effective on the date hereof.

12.    Term of Agreement. This Agreement will remain in effect until the advances made by the Lender pursuant hereto and all interest and expenses payable by the Borrower pursuant to the terms of the Notes have been repaid in full, or until this Agreement is discharged or terminated by the Lender in writing.

13.    Course of Dealing, Delay and Waiver. No course of dealing or other conduct heretofore pursued, accepted or acquiesced in by the Lender will operate as a waiver of any right or remedy of the Lender under this Agreement. No delay by the Lender in exercising any such right or remedy will operate as a waiver thereof or of any other such right or remedy. No waiver by the Lender of any such right or remedy will be effective unless made in a writing duly executed by the Lender and specifically referring to such waiver. No waiver by the Lender on any one occasion of any such right or remedy will operate as a waiver thereof or of any other such right or remedy on any future occasion.

14.    Governing Law. This Agreement and the transactions evidenced hereby will be construed under the internal laws of the State of New York.

15.    Notices. All notices, requests, demands, directions and other communications which may or are required to be given, served or sent under this Agreement or under applicable law will be in writing and will be deemed to have been properly given or sent if (i) mailed by registered or certified mail with postage prepaid, return receipt requested; or (ii) sent by Federal Express or similar courier service, and addressed to the applicable party at the address stated above, or, as to each party, at such other address as will be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section; or (iii) delivered by personal delivery to an officer of the Borrower or Lender. All such notices, requests, demands, directions and other communications will, when mailed in the manner specified in (i) above be effective three (3) business days after being so mailed, when sent in the manner specified in (ii) above be effective one (1) business day after being so sent, and when delivered in the manner specified in (iii) above be effective when delivered.

16.    Severability. Whenever possible, each provision of this Agreement will be interpreted

in such manner as to be effective and valid under applicable law. If, however, any such provision is prohibited by or invalid under such law, it will be deemed modified to conform to the minimum requirements of such law, or if for any reason such provision is not deemed so modified, it will be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other provision of this Agreement being prohibited or invalid.

      17.    Waiver of Trial by Jury. THE BORROWER AND THE LENDER HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE BORROWER OR THE LENDER MAY HAVE IN ANY ACTION OR PROCEEDING IN LAW OR IN EQUITY IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS RELATED HERETO.

      18.    Entire Agreement. This Agreement contains the entire understanding and agreement between the Borrower and the Lender with respect to the subject matter of this Agreement and the advances to be made by the Lender to the Borrower, and supersedes each course of conduct heretofore pursued, accepted or acquiesced in, and each oral and written agreement and representation heretofore made, by the Lender Party with respect thereto, whether or not relied or acted upon. This Agreement is binding upon the parties hereto and their respective successors and permitted assigns. No variation or modification of this Agreement will be binding unless it is in writing and is signed by the both the Borrower and the Lender.

      19.    Counterparts. This Agreement may be signed on different counterparts by different parties, all of which counterparts when taken together will be deemed to be a complete Agreement. After this Agreement is signed by a party or parties hereto, and such Agreement has been transmitted by facsimile or e-mail means, such facsimile or e-mail transmission will be considered for all purposes to be delivered and to be an original.

      IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto on the day and year first above written.

Borrower:

                          SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION

                          By: _Philip C. Linlaw_ PRES.
                                                Title

Lender:

                          DNC GAMING MANAGEMENT IN SUFFOLK, LLC

                          By: _____
                                                  Title

in such manner as to be effective and valid under applicable law. If, however, any such provision is prohibited by or invalid under such law, it will be deemed modified to conform to the minimum requirements of such law, or if for any reason such provision is not deemed so modified, it will be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other provision of this Agreement being prohibited or invalid.

17.    Waiver of Trial by Jury. THE BORROWER AND THE LENDER HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE BORROWER OR THE LENDER MAY HAVE IN ANY ACTION OR PROCEEDING IN LAW OR IN EQUITY IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS RELATED HERETO.

18.    Entire Agreement. This Agreement contains the entire understanding and agreement between the Borrower and the Lender with respect to the subject matter of this Agreement and the advances to be made by the Lender to the Borrower, and supersedes each course of conduct heretofore pursued, accepted or acquiesced in, and each oral and written agreement and representation heretofore made, by the Lender Party with respect thereto, whether or not relied or acted upon. This Agreement is binding upon the parties hereto and their respective successors and permitted assigns. No variation or modification of this Agreement will be binding unless it is in writing and is signed by the both the Borrower and the Lender.

19.    Counterparts. This Agreement may be signed on different counterparts by different parties, all of which counterparts when taken together will be deemed to be a complete Agreement. After this Agreement is signed by a party or parties hereto, and such Agreement has been transmitted by facsimile or e-mail means, such facsimile or e-mail transmission will be considered for all purposes to be delivered and to be an original.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto on the day and year first above written.

Borrower:                                SUFFOLK REGIONAL OFF-TRACK
                                         BETTING CORPORATION

                                         By: _____
                                                                        Title

Lender:                                  DNC GAMING MANAGEMENT IN
                                         SUFFOLK, LLC

                                         By: _Michael A. Corbin_, Treasurer
                                                                        Title

STATE OF NEW YORK )
                   )    SS.:
COUNTY OF SUFFOLK )

On the _____ day of _____, 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the _____ of Suffolk Regional Off-Track Betting Corporation, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK )
                   )    SS.:
COUNTY OF ERIE )

On the 30th day of October, 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared Michael D. Corbin, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the Treasurer of DNC Gaming Management in Suffolk, LLC, and that by his signature on the instrument, the limited liability company on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TERRY C. BURTON
Notary Public, State of New York
Qualified in Erie County
My Commission Expires _JUNE 29, 2015_

STATE OF NEW YORK      )
                       )      SS.:
COUNTY OF SUFFOLK      )

On the _30_ day of _October_____, 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared _Philip Nolan_____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the _President_____ of Suffolk Regional Off-Track Betting Corporation, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

Notary Public        **MICHAEL HARRISON**
                     Notary Public, State of New York
                     No. 01HA5025220
                     Qualified in Suffolk County
                     Commission Expires March 21, 20_18_

STATE OF NEW YORK      )
                       )      SS.:
COUNTY OF SUFFOLK      )

On the ____ day of _____, 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the _____ of DNC Gaming Management in Suffolk, LLC, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

Notary Public

## SCHEDULE A

## LEGAL DESCRIPTION

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING AT MEDFORD, TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF LONG ISLAND AVENUE DISTANT 290.17 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF LONG ISLAND AVENUE AND THE WESTERLY SIDE OF OREGON AVENUE, SAID POINT ALSO BEING WHERE THE DIVISION LINE BETWEEN THE LANDS HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU INTERSECTS THE NORTHERLY SIDE OF LONG ISLAND AVENUE;

RUNNING THENCE SOUTH 82° 51' 40" WEST ALONG THE NORTHERLY SIDE OF LONG ISLAND AVENUE, 1233.64 FEET TO THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK;

THENCE NORTH 4° 47' 37" WEST ALONG SAID LAST MENTIONED LAND 1359.24 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) SAID POINT ALSO BEING WHERE THE DIVISION LINE OF THE PREMISES HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK, FORMERLY OF JOHN A. BOWNAN INTERSECTS THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST ALONG THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) 154.42 FEET TO THE STATE OF NEW YORK RECHARGE BASIN;

THENCE SOUTH 4° 35' 04" EAST ALONG THE STATE OF NEW YORK RECHARGE BASIN 368.51 FEET;

THENCE NORTH 84° 20' 34" EAST STILL ALONG THE STATE OF NEW YORK RECHARGE BASIN .02 FEET;

THENCE NORTH 84° 21' 15" EAST 241.87 FEET;

THENCE NORTH 7° 55' 35" EAST 308.09 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST 783.30 FEET TO THE LAND NOW OR FORMERLY OF EDWARD BERNACKI, JR.;

THENCE SOUTH 5° 08' 20" EAST PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWARD BERNACKI, JR., PARTIALLY ALONG THE WESTERLY TERMINUS OF ROBINSON AVENUE AND PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU, 1052.74 FEET TO THE NORTHERLY SIDE OF LONG ISLAND AVENUE AT THE POINT OR PLACE OF BEGINNING.

EXCEPTING THEREFROM ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK, STATE OF NEW YORK FOR HIGHWAY PURPOSES, ADJACENT TO THE SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AS SHOWN ON A MAP AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY BOUNDARY OF THE EXISTING SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AT THE INTERSECTION OF THE SAID BOUNDARY WITH

THE DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE WEST AND THE LANDS OF EDWARD BERNACKI, JR., REPUTED OWNER ON THE EAST;

THENCE SOUTH 05° 08' 20" EAST ALONG SAID DIVISION LINE 14.32 FEET TO A POINT;

THENCE NORTH 83° 00' 00" WEST THROUGH THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER, 786.54 FEET TO A POINT ON THE DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE EAST AND THE LANDS OF STATE OF NEW YORK, REPUTED OWNER ON THE WEST;

THENCE NORTH 07° 55' 48" EAST ALONG SAID DIVISION LINE 14.00 FEET TO ITS INTERSECTION WITH THE SOUTHERLY BOUNDARY OF SAID EXISTING ROAD;

THENCE SOUTH 83° 00' 00" EAST ALONG THE LAST MENTIONED SOUTHERLY BOUNDARY 783.30 FEET TO THE POINT OF BEGINNING.

TOGETHER with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

TOGETHER, with all buildings, structures and other improvements now or hereafter erected, constructed or situated upon said premises, and all fixtures and other personal property now or hereafter affixed to, or used in connection with, said premises, and any and all replacements thereof and additions thereto, all of which will be deemed to be and remain and form a part of said premises and are covered by the lien of this Mortgage (said premises, buildings, structures, other improvements, fixtures and equipment and other personal property being collectively referred to in this Agreement as the "Premises");

TOGETHER with all strips and gores of land adjoining or abutting the Premises;

TOGETHER with all tenements, hereditaments and appurtenances and all the estate and rights of the Borrower in and to the Premises;

TOGETHER with all awards heretofore or hereafter made by any federal, state, county, municipal or other governmental authority, or by whomsoever made in any condemnation or eminent domain proceedings whatsoever, to the present or subsequent owners of the Premises or any portion thereof, for the acquisition for public purposes of the Premises or any portion thereof or any interest therein or any use thereof, or for consequential damages on account thereof, including, but not limited to, any award for any change of grade of streets affecting the Premises or any portion thereof and any award for any damage to the Premises or any portion hereof or any interest therein or any use thereof.

## SCHEDULE B

## SECTION 22 LIEN LAW AFFIDAVIT

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) SS: |
| COUNTY OF SUFFOLK | ) |

Philip C. Nolan, being duly sworn, deposes and says that:

1.      He is the President and Chief Executive Officer of Suffolk Regional Off-Track Betting Corporation, a public benefit corporation which maintains an office located at 5 Davids Drive, Hauppauge, New York 11788 (the "Borrower");

2.      The Borrower has entered into the annexed Building Loan Contract with DNC Gaming Management in Suffolk, LLC, which maintains an office located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Lender"), dated as of October 30, 2014 (the "Building Loan Contract");

3.      The Building Loan Contract relates to the construction of certain improvements to real property located in the State of New York, County of Suffolk and Town of Brookhaven described with more particularity in the Building Loan Contract (the "Improvement");

4.      The total amount of the two loans described in the Building Loan Contract is $76,400,000.00 (the "Loans").

5.      The consideration paid, or to be paid, for the Loan is $0.00.

6.      The expenses incurred or to be incurred in connection with the Loan are as follows:

| | | |
|---|---|---|
| (a) | Recording Fees (est.) | $    1,175.00 |
| (b) | Title Insurance Premiums | $ 275,517.00 |
| (c) | Escrow Closing Fee | $    2,500.00 |
| (d) | Real Property Taxes and Assessments | $    4,762.52 |

Total Expenses ............................................................………..    $ 283,954.52

7.      The amount, if any, to be advanced from the Loan to repay amounts previously advanced to the Borrower pursuant to Notices of Lending for costs of the Improvement is $0.00.

8.      The amount, if any, to be advanced from the Loan to reimburse the Borrower for costs of the Improvement expended by the Borrower after the commencement of the Improvement but prior to the date hereof are itemized as follows: $0.00.

9.      The amount advanced from the Loan to fund the purchase price for the real property upon which the Improvement is to be constructed is $10,950,000.00.

10.     The net sum available to the Borrower from the Loan for the Improvement is $65,166,045.48;

11.    This statement is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York, as amended; and

12.    The facts stated above and any costs itemized on this statement are true and accurate.

Philip C. Nolan, President
and Chief Executive Officer

Sworn to before me this 30 day
of October, 2014.

_____
Notary Public

MICHAEL HARRISON
Notary Public, State of New York
No. 01HA5025220
Qualified in Suffolk County
Commission Expires March 21, 20 18

## NOTICE OF LENDING
## PURSUANT TO SECTION 73 OF THE LIEN LAW

1.      DNC GAMING MANAGEMENT IN SUFFOLK, LLC, with offices located at 40 Fountain Plaza, Buffalo, New York 14202, is the entity making the advances as "Lender";

2.      SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation with offices located at 5 Davids Drive, Hauppauge, New York 11788 (the "Borrower"), is the entity to whom or on whose behalf the advances are being made;

3.      The Borrower is (x) the owner (_) the contractor (_) a subcontractor of the property subject hereto;

4.      The address of the real property for which the advances are being made is 440 Long Island Expressway Drive South, Brookhaven, New York (the "Real Property"). The legal description of the Real Property appears in Exhibit "A" attached hereto and made a part hereof.

5.      The record owner of the Real Property is SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION;

6.      The improvements being made to the real property described above consist of the construction of (i) a facility for video lottery gaming and pari-mutuel wagering activities; (ii) improvements for the conduct of restaurant, catering and other customer hospitality functions; and (iii) improvements to the parking areas and common areas located on the real property;

7.      Advances on or before the date of filing hereof and for which this Notice of Lending is intended to be effective were as follows:

|  |  |
|---|---|
| July 1, 2014: | $   500,000.00 |
| October 30, 2014: | $ 10,732,704.52; and |

8.      The maximum balance of advances made or to be made pursuant to this Notice of Lending is $65,166,045.48.

Dated: October 30, 2014

Lender:

DNC GAMING MANAGEMENT IN SUFFOLK, LLC

By: _Michael A. Corbin_____
Name: Michael D. Corbin
Title:  Treasurer

EXHIBIT D

First Loan Note

## NOTE (FIRST LOAN)

October 30, 2014                                                     UP TO $65,000,000.00

FOR VALUE RECEIVED, SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 5 Davids Drive, Hauppauge, New York 11788 (the "Borrower") promises to pay to the order of DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company, at its principal office and place of business located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Lender"), in lawful money of the United States and in immediately available funds, the amount actually advanced by the Lender pursuant to the "First Loan" as defined in the Building Loan Contract between the Borrower and the Lender bearing even date herewith (the "Building Loan Contract"), plus all interest on the aggregate outstanding amount of such advances at the rate set forth in this Note.

The Borrower, the Lender and Delaware North Companies Gaming & Entertainment, Inc. (the "Guarantor") are parties to a Development and Management Services Agreement dated March 7, 2014, as amended and supplemented by a Letter Agreement between the Borrower and the Lender dated October 9, 2014 (collectively, the "Development and Management Services Agreement"; capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Development and Management Services Agreement or, if not defined therein, in the Building Loan Contract), pursuant to which the Lender and the Guarantor have committed to advance a First Loan of up to Sixty-Five Million Dollars ($65,000,000.00) to the Borrower (the "First Loan") to fund the Borrower's design, development, construction and furnishing of a new video lottery gaming facility in Suffolk County, New York (the "Gaming Facility"). The First Loan will be advanced to the Borrower pursuant to the Building Loan Contract during the period of time prior to the completion and opening of the Gaming Facility, with a final advance of the First Loan to be made to fund any final obligations associated with the construction and furnishing of the Gaming Facility and the Borrower's working capital requirements and bonding costs (in an amount to be mutually agreed by the Lender and the Borrower). The period of time prior to the "Commencement Date" as defined in the Development and Management Services Agreement is hereafter referred to as the "Construction Period" and the period of time subsequent to the Commencement Date is hereafter referred to as the "Permanent Period". During the Permanent Period, the First Loan will be repaid by the Borrower in the manner provided in this Note.

NOW, THEREFORE, for good and valuable consideration, the Borrower hereby agrees as follows:

1.      Advances during the Construction Period. During the Construction Period, the Lender will maintain a schedule of the amounts advanced under this Note consistent with the Building Loan Contract, the dates of such advances, and the amount of interest accruing with respect to such advances. Entries on such schedule by the Lender will be treated by the parties as evidence of the total amount of such advances and the accrued interest on such advances. No failure by the Lender to make an entry of any advance of funds in fact made under this Note, or any interest accruing under this Note, will affect the Borrower's obligation to repay such advances or interest.

2.    <u>Interest during the Construction Period</u>. Except to the extent otherwise expressly provided in this Note, no principal sum advanced under this Note, or any interest with respect thereto, will be payable during the Construction Period. During the Construction Period, the outstanding amount of all advances made to the Borrower pursuant to the First Loan will accrue interest at the rate of four and one-quarter percent (4.25%) per annum. Interest accruing during the Construction Period will be added to the principal sum advanced under this Note as provided in Section 3 hereof, and the Borrower will not be required to make payment of interest accrued during the Construction Period.

3.    <u>Determination of the Outstanding Principal Sum of the First Loan</u>. As of the first (1st) day of the Permanent Period, and on the first (1st) day of each month thereafter until the Lender makes its final advance hereunder, the Lender will compute the sum of (a) the total amount of all funds advanced hereunder as of such date, plus (b) the interest which accrued on such advances during the Construction Period, plus (c) the amount of any additional advances made by the Lender hereunder after the Commencement Date pursuant to the Building Loan Contract, and such sum will be the "Outstanding Principal Sum of the First Loan" to be repaid by the Borrower with interest during the Permanent Period.

4.    <u>Interest during the Permanent Period</u>. During the first year of the Permanent Period, the Outstanding Principal Sum of the First Loan will bear interest at the rate of four and one-quarter percent (4.25%) per annum. The interest rate on the Outstanding Principal Sum of the First Loan will be subject to cumulative annual increases on each anniversary of the Commencement Date equal to three-quarters of one percent (0.75%) per annum until the Outstanding Principal Sum of the First Loan has been paid in full; provided however, that at no time will the interest rate payable with respect to the Outstanding Principal Sum of the First Loan exceed seven percent (7.0%) per annum.

5.    <u>Repayment</u>. During the Permanent Period, the Borrower promises to pay the Outstanding Principal Sum of the First Loan and all interest accruing with respect thereto, to the order of the Lender at its office identified above, in lawful money of the United States and in immediately available funds in accordance with this Section 5. The Borrower further promises to pay all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Lender in endeavoring to collect any amount owing pursuant to this Note. Payment of the Outstanding Principal Sum of the First Loan and the interest with respect thereto will be made in a manner consistent with the terms of the Development and Management Services Agreement, as outlined below.

Defined terms appearing in this Section 5 which are not defined elsewhere in this Note will have the same meanings given to them in the Development and Management Services Agreement. Consistent with the terms of Section 7.02.3 of the Development and Management Services Agreement, the Borrower's "Gross Revenues" from its "Business" conducted at the Gaming Facility will be applied on a monthly basis as follows:

(a)    First, to the payment of, or provision for, all "Expenses" incurred or anticipated to be incurred in connection with the "Business";

(b)    Second, to the payment of a distribution to the Borrower in the amount Four Million Dollars ($4,000,000) during the first twelve months following the "Commencement Date", and in the amount of Six Million Dollars ($6,000,000) during each subsequent twelve month period thereafter, which will be payable in equal monthly installments

2

(the "Minimum Annual Distribution");

(c)     Third, to the reimbursement to the Lender of any "Working Capital Advances" made by it pursuant to Section 5.04 of the Development and Management Services Agreement;

(d)     Fourth, to the reimbursement to the Guarantor of any payments of the "Minimum Annual Distribution" made by it pursuant to the payment guarantee in Section 7.03 of the Development and Management Services Agreement;

(e)     Fifth, to the monthly payment, on or before the twentieth (20th) day following the month that such interest accrued, of any accrued and unpaid interest with respect to the Outstanding Principal Sum of the First Loan, and to the extent applicable, any accrued and unpaid interest with respect to the "Second Loan" as defined in the Building Loan Contract;

(f)     Sixth, to the payment of the Lender's monthly "Management Fee" described in Section 8.01.1 of the Development and Management Services Agreement;

(g)     Seventh, to the funding of the "Capital Renewals Reserve" to the extent required in Section 5.05.5 of the Development and Management Services Agreement; and

(h)     Thereafter, any remaining amount of "Gross Revenues" not required to meet the foregoing "Expenses", "Minimum Annual Distributions", accrued interest charges with respect to the First Loan and the Second Loan (if applicable), "Management Fees" and "Capital Renewals Reserve" payments (such remaining amount being hereafter referred to as the "Residual Cash Flow") will be applied on a monthly basis in the following manner:

(i)     During the first twenty-four (24) months after the "Commencement Date", seventy percent (70%) of the Residual Cash Flow will be applied to repayment of the Outstanding Principal Sum of the First Loan; and

(ii)     Commencing with the twenty-fifth (25th) month after the Commencement Date, seventy-five percent (75%) of the Residual Cash Flow will be applied to repayment of the Outstanding Principal Sum of the First Loan, until the Outstanding Principal Sum of the First Loan and all other amount due pursuant to this Note have been paid in full.

In the event that for any month the "Gross Revenues" are insufficient to fund full payment of the obligations described in subsections (c), (d), (e), (f) and (g) above, the accrued but unpaid portion of those obligations will be carried forward on a month-by-month basis (and in the same priority of payment as set forth above) until the "Gross Revenues" are sufficient to fund the full payment of both the current amounts described in subsections (a) and (b) above and the accrued obligations described in subsections (c), (d), (e), (f) and (g).  For the avoidance of doubt, no payment of principal or interest under this Note will be due to the extent that the Borrower's Gross Revenues are insufficient to fund the obligations described in subsections (a), (b), (c), (d), (e), (f) , (g) and (h) in the order of priority outlined above.

3

Notwithstanding anything to the contrary provided above, the entire unpaid principal amount of this Note and all accrued interest and other amounts due with respect to this Note is due and payable in full upon the earlier to occur of (i) the tenth (10th) anniversary of the "Commencement Date", or (ii) thirty (30) days after the date of expiration or termination of the Development and Management Services Agreement.

6.      Interest Not in Excess of Maximum Rate.  Notwithstanding the foregoing, in no event will the Borrower pay interest at a rate in excess of the maximum rate permitted by applicable law. Solely to the extent necessary to result in such interest not being payable at a rate in excess of the maximum rate, any amount that would be treated as part of such excess interest under a final judicial interpretation of applicable law will be deemed to have been a mistake and be automatically cancelled, and if received by the Lender will be refunded to the Borrower, it being the intention of the Lender and the Borrower that interest will not be payable at a rate in excess of the maximum rate.

7.      Prepayment.  The Borrower will have the option of paying the Outstanding Principal Sum of the First Loan and all accrued interest with respect thereto to the Lender in advance, in full or in part, at any time and from time to time without premium or penalty, subject to the requirement that the Borrower provide the Lender at least one (1) business day's advance written notice of any such prepayment. Any partial prepayment will include all accrued interest with respect to the Outstanding Principal Sum of the First Loan, together with such amount of the Outstanding Principal Sum of the First Loan as the Borrower desires to pay.

8.      Collateral.  The payment of this Note is secured by a Mortgage given by the Borrower to the Lender bearing even date herewith (the "Mortgage"), and by a Security Agreement given by the Borrower to the Lender bearing even date herewith (the "Security Agreement"), as either of the same may be amended, modified, restated, substituted and replaced.

9.      Default.  Any of the following will constitute an "Event of Default":

(a)     The Borrower fails to pay any of the principal or interest on this Note when due and such failure continues unremedied for five (5) business days after written notice of such failure has been given by the Lender to the Borrower;

(b)     The Borrower defaults in the performance of any obligation, term or condition of this Note (other than any obligation to pay any payment of principal or interest pursuant to this Note), or any obligation, term or condition of the Development and Management Services Agreement (including without limitation, any of the defaults specified in Section 3.06 thereof), the Building Loan Contract, the Mortgage or the Security Agreement, and such default continues unremedied for fifteen (15) business days (or such longer cure period as may be provided in the document which has allegedly been breached) after written notice of such default has been given to the Borrower;

(c)     There occurs any event or condition which, after notice and lapse of time for any cure thereof, permits the acceleration of the First Loan or the Second Loan, which event or condition is referred to in any of the Development and Management Services Agreement, the Building Loan Contract, the Mortgage or the Security Agreement;

4

(d)     Any representation or warranty made by the Borrower in the Development and Management Services Agreement, the Building Loan Contract, the Mortgage or the Security Agreement proves to be false or misleading when made in any material respect;

(e)     The Borrower applies for, consents to, or is otherwise subject to the appointment of a receiver, trustee or liquidator of the Borrower or any of its properties or assets, or except in connection with the pending Bankruptcy Case (as defined in the Development and Management Services Agreement), the Borrower (i) admits in writing its inability to pay its debts as they mature; (ii) makes a general assignment for the benefit of creditors; (iii) is adjudicated as bankrupt or insolvent; or (iv) files a voluntary petition in bankruptcy, or a petition or any answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or any answer admitting the material allegations of a petition filed against it in any proceeding under any such law;

(f)     Except in connection with the pending Bankruptcy Case (as defined in the Development and Management Services Agreement), an order, judgment or decree is entered without the application, approval or consent of the Borrower, by any court of competent jurisdiction, approving a petition seeking reorganization of the Borrower or a substantial part of its properties or assets, and such order, judgment or decree is not dismissed or stayed within a period of sixty (60) days;

(g)     Final judgment for the payment of money in excess of One Hundred Thousand Dollars ($100,000.00) is rendered against the Borrower and the same remains undischarged by payment or bonding for a period of thirty (30) days during which execution is not effectively stayed; or

(h)     The Development and Management Services Agreement expires by its terms or is earlier terminated by any party pursuant to the provisions of said Agreement.

At any time after the occurrence of an Event of Default, the Lender may, at its sole discretion and by written notice to the Borrower, declare all or any part of the amounts outstanding under this Note to be immediately due and payable; provided however, that upon an Event of Default under subparagraphs (e) or (f) above, all amounts outstanding under this Note will become immediately due and payable without any action on the part of the Lender. The Borrower expressly waives the requirements of presentment, demand, protest, or other notice of any kind (other than notice of Default as provided herein) as a condition to its obligation to immediately pay the unpaid Outstanding Principal Sum of the First Loan, all accrued interest, any expenses to which the Lender is entitled pursuant to this Note, and all other amounts owed pursuant to the Note or pursuant to any other agreement to which the Borrower and the Lender are parties. In addition, after an Event of Default the Lender may take possession of all collateral pledged or securing the obligations under this Note under the Mortgage and the Security Agreement with or without notice, and for that purpose may enter upon the Borrower's premises and remove the same. After any Event of Default, the Lender may exercise all other remedies under any of the Development and Management Services Agreement, the Building Loan Contract, the Mortgage, the Security Agreement, or under the New York Uniform Commercial Code.

5

10.    Lender's Right to Setoff. The Lender will have the right to set off against the amounts owing under this Note any property or funds held in a deposit or other account of the Borrower which the Lender or any of its affiliates have access to, or any property or funds in the Lender's possession owing to the Borrower, and such set-off will be deemed to have been exercised immediately at the time the Lender or such affiliate elects to do so.

11.    New York Law. This Note will be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York.

12.    Modification. This Note will not be extended, amended or modified orally, nor may any of its provisions be waived orally.

13.    Miscellaneous. This Note, the Management and Operating Services Agreement, the Building Loan Contract, the Mortgage and the Security Agreement contain the entire agreement between the Lender and Borrower with respect to the First Loan and supersede every course of dealing, other conduct, oral agreement and representation previously made with respect thereto. No single, partial or delayed exercise by the Lender or its agents of any right or remedy will preclude the subsequent exercise by the Lender or it agents at any time of any right or remedy of the Lender. No waiver or amendment of any provision of this Note will be effective unless made specifically in writing by the Lender. No course of dealing or other conduct and no oral agreement or representation made by the Lender will operate as a waiver of any right or remedy of the Lender. The Borrower agrees that in any legal proceeding, a copy of this Note with the Borrower's signature may be admitted into evidence as an original. This Note is a binding obligation enforceable against the Borrower and its successors and assigns, and will inure to the benefit of the Lender and its successors and assigns. If a court deems any provision of this Note invalid, the remainder of the Note will remain in effect. Section headings are for convenience of reference only.

14.    Jurisdiction. The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Suffolk County, New York or in the Federal Eastern District of New York.

15.    Trial by Jury. THE BORROWER AND THE LENDER HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE BORROWER OR THE LENDER MAY HAVE IN ANY ACTION OR PROCEEDING IN LAW OR IN EQUITY IN CONNECTION WITH THIS NOTE OR THE TRANSACTIONS RELATED HERETO.

16.    Notices. All notices, requests, demands, directions and other communications which may or are required to be given, served or sent under this Note or under applicable law will be in writing and will be deemed to have been properly given or sent if (i) mailed by registered or certified mail with postage prepaid, return receipt requested; or (ii) sent by Federal Express or similar courier service, and addressed to the applicable party at the address stated above, or, as to each party, at such other address as will be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section; or (iii) delivered by personal delivery to an officer of the Borrower or Guarantor. All such notices, requests, demands, directions and other communications will, when mailed in the manner specified in (i) above be effective three (3) business days after being so mailed, when sent in the manner specified in (ii) above be effective one (1) business day after being so sent, and when delivered in the manner specified in (iii) above be effective when delivered.

6

IN WITNESS WHEREOF, this Note been duly executed by the Borrower as of the day and year first above written.

SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION

By _Philip C. Larko_ PRES.
Title

7

STATE OF NEW YORK )
) SS.:
COUNTY OF SUFFOLK )

On the 30 day of October        , 2014, before me, the undersigned, a notary public in
and for the State of New York, personally appeared Phil o Nolan        , known to me or proved to
me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his capacity as the
President        of Suffolk Regional Off-Track Betting Corporation, and that by his signature on
the instrument, the corporation on behalf of which the individual acted, executed the instrument.

_____
Notary Public

MICHAEL HARRISON
Notary Public, State of New York
No. 01HA5025220
Qualified in Suffolk County
Commission Expires March 21, 20 18

8

# EXHIBIT E

## Security Agreement



Delaware North Companies Gaming & Entertainment

October 9, 2014

Mr. Philip Nolan, President
Suffolk Regional Off-Track Betting Corporation
5 Davids Drive
Hauppauge, New York 11788

Re:   Memorandum of Understanding RegardingPotential Future
      Funding of Additional Development Costs

Dear Mr. Nolan:

This letter is further to our recent conversations regarding the additional land acquisition, facility construction and pre-opening costs that we now project will be incurred in connection with the development and opening of a new video lottery gaming facility by Suffolk Regional Off-Track Betting Corporation ("Suffolk OTB"). Based on current information, we now anticipate the entire project cost will amount to approximately $76.4 million, which is $11.4 million greater than the estimated $65 million loan (the "First Loan") to be provided by DNC Gaming Management in Suffolk, LLC (the "Manager") under Article III of the Development and Management Services Agreement dated March 7, 2014 (the "DMS Agreement").

It is anticipated that such additional funding will only be drawn once the First Loan is exhausted and will first be required in the second half of 2015. In order to address this potential funding shortfall, we have reached the following additional understandings:

1.   Second Loan. In addition to the $65 million First Loan, the Manager will provide Suffolk OTB with a second loan of up to $11.4 million to cover the additional anticipated costs of developing and opening Suffolk OTB's new video lottery gaming facility (the "Second Loan"). The outstanding amount of the Second Loan (principal and accrued interest) will bear interest at the initial rate of ten percent (10.0%) per annum, with such interest rate to be subject to increases of 200 basis points on each six month anniversary of the date that Suffolk OTB takes its first draw under the Second Loan; subject however, to the lower of eighteen percent (18%) per annum or the highest rate permitted by New York law. Interest with respect to the Second Loan will accrue and be added to principal until the third (3rd) anniversary of the date that Suffolk OTB's gaming facility is opened to the public, after which period of time interest on the Second Loan will be payable in equal monthly installments on or before the first (1st) day of each month thereafter. After the First Loan has been paid in full, the principal amount of the Second Loan will be repaid with seventy-five percent (75%) of the gaming facility's "Residual Cash Flow", as that phrase is defined in Section 7.02.3(h) of the DMS Agreement. At any time after the entire amount of the First Loan has been repaid, the Second Loan may be repaid by Suffolk OTB without penalty. The Second Loan will be reflected in a promissory note to be

40 Fountain Plaza Buffalo, New York 14202-2285 716-858-5000    716-858-5056



Mr. Philip Nolan, President
October 9, 2014
Page 2

delivered by Suffolk OTB to the Manager, and will be secured by the Mortgage, the Building
Loan Agreement and the Security Agreement described in the DMS Agreement.

For the avoidance of doubt, upon repayment of the Municipality-in-Bankruptcy (MIB)
Loans provided by the Manager to Suffolk OTB in its bankruptcy reorganization proceeding, the
liens held by the Manager against Suffolk OTB's assets unrelated to the video lottery gaming
facility (including without limitation, Suffolk OTB's headquarters property and other pari-mutual
wagering locations) will be released and Suffolk OTB will have the right to sell, lease or
otherwise transfer those other properties and retain the proceeds of such transactions.
Furthermore, the Manager understands that Suffolk OTB is presently negotiating to sell its
Headquarters Building located at 5 Davids Drive in Hauppauge, New York to raise funds for
operations. To the extent the MIB Loans have not been repaid by application of credits/rights
payments due Suffolk OTB under the DMS Agreement at the time of such sale, the Manager
agrees that its liens will attach to the remaining two pari-mutuel wagering locations only.

    2.    Site Acquisition and Logistics.  The real property located at 440 Long Island
Expressway Drive South, in the Town of Brookhaven, Suffolk County, New York (the "Property")
to be acquired for the development of the new gaming facility is comprised of approximately 31
acres.  The Property is larger than what is required for the planned 1,000 machine gaming facility.
However, in light of Suffolk OTB's concern that any excess acreage be available for a possible
future expansion of its gaming operations, the proceeds of the First Loan and the Second Loan
will be available to Suffolk OTB to fund its acquisition of the entire 31 acres of the Property;
subject however, to a covenant which requires the Manager's consent (which consent will not be
unreasonably withheld if the expansion is intended for the enhancement of gaming facility
revenues) to the construction of improvements on the Property beyond those contemplated for
the 1,000 machine gaming facility for so long as the First Loan and the Second Loan remain
outstanding. The site plan for the gaming facility will provide that any excess portions of the
Property must be accessible from the Long Island Expressway service road and reasonably
marketable by Suffolk OTB.
    3.    Guaranteed Maximum Price to be Required.  Suffolk OTB and the Manager agree
that the general contractor or construction manager to be retained by Suffolk OTB to build and
furnish the new video lottery gaming facility will be required to provide the parties with a
guaranteed maximum price for the facility, in order to avoid (to the extent possible) the incurring
of additional project cost overruns.

    4.    Amendment of the DMS Agreement.  Effective as of the date that the first
advance of funds under the Second Loan is made, the parties hereby agree that Section 12.01 of
the DMS Agreement will be amended and restated in its entirety to provide as follows:

    12.01  Term of the Agreement.  Subject to earlier termination as provided below, the
    initial term of this Agreement (the "Initial Term") will commence as of the date of its
    execution, and will continue until the later of (i) the fifteenth (15th) anniversary of the
    Commencement Date, or (ii) the date that the principal amount of the Loan described in
    Article III hereof and the Second Loan described in that certain letter agreement between
    Suffolk OTB and the Manager dated October 9, 2014, and all interest and other amounts

Mr. Philip Nolan, President
October 9, 2014
Page 3

specified in the promissory notes delivered by Suffolk OTB which are reflective of such loans, have been fully paid to the Manager.

In the event that Suffolk OTB does not take any advance of funds under the Second Loan, the foregoing amendment to Section 12.01 of the DMS Agreement will notbe effective and the original terms of Section 12.01 in the DMS Agreement as executed on or about March 7, 2014 will continue in full force and effect.

If the foregoing accurately sets forth our understandings and agreements, please sign and return a fully executed copy of this letter agreement to us.

Best regards,

DELAWARE NORTH COMPANIES
GAMING & ENTERTAINMENT, INC.

E. Brian Hansberry, President

Agreed to and accepted as of the
14 day of October, 2014

SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION

By _____
Philip Nolan, President

## AMENDMENT TO SECURITY AGREEMENT

This is an Amendment (the "Amendment") dated May $\cancel{24}$, 2016 and effective as of October 30, 2014, to that certain Security Agreement dated October 30, 2014, by and between SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation ("Debtor") and DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company ("Secured Party")(the "Agreement"). The Debtor and the Secured Party are referred to herein collectively as the "Parties" and individually as a "Party".

### RECITALS

WHEREAS, the Debtor and the Secured Party desire, upon the terms and conditions hereinafter provided, to amend the Agreement.

NOW, THEREFORE, the Parties hereby agree as follows:

1.     Section 3(e) of the Agreement which states:

(e) the Collateral is or will be located at 440 Long Island Expressway Drive South, Brookhaven, New York;

shall be replaced in its entirety with:

(e) the Collateral is or will be located at the Premises (as described on Exhibit A);

2.     Section (a) of Exhibit A which states:

(a)     All Equipment and Fixtures now or hereafter owned or acquired by the Debtor and located at 440 Long Island Expressway Drive South, Brookhaven, New York (the "Premises").

shall be replaced in its entirety with:

(a)     All Equipment and Fixtures now or hereafter owned or acquired by the Debtor and located at 440 South Service Road, Medford, New York, 11763, also known as 440 Long Island Expressway Drive South, Brookhaven, New York, also known as 440 Expressway Drive, Brookhaven, New York, also known as Long Island Avenue, Medford, New York 11763 (the "Premises").

3.     Except as modified by this Amendment, the terms and provisions of the Agreement shall remain in full force and effect.

4.     This Amendment may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single agreement.

*129422.2*                              *Signature page follows*

IN WITNESS WHEREOF, each of the Parties hereto has duly executed this Amendment.

**DEBTOR:**
**SUFFOLK REGIONAL OFF-TRACK BETTING**
**CORPORATION**

By:_____
Name: Philip C. Nolan
Title: President

**SECURED PARTY:**
**DELAWARE NORTH COMPANIES GAMING &**
**ENTERTAINMENT, INC.**

By:_____
Name: E. Brian Hansberry
Title: President

*(Signature page to Amendment to Security Agreement)*

**DEBTOR:**
**SUFFOLK REGIONAL OFF-TRACK BETTING**
**CORPORATION**

By:_____
Name: Philip C. Nolan
Title: President

**SECURED PARTY:**
**DELAWARE NORTH COMPANIES GAMING &**
**ENTERTAINMENT, INC.**

By:_____
Name: E. Brian Hansberry
Title: President

*(Signature page to Amendment to Security Agreement)*

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is made the 30th day of October, 2014, between SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 5 Davids Drive, Hauppauge, New York 11788 (the "Debtor"), and DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company having its principal office and place of business located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Secured Party").

WITNESSETH, to secure the payment of an indebtedness in the principal sum of up to SEVENTY-SIX MILLION FOUR HUNDRED THOUSAND DOLLARS ($76,400,000.00), lawful money of the United States, together with interest thereon, evidenced by, and to be paid according to, certain notes, secured hereby, made and delivered by the Debtor to the Secured Party and bearing even date herewith (collectively the "Notes"), the Debtor hereby grants to the Secured Party a security interest (the "Security Interest") in all of the Debtor's property identified in Exhibit A attached hereto and made a part hereof (the "Collateral"), as continuing and collateral security for the payment of any and all indebtedness, liabilities and obligations now existing or which may hereafter arise by reason of the Notes, this Security Agreement, or any amendments, renewals, extensions, modifications or substitutions of the Notes or this Security Agreement (collectively the "Indebtedness").

THE DEBTOR COVENANTS WITH THE SECURED PARTY AS FOLLOWS:

1.     Pay Indebtedness.  The Debtor will pay the Indebtedness as hereinbefore provided.

2.     Reference to Defined Terms.  Unless otherwise specifically defined herein, all defined terms used in this Security Agreement will have the meanings given to them in the New York Uniform Commercial Code.

3.     Representations and Warranties of the Debtor.  The Debtor represents and warrants that: (a) the Debtor is the owner of the Collateral free of all security interests, adverse claims or other encumbrances except for the Security Interest created hereby; (b) the Debtor is authorized to enter into this Security Agreement, and this Security Agreement is not in contravention of any law or any indenture, agreement or undertaking to which the Debtor is a party or by which it is bound; (c) the Debtor is duly organized and validly existing under the laws of the State of New York and is in good standing and authorized to do business in all jurisdictions in which the Debtor is conducting business; (d) the Debtor's chief executive office is located, and the Debtor's records concerning the Collateral are kept, at the address specified above; (e) the Collateral is or will be located at 440 Long Island Expressway Drive South, Brookhaven, New York; (f) each Account and General Intangible which is an outstanding obligation is genuine and enforceable in accordance with its terms against the party obligated to pay it (the "Account Debtor"); and (g) any amounts represented by the Debtor to the Secured Party as owing by any Account Debtor is the correct amount owing and is not subject to any defense, offset, claim or counterclaim against the Debtor.

4.     Covenants of the Debtor.  So long as any Indebtedness remains unpaid, the Debtor will (a) defend the Collateral against the claims and demands of all other parties including any Account Debtor, will keep the Collateral free from all security interests or other encumbrances except the Security Interest, and will not sell, transfer, lease or otherwise dispose of any Collateral or

any interest therein without the prior written consent of the Secured Party, other than sales of Inventory in the ordinary course of business; (b) notify the Secured Party promptly in writing of any change in the address of the Debtor specified in the first paragraph of this Security Agreement or in the Debtor's name, identity or structure; (c) notify the Secured Party promptly in writing of any change in the location of any Collateral or of the records with respect thereto or any additional locations at which the Collateral or records are kept, and will permit the Secured Party or its agents to inspect such records; (d) immediately deliver to the Secured Party notice of any loss, destruction or theft of any of the Collateral from any cause, the threat or commencement by any person or entity other than the Secured Party of any action or other legal proceeding relating to any of the Collateral, or the assertion by any person or entity other than the Secured Party of any demand or claim relating to any of the Collateral; (e) pay all taxes, assessments and other charges of every nature which may be levied or assessed against the Collateral; (f) keep, in accordance with generally accepted accounting principles, consistently applied, accurate and complete books and records concerning the Collateral, will mark any and all such records concerning the Collateral at the Secured Party's request to indicate the Security Interest, will permit the Secured Party or its agents to audit and make extracts from and copy such records or any of the Debtor's books, ledgers, reports, correspondence or other records, and will furnish the Secured Party with financial statements and such other information concerning the Debtor as the Secured Party may from time to time reasonably request; and (g) not, without the Secured Party's written consent, make or agree to make any alteration, modification or cancellation of, or substitution for, or credits, adjustments or allowances on, any of the Collateral.

5.    Verification of the Collateral.  The Secured Party will have the right to verify any or all of the Collateral in any manner and through any medium that the Secured Party may deem appropriate, and to notify any person or entity of the interest of the Secured Party in the Collateral, and the Debtor agrees to furnish all assistance and information and perform any acts which the Secured Party may reasonably require in connection therewith.

6.    Financing Statements.  The Debtor authorizes the Secured Party to file such financing statements or other documents relating to the Collateral, without the Debtor's signature thereon, as the Secured Party may deem appropriate, and the Debtor appoints the Secured Party as the Debtor's attorney-in-fact to execute any such financing statement or other documents in the Debtor's name and to perform all other acts which the Secured Party deems appropriate to perfect and continue the Security Interest and to protect and preserve the Collateral.

7.    Default.  An "Event of Default" occurs or exists for purposes of this Security Agreement if (a) the Debtor defaults in the payment when due (after the expiration of any expressly applicable grace period), whether by acceleration or otherwise, of any part of the Indebtedness or any other amount owed under the Notes; (b) the Debtor defaults in the performance when due (after the expiration of any expressly applicable grace period) of any obligation other than an obligation to pay money, that is now or hereafter owing by the Debtor to the Secured Party, whether under this Security Agreement or any other agreement or instrument delivered by the Debtor to the Secured Party; (c) the Debtor sells, assigns or otherwise transfers or disposes of all or substantially all of the Debtor's assets, makes or permits a fraudulent transfer or fraudulent conveyance of any of the Debtor's assets, makes any bulk sale, sends any notice of any intended bulk sale, fails to pay, withhold or collect any tax as required by any statute, regulation or other law, has served or filed against the Debtor or against any of the Debtor's assets any attachment, levy, tax lien, warrant or similar lien, or has entered against the Debtor or against any of the Debtor's assets any judgment, order or award of any court, agency or other governmental authority or arbitrator which is not

2

removed by the Debtor within sixty (60) days after the Debtor's receipt of written notice thereof; (d) the Debtor has any receiver, trustee, liquidator, sequestrator or custodian of the Debtor or of any of the Debtor's assets appointed, makes any assignment for the benefit of creditors, or commences or has commenced against the Debtor (unless such case commenced against the Debtor is dismissed within sixty (60) days after the Debtor's receipt of written notice thereof) any case or other proceeding pursuant to any bankruptcy law or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of, or for the settlement of claims against, the Debtor other than the Debtor's Chapter 9 bankruptcy reorganization proceeding which is currently pending in the United States Bankruptcy Court for the Eastern District of New York in the case entitled *In re Suffolk Regional Off-Track Betting Corporation, Case No. 1-12-43503-CEC*, filed on May 11, 2012; (e) any representation or warranty made in this Security Agreement, or any other representation or warranty heretofore or hereafter made to the Secured Party by or on behalf of the Debtor, proves as of the date of such representation or warranty to have been incorrect or misleading in any material respect; or (f) there occurs any loss, theft, destruction or any substantial damage to, any of the Collateral not covered by insurance.

8.      Remedies of the Secured Party following a Default.  Upon the happening of any Event of Default, the Secured Party's rights and remedies with respect to the Collateral will be those of a Secured Party under the Uniform Commercial Code and under any other applicable law, as the same may from time to time be in effect, together with those rights granted to the Secured Party in this Section 8 and in any other agreement now or hereafter in effect between the Debtor and the Secured Party.  Without limiting the generality of the foregoing, after the occurrence of an Event of Default the Secured Party may:

(a)     Notify any or all Account Debtors and other parties obligated to pay the Collateral of the Security Interest granted hereby, and direct any and all such parties to make all payments of the Collateral to the Secured Party;

(b)     Perform any of the duties of the Debtor set forth in this Security Agreement, at the Debtor's expense;

(c)     Demand, collect and sue on the Collateral (in either the Debtor's name or the Secured Party's name,  at the option of the Secured Party) with the right to enforce, compromise, settle or discharge the Collateral, and to endorse the Debtor's name on any and all Checks, Commercial Paper, and any other Instruments pertaining to or constituting the Collateral; and

(d)     Acting as the Debtor's attorney-in-fact without restriction, in the same manner, to the same extent and with the same effect as if the Debtor were to perform such act, to (i) receive and collect all mail addressed to the Debtor; (ii) direct the place for delivery thereof; (iii) open and remove the contents of such mail; (iv) retain all contents thereof relating to the Collateral; and (v) perform all other acts to preserve the Collateral which the Secured Party deems appropriate.

All rights and remedies of the Secured Party pursuant to this Security Agreement or otherwise will be cumulative, and no such right or remedy will be exclusive of any other such right or remedy.  No single or partial exercise by the Secured Party of any such right or remedy will preclude any other or further exercise thereof, or any exercise by the Secured Party of any other right or remedy.

3

9.      Procedural Requirements. The Debtor waives, without notice, each act and other thing upon which, but for such waiver, any of the Debtor's obligations pursuant to this Security Agreement or any right or remedy of the Secured Party pursuant to this Security Agreement or otherwise would or might be conditioned. Without limiting the generality of the preceding sentence, no such obligation, right or remedy will be conditioned upon, and such waiver will apply to, any demand, presentment or protest, notice of nonpayment, notice of protest, or any other matter.

10.      Preservation of the Collateral and Risk of Loss. The Secured Party will have no obligation to take, and the Debtor will have the sole responsibility for taking, any and all steps to preserve all rights against any and all prior parties to any Instrument or Chattel Paper, whether Collateral or Proceeds and whether or not in the Secured Party's possession. The Debtor waives protest of any Instrument constituting Collateral at any time held by the Secured Party on which the Debtor is in any way liable and waives notices of any other action taken by the Secured Party following an Event of Default. The Debtor will at all times bear the full risk of loss or theft of, or damage to or destruction of, the Collateral.

11.      Expenses. The Debtor will pay to the Secured Party on demand each cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, for litigation or for any other purpose, attorneys' fees and disbursements) reasonably incurred by the Secured Party (a) in enforcing or performing any of the obligations of the Debtor pursuant to this Security Agreement; or (b) in preserving or exercising any right or remedy pursuant to this Security Agreement.

12.      Course of Dealing, Delay and Waiver. No course of dealing or other conduct heretofore pursued, accepted or acquiesced in by the Secured Party will operate as a waiver of any right or remedy of the Secured Party under this Security Agreement. No delay by the Secured Party in exercising any such right or remedy will operate as a waiver thereof or of any other such right or remedy. No waiver by the Secured Party of any such right or remedy will be effective unless made in a writing duly executed by the Secured Party and specifically referring to such waiver. No waiver by the Secured Party on any one occasion of any such right or remedy will operate as a continuing waiver thereof or of any other such right or remedy on any future occasion.

13.      Term of Agreement. This Security Agreement will remain in full force and effect until all of the Indebtedness is paid in full.

14.      Governing Law. This Security Agreement and the transactions evidenced hereby will be construed under the internal laws of the State of New York.

15.      Notices. All notices, requests, demands, directions and other communications which may or are required to be given, served or sent under this Security Agreement or under applicable law will be in writing and will be deemed to have been properly given or sent if (i) mailed by registered or certified mail with postage prepaid, return receipt requested; or (ii) sent by Federal Express or similar courier service, and addressed to the applicable party at the address stated above, or, as to each party, at such other address as will be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section; or (iii) delivered by personal delivery to an officer of the Debtor or the Secured Party. All such notices, requests, demands, directions and other communications will, when mailed in the manner specified in (i) above be effective three (3) business days after being so mailed, when sent in the manner specified in (ii)

4

above be effective one (1) business day after being so sent, and when delivered in the manner specified in (iii) above be effective when delivered.

16.    Severability.  Whenever possible, each provision of this Security Agreement will be interpreted in such manner as to be effective and valid under applicable law.  If, however, any such provision is prohibited by or invalid under such law, it will be deemed modified to conform to the minimum requirements of such law, or if for any reason it is not deemed so modified, it will be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other provision being prohibited or invalid.

17.    Waiver of Trial by Jury.  THE DEBTOR AND THE SECURED PARTY HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY EACH WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE DEBTOR OR THE SECURED PARTY MAY HAVE IN ANY ACTION OR PROCEEDING IN LAW OR IN EQUITY IN CONNECTION WITH THIS SECURITY AGREEMENT OR THE TRANSACTIONS RELATED HERETO.

18.    Entire Agreement.  This Security Agreement contains the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Security Agreement, and supersedes each course of conduct heretofore pursued, accepted or acquiesced in, and each oral and written agreement and representation heretofore made, by the Secured Party with respect thereto, whether or not relied or acted upon.  This Security Agreement is binding upon the Debtor and upon each successor of the Debtor, and will inure to the benefit of, and be enforceable by, the Secured Party and each successor and assignee of the Secured Party.  No modification of this Security Agreement or waiver of any such right or remedy will be effective unless made in a writing duly executed by the party to be bound thereby.

19.    Counterparts.  This Security Agreement may be signed on different counterparts by different parties, all of which counterparts when taken together will be deemed to be a complete Security Agreement.  After this Security Agreement is signed by a party or parties hereto, and such Security Agreement has been transmitted by facsimile or e-mail means, such facsimile or e-mail transmission will be considered for all purposes to be delivered and to be an original.

IN WITNESS WHEREOF, this Security Agreement has been duly executed by the Debtor as of the day and year first above written.

SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION

By  Philip C. Hrlan , PRES .
                                              Title

STATE OF NEW YORK        )
                         )      SS.:
COUNTY OF SUFFOLK        )

On the 30 day of October____, 2014, before me, the undersigned, a notary public in and for the State of New York, personally appeared Ph.l.P Pelin____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the Presidut____ of Suffolk Regional Off-Track Betting Corporation, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

_____
Notary Public

MICHAEL HARRISON
Notary Public, State of New York
No. 01HA5025220
Qualified in Suffolk County
Commission Expires March 21, 20 _18_

## EXHIBIT A

## THE COLLATERAL

Defined terms used in this Exhibit A will have the meanings given to them in Articles 8 and 9 of the New York Uniform Commercial Code.

The Collateral to which this Security Agreement pertains is comprised of the Debtor's present and future interests in all of the following:

(a)    All Equipment and Fixtures now or hereafter owned or acquired by the Debtor and located at 440 Long Island Expressway Drive South, Brookhaven, New York (the "Premises");

(b)    All of the Debtor's Inventory and Goods  located at the Premises (including without limitation, all raw materials, goods in process, finished goods, packaging material, and goods acquired or held for sale);

(c)    All of the Debtor's Accounts, Chattel Paper, Checks, Commercial Tort Claims, Contract Rights, Choses in Action, Deposit Accounts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Money, Promissory Notes, Securities and Software of every kind or nature related to, derived from, situated at or otherwise associated with the business conducted by the Debtor at the Premises, now due or hereafter to become due, and including insurance rights arising from or out of the assets referred to in subclauses (a) and (b) above; and

(d)    All Cash Proceeds, Noncash Proceeds and Products arising from or out of the assets referred to in subclauses (a), (b) and (c) above in any form, including without limitation, insurance proceeds, increases and profits received therefrom, all substitutions therefor, Goods represented thereby, and Records pertaining thereto, whether any of the foregoing is now owned or is hereafter acquired by the Debtor.

## SECTION 22 LIEN LAW AFFIDAVIT

STATE OF NEW YORK )
                          )     ss:
COUNTY OF SUFFOLK )

      Philip C. Nolan, being duly sworn, deposes and says that:

      1.      He is the President and Chief Executive Officer of Suffolk Regional Off-Track Betting Corporation, a public benefit corporation which maintains an office located at 5 Davids Drive, Hauppauge, New York 11788 (the "Borrower");

      2.      The Borrower has entered into the annexed Building Loan Contract with DNC Gaming Management in Suffolk, LLC, which maintains an office located at 40 Fountain Plaza, Buffalo, New York 14202 (the "Lender"), dated as of October 30, 2014 (the "Building Loan Contract");

      3.      The Building Loan Contract relates to the construction of certain improvements to real property located in the State of New York, County of Suffolk and Town of Brookhaven described with more particularity in the Building Loan Contract (the "Improvement");

      4.      The total amount of the two loans described in the Building Loan Contract is $76,400,000.00 (the "Loans").

      5.      The consideration paid, or to be paid, for the Loan is $0.00.

      6.      The expenses incurred or to be incurred in connection with the Loan are as follows:

| | | |
|---|---|---:|
| (a) | Recording Fees (est.) | $ 1,175.00 |
| (b) | Title Insurance Premiums | $ 275,517.00 |
| (c) | Escrow Closing Fee | $ 2,500.00 |
| (d) | Real Property Taxes and Assessments | $ 4,762.52 |

Total Expenses ................................................................................ $ 283,954.52

      7.      The amount, if any, to be advanced from the Loan to repay amounts previously advanced to the Borrower pursuant to Notices of Lending for costs of the Improvement is $0.00.

      8.      The amount, if any, to be advanced from the Loan to reimburse the Borrower for costs of the Improvement expended by the Borrower after the commencement of the Improvement but prior to the date hereof are itemized as follows: $0.00.

      9.      The amount advanced from the Loan to fund the purchase price for the real property upon which the Improvement is to be constructed is $10,950,000.00.

      10.      The net sum available to the Borrower from the Loan for the Improvement is $65,166,045.48;

11.    This statement is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York, as amended; and

12.    The facts stated above and any costs itemized on this statement are true and accurate.

Philip C. Nolan, PRES.

Philip C. Nolan, President
and Chief Executive Officer

Sworn to before me this 30 day
of October, 2014.

_____
Notary Public

MICHAEL HARRISON
Notary Public, State of New York
No. 01HA5025220
Qualified in Suffolk County
Commission Expires March 21, 20/8

EXHIBIT F

Performance Criteria

Set forth below are the goals that the Manager must meet as a condition to the extension of its management rights at the Gaming Facility beyond the Initial Term (or an Extension Term).

*Quantitative Goals*

As a condition to renewal of its management rights at the Gaming Facility beyond the Initial Term (or an Extension Term), the Manager will cause the Gaming Facility to realize average year-over-year growth of 1% per year in Net Gaming Revenues over the course of the Initial Term beginning from the Full Facility Opening Date (or the beginning of an Extension Term). If the Manager achieves average year-over-year growth of 1% per year or more in Net Gaming Revenues (during the Initial Term as described above or an Extension Term, as applicable) Manager will have the right to extend the term of the Amended and Restated Development and Management Services Agreement by up to three (3) ten (10) year Extension Terms.

The following additional measures will be taken or considered in the calculation of any extension of the Amended and Restated Development and Management Services Agreement for a period of time beyond the Initial Term:

> The Manager will receive up to four (4) (or in the case of each Extension Term up to two (2)) 500 basis point allowances (or credits) in the calculation of the change in year-over-year Net Gaming Revenue if at any time during the Initial Term (or the then applicable Extension Term): (a) Internet gaming or gambling is legalized in New York State; or (b) a competitive video lottery or casino facility is opened at a location within Suffolk or Nassau Counties; or (c) an Extraordinary Event occurs.

*Qualitative Goals*

The following performance metrics will be used in determining the quality of the Manager's performance under the Amended and Restated Development and Management Services Agreement. Each of the four enumerated categories set forth below will be given an overall weight for purposes of scoring. The combined total performance percentage for the year will be established by adding together the scores for all four performance categories. If it appears that the Manager's performance in any of these areas is deficient, Suffolk OTB and the Manager we will meet to establish a plan of action, and then the Manager will promptly undertake corrective steps to improve the quality of its performance. In addition, these performance metrics will be revisited and revised from time to time, to the extent that both of the parties deem necessary.

The Manager's right to extend the term of the Amended and Restated Development and Management Services Agreement for an additional period of time as set forth in the Agreement will be dependent on the Manager's achieving a cumulative overall performance percentage of not less than eighty percent (80%) during the last year of the Initial Term (or the last year of any subsequent Extension Term), with the weight to be applied to each qualitative goal to be as set forth below:

1.    Reporting – (Overall Weight 30%)

- Daily gross and net gaming revenue reports will be provided to Suffolk OTB's designated officers no later than 12:00 noon of the following day.  (Weight 5%)

- A monthly business review will be provided by the General Manager and members of the Senior Management Team (as appropriate) to Suffolk OTB's designated officers on a regular monthly basis, subject to scheduling.  (Weight 5%)

- Capital renewals fund balances will be provided to Suffolk OTB's designated officers within 25 business days after the close of each month.  (Weight 5%)

- An annual business plan and budget will be provided to Suffolk OTB's designated officers not less than 45 days prior to the beginning of each calendar year. (Weight 5%)

- Annual and mid-year business review meetings will be provided by the General Manager and members of the Senior Management Team (as appropriate) to Suffolk OTB's designated officers for the purpose of discussing business opportunities and threats, and to generally respond to any questions pertaining to the conduct of the Business.  (Weight 5%)

- A report on specific marketing strategies and the results of marketing efforts will be provided by the General Manager and the Senior Director of Marketing to Suffolk OTB's designated officers not less frequently than twice each year. (Weight 5%)

2.    Customer Service – (Overall Weight 40%)

- At least once each year, an independent quality assurance assessment provider will measure the Gaming Facility's compliance with Delaware North's *GuestPath*® standards for gaming properties without a hotel, and the Gaming Facility will receive an overall compliance score of at least 80%.  (Weight 20%)

- At least once each year, the independent quality assurance assessment provider will survey the Gaming Facility's customers to determine their experience at the property.  This "voice of the guest" survey will include performance

measurements with respect to the customers' "overall satisfaction" and "likelihood to recommend" – two key industry metrics of customer loyalty – and the Gaming Facility will receive an average score of at least 80% for each of these criteria. (Weight 20%)

3.    Human Resources – (Overall Weight 20%)

- The Gaming Facility staffing plan for each quarter will be provided to Suffolk OTB's designated officers at least 20 days prior to the beginning of each calendar quarter. (Weight 10%)

- At least once each year, the Gaming Facility's Human Resources Department will conduct an employee satisfaction survey to verify that the overall job satisfaction of the hourly staff is at least 80%. (Weight 10%)

4.    Maintenance Standards – (Overall Weight 10%)

- A maintenance schedule to be established by mutual agreement as part of the annual business plan will be followed to ensure that the Gaming Facility is maintained in the best possible condition. (Weight 5%)

- All maintenance issues of which the Manager becomes aware will be addressed within 24 hours of notification, with the corrective work to be completed as soon thereafter as is reasonably possible. (Weight 5%)

If the Manager is denied the reasonable opportunity to achieve any of these qualitative goals for reasons beyond its control, those goals will be removed from consideration and only the goals that the Manager had a reasonable opportunity to achieve will be used in the determination of whether it has earned the right to an extension of the Amended and Restated Development and Management Services Agreement. Subject to the foregoing, and provided that the Manager achieves a cumulative qualitative performance percentage of 80% or greater during the last year of the Initial Term (or the last year of any subsequent Extension Term), the Manager will be eligible for renewal of the Amended and Restated Development and Management Services Agreement for an additional period of years as set forth in Section 12.02 of the Amended and Restated Development and Management Services Agreement.

# EXHIBIT G

Lease

To be attached when drafted and agreed

# EXHIBIT H

Working Capital and Leasehold Improvements Loan

# LOAN AGREEMENT

This Loan Agreement (this **"Agreement"**), dated as of May 24, 2016, is entered into between **SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**, a New York public benefit corporation (the **"Borrower"**), and **DNC GAMING MANAGEMENT IN SUFFOLK, LLC**, a New York limited liability company (the **"Lender"**).

## RECITALS

WHEREAS, the Borrower commenced a case in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") under Chapter 9 of the Bankruptcy Code on May 11, 2012, being Case No. 12-43503 (the "Bankruptcy Case"); and

WHEREAS, On September 11, 2014, Borrower filed its Second Amended Plan for the Adjustment of Debts of Suffolk Regional Off-Track Betting Corporation dated September 11, 2014 [Docket No. 318-1] (as amended, the "Plan"); and

WHEREAS, On October 22, 2014, at the conclusion of a contested confirmation hearing, the Bankruptcy Court overruled objections to the Plan filed by certain creditors of the Borrower; and

WHEREAS,  On October 30, 2014, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Plan for the Adjustment of Debts of Suffolk Regional Off-Track Betting Corporation [Docket No. 326] (the "Confirmation Order") confirming the Plan.  The Bankruptcy Court retains limited jurisdiction over the Borrower pursuant to the terms of the Plan and Confirmation Order; and

WHEREAS, the Plan became effective on October 30, 2014 (the "Effective Date"); and

WHEREAS, in connection with a proposed development of a planned video lottery gaming facility that will be owned by the Borrower and operated by the Lender and/or Delaware North Companies Gaming & Entertainment, Inc. ("DNC Gaming"), an affiliate of the Lender, the Borrower, the Lender and DNC Gaming entered into that certain Development and Management Services Agreement dated March 7, 2014 (together with the Exhibits thereto); and

WHEREAS, the Borrower, the Lender and DNC Gaming entered into that certain Amended and Restated Development and Management Services Agreement (together with the Exhibits thereto, as amended, restated, supplemented or otherwise modified from time to time) dated May 24, 2016 (the "DMS Agreement"); and

WHEREAS, in anticipation of the effectiveness of the DMS Agreement, the Lender has agreed to advance funds to the Borrower (i) to fund the general business activities of the Borrower and (ii) to fund all or a portion of the costs of the design, development and build-out of a site for Borrower's planned video lottery gaming facility and to fund the gaming facility's liquidity needs for paying customers of the gaming facility, in the manner contemplated in the DMS Agreement; and

WHEREAS, the parties hereto intend that the loans advanced pursuant to this Agreement to fund the general business activities of the Borrower will be as provided herein and subject to the terms and provisions in the DMS Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.01    Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

**"Affiliate"** as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person, or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

**"Agreement"** has the meaning for such term set forth in the Preamble of this Agreement.

**"Asset Sale"** means any Disposition of any property or series of related Dispositions of any property (excluding any such Disposition permitted by Section 7.05).

**"Bankruptcy Case"** has the meaning for such term set forth in the Recitals of this Agreement.

**"Bankruptcy Court"** has the meaning for such term set forth in the Recitals of this Agreement.

**"Bankruptcy Code"** means Title 11 of the United States Code, as amended from time to time, or any similar federal or state law for the relief of debtors.

**"Borrower"** has the meaning for such term set forth in the Preamble of this Agreement.

**"Borrowing Date"** means any Business Day specified by the Borrower in a borrowing notice as a date on which the Borrower requests the Lender to make a Loan hereunder.

**"Brookhaven Property"** means the real property and improvements located at 440 South Service Road, Medford, New York 11763, also known as 440 Long Island Expressway Drive South, Brookhaven, New York, also known as 440 Expressway Drive, Brookhaven, New York, also known as Long Island Avenue, Medford, New York 11763, as described on Schedule 1.01(b).

**"Business Day"** means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Closing Date**" means the date on which the conditions precedent set forth in Section 4.01 are satisfied or waived with respect to a Loan made pursuant to this Agreement.

"**Collateral**" has the meaning for such term set forth in the Security Agreement.

"**Committee**" has the meaning for such term set forth in Section 8.02(c).

"**Debt**" of any Person at any date, without duplication, means (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables and accrued expenses incurred in the ordinary course of business and not past due for more than 90 days after the date on which each such trade payable or account payable was created and (ii) any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities in respect of obligations of the kind referred to in subsections (a) through (d) of this definition; (f) all guaranty obligations of such Person in respect of obligations of the kind referred to in subsections (a) through (e) above; and (g) all obligations of the kind referred to in subsections (a) through (f) above secured by (or which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation; and (h) all debt of any partnership, unlimited liability company or unincorporated joint venture in which such Person is a general partner, member or a joint venturer, respectively (unless such Debt is expressly made non-recourse to such Person).

"**Default**" means an Event of Default or an event which, upon the giving of notice, the lapse of time, or both would, unless cured or waived, become an Event of Default.

"**Deficiency Note**" means the amended and restated promissory note evidencing the difference between the outstanding principal and interest under the First Loan Note and the Net Cash Proceeds from the sale of the Brookhaven Property, if any.

"**Disclosure Statement**" means a disclosure statement for the Plan in a form reasonably acceptable to the Lender.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**DMS Agreement**" has the meaning for such term set forth in the Recitals of this Agreement.

"**DNC Gaming**" has the meaning for such term set forth in the Recitals of this Agreement.

"**Dollars**" and "**$**" mean lawful money of the United States of America.

"**Environmental Action**" means any action, suit, demand, demand letter, claim, notice of violation or non-compliance, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any permit issued under any Environmental Law, or any Hazardous Material, or arising from alleged injury or threat to health, safety or the environment, including by any Governmental Authority or third party for (a) enforcement, clean-up, removal, response, remedial or other actions or damages and (b) damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means any and all Federal, state, foreign, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law as applicable in connection with the physical condition or use of the Mortgaged Properties, as now or may at any time hereafter be in effect, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or, to the extent relating to exposure to substances that are harmful or detrimental to the environment, human health or safety.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership (or profit) interests in a Person (other than a corporation), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"**Event of Default**" has the meaning for such term set forth in Section 8.1.

"**Extraordinary Receipts**" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards and similar payments, indemnity payments and any purchase price adjustment received in connection with any purchase agreement; *provided, however, that* Extraordinary Receipts shall not include cash receipts from proceeds of insurance, condemnation awards or similar payments, or indemnity payments to the extent that such funds are received by any Person in respect of any third party claim against such Person and applied to pay (or reimburse such Person for its prior payment of) such claim plus related costs and expenses.

"**First Loan Note**" means that certain promissory note, dated as of October 30, 2014, made by the Borrower in favor of the Lender in the original principal amount of Sixty-Five Million Dollars ($65,000,000)

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied.

"**Gaming Bankroll Requirement**" means money that is required by the gaming facility to provide liquidity for payouts to customers of the gaming facility.

**"Governmental Authority"** means the government of any nation or any political subdivision thereof having jurisdiction over the Borrower or the Mortgaged Properties, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

**"Hazardous Materials"** means (a) any gasoline, petroleum or petroleum products or by-products, radioactive materials, friable asbestos or asbestos-containing materials, urea-formaldehyde insulation, polychlorinated biphenyls and radon gas, and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

**"Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended.

**"Lender"** has the meaning for such term set forth in the Preamble of this Agreement.

**"Lien"** means any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

**"Loan"** means the 2016 Working Capital Loan or any Project Development and Gaming Facility Bankroll Loan, as the context may require, and **"Loans"** means either (i) the 2016 Working Capital Loan or Project Development and Gaming Facility Bankroll Loans or (ii) the 2016 Working Capital Loan and Project Development and Gaming Facility Bankroll Loans, as the context may require.

**"Loan Documents"** means, collectively, this Agreement, the Security Agreement, the Mortgage, the 2016 Working Capital Loan Note, the Project Development and Gaming Facility Bankroll Loan Note, and all other agreements, documents, certificates and instruments executed and delivered to the Lender by the Borrower from time to time in connection therewith, as the same may be amended, restated, supplemented or extended.

**"Material Adverse Effect"** means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Borrower, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any Lien purported to be created by any Loan Document, (d) the rights or remedies of the Lender under any Loan Document or (e) the ability of the Borrower to perform any of its material obligations under any Loan Document to which it is a party.

**"Material Contracts"** with respect to any Person, means each contract that is material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

**"Maturity Date"** means the earliest to occur of (a) ten (10) years after the Full Facility Opening Date  (as defined in the DMS Agreement) (b) thirty (30) days after the termination of the DMS Agreement for any reason or (c) at the option of Lender following the occurrence of an Event of Default.

**"Mortgage"** means that certain Mortgage and Security Agreement, dated as of the date hereof, made by the Borrower in favor of the Lender, as the same may be amended, restated, supplemented or extended.

"**Mortgaged Properties**" means the real properties listed on Schedule 1.01(b), as updated from time to time, as to which the Lender shall be granted Liens pursuant to the Mortgage.

"**Net Cash Proceeds**" means (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and cash equivalents (including any such proceeds actually received from deferred payments of principal pursuant to a note, a receivable or otherwise), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be reserved for indemnification, adjustment of purchase price or similar obligations pursuant to the agreements governing such Asset Sale, amounts required to be applied to the repayment of Debt secured by a Permitted Lien on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Loan Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any incurrence of Debt, the cash proceeds received from such incurrence or issuance, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"**Obligations**" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, covenants, and indemnities of, the Borrower arising under any Loan Document, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

"**PATRIOT Act**" has the meaning for such term set forth in Section 9.11.

"**Permitted Liens**" means, at any time, Liens in respect of property of Borrower permitted to exist at such time pursuant to the terms of Section 7.02.

"**Plan**" has the meaning for such term set forth in the Recitals of this Agreement.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority or other entity.

"**Project Development and Gaming Facility Bankroll Loan**" means a Loan which accrues interest at the Project Development and Gaming Facility Bankroll Loan Effective Rate and is made for purposes of funding a portion of the Project Development Requirements or the Gaming Facility Bankroll Requirements.

"**Project Development and Gaming Facility Bankroll Loan Effective Rate**" Prior to the Full Facility Opening Date (as defined in the DMS Agreement) and for one year thereafter, interest will accrue at a rate equal to four and one-quarter percent (4.25%) per annum.  Beginning on the first anniversary of the Full Facility Opening Date the interest rate shall be subject to cumulative annual increases on each anniversary of the Full Facility Opening Date equal to three-quarters of one percent (0.75%) per annum until the outstanding principal amount to the Project Development and Gaming Facility Bankroll Loans have been paid in full; provided, however, that at no time will the interest rate payable with respect to the outstanding principal amount of the Project Development and Gaming Facility Bankroll Loans exceed seven percent (7.0%) per annum.

"**Project Development and Gaming Facility Bankroll Note**" means a promissory note of the Borrower payable to the Lender evidencing the Project Development and Gaming Facility Bankroll Loan, as the same may be amended, restated, supplemented or extended.

**"Project Development Requirement"** means the costs either incurred by the Lender or incurred by the Borrower that the Lender, in its sole discretion, approves and/or advances, in either case, in connection with the design, development or build-out of the gaming facility, in the manner contemplated in the DMS Agreement.

**"Recovery Event"** means any settlement of or payment to the Borrower in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower.

**"Related Parties"** with respect to any Person, means such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors and representatives of it and its Affiliates.

**"Requirement of Law"** as to any Person, means any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

**"Security Agreement"** means that certain General Security Agreement made by the Borrower in favor of the Lender, dated on or about the date hereof, as the same may be amended, restated, supplemented or extended.

**"Subsidiary"** as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person.

**"Taxes"** means any and all present or future income, stamp or other taxes, levies, imposts, duties, deductions, charges, fees or withholdings imposed, levied, withheld or assessed by any Governmental Authority, together with any interest, additions to tax or penalties imposed thereon and with respect thereto.

**"2016 Working Capital Loan"** means a Loan which accrues interest at the 2016 Working Capital Loan Effective Rate and is made for purposes of funding a portion of the 2016 Working Capital Requirement.

**"2016 Working Capital Loan Effective Rate"** means, a rate equal to five percent (5.0%) per annum.

**"2016 Working Capital Loan Note"** means a promissory note of the Borrower payable to the Lender evidencing the 2016 Working Capital Loan, as the same may be amended, restated, supplemented or extended.

**"2016 Working Capital Requirement"** means the near-term working capital needs of the Borrower, which in no event will exceed an aggregate amount of $2,500,000, which the Borrower represents that when combined with cost management strategies and other cash resources available to the Borrower will be sufficient to pay the Borrower's operating costs.

**"Uniform Commercial Code"** means the Uniform Commercial Code as in effect in the state of New York from time to time.

**Section 1.02    Interpretation.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(b)    All accounting and finance terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing the Borrower's audited financial statements, except as otherwise specifically prescribed herein.

## ARTICLE II
### The Loans

**Section 2.01    2016 Working Capital Loan.**

(a)    <u>2016 Working Capital Loan</u>.

(i)    Subject to the terms and conditions of this Agreement, the Lender agrees to make the 2016 Working Capital Loan to the Borrower as follows:

(A)    the 2016 Working Capital Loan in an amount of Two Million Five Hundred Thousand Dollars ($2,500,000) will be advanced on the date of this Agreement;

(ii)    Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

(b)    <u>Repayment of 2016 Working Capital Loan</u>.  The outstanding principal amount of the 2016 Working Capital Loan shall be due and payable on the Maturity Date.

**Section 2.02    Project Development and Gaming Facility Bankroll Loans.**

(a)    <u>Project Development and Gaming Facility Bankroll Loan Advances</u>.  **AT THE SOLE DISCRETION OF THE LENDER** and subject to the terms and conditions of this Agreement, the sub-limits set forth herein, and the DMS Agreement, the Lender may, from time to time after a Closing Date but prior to the Maturity Date, following either (i) a written request of the Borrower or (ii) the payment by the Lender directly of a Project Development Requirement or a Gaming Facility Bankroll Requirement pursuant to the DMS Agreement, make Project Development and Gaming Facility Bankroll Loans to the Borrower in an amount not to exceed Thirty-Nine Million Dollars ($39,000,000) in the aggregate, with the amount and timing of such Project Development and Gaming Facility Bankroll Loans to be based on such factors as the Lender in its sole discretion may determine to be appropriate.  Amounts borrowed under this Section 2.02 and repaid or prepaid may not be reborrowed.

(b)    <u>Procedures for Project Development and Gaming Facility Bankroll Loan Borrowing</u>.

(i)      <u>Lender Advances</u>. In the event that the Lender shall pay directly any costs or other amounts for a Project Development Requirement or a Gaming Facility Bankroll Requirement pursuant to the DMS Agreement or a Gaming Facility Bankroll Requirement, the Lender shall inform Borrower when the Lender has made such payment , deliver to Borrower a written disbursement notice and the amount thereof shall constitute a Project Development and Gaming Facility Bankroll Loan which shall be applied against the available balance of the Project Development and Gaming Facility Bankroll Loan.

(ii)      In the event that the Borrower plans to pay a Project Development Requirement or a Gaming Facility Bankroll Requirement, the Borrower shall deliver to the Lender an irrevocable borrowing notice, in form reasonably acceptable to the Lender, for a Project Development and Gaming Facility Bankroll Loan, together with such additional information and documents as the Lender may request in its sole discretion, no later than ten (10) Business Days prior to the requested borrowing date. Any such amounts disbursed by Lender pursuant to such a borrowing request shall constitute a Project Development and Gaming Facility Bankroll Loan.

(c)      <u>Repayment of Project Development and Gaming Facility Bankroll Loans</u>. The outstanding principal amount of the Project Development and Gaming Facility Bankroll Loans, if and whenever disbursed by Lender, shall be due and payable on the Maturity Date.

(d)      <u>Limitation on Project Development and Gaming Facility Bankroll Loans for Gaming Facility Bankroll Requirements</u>. Notwithstanding anything to the contrary set forth in this Agreement, the aggregate of all Project Development and Gaming Facility Bankroll Loans to fund the Gaming Facility Bankroll Requirements shall not exceed Five Million Dollars ($5,000,000).

**Section 2.03    Repayment of Loans; Evidence of Debt.**

(a)      The Borrower hereby unconditionally promises to pay to the Lender in full in cash, to the extent not previously paid in accordance with the terms and conditions of the DMS Agreement or otherwise, the then-unpaid principal amount of all Loans on the Maturity Date.

(b)      The Lender shall maintain an account or accounts evidencing indebtedness of the Borrower to the Lender resulting from each Loan, including the amounts of principal and interest payable and paid to the Lender from time to time under this Agreement.

(c)      On or about the date of this Agreement, the Borrower will promptly execute and deliver to the Lender the 2016 Working Capital Loan Note and a Project Development and Gaming Facility Bankroll Loan Note.

**Section 2.04    Optional Prepayments.** The Borrower may at any time and from time to time prepay the Loans, in whole or in part, upon prior written notice to the Lender, which notice shall specify the date and amount of such prepayment; *provided that* any prepayment, which is not made in full, shall be in a principal amount of no less than $10,000 or a whole multiple of $10,000 in excess thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. The Borrower is required to make any such optional prepayments in the order provided for in Section 2.06.

**Section 2.05    Mandatory Prepayments.**

(a)     If any Debt shall be incurred by the Borrower (excluding any Debt permitted to be incurred pursuant to Section 7.01), then, no later than five Business Days after the Borrower receives the Net Cash Proceeds therefrom, the Loans shall be prepaid by an amount equal to 100% of the amount of the Net Cash Proceeds from such incurrence or issuance in the manner set forth in Section 2.06.

(b)     Except as set forth in Section 2.05(d), if on any date the Borrower shall receive Net Cash Proceeds from any Asset Sale or Recovery Event, then, within five Business Days of the date of receipt by the Borrower of such Net Cash Proceeds, the Loans shall be prepaid as set forth in Section 2.06; *provided that*, so long as no Event of Default shall have occurred and be continuing at the time of the Borrower's receipt of such Net Cash Proceeds, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets used or useful in the Borrower's business (which have been approved for purchase by Lender) so long as within 120 days following receipt of such Net Cash Proceeds such purchase shall have been consummated (as certified by the Borrower in writing to the Lender).  Any Net Cash Proceeds not so reinvested pursuant to the proviso in the immediately preceding sentence shall be immediately applied to the prepayment of the Loans in the manner set forth in Section 2.06.

(c)     Upon any Extraordinary Receipt received by or paid to or for the account of the Borrower, and not otherwise included in Section 2.05(a) or Section 2.05(b), the Borrower shall prepay the Loans in the manner set forth in Section 2.06 in an amount equal to 100% of all Net Cash Proceeds received therefrom within five Business Days of the date of receipt thereof by the Borrower; *provided that*, so long as no Event of Default shall have occurred and be continuing at the time of the Borrower's receipt of such Net Cash Proceeds, the Borrower may  reinvest all or any portion of such Net Cash Proceeds in assets used or useful in the Borrower's business (which have been approved for purchase by Lender) so long as within 120 days following receipt of such Net Cash Proceeds such purchase shall have been consummated (as certified by the Borrower in writing to the Lender).  Any Net Cash Proceeds earmarked for reinvestment or that are not earmarked for reinvestment pursuant to the proviso in the immediately preceding sentence that are not so reinvested shall be immediately applied to the prepayment of the Loans in the manner set forth in Section 2.06.

(d)     If on any date the Borrower shall receive Net Cash Proceeds resulting from the sale of the Brookhaven Property, then, within five Business Days of the date of receipt by the Borrower of such Net Cash Proceeds, the Net Cash Proceeds shall be applied to repay first all outstanding principal and interest amounts under the First Loan Note.  If the First Loan Note is not paid in full with such Net Cash Proceeds, then the Borrower shall execute and deliver to the Lender the Deficiency Note in accordance with the terms and conditions of the DMS Agreement.  To the extent that any Net Cash Proceeds are remaining after repayment of all outstanding principal and interest under the First Loan Note, the balance of such Net Cash Proceeds shall be used to prepay the Obligations hereunder in the manner set forth in Section 2.06.


**Section 2.06     Application of Prepayments.**  Amounts to be applied in connection with prepayments made pursuant to Section 2.04 and Section 2.05(a), 2.05(b) or 2.05(c) shall be applied first, to the prepayment of the 2016 Working Capital Loan, second, to the Project Development and Bankroll Loans and third, to any other Debt owed by Borrower to Lender or any of Lender's Affiliates.  Each prepayment of the Loans under Section 2.04 and 2.05 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.


**Section 2.07     Interest.**

(a)　　The 2016 Working Capital Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing Date at a rate per annum equal to the 2016 Working Capital Loan Effective Rate.

(b)　　Each Project Development and Gaming Facility Bankroll Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing Date at a rate per annum equal to the Project Development and Gaming Facility Bankroll Loan Effective Rate.

(c)　　If (i) all or any amount of the principal of any Loan is not paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such all outstanding Loans (whether or not overdue) shall bear interest at a rate of interest per annum equal to the rate that would otherwise be applicable thereto, plus 2%, and shall be payable on demand, and (ii) if all or any portion of any interest on any Loan or other amount payable hereunder shall not be paid when due (after giving effect to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such overdue amount shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto plus 2%, payable on demand, in each case, from the date of such non-payment until such amount is paid in full.

(d)　　Interest on the 2016 Working Capital Loan and each Project Development and Gaming Facility Bankroll Loan shall be payable in the first instance in accordance with the terms and conditions of the DMS Agreement and otherwise as provided herein.  In any event, all accrued, but unpaid interest shall be due and payable upon any prepayment of the 2016 Working Capital Loan or any Project Development and Gaming Facility Bankroll Loan, any termination of the 2016 Working Capital Loan or Project Development and Gaming Facility Bankroll Loan and, if not otherwise prepaid, on the Maturity Date.

**Section 2.08　　Computation of Interest and Fees.** All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid. Each determination by the Lender of an interest rate or fee hereunder pursuant to the terms hereof shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.09　　No Discharge.** The Borrower agrees that its obligations hereunder shall not be discharged by the entry of an order confirming the Plan or any other plan of adjustment or reorganization.

## ARTICLE III
## INTENTIONALLY DELETED

## ARTICLE IV
### CONDITIONS PRECEDENT

**Section 4.01　　Conditions Precedent to Loan Closing.** On or before the Closing Date:

(a)　　<u>Loan Documents</u> – The Lender shall have received:  (i) this Agreement, duly executed and delivered by an authorized officer of the Borrower; and (ii) the Security Agreement, Mortgage and each other Loan Document, in each case satisfactory to the Lender in its sole discretion and executed and delivered by the Borrower.

     (b)    <u>Lien Searches</u> – The Lender shall have received results of a recent lien search with respect to the Borrower in the State of New York and the jurisdictions in which the assets of the Borrower are located, and such searches reveal no liens on any of the assets of the Borrower, except for Permitted Liens or Liens discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Lender.

     (c)    <u>Receipt of Fees</u> – The Lender shall have received all fees and expenses required to be paid hereunder for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date. All such amounts may be paid with proceeds of Loans made on the Closing Date.

     (d)    <u>Environmental Audit</u> – The Lender shall have received an environmental audit conducted by an independent third party consultant with respect to the real properties of the Borrower specified by the Lender acceptable to the Lender in its sole discretion.

     (e)    <u>Secretary's Certificate</u> – The Lender shall have received, in form and substance reasonably satisfactory to it, a certificate of the Borrower, certified by a secretary of the Borrower, dated the Closing Date, including: (i) a certificate of incorporation of the Borrower certified by the New York State Department of State; (ii) the by-laws of the Borrower as in effect on the date on which the resolutions referred to below were adopted; (iii) resolutions of the governing body of the Borrower approving the transactions contemplated by the Loan Documents; (iv) a certification that the names and signatures of the officers authorized to sign each Loan Document and other documents to be delivered hereunder and thereunder on behalf of the Borrower are true and correct; and (v) a good standing certificate with respect to the Borrower from the New York State Department of State.

     (f)    <u>Mortgage and Related Materials</u> – The Lender shall have received or waived the requirement for:

        (i)    a Mortgage with respect to the Mortgaged Properties, executed and delivered by a duly authorized officer of the Borrower;

        (ii)    the Lender shall have received, and the title insurance company issuing the policy referred to in clause (iii) below shall have received, maps or plats of an as-built survey of the Mortgaged Properties certified to the Lender and the title insurance company in a manner reasonably satisfactory to them, dated a date reasonably satisfactory to the Lender and the title insurance company by an independent professional licensed land surveyor satisfactory to the Lender and the title insurance company;

        (iii)    in respect of the Mortgaged Properties, a mortgagee's title insurance policy in form and substance reasonably satisfactory to the Lender. The Lender shall have received evidence satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid.  All such amounts may be paid with proceeds of Loans made on the Closing Date;

        (iv)    appraisals of the Mortgaged Properties, performed by an appraiser reasonably acceptable to the Lender, dated a date satisfactory to the Lender and indicating an appraisal value that is acceptable to the Lender in is sole discretion and otherwise in form and substance reasonably satisfactory to the Lender, and

        (v)    If any of the Mortgaged Properties is located in an area which has been identified by any governmental agency, authority or body as a flood hazard area or the like (A) a policy of flood insurance that (1) covers all or part of the Mortgaged Properties; (2) is written in an amount not less than the outstanding principal amount of the debt secured by such Mortgage that is reasonably allocable to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less; and (3) has a term ending later than the maturity of the Debt secured by such Mortgage, and (B) confirmation that the Borrower shall have received a copy of all recorded documents

referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (iii) above and a copy of all other material documents affecting the Mortgaged Properties.

      (g)     Evidence of Insurance – The Lender shall have received evidence of insurance coverage in form, scope and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.08 and Section 6.06 of this Agreement.

      (h)     Gaming Commission Approval – The Lender shall have received evidence, satisfactory to the Lender in its sole discretion, that the New York State Gaming Commission has approved and authorized the Loans, the Loan Documents, the DMS Agreement and all liens and security interests contemplated thereby, to the extent required by law.

      (i)     No Litigation – The Lender shall have received evidence, satisfactory to the Lender in its sole discretion, that no litigation have been commenced that has not been stayed by the Bankruptcy Court that, if successful, would have a material adverse impact on the Borrower, its business or ability to repay the 2016 Working Capital Loan or the Project Development and Gaming Facility Bankroll Loan, or that would challenge the transactions contemplated by the Loan Documents.

      **Section 4.02    Conditions Precedent to Each Loan.** The obligation of the Lender to make each Loan requested to be made by it hereunder, is subject to the satisfaction or the waiver by the Lender of the following conditions precedent, **WHICH CONDITIONS PRECEDENT IN NO WAY LIMIT THE ABILITY OF THE LENDER TO REFUSE TO MAKE LOANS IN ITS SOLE DISCRETION:**

      (a)     The continued satisfaction of all of the conditions set forth in Section 4.01

      (b)     Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on such earlier date.

      (c)     No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

      Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower, as of the date such Loan is made, that the conditions contained in Article IV have been satisfied.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES

      To induce the Lender to enter into this Agreement and to make the Loans hereunder, the Borrower hereby represents and warrants to the Lender that:

      **Section 5.01    Existence; Compliance with Laws.** The Borrower (a) is duly organized, validly existing and in good standing under the laws of State of New York and (b) is in compliance with all Requirements of Law in all material respects.

      **Section 5.02    Power; Authorization; Enforceability.**

(a)    Subject to the receipt of the approval of the New York Gaming Commission, the Borrower has the power and authority, and the legal right, to own or lease and operate its property, and to carry on its business as now conducted and as proposed to be conducted, and to execute, deliver and perform the Loan Documents to which it is a party and to obtain Loans hereunder. Subject to the entry of the Final Order and receipt of the approval of the New York Gaming Commission, the Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize the borrowing of Loans on the terms and conditions contained herein. Subject to the entry of the Final Order and receipt of the approval of the New York Gaming Commission, to the extent required by law, no consent or authorization of, filing with, notice to or other act by, or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices that have been obtained or made and are in full force and effect, and (ii) the filings referred to in Section 4.1(g). Each Loan Document has been duly executed and delivered by the Borrower.

(b)    This Agreement constitutes, and each other Loan Document when delivered hereunder will constitute, a legal, valid and binding obligation of the Borrower party thereto, enforceable against each the Borrower in accordance with its terms.

**Section 5.03    No Contravention.** Subject to the entry of the Final Order and receipt of the approval of the New York Gaming Commission, the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowing of Loans hereunder and the use of the proceeds thereof will not violate any Requirement of Law in any material respect, the certificate of incorporation and the bylaws of the Borrower, or any contractual obligation of the Borrower in any material respect and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or assets pursuant to any Requirement of Law or any such contractual obligation (other than the Liens created by the Loan Documents). No Requirement of Law or contractual obligation applicable to the Borrower would reasonably be expected to have a Material Adverse Effect.

**Section 5.04    No Litigation.** Except for the Bankruptcy Case, no action, suit, litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower or against any of its property or assets (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

**Section 5.05    No Default.** No Default or has occurred and is continuing and no default has occurred and is continuing under or with respect to any contractual obligation of the Borrower that would reasonably be expected to have a Material Adverse Effect.

**Section 5.06    Ownership of Property; Liens.**

(a)    The Borrower has fee simple title to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its real and personal property, and none of such property is subject to any Lien except as permitted by Section 7.02. The Borrower owns no real property other than the Mortgaged Properties.

(b)      Schedule 5.06 sets forth a complete and accurate list as of the date hereof of all leases of real property under which the Borrower is the lessee, showing as of the date hereof, the street address, county or other relevant jurisdiction, state, lessor, expiration date and annual rental cost thereof.

**Section 5.07     Environmental Matters.** Except as disclosed on the environmental audits provided to the Lender prior to the Closing Date:

(a)      none of the facilities or properties currently owned, leased or operated by the Borrower (the **"Properties"**) contain or previously contained, any Hazardous Materials in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could result in liability under, any Environmental Law in any material respect;

(b)      the Borrower has not received any written notice of actual or alleged violation, non-compliance or liability, in any material respect, regarding compliance with Environmental Laws or other environmental matters or with respect to any of the Properties or the business operated by the Borrower, nor is there any reasonable reason to believe that any such notice will be received or is being threatened;

(c)      the Properties and all operations at the Properties are and formerly have been in compliance with all applicable Environmental Laws in all material respects, and there is no contamination at, under or about the Properties in violation of any Environmental Law in any material respect;

(d)      Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could reasonably be expected to result in liability under, any Environmental Law in any material respect; no Hazardous Materials have been generated, treated, stored or disposed of at, on or under any of the Properties in material violation of, or in a manner that could result in material liability under, any applicable Environmental Law; and there has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of the Borrower in connection with the Properties or the business operated by the Borrower, in material violation of or in amounts or in a manner that could reasonably expect to result in material liability under Environmental Laws;

(e)      no administrative or governmental action or judicial proceeding is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which the Borrower is or will be a party with respect to the Properties or the business operated by the Borrower, nor are there any decrees or orders or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the business operated by the Borrower, that, in each case, could reasonably be expected to have a Material Adverse Effect; and

(f)      to the Borrower's knowledge, the Borrower has not assumed any liability of any other Person under Environmental Laws.

**Section 5.08     Insurance.** The properties of the Borrower are insured with financially sound and reputable insurance companies, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similarly situated properties to the Properties.

**Section 5.09     Material Contracts.** Other than as a result of the existence of the Bankruptcy Case, Borrower is not in breach or in default in any material respect of or under any Material Contract and has not received any notice of the intention of any other party thereto to terminate any Material Contract.

**Section 5.10     Taxes.** The Borrower has filed all Federal, state and other tax returns that are required to be filed and, other than as permitted by the Bankruptcy Case, has paid all taxes shown thereon to be due, together with applicable interest and penalties, and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (except those that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower). Other than any tax Lien subject to the automatic stay in connection with the Bankruptcy Case, no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge. The Borrower is not a party to any tax sharing agreement.

**Section 5.11     Pension Plans.** Other than as a result of the existence of the Bankruptcy Case, each pension plan of the Borrower and the Borrower is in compliance with the Employee Retirement Income Security Act of 1974, the Internal Revenue Code and any Requirement of Law in all material respects.

**Section 5.12     Margin Regulations; Investment Company Act.** The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock (as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System of the United States as in effect from time to time), and no proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. The Borrower neither is nor is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

**Section 5.13     Subsidiaries; Equity Interests.** The Borrower has no Subsidiaries. The Borrower owns no Equity Interests in any other corporation or entity.

**Section 5.14     Labor Matters.** Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect (a) there are no strikes, lockouts or other labor disputes pending or, to the knowledge of the Borrower, threatened against the Borrower, (b) hours worked by and wages paid to employees of the Borrower have not violated the Fair Labor Standards Act or any other applicable Requirement of Law, and (c) all payments due in respect of employee health and welfare insurance from the Borrower have been paid or properly accrued on the books of the Borrower.

**Section 5.15     Accuracy of Information, Etc.** The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it is subject as of the Closing Date, and all other matters known to it as of the Closing Date, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. No statement or information contained in this Agreement, any other Loan Document, or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents (other than projections, budgets and other "forward-looking" information, all of which have been prepared on a reasonable basis and in good faith by or on behalf of the Borrower), contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statement contained herein or therein not misleading in any material respect.

**Section 5.16     Security Documents.**

(a)    The Security Agreement creates in favor of the Lender a legal, valid, continuing and enforceable security interest in the Collateral.

(b)    The Mortgage creates in favor of the Lender, a legal, valid, continuing and enforceable Lien in the Mortgaged Properties. The Lender, at its sole discretion may also file or record the Mortgage with the appropriate Governmental Authorities.

### Section 5.17    PATRIOT Act; OFAC and Other Regulations.

(a)    The Borrower has not violated any Anti-terrorism Laws in any material respect.

(b)    The Borrower is not a Blocked Person.

(c)    To its knowledge, the Borrower does not: (i) conduct any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any Blocked Person; (ii) deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-terrorism Law; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-terrorism Law in any material respect.

(d)    "Anti-terrorism Law" means any Requirement of Law related to money laundering or financing terrorism including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (also known as the Bank Secrecy Act), the Trading With the Enemy Act (50 U.S.C. § 1 et seq.) and Executive Order 13224 (effective September 24, 2001).

(e)    "Blocked Person" means any Person that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, or (ii) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

### ARTICLE VI
### AFFIRMATIVE COVENANTS

So long as any Loans or any other amounts payable to the Lender hereunder or under any other Loan Document have not been paid in full, the Borrower shall:

### Section 6.01    Financial Statements.    Provide to the Lender the financial reports required under the DMS Agreement.

### Section 6.02    Certificates; Other Information. Furnish the following to the Lender:

(a)    Promptly upon receipt of the same, copies of all notices, requests and other documents received by the Borrower under or pursuant to any Material Contract regarding or related to any breach or default by any party thereto or any other event that would reasonably be expected have a Material Adverse Effect and copies of

the foregoing and such information and reports in Borrower's possession regarding Material Contracts as the Lender may reasonably request from time to time;

(b)    Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower as the Lender may from time to time reasonably request pursuant to the DMS Agreement.

**Section 6.03    Notices.** Promptly and in any event within five (5) business days of becoming aware thereof, give notice to the Lender of:

(a)    The occurrence of any Default or Event of Default;

(b)    Any default or event of default under any Material Contract other than as a result of the Bankruptcy Case;

(c)    Any litigation, investigation, or proceeding against the Borrower (i) in which the amount involved is at least $100,000 and not covered in full by insurance, or (ii) which relates to any Loan Document, or (iii) that may exist at any time between the Borrower and any Governmental Authority, including but not limited to any matter revolving any pension plan or liability of the Borrower or the Borrower;

(d)    The occurrence of any Environmental Action against or of any noncompliance by the Borrower with any Environmental Law or relevant permit; and

(e)    Any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

**Section 6.04    Maintenance of Existence; Compliance.** Preserve, renew and maintain in full force and effect its corporate or organizational existence; take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business; and comply with all contractual obligations and Requirements of Law in all material respects.

**Section 6.05    Performance of Material Contracts.** Other than as a result of the Bankruptcy Case, perform and observe all the terms and provisions of any such Material Contract necessary to be performed or observed by it, maintain such Material Contracts in full force and effect, enforce each such Material Contract in accordance with its terms in all material respects and take all such action to such end as may be from time to time reasonably requested by the Lender.

**Section 6.06    Maintenance of Property; Insurance.** Maintain and preserve all of its property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; and maintain insurance with respect to its property and business with financially sound and reputable insurance companies that are not Affiliates of the Borrower, in such amounts and covering such risks as the Lender may from time to time reasonably require with deductibles reasonably acceptable to the Lender. The Borrower will maintain fire, vandalism, earthquake (if requested), loss of rents and extended coverage casualty insurance for the full replacement value of the buildings and other improvements on the Mortgaged Properties. The Borrower shall also maintain comprehensive general public liability insurance in such amounts as are reasonably acceptable to the Lender. Each policy will be endorsed with appropriate endorsements designating the Lender as mortgagee, lender loss payee or additional insured, as applicable, as reasonably requested by the Lender, and which policies

of insurance shall provide that all losses thereunder shall be payable to the Lender, as its interest may appear, and the Lender shall apply any proceeds of such insurance received by it pursuant to subject to Section 2.05(c), and the original or duplicates of such policies of insurance or certificates thereof shall be delivered to Lender, on the date hereof, upon each renewal and upon its reasonable request. Receipt of delivery of any insurance policy shall not constitute approval by the Lender of the insurer, coverage, form, amount or sufficiency of the policy. The Borrower will comply promptly with all applicable requirements of any insurance rating authorities in all material respects. The Borrower will promptly give notice to the Lender of any damage by fire or other casualty to the Mortgaged Properties.

**Section 6.07    Inspection of Property; Books and Records; Discussions.** Keep proper books of records and accounts, in which full, true and correct entries in all material respects and in any event in conformity with GAAP and all Requirements of Law in all material respects shall be made of all dealings and transactions and assets in relation to its business and activities; and permit the Lender to visit and inspect, during normal business hours and with reasonable prior notice, any of its properties and examine and make abstracts from any of its books and records and to discuss its business operations, properties and financial and other condition with its officers and employees and its independent public accountants, in each case, as the Lender shall reasonably request.

**Section 6.08    Environmental Laws.** Obtain, comply and maintain in all respects, and ensure the same in all respects by all tenants and subtenants, if any, with all applicable Environmental Laws, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, in each case, in all material respects.

**Section 6.09    Use of Proceeds.**

(a)    Use the proceeds of the 2016 Working Capital Loan to fund the 2016 Working Capital Requirement, and for no other purpose. Such funds shall be used in a manner agreed upon by the Lender and the Borrower.

(b)    Use the proceeds of the Project Development and Gaming Facility Bankroll Loans to fund all or a portion of the Project Development Requirements or the Gaming Facility Bankroll Requirements, with such costs and uses to be subject to the Lender's approval in its sole discretion, and for no other purpose.

**Section 6.10    Additional Collateral, Etc.**

(a)    With respect to any property acquired after the Closing Date by the Borrower that is intended to be subject to a Lien created by any Loan Document, other than property described in clause (b) below, as to which the Lender, does not have a perfected Lien, promptly, and in any event within 10 days of acquiring such property, (i) execute and deliver to the Lender such supplements or amendments to the Security Agreement or such other documents as the Lender deems reasonably necessary to grant to the Lender a security interest in such property, and (ii) take all actions reasonably necessary to grant to the Lender a perfected first priority security interest in such property, including the filing of UCC-1 financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Lender.

(b)    With respect to any fee interest in any real property acquired after the Closing Date by the Borrower other than any such real property subject to a Lien expressly permitted by this Agreement promptly, and

in any event within 30 days of acquiring an interest in such property, (i) deliver, upon the request of the Lender, title reports, title insurance, surveys, environmental assessment reports and other documents required by the Lender in its reasonable discretion, each in scope, form and substance reasonably satisfactory to the Lender and (ii) execute and deliver a Mortgage in favor of the Lender, and if requested by the Lender, a building loan agreement or other applicable documentation, in favor of the Lender.

**Section 6.11    Further Assurances.** Promptly upon the request of the Lender, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgement, filing or recordation thereof; and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, building loan agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances and other instruments as the Lender may reasonably require from time to time in order to carry out more effectively the purposes of the Loan Documents.

**Section 6.12    Payment of Taxes and Assessments.**  Pay prior to the addition of any penalty or interest thereon all taxes, assessments, payments in lieu of taxes, charges, sewer bills and water rates, affecting the Premises or levied upon or by reason of the recording of any Loan Document (except those that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrower) and provide the Lender with copies of receipts for the payment thereof upon the reasonable request of the Lender.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Loans or any other amounts payable to the Lender hereunder or under any other Loan Document have not been paid in full, the Borrower shall not:

**Section 7.01    Limitation on Debt.** Create, incur, assume, permit to exist or otherwise become liable with respect to any Debt, except (a) Debt created under the Loan Documents, (b) Debt existing on the date hereof and listed in submissions of the Borrower to the Bankruptcy Court, (c) Debt owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business, (d) Debt of the Borrower in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business, (e) Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however that such Debt is extinguished within five (5) Business Days of incurrence, (f) Debt arising in connection with endorsement of instruments for deposit in the ordinary course of business, (g) Debt of the Borrower consisting of the financing of insurance premiums in the ordinary course of business and (h) Debt representing deferred compensation to employees of the Borrower incurred in the ordinary course of business.

**Section 7.02    Limitation on Liens.** Create, incur, assume or permit to exist any Lien on any property or assets now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except:

(a)      Liens created pursuant to or arising under any Loan Document;

(b)      Liens imposed by law for taxes, assessments or governmental charges (i) not yet due, (ii) which are being contested in good faith and by appropriate proceedings diligently conducted if adequate reserves with respect thereto are maintained in accordance with GAAP on the books of the Borrower or (iii) as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(c)      Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens imposed by law (i) arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted or (ii) as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to an order of the Bankruptcy Court;

(d)      Pledges and deposits and other Liens (i) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower;

(e)      Liens (including deposits) to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of like nature, in each case in the ordinary course of business;

(f)      Easements, zoning restrictions, rights-of-way, minor defects or irregularities in title and similar encumbrances on real property imposed by law or arising in the ordinary course of business which, in the aggregate, are not material in amount and which do not materially detract from the value of the affected property or interfere materially with the ordinary conduct of business of the Borrower;

(g)      Liens in existence as of the date hereof which are listed on the title reports provided to the Lender on or prior to the date hereof;

(h)      Banker's liens, rights of setoff and other similar Liens that are customary in the banking industry and existing solely with respect to cash and other amounts on deposit in one or more bank accounts maintained by the Borrower;

(i)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(j)      Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges, deposits in connection with tenders, contracts or leases to which the Borrower is a party or other deposits required to be made in the ordinary course of business, provided in each case that such Liens do not secure Debt and that the obligation secured is not overdue for a period of more than 30 days or, if overdue for a period of more than 30 days, is being contested in good faith by appropriate proceedings which prevent enforcement of such Lien and adequate reserves have been established therefor; and

(k)      Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code of the applicable jurisdiction on items in the course of collection.

**Section 7.03    Mergers.**  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve.

**Section 7.04    Limitation on Investments.**  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase, hold or acquire any Equity Interests, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person.

**Section 7.05    Limitation on Dispositions.**  Dispose of any of its property, whether now owned or hereafter acquired, or issue or sell any Equity Interests to any Person, except (i) the sale or Disposition of machinery and equipment no longer used or useful in the business of the Borrower, (ii) the Disposition of obsolete or worn-out property in the ordinary course of business, (iii) the sale of inventory in the ordinary course of business and (iv) upon the prior written consent of the Lender, the Disposition of the Brookhaven Property.

**Section 7.06    Limitation on Prepayments of Debt and Amendments of Debt Instruments.**  Except as specifically provided in Sections 2.04 and 2.05, make or offer to make any optional or voluntary payment or prepayment on or redemption, defeasance or purchase of any amounts (whether principal or interest) payable under any other Debt.

**Section 7.07    Limitation on Transactions with Affiliates.**  Enter into or be a party to any transaction including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate other than the State of New York unless such transaction is on fair and reasonable terms and in the ordinary course of business of the Borrower.

**Section 7.08    Limitation on Amendments.**  Amend, supplement or otherwise modify (pursuant to a waiver or otherwise) (a) its articles of incorporation, certificate of designation, operating agreement, bylaws or other organizational document; or (b) the terms and conditions of any Material Contract; in each case, in any respect materially adverse to the interests of the Lender, without the Lender's prior written consent.

## ARTICLE VIII
### EVENTS OF DEFAULT AND REMEDIES

**Section 8.01    Events of Default.**  Each of the following events or conditions shall constitute an "**Event of Default**" (whether it shall be voluntary or involuntary or come about or be effected by any Requirement of Law or otherwise):

(a)    <u>Payment Default</u> – the Borrower fails to pay (x) any principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (y) any interest on any Loan, or any fee or other amount payable hereunder or under any other Loan Document when due and such failure remains unremedied for a period of three (3) Business Days.

(b)    <u>False Representations</u> – any representation, warranty, certification or other statement of fact made by or on behalf of the Borrower herein or in any other Loan Document or any other certificate, document, report, financial statement or other document furnished by or on behalf of the Borrower to the Lender pursuant to any

Loan Document proves to have been false or misleading in any material respect on or as of the date made or deemed made;

(c)     <u>Failure to Comply with Loan Documents</u> – the Borrower fails to perform or observe any other covenant, term, condition or agreement contained in this Agreement or any other Loan Document (other than as provided in subsections (a) and (b) of this Section 8.01), or any other loan documents evidencing indebtedness of Borrower to Lender, and such failure continues unremedied for a period of thirty (30) days after written notice to the Borrower from the Lender;

(d)     <u>Default Under Other Debt</u> – the Borrower fails to pay any principal or interest in respect of any other Debt in the amount in excess of $100,000 when due and such failure continues after the applicable grace period, if any, or fails to perform or observe any other covenant, term, condition or agreement relating to any such Debt beyond any applicable grace period;

(e)     <u>Bankruptcy, Insolvency</u> -

(i)     The Borrower, without the consent of the Lender or DNC Gaming: (x) commences any case other than the Bankruptcy Case, proceeding or other action under the Bankruptcy Code or any other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership, insolvency, rearrangement, reorganization or similar debtor relief law of the US or other applicable jurisdictions in effect from time to time, seeking (A) to have an order for relief entered with respect to it, or (B) to adjudicate it as bankrupt or insolvent, or (C) reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (D) appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or (y) makes a general assignment for the benefit of its creditors;

(ii)     there is commenced against the Borrower in a court of competent jurisdiction any case, proceeding or other action of a nature referred to in clause (i) above which (x) results in the entry of an order for relief or any such adjudication or appointment or (y) remains undismissed, undischarged, unstayed or unbonded for sixty (60) days;

(iii)     there is commenced against the Borrower any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which has not been vacated, discharged, stayed or bonded pending appeal within (30) days from the entry thereof; or

(iv)     the Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above.

(f)     <u>Pension Issues</u> – other than in connection with the Bankruptcy Case, any pension plan of the Borrower fails to comply with applicable law, or has vested unfunded liabilities that, in the opinion of the Lender, might reasonably be expected have a Material Adverse Effect;

(g)     <u>Judgment</u> – one or more judgments or decrees is entered against the Borrower by a court of competent jurisdiction involving, in the aggregate, a liability (not paid or fully covered by insurance as to which the relevant insurance company has been notified and has not denied coverage or for which the Borrower has not set aside adequate reserves on its balance sheet) in an amount in excess of $100,000 and all such judgments or decrees have not been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof;

(h)     Enforceability of Security Interests – any Lien created by the Security Agreement or Mortgage ceases to be enforceable and of the same effect and priority purported to be created thereby, other than as expressly permitted hereunder or thereunder or solely as a result of the acts or omissions by the Lender;

(i)     Validity of Loan Documents – any provision of any Loan Document ceases for any reason to be valid, binding and in full force and effect, other than as expressly permitted hereunder or thereunder or solely as a result of the acts or omissions by the Lender; the Borrower contests in any manner the validity or enforceability of any provision of any Loan Document; the Borrower denies that it has any or further liability or obligation under any provision of any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Loan Documents) or purports to revoke, terminate or rescind any provision of any Loan Document;

(j)     Intentionally deleted;

(k)     Default Under Other Obligation to the Lender – the Borrower defaults in the payment or performance of any obligations of any type to the Lender or any affiliate of the Lender, including but not limited to DNC Gaming;

(l)     Termination of DMS Agreement – upon Termination (as such term is defined in the DMS Agreement) of the DMS Agreement by any party thereto.

(m)     Gaming Commission Approvals -

(i)     the Borrower fails to submit all necessary documentation to the New York State Gaming Commission on or before July 1, 2016  to obtain approval of: (i) the DMS Agreement and the associated project financing and (ii) the necessary video lottery gaming licenses (or temporary licenses) to the Borrower and its executive and management employees; provided, however, that the Lender may, in its sole discretion, elect to grant an extension so long as the Borrower is diligently cooperating with the New York State Gaming Commission's requests for documentation;

(ii)     the Borrower receives correspondence or other information from the New York Gaming Commission (which the Borrower will promptly share with the Lender) to the effect that (A) the Borrower or any of its employees is not suitable for licensing as the owner or operator of a video lottery gaming facility, and/or (B) the DMS Agreement or the transaction contemplated thereby will not, or are unlikely to, receive the approval of the New York Gaming Commission, and the issues raised in such correspondence or other information, if capable of cure, are not cured within thirty (30) days after receipt of such correspondence or information by the Borrower;

(iii)     the Borrower fails to obtain New York State Gaming Commission approval of: (i) the DMS Agreement and (ii) the necessary video lottery gaming licenses (or temporary licenses) for the Borrower and its executive and management employees on or before September 1, 2016; provided, however, that the Lender may elect to grant an extension so long as Borrower is diligently seeking such approval;

(n)     Defaults Related to Pending Bankruptcy Case –

(i)     an order is entered by the Bankruptcy Court dismissing the Bankruptcy Case without the Lender's consent;

(ii)     any motion is filed in the Bankruptcy Case or otherwise for any relief directly or indirectly affecting the Collateral or the Mortgaged Properties in a material manner unless: (a) the Lender has given the Borrower its written consent to make such motion, or (b) all of the Borrower's obligations to the Lender

have been indefeasibly paid in full in cash, and completely satisfied upon consummation of the transaction contemplated thereby;

(iii)    the Loan Documents and the Final Order shall, for any reason, cease to create a valid Lien on any of the Collateral or the Mortgaged Properties purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein against the Borrower, or the Borrower shall so allege in any pleading filed in any court or should any material provision of any Loan Document, for any reason, cease to be valid and binding on the Borrower or the Borrower shall so state in writing.

At the request of the Borrower, the Lender may agree to extend, modify or waive each of the Defaults set forth in this Section 8.01, in the Lender's sole discretion.

**Section 8.02    Remedies Upon Event of Default.** If any Event of Default occurs and is continuing, then:

(a)    if such event is an Event of Default specified in Section 8.01(e) above with respect to the Borrower, the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable and the Borrower shall have no right to request or receive further Loans under this Agreement;

(b)    if such event is an Event of Default (other than an Event of Default under Section 8.01(e)), any or all of the following actions may be taken:

(i)    the Lender may, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable and the Borrower shall have no right to request or receive further Loans under this Agreement;

(ii)    the Lender may exercise all rights and remedies available to it under the Security Agreement, Mortgage and any other Loan Document; and

(iii)    there shall be a deemed automatic termination of the automatic stay under Section 362 of the Bankruptcy Code (to the extent it is applicable) without further order of the Bankruptcy Court or the need for filing any motion for relief from the automatic stay or any other pleading.

.

# ARTICLE IX
## MISCELLANEOUS

**Section 9.01    Notices.**

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (or by e-mail as provided in paragraph (b) below), all notices and other communications provided for herein shall be made in writing and mailed by certified or registered mail, delivered by hand or overnight courier service, or sent by e-mail or facsimile as follows:

(i)    If to the Borrower, to it at 425 Oser Avenue, Suite 2, Hauppauge, New York, 11788, Attention of Anthony Pancella (Email pancellaa@suffolkotb.com; Telephone No. (631) 853-1000.

(ii)     If to the Lender, to it at DNC Gaming Management in Suffolk, LLC, 250 Delaware Ave., Buffalo, New York 14202, Attention of General Counsel, (Email rshah@delawarenorth.com and tpopek@delawarenorth.com; Facsimile No. (716) 858-5056, Telephone No. (716) 858-5043).

Notices mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received. Notices sent by e-mail or facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next Business Day).

(b)     Notices and other communications to the Lender and the Borrower hereunder or under any other Loan Document may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites); *provided that*, if such notice, e-mail or other communication is not sent during the recipient's normal business hours, such notice, e-mail or communication shall be deemed to have been sent at the recipient's opening of business on the next Business Day.

(c)     Either party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other party.

### Section 9.02     Amendments and Waivers.

(a)     No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall comply with paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender.

### Section 9.03     Expenses; Indemnity; Damage Waiver.

(a)     The Borrower agrees to pay at Closing, and on demand from time to time:

(i)     all costs and expenses incurred by the Lender and its Affiliates, including without limitation the reasonable fees, charges and disbursements of counsel for the Lender, in connection with the preparation, negotiation, execution, delivery and administration of the Loan Documents and any amendments, waivers or other modifications of the provisions of any Loan Document (whether or not the transactions contemplated by the Loan Documents are consummated);

(ii)     all costs and expenses incurred by the Lender, including the reasonable fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement or protection of its rights (i) in connection with the Loan Documents, including its rights under this Section 9.03, or (ii) in connection with the

Loans issued under this Agreement, including all such costs and expenses incurred in connection with any restructuring, workout or negotiations in respect of the Loan Documents or such Loans; and

      (iii)    all costs and expenses incidental to the Loans and the reasonable costs of outside counsel, *provided*, *however*, that neither the fees, costs and/or expenses of the Lender's architects, engineers and environmental consultants nor any fees, costs and/or expenses relating to the following items shall be deemed to be reasonable out-of-pocket fees and disbursements unless such fees, costs and/or expenses are reasonably incurred by the Lender after its good faith review and consideration of appraisals, environmental reports, title documents and title insurance policies, surveys, lien searches, intellectual property searches, and evidence of insurance in possession of the Borrower or its counsel provided by the Borrower to the Lender on or before the date hereof:  title examinations; insurance matters; flood zone determinations; appraisals; field examinations; environmental matters; lien searches; intellectual property searches; and surveys.

      (b)    The Borrower agrees to indemnify and hold harmless the Lender and each of its Related Parties (each, an **"Indemnified Party"**) from and against, any and all claims, damages, losses, liabilities and related expenses (including the reasonable fees, charges and expenses of any counsel for any Indemnified Party), incurred by any Indemnified Party or asserted against any Indemnified Party by any Person (including the Borrower) other than such Indemnified Party and its Related Parties arising out of, in connection with, or by reason of:

      (i)    the execution or delivery of any Loan Document or any agreement or instrument contemplated in any Loan Document, the performance by the parties thereto of their respective obligations under any Loan Document or the consummation of the transactions contemplated by the Loan Documents;

      (ii)    any Loan or the actual or proposed use of the proceeds therefrom; or

      (iii)    any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or, and regardless of whether any Indemnified Party is a party thereto;

      *provided that*, such indemnity shall not be available to any Indemnified Party to the extent that such claims, damages, losses, liabilities or related expenses (A) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Party or (B) result from a claim brought by the Borrower against any Indemnified Party for breach in bad faith of such Indemnified Party's obligations under any Loan Document, if a court of competent jurisdiction has rendered a final and non-appealable judgment in favor of the Borrower or the Borrower on such claim. This Section 9.03(b) shall only apply to Taxes that represent losses, claims, damages or similar charges arising from a non-Tax claim.

      (c)    Each of the Lender and the Borrower agrees, to the fullest extent permitted by applicable law, not to assert, and hereby waives, any claim against the other party hereto or any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (including, without limitation, any loss of profits or anticipated savings), as opposed to actual or direct damages, resulting from this Agreement or any other Loan Document or arising out of such party's or such Indemnified Party's activities in connection herewith or therewith (whether before or after the Closing Date).

      (d)    All amounts due under Section 9.03 shall be payable not later than ten (10) Business Days after demand is made for payment by the Lender.

      (e)    The Borrower agrees it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification or contribution could be

sought under Section 9.03 (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding) without the prior written consent of the applicable Indemnified Party, unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding.

Section 9.04    **Successors and Assigns.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.  The Lender may, at any time, without the consent of the Borrower, assign all or part of this Agreement in its sole discretion.

Section 9.05    **Survival.** All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and all covenants and agreements shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as any right of the Borrower to request a Loan hereunder has not expired or terminated. This Agreement shall terminate concurrently with the repayment of the Obligations in full; *provided, however,* that the provisions of Article IX, and any other provision of this Agreement which by its terms survives termination or maturity, shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, or the termination of this Agreement or any provision hereof.  Lender hereby agrees to provide to Borrower, at Borrower's expense, such releases and other documents necessary to evidence such terminations promptly upon the request of Borrower.

Section 9.06    **Counterparts; Integration; Effectiveness; Headings.**  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received a counterpart hereof executed by the Borrower. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 9.07    Severability.** If any term or provision of any Loan Document is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision thereof or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify the applicable Loan Document so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.08    Right of Setoff.** If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, and without prior notice to the Borrower, any such notice being expressly waived by the Borrower, to set off and appropriate and apply any and all other obligations at any time owing by the Lender or Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations, whether direct or indirect, absolute or contingent, matured or unmatured, and irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations of the Borrower are owed to an Affiliate of the Lender different from the Affiliate holding such deposit or obligated on such indebtedness. The Lender agrees to notify the Borrower promptly after any such set off and appropriation and application; *provided that* the failure to give such notice shall not affect the validity of such set off and appropriation and application.

**Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.**

(a)    This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)    The Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against the Lender or any of its Related Parties in any way relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, in any forum other than the courts of the State of New York sitting in Erie County, and of the United States District Court of the Western District of New York, and any appellate court from any thereof, and the Borrower/each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of any New York State or Federal court located in the State of New York and agrees that any such action, litigation or proceeding may be brought in any such State or Federal Court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein or in any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any such court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted

by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    The Borrower irrevocably consents to the service of process in the manner provided for notices in Section 9.01 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**Section 9.10    Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.11    USA PATRIOT Act.** The Lender hereby notifies the Borrower that pursuant to the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the PATRIOT Act, and the Borrower agrees to provide such information from time to time to the Lender.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**

By_____

Name: Philip C. Nolan
Title: President

**DNC GAMING MANAGEMENT IN SUFFOLK, LLC**

By_____

Name: E. Brian Hansberry
Title: President

*[SIGNATURE PAGE FOR LOAN AGREEMENT]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**

By_____

Name: Philip C. Nolan
Title: President

**DNC GAMING MANAGEMENT IN SUFFOLK, LLC**

By_____

Name: E. Brian Hansberry
Title: President

*[SIGNATURE PAGE FOR LOAN AGREEMENT]*

## SCHEDULE 1.01(b) – MORTGAGED PROPERTIES

"Brookhaven Property", located at 440 South Service Road, Medford, New York 11763, also known as 440 Long Island Expressway Drive South, Brookhaven, New York, also known as 440 Expressway Drive, Brookhaven, New York, also known as Long Island Avenue, Medford, New York 11763

"Airport Branch", located at 300 Knickerbocker Avenue, Bohemia, New York

## SCHEDULE 5.06 – LEASED PROPERTY

| Address | County | State | Lessor | Expiration | Annual Rent |
|---|---|---|---|---|---|
| 6243 Jericho Turnpike Commack, NY 11725 | Suffolk | NY | 6243 Jericho Realty Corp. | 7/31/15 | $185,400 to $223,572 |
| 1937 Middle Country Road Centereach, NY 11720 | Suffolk | NY | Centereach Commons Realty LLC | 4/30/19 | $88,304.76 to $117,103.08 |
| Sherwood Plaza, Broad Hollow Road & Sherwood Ave. Farmingdale, NY 11735 | Suffolk | NY | Sherwood 110 Corp. | 9/14/15 | $72,854.04 |
| 425 Oser, Suite 2 Hauppauge, NY 11788 | Suffolk | NY | | | |
| 690 Motor Parkway Hauppauge, NY 11788 | Suffolk | NY | | | |

EXHIBIT I

2016 Working Capital Loan Note

## 2016 WORKING CAPITAL LOAN NOTE

May 24, 2016                                                    Hauppauge, New York

FOR VALUE RECEIVED, the undersigned, **SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**, a New York public benefit corporation (the "Borrower"), hereby promises to pay to the order of **DNC GAMING MANAGEMENT IN SUFFOLK, LLC** (the "Lender") the principal amount of the 2016 Working Capital Loan of the Lender outstanding from time to time, not to exceed Two Million Five Hundred Thousand Dollars ($2,500,000), in accordance with the provisions of the Loan Agreement, dated on or about the date hereof, among the Borrower and the Lender from time to time party thereto (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Loan Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

(a) The Borrower promises to pay interest on the unpaid principal amount of the 2016 Working Capital Loan from the date of such Loan until such principal amount is paid in full, at the interest rates and at the times provided in the Loan Agreement. All payments of principal and interest shall be made to the Lender in Dollars in immediately available funds at the address of Lender set forth in Section 9.01 of the Loan Agreement, as such address may be updated as provided in such Section.

(b) This 2016 Working Capital Loan Note (this "Note") is one of the notes referred to in the Loan Agreement and is made subject to the provisions thereof. This Note is secured by the Collateral and the Mortgaged Properties. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

(c) The 2016 Working Capital Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its 2016 Working Capital Loan and all payments made on the Working Capital Loan; provided that any failure of the Lender to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Note.

(d) The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind except for any notice the Borrower is expressly entitled to receive pursuant to any Loan Document. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[SIGNATURE PAGE FOLLOWS]

**SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**

By _Philip C. Nolan_

**Name:** Philip C. Nolan
**Title:** President

[SIGNATURE PAGE FOR 2016 WORKING CAPITAL LOAN NOTE]

EXHIBIT J

Project Development and Gaming Facility Bankroll Loan Note

# PROJECT DEVELOPMENT AND GAMING FACILITY BANKROLL LOAN NOTE

May 24, 2016                                                    Hauppauge, New York

FOR VALUE RECEIVED, the undersigned, **SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**, a New York public benefit corporation (the "Borrower"), hereby promises to pay to the order of **DNC GAMING MANAGEMENT IN SUFFOLK, LLC** (the "Lender") the principal amount of the Project Development Loans of the Lender outstanding from time to time, not to exceed Thirty Nine Million Dollars ($39,000,000), in accordance with the provisions of the Loan Agreement, dated on or about the date hereof, among the Borrower and the Lender from time to time party thereto (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Loan Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

(a) The Borrower promises to pay interest on the unpaid principal amount of the Project Development and Gaming Facility Bankroll Loans from the date of such Loans until such principal amount is paid in full, at the interest rates and at the times provided in the Loan Agreement. All payments of principal and interest shall be made to the Lender in Dollars in immediately available funds at the address of Lender set forth in Section 9.01 of the Loan Agreement, as such address may be updated as provided in such Section.

(b) This Project Development and Gaming Facility Bankroll Loan Note (this "Note") is one of the notes referred to in the Loan Agreement and is made subject to the provisions thereof. This Note is secured by the Collateral and the Mortgaged Properties. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

(c) The Project Development and Gaming Facility Bankroll Loans made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Project Development and Gaming Facility Bankroll Loans and all payments made on the Project Development and Gaming Facility Bankroll Loans; *provided* that any failure of the Lender to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Note.

(d) The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind except for any notice the Borrower is expressly entitled to receive pursuant to any Loan Document. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**

By _____

**Name:** Philip C. Nolan
**Title:** President

[SIGNATURE PAGE FOR PROJECT DEVELOPMENT
AND GAMING FACILITY BANKROLL LOAN NOTE]

EXHIBIT K

Second Security Agreement

## GENERAL SECURITY AGREEMENT

1. **Security Interest.** **SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION,** a New York public benefit corporation and having its chief executive office at, 425 Oser Avenue, Suite 2, Hauppauge, New York 11788 ("**Debtor**"), hereby grants to **DNC GAMING MANAGEMENT IN SUFFOLK, LLC,** a New York limited liability company ("**Secured Party**") a continuing security interest ("**Security Interest**") in all property of Debtor described in <u>Schedule A</u> annexed to this Security Agreement (together with all amendments, supplements or other modifications, this "**Agreement**") hereto and made part hereof and on any separate schedule(s) at any time or from time to time furnished by Debtor to Secured Party, (all of which are hereby deemed part of this Agreement), in all supporting obligations thereof and in all increases or profits received therefrom, the software and books and records related thereto, and in all parts, accessories, special tools, attachments, additions, accessions, replacements and substitutions thereto or therefor, wherever located, whether now existing or hereafter acquired or created, and in all Proceeds of all of the foregoing in any form (the "**Collateral**"); provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, in no event shall any of the following constitute Collateral:  (a) any intent-to-use US trademark application for which an amendment to allege use or statement of use has not been filed and accepted by the United States Patent and Trademark Office and that would otherwise be deemed invalidated, cancelled or abandoned due to the grant of a Lien thereon (provided that such intent-to-use application shall be considered Collateral immediately and automatically upon such filing and acceptance), and (b) any rights or interest in any contract, lease, permit, license, charter or license agreement covering real or personal property of Debtor if under the terms of such contract, lease, permit, license, charter or license agreement, or applicable law with respect thereto, the grant of a Lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, charter or license agreement and such prohibition has not been waived or the consent of the other party to such contract, lease, permit, license, charter or license agreement has not been obtained (provided, that the foregoing exclusions of this clause (b) shall in no way be construed to (i) apply to the extent that any described prohibition is unenforceable under Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code or other applicable law, (ii) limit, impair or otherwise affect Secured Party's continuing security interest in and Liens upon any rights or interests of Debtor in or to (A) monies due or to become due under any such contract, lease, permit, license, charter or license agreement (including any accounts) or (B) any proceeds from the sale, license, lease or other disposition of any such contract, lease, permit, license, charter or license agreement, or (iii) apply to the extent that any consent or waiver has been obtained that would permit Secured Party's Security Interest, notwithstanding the prohibition (clauses (a) and (b) above, collectively, the "**Excluded Assets**").

2. **Obligations.**  The term "Obligations" means any and all indebtedness or other obligations of Debtor to Secured Party in any capacity, now existing or hereafter incurred, however created or evidenced, regardless of kind, class or form, whether direct, indirect, absolute or contingent (including obligations pursuant to any guaranty, endorsement, other assurance of payment or otherwise), whether joint or several, whether from time to time reduced and thereafter increased, or entirely extinguished and thereafter reincurred, together with all extensions, renewals and replacements thereof, and all interest, fees, charges, costs or expenses which accrue on or in connection with the foregoing, including, without limitation, any indebtedness or obligations (i) not yet outstanding but contracted for, or with regard to which any other commitment by Secured Party exists; (ii) arising prior to, during or after any pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding; (iii) owed by Debtor to others and which Secured Party obtained, or may obtain, by assignment or otherwise; or (iv) payable under this Agreement.

3. **Representations and Warranties of Debtor.**  Debtor represents and warrants to Lender that, except as may hereafter be disclosed in writing by Debtor to Secured Party, the Collateral is located at and used in connection with Debtor's business operations at the Mortgaged Properties or the leased properties listed on Schedule 5.06 of the Loan Agreement, and Debtor's records concerning the Collateral are kept only at such address(es).

4. **Covenants.**

    a.  Debtor will defend the Collateral against the claims and demands of all other parties other than Persons holding Permitted Liens, including, without limitation, defenses, setoffs, claims and counterclaims asserted by any obligor against Debtor and/or Secured Party and will not sell, transfer, lease, assign, deliver or otherwise dispose of any Collateral or any interest therein except as may be permitted by the Loan Agreement;

b.   Except in connection with Permitted Liens, Debtor will deliver to Secured Party, upon reasonable request, any instruments, documents and chattel paper constituting, representing or relating to the Collateral or any part thereof and any schedules, invoices, shipping documents, delivery receipts, purchase orders, contracts or other documents representing or relating to the Collateral or any part thereof;

c.   Without thirty (30) days prior written notice to Secured Party, Debtor will not (i) change its business addresses or chief executive office, or (ii) make any change in Debtor's name, state of formation, identity or organizational status;

d.   Debtor will not permit any part of the Collateral to be or become an accession to other goods not covered by this Agreement; and

e.   Debtor will execute and deliver to Secured Party such assignments and other documents and will take such other actions relating to the Security Interest and the perfection thereof as Secured Party may reasonably request and will pay all costs of title searches and filing financing statements, certificates of title, assignments and other documents in all public offices requested by Secured Party; provided, however, that in no event shall the Security Interest in any motor vehicle be perfected.

**5.   Provisions Related to Collateral**.

a.   Debtor irrevocably makes, constitutes and appoints Secured Party (and any of Secured Party's designated officers, employees or agents) as its true and lawful attorney in fact with power to sign its name and to take any of the following actions, in its name or in the name of Secured Party, as Secured Party may determine, at any time (except as expressly limited in this Section 5) without notice to Debtor and at Debtor's expense, , if an Event of Default has occurred and is continuing:

   i.   Verify the validity and amount of, or any other matter relating to, the accounts with account debtors, and notify all account debtors that the accounts have been assigned to Secured Party and that Secured Party has a Security Interest in the accounts;

   ii.   Take control in any manner of any cash or noncash items of payment or proceeds of the accounts;

   iii.   In any case and for any reason, notify the United States Postal Service to change the addresses for delivery of mail addressed to Debtor to such address as Secured Party may designate and receive, open and dispose of all mail addressed to Debtor; and

   iv.   Enforce payment of and collect any accounts, by legal proceedings or otherwise, and for such purpose Secured Party may:

   v.   Demand payment of any accounts or instruct any account debtors to make payment of accounts directly to Secured Party (whether to a lockbox account or otherwise);

   vi.   Receive and collect all monies due or to become due to Debtor;

   vii.   Exercise all of Debtor's rights and remedies with respect to the collection of the accounts, and settle, adjust, compromise, extend, renew, discharge or release the accounts;

   viii.   Endorse the name of Debtor upon any chattel papers, documents, instruments, invoices, freight bills, bills of lading or similar documents or agreements relating to accounts or goods pertaining to accounts or upon any checks or other medium of payment or evidence of security interest that may come into Secured Party's possession; and

   ix.   Sign the name of Debtor to verifications of accounts sent by account debtors to Debtor and take all other actions necessary or desirable to protect Debtor's interest(s) in the accounts.

b.   Debtor irrevocably authorizes and directs each account debtor to honor any demand by Secured Party that all payments in respect of the accounts thereafter be paid directly to Secured Party; provided, however,

that Secured Party agrees that it will not make any such demand unless an Event of Default has occurred and is continuing. In each such case account debtor may continue directing all such payments to Secured Party until account debtor shall have received written notice from Secured Party either that the Indebtedness has been paid in full, that Secured Party has released its security interest or that Secured Party no longer requires that such payments be directed to Secured Party. No account debtor shall have any responsibility to inquire into Secured Party's right to make any such demand or to follow Secured Party's disposition of any moneys paid to Secured Party by account debtor.

    c.    If an Event of Default has occurred and is continuing, Debtor further agrees to use its best efforts to assist Secured Party in the collection and enforcement of the accounts and will not hinder, delay or impede Secured Party in any manner in its collection and enforcement of the accounts.

**6.**    <u>Verification of Collateral</u>.    Secured Party shall have the right to verify all or any Collateral in any manner and through any medium Secured Party may consider appropriate, and Debtor agrees to furnish all assistance and information and perform any acts which Secured Party may reasonably require in connection therewith.

**7.**    <u>Notification and Payments</u>.    Secured Party may notify Debtor in writing, at any time after the occurrence and during the continuation of an Event of Default, as applicable, and without waiving in any manner the Security Interest, that any payments on account of and from the Collateral received by Debtor (a) shall be held by Debtor in trust for Secured Party in the same medium in which received, (b) shall not be commingled with any assets of Debtor and (c) shall be turned over to Secured Party not later than the next business day following the day of their receipt.

**8.**    <u>Events of Default and Remedies</u>.    This Agreement is executed and delivered subject to the terms of the Loan Agreement and reference is hereby made to the Loan Agreement for the provisions relating to the Events of Default (as defined in the Loan Agreement).

    a.    Upon the occurrence and during the continuation of an Event of Default, Secured Party's rights and remedies with respect to the Collateral shall be those of a Secured Party under the Uniform Commercial Code and under any other applicable law, as the same may from time to time be in effect, in addition to those rights granted herein and in any other agreement now or hereafter in effect between Debtor and Secured Party.

    b.    Without in any way limiting the foregoing, Secured Party, upon the occurrence and during the continuation of an Event of Default, may at any time and from time to time, with or without judicial process (except to the extent required by applicable law), enter upon any premises in which any Collateral may be located and, without resistance or interference by Debtor, take possession of the Collateral; and/or dispose of any Collateral on any such premises; and/or require Debtor to assemble and make available to Secured Party at the expense of Debtor any Collateral at any place or time designated by Secured Party; and/or remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof. Secured Party may apply the net proceeds actually received from any sale or other disposition to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorney's fees and all legal, travel and other expenses incurred by Secured Party in attempting to collect any part of the Indebtedness or enforcing this Agreement; and then to the Indebtedness in such order of application as Secured Party may elect; and Debtor shall remain liable and will pay to Secured Party on demand the amount of any deficiency remaining, together with interest thereon at the highest rate then payable on the Indebtedness.

    c.    Without in any way requiring notice to be given in the following manner, Debtor agrees that any notice by Secured Party of sale, disposition or other intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if such notice is mailed by regular mail, postage prepaid, at least ten (10) days prior to such action, to the address set forth above as the location of Debtor's chief executive office or to any other address which Debtor has specified in writing to Secured Party as the address to which notices hereunder shall be given to Debtor.

    d.    Debtor agrees to pay on demand all reasonable costs and expenses incurred by Secured Party in enforcing this Agreement, in realizing upon or protecting any Collateral and in enforcing and collecting any

Indebtedness or any guaranty thereof, including, without limitation, if Secured Party retains counsel for advice, suit, insolvency proceedings or any of the above purposes, the reasonable counsel's fees and expenses incurred by Secured Party.

9. **Miscellaneous Provisions.**

a. Debtor hereby appoints Secured Party as attorney-in-fact of Debtor, irrevocably and with power of substitution, in the same manner, to the same extent and with the same effect as if Debtor were to do the same to file financing statements relating to the Collateral, including financing statements identifying the Collateral as "All Assets" or "All Personal Property and Fixtures" or using similar language, or to execute and file any such financing statement in Debtor's name, all as Secured Party may deem appropriate to perfect and continue the Security Interest; upon the occurrence and during the continuation of an Event of Default (i) to make, adjust or settle and receive payment on any insurance claims with respect to the Collateral; (ii) to execute proofs of claim and loss or similar documents; (iii) to execute endorsements, assignments or other instruments of sale, conveyance or transfer for any Collateral; and (iv) to perform all other acts which Secured Party deems reasonably appropriate to protect and preserve the Collateral and to enforce the terms of this Agreement. Debtor ratifies all acts of said attorney-in-fact and agrees that said attorney shall not be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law, other than as a result of gross negligence, willful misconduct or bad faith of said attorney. This power, being coupled with an interest, is unconditional and irrevocable until the Indebtedness is paid in full.

b. Intentionally deleted.

c. Upon Debtor's failure to perform any of its covenants or obligations hereunder, which failure constitutes an Event of Default, Secured Party may, but shall not be obligated to, perform any or all such covenants or obligations, and Debtor shall pay an amount equal to the expense thereof to Secured Party upon demand by Secured Party, and all such amounts shall become part of the Indebtedness secured hereby.

d. No course of dealing and no delay or omission by Secured Party in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Secured Party may remedy any default by Debtor hereunder or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Debtor. All rights and remedies of Secured Party hereunder are cumulative, and are in addition to any and all rights and remedies available to Secured Party under the Uniform Commercial Code and other applicable law in effect from time to time.

e. Secured Party shall have no obligation to take, and Debtor shall have the sole responsibility for taking, any and all steps to preserve rights against any and all prior parties to any instrument or chattel paper constituting Collateral whether or not in Secured Party's possession. Secured Party shall not be responsible to Debtor for loss or damage resulting from Secured Party's failure to enforce or collect any Collateral or to collect any moneys due or to become due thereunder, other than as a result of gross negligence, willful misconduct or bad faith of Secured Party. Debtor waives protest of any instrument constituting Collateral at any time held by Secured Party on which Debtor is in any way liable and waives notice of any other action taken by Secured Party.

f. Without limiting its rights of setoff under New York law generally, upon and at any time and from time to time if any Event of Default exists, Secured Party shall have the set-off rights set forth in the Loan Agreement.

g. The rights and benefits of Secured Party hereunder shall, if Secured Party so agrees, inure to any party acquiring any interest in the Indebtedness or any part thereof.

h. Secured Party and Debtor shall include the heirs, distributees, executors or administrators, or successors or assigns, of those parties.

i.  This Agreement, and the security interest granted hereunder, shall terminate concurrently with the repayment of the Indebtedness in full. Secured Party hereby agrees to provide to Debtor, at Debtor's expense, such releases and other documents necessary to evidence such terminations promptly upon the request of Debtor.

j.  No modification, rescission, waiver, release or amendment of any provision of this Agreement shall be binding except by a written agreement subscribed by Debtor and by a duly authorized officer of Secured Party.

k.  This Agreement and the transaction evidenced hereby shall be construed under the laws of New York State as the same may from time to time be in effect. All terms defined in the Uniform Commercial Code, unless otherwise defined in this Agreement or in any financing statement, shall have the definitions set forth in the Uniform Commercial Code adopted in New York State as in effect on the date of this Agreement and as the same may be amended, modified or supplemented from time to time. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

l.  This Agreement is and is intended to be a continuing Security Agreement and shall remain in full force and effect until all of the Indebtedness and any extensions or renewals thereof shall be paid in full.

m.  Each of Secured Party and Debtor agrees, to the fullest extent permitted by applicable law, not to assert, and hereby waives, any claim against the other party hereto or any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (including, without limitation, any loss of profits or anticipated savings), as opposed to actual or direct damages, resulting from this Agreement or any other Loan Document or arising out of such party's or such Indemnified Party's activities in connection herewith or therewith (whether before or after the Closing Date).

10. **CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

a.  **DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY (i) CONSENTS IN EACH ACTION AND OTHER LEGAL PROCEEDING COMMENCED BY SECURED PARTY AND ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE INDEBTEDNESS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL TO THE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK, AND WITH RESPECT TO THE FORECLOSURE OF REAL PROPERTY OF ANY COURT OF THE STATE OF NEW YORK SITTING IN SUFFOLK COUNTY AND (ii) WAIVES EACH OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING.**

b.  **EACH OF SECURED PARTY, BY ITS ACCEPTANCE HEREOF, AND DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO, AND IN, ANY ACTION OR OTHER LEGAL PROCEEDING OF ANY NATURE, RELATING TO (i) THIS AGREEMENT, ANY RELATED LOAN DOCUMENT OR ANY COLLATERAL, (ii) ANY TRANSACTION CONTEMPLATED BY ANY SUCH DOCUMENT OR (iii) ANY NEGOTIATION, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT, OR ANY COLLATERAL. DEBTOR CERTIFIES THAT NEITHER SECURED PARTY NOR ANY REPRESENTATIVE THEREOF HAS REPRESENTED TO DEBTOR THAT SECURED PARTY WILL NOT SEEK TO ENFORCE THE WAIVER MADE BY DEBTOR IN THIS SECTION. DEBTOR ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL AS NECESSARY AND APPROPRIATE.**

Dated this 24th day of May 2016.

SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION

By _____

Name: Philip C. Nolan
Title: President

*[SIGNATURE PAGE FOR SECURITY AGREEMENT]*

## SCHEDULE A

All terms, unless otherwise defined in this Agreement or in any financing statement, shall have the definitions set forth in the Uniform Commercial Code adopted in New York State, as in effect on the date of this Agreement and as may be amended, modified or supplemented from time to time.

"Collateral" means all of Debtor's accounts (including, without limitation, health-care-insurance receivables), equipment, inventory, fixtures, general intangibles, chattel paper, instruments, documents, goods, cash, deposit accounts, investment property, letters of credit and letter-of-credit rights, supporting obligations, commercial tort claims (if any, as described), insurance proceeds, and property in Secured Party's control or possession, software, books and records, all attachments, replacements, substitutions, and the proceeds of all the foregoing; provided, however, that in no event shall any Excluded Asset constitute Collateral.

Description of Commercial Tort Claims:  Any claims arising out of or related to the Brookhaven Property (as defined in the Loan Agreement).

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | |
|---|---|
| 1a. ORGANIZATION'S NAME | SUFFOLK COUNTY OFF-TRACK BETTING CORPORATION |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME / MIDDLE NAME / SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 425 Oser Avenue, Suite 2 | Hauppauge | NY | 11788 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | Public Benefit Corp. | New York | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | |
|---|---|
| 2a. ORGANIZATION'S NAME | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME / MIDDLE NAME / SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | |
|---|---|
| 3a. ORGANIZATION'S NAME | DNC GAMING MANAGEMENT IN SUFFOLK, LLC |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME / MIDDLE NAME / SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 250 Delaware Avenue | Buffalo | NY | 14202 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All personal property and fixtures of Debtor.

5. ALTERNATIVE DESIGNATION (if applicable) ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

NYS

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SUFFOLK COUNTY OFF-TRACK BETTING CORPORATION | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 425 Oser Avenue, Suite 2 | Hauppauge | NY | 11788 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| Not Applicable | | Public Benefit Corp. | New York | | ☑ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| Not Applicable | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| DNC GAMING MANAGEMENT IN SUFFOLK, LLC | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 250 Delaware Avenue | Buffalo | NY | 14202 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All property and fixtures of Debtor.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

Suffolk County

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

OR **SUFFOLK COUNTY OFF-TRACK BETTING CORPORATION**

9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX

10.MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | □ NONE |

12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

14. Description of real estate:

## See attached Schedule A

16. Additional collateral description:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

## SCHEDULE A

300 Knickerbocker Avenue, Bohemia
County of Suffolk
State of New York
District 0500
Section 193.00
Block 010.00
Lot 016.023


440 South Service Road, Medford
County of Suffolk
State of New York
District 0200
Section 736.00
Block 001.00
Lot 002.001

440 Expressway Drive
District 0200
Section 736.00
Block 01.00
Lot 002.002 and
District 0200
Section 736.00
Block 1.00
Lot 02.003

Long Island Avenue, Medford
District 0200
S/B/L 736.00/01.00/002.001

440 Long Island Expressway Drive South, Brookhaven, New York

EXHIBIT L

Deficiency Note

# DEFICIENCY NOTE

_____, 201__                                          $_____

FOR VALUE RECEIVED, SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION, a New York public benefit corporation having its principal office and place of business located at 425 Oser Avenue, Suite 2, Hauppauge, New York 11788 (the "Borrower") promises to pay to the order of DNC GAMING MANAGEMENT IN SUFFOLK, LLC, a New York limited liability company, at its principal office and place of business located at 250 Delaware Avenue, Buffalo, New York 14202 (the "Lender"), in lawful money of the United States and in immediately available funds, the principal sum of _____ ($_____), plus all interest on the aggregate outstanding amount at the rate set forth in this Note.

The Borrower, the Lender and Delaware North Companies Gaming & Entertainment, Inc. (the "Guarantor") are parties to an Amended and Restated Development and Management Services Agreement dated May 24, 2016 (as amended, the "DMS Agreement"), pursuant to which the Lender has agreed, subject to the terms of the DMS Agreement and related documentation, to make the following loans to, among other things, fund the Borrower's design, development, build-out and furnishing of a new video lottery gaming facility in Suffolk County: (i) a loan of up to Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "2016 Working Capital Loan"); (ii) a loan of up to Thirty-Nine Million Dollars ($39,000,000.00) (the "Project Development and Gaming Facility Bankroll Loan"); and (iii) pursuant to a previous agreement between the Borrower and the Lender, a loan of up to Sixty-Five Million Dollars ($65,000,000.00) (the "First Loan").

Pursuant to the terms of the DMS Agreement, upon the sale of the real property and improvements located at 440 South Service Road, Medford, New York 11763 (the "Brookhaven Property"), the net proceeds of such sale were to be applied first to repay the outstanding balance of the First Loan. If the First Loan was not paid in full with the proceeds of the sale of the Brookhaven Property, the unpaid balance of the First Loan shall remain outstanding, and the note evidencing such outstanding amount of the First Loan be replaced by the "Deficiency Note" (as defined in the DMS Agreement) and repaid as set forth in such Deficiency Note. This Note is the Deficiency Note referred to in the DMS Agreement.

NOW, THEREFORE, for good and valuable consideration, the Borrower hereby agrees as follows:

1.    <u>Maturity Date</u>. The Maturity Date shall have the meaning set forth in the DMS Agreement. On the Maturity Date, all unpaid principal, interest and other charges due under this Note shall be paid to the Lender in full.

2.    <u>Interest Rate</u>. The Borrower will pay interest on any principal indebtedness outstanding from time to time, until the full amount of the principal has been paid. Commencing on the date of this Note, the Borrower will pay interest on the outstanding principal amount at the same rate of interest applicable to the Project Development and Gaming Facility Bankroll Loan as of the date of this Note. The interest rate will be subject to cumulative annual increases on each anniversary of the date of this Note equal to three-quarters of one percent (0.75%) until the outstanding principal amount has been paid in full; provided, however, that at no time will the interest rate hereunder exceed seven percent (7.0%).

3.    <u>Repayment</u>. The Borrower promises to pay the outstanding principal amount and all interest accruing with respect thereto, to the order of the Lender at its office identified above, in lawful money of the United States and in immediately available funds in accordance with this Section 3. The Borrower further promises to pay all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Lender in endeavoring to collect any amount owing pursuant to this Note. Payment of the outstanding principal amount and the interest with respect thereto will be made in a manner consistent with the terms and conditions of the DMS Agreement.

4.    <u>Interest Not in Excess of Maximum Rate</u>. Notwithstanding the foregoing, in no event will the Borrower pay interest at a rate in excess of the maximum rate permitted by applicable law. Solely to the extent necessary to

result in such interest not being payable at a rate in excess of the maximum rate, any amount that would be treated as part of such excess interest under a final judicial interpretation of applicable law will be deemed to have been a mistake and be automatically cancelled, and if received by the Lender will be refunded to the Borrower, it being the intention of the Lender and the Borrower that interest will not be payable at a rate in excess of the maximum rate.

5.    Prepayment.  The Borrower will have the option of paying the outstanding principal amount and all accrued interest with respect thereto to the Lender in advance, in full or in part, at any time and from time to time without premium or penalty, subject to the requirement that the Borrower provide the Lender at least one (1) business day's advance written notice of any such prepayment.  Any partial prepayment will include all accrued interest with respect to the outstanding principal amount, together with such amount of the outstanding principal as the Borrower desires to pay.

6.    Collateral.  The payment of this Note is secured by one or more mortgages or security agreements, or other security instruments, given by the Borrower to the Lender (collectively, the "Security Instruments").

7.    Default.  Any of the following will constitute an "Event of Default":

(a)    The Borrower fails to pay any of the principal or interest on this Note when due and such failure continues unremedied for five (5) business days after written notice of such failure has been given by the Lender to the Borrower;

(b)    The Borrower defaults in the performance of any obligation, term or condition of this Note (other than any obligation to pay any payment of principal or interest pursuant to this Note), or any obligation, term or condition of the DMS Agreement (including without limitation, any of the defaults specified in Section 3.06 thereof), the First Loan, the 2016 Working Capital Loan, the Project Development and Gaming Facility Bankroll Loan, or any Security Instrument, and such default continues unremedied for fifteen (15) business days (or such longer cure period as may be provided in the document which has allegedly been breached) after written notice of such default has been given to the Borrower;

(c)    There occurs any event or condition which, after notice and lapse of time for any cure thereof, permits the acceleration of the outstanding principal amount and interest on this Note, which event or condition is referred to in any of the DMS Agreement, the documents evidencing the First Loan, the 2016 Working Capital Loan or the Project Development and Gaming Facility Bankroll Loan or any Security Instrument;

(d)    Any representation or warranty made by the Borrower in the DMS Agreement, the documents evidencing the First Loan, the 2016 Working Capital Loan or the Project Development and Gaming Facility Bankroll Loan or any Security Instrument proves to be false or misleading when made in any material respect;

(e)    The Borrower applies for, consents to, or is otherwise subject to the appointment of a receiver, trustee or liquidator of the Borrower or any of its properties or assets, or except in connection with the pending Bankruptcy Case (as defined in the DMS Agreement), the Borrower (i) admits in writing its inability to pay its debts as they mature; (ii) makes a general assignment for the benefit of creditors; (iii) is adjudicated as bankrupt or insolvent; or (iv) files a voluntary petition in bankruptcy, or a petition or any answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or any answer admitting the material allegations of a petition filed against it in any proceeding under any such law;

(f)    Except in connection with the pending Bankruptcy Case (as defined in the DMS Agreement), an order, judgment or decree is entered without the application, approval or

consent of the Borrower, by any court of competent jurisdiction, approving a petition seeking reorganization of the Borrower or a substantial part of its properties or assets, and such order, judgment or decree is not dismissed or stayed within a period of sixty (60) days;

(g)     Final judgment for the payment of money in excess of One Hundred Thousand Dollars ($100,000.00) is rendered against the Borrower and the same remains undischarged by payment or bonding for a period or thirty (30) days during which execution is not effectively stayed; or

(h)     The DMS Agreement expires by its terms or is earlier terminated by any party pursuant to the provisions of said Agreement.

At any time after the occurrence of an Event of Default, the Lender may, at its sole discretion and by written notice to the Borrower, declare all or any part of the amounts outstanding under this Note to be immediately due and payable; provided however, that upon an Event of Default under subparagraphs (e) or (f) above, all amounts outstanding under this Note will become immediately due and payable without any action on the part of the Lender. The Borrower expressly waives the requirements of presentment, demand, protest, or other notice of any kind (other than notice of Default as provided herein) as a condition to its obligation to immediately pay the unpaid outstanding principal amount, all accrued interest, any expenses to which the Lender is entitled pursuant to this Note, and all other amounts owed pursuant to the Note or pursuant to any other agreement to which the Borrower and the Lender are parties. In addition, after an Event of Default the Lender may take possession of all collateral pledged or securing the obligations under this Note under any Security Instrument with or without notice, and for that purpose may enter upon the Borrower's premises and remove the same. After any Event of Default, the Lender may exercise all other remedies under any of the DMS Agreement, the documents evidencing the First Loan, the 2016 Working Capital Loan or the Project Development and Gaming Facility Bankroll Loan, the Security Instruments, or under the New York Uniform Commercial Code.

8.     Lender's Right to Setoff. The Lender will have the right to set off against the amounts owing under this Note any property or funds held in a deposit or other account of the Borrower which the Lender or any of its affiliates have access to, or any property or funds in the Lender's possession owing to the Borrower, and such set-off will be deemed to have been exercised immediately at the time the Lender or such affiliate elects to do so.

9.     New York Law. This Note will be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York.

10.     Modification. This Note will not be extended, amended or modified orally, nor may any of its provisions be waived orally.

11.     Miscellaneous. This Note, the DMS Agreement, the agreements evidencing the First Loan, the 2016 Working Capital Loan and the Project Development and Gaming Facility Bankroll Loan, and the Security Instruments contain the entire agreement between the Lender and Borrower with respect to the Loan and supersede every course of dealing, other conduct, oral agreement and representation previously made with respect thereto. No single, partial or delayed exercise by the Lender or its agents of any right or remedy will preclude the subsequent exercise by the Lender or it agents at any time of any right or remedy of the Lender. No waiver or amendment of any provision of this Note will be effective unless made specifically in writing by the Lender. No course of dealing or other conduct and no oral agreement or representation made by the Lender will operate as a waiver of any right or remedy of the Lender. The Borrower agrees that in any legal proceeding, a copy of this Note with the Borrower's signature may be admitted into evidence as an original. This Note is a binding obligation enforceable against the Borrower and its successors and assigns, and will inure to the benefit of the Lender and its successors and assigns. If a court deems any provision of this Note invalid, the remainder of the Note will remain in effect. Section headings are for convenience of reference only.

12.     Jurisdiction. The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Suffolk County, New York or in the Federal Eastern District of New York.

13.     Trial by Jury. THE BORROWER AND THE LENDER HEREBY KNOWINGLY AND VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT EITHER THE BORROWER OR THE LENDER MAY HAVE IN ANY ACTION OR PROCEEDING IN LAW OR IN EQUITY IN CONNECTION WITH THIS NOTE OR THE TRANSACTIONS RELATED HERETO.

14.     Notices. All notices, requests, demands, directions and other communications which may or are required to be given, served or sent under this Note or under applicable law will be in writing and will be deemed to have been properly given or sent if (i) mailed by registered or certified mail with postage prepaid, return receipt requested; or (ii) sent by Federal Express or similar courier service, and addressed to the applicable party at the address stated above, or, as to each party, at such other address as will be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section; or (iii) delivered by personal delivery to an officer of the Borrower or Guarantor. All such notices, requests, demands, directions and other communications will, when mailed in the manner specified in (i) above be effective three (3) business days after being so mailed, when sent in the manner specified in (ii) above be effective one (1) business day after being so sent, and when delivered in the manner specified in (iii) above be effective when delivered.

15.     Amended and Restated Note. The Borrower acknowledges and agrees that this Note is given in replacement of and in substitution for, but not in payment of, that certain Note made by the Borrower in favor of the Lender dated October 30, 2014 in the original principal amount of Sixty-Five Million Dollars ($65,000,000.00) (the "First Note"). The Borrower further acknowledges and agrees that: (a) the obligations of the Borrower as evidenced by the First Note shall continue in full force and effect, as amended and restated by this Note, all of such obligations being hereby ratified and confirmed by the Borrower; (b) any and all liens, pledges, assignments and security interests securing the Borrower's obligations under the First Note shall continue in full force and effect, are hereby ratified and confirmed by the Borrower, and are hereby acknowledged by the Borrower to secure, among other things, all of the Borrower's obligations to the Lender under this Note, with the same priority, operation and effect as that relating to the obligations under the First Note; and (c) nothing herein contained shall be construed to extinguish, release, or discharge, or constitute, create, or effect a novation of, or an agreement to extinguish, the obligations of the Borrower with respect to the indebtedness originally described in the First Note or any of the liens, pledges, assignments and security interests securing such obligations.

IN WITNESS WHEREOF, this Note been duly executed by the Borrower as of the day and year first above written.

SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION

By:_____
Title

STATE OF NEW YORK      )
                       )      SS.:
COUNTY OF SUFFOLK      )

On the _____ day of _____, 201__, before me, the undersigned, a notary public in and for the State of New York, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the _____ of Suffolk Regional Off-Track Betting Corporation, and that by his signature on the instrument, the corporation on behalf of which the individual acted, executed the instrument.

_____
Notary Public

# EXHIBIT M

New Mortgage

WHEN RECORDED, RETURN TO:
    Christofer C. Fattey, Esq.
    Hodgson Russ LLP
    140 Pearl Street, Suite 100
    Buffalo, NY 14202

## MORTGAGE AND SECURITY AGREEMENT

        **THIS MORTGAGE AND SECURITY AGREEMENT** is made as of May 24, 2016 (as amended, supplemented, replaced or otherwise modified, this "Mortgage") by **SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION**, a New York public benefit corporation and having its chief executive office at 425 Oser Avenue, Suite 2, Hauppauge, New York, 11788 ("Borrower"), to **DNC GAMING MANAGEMENT IN SUFFOLK, LLC**, a New York limited liability company with an address at 250 Delaware Avenue, Buffalo, New York 14202 ("Lender").

### ARTICLE I. Definitions

        Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the hereinafter-defined Loan Agreement or if defined in the Uniform Commercial Code in New York State, as defined therein. In addition to the foregoing, the following terms shall have the following respective meanings when used herein.

        **1.1**    **Awards:**  Any and all awards heretofore or hereafter made by any federal, state, county, municipal or other governmental authority, or by whomsoever made in any condemnation, eminent domain, or equivalent proceeding, to the present or subsequent owners of any interest encumbered by this Mortgage for the acquisition for public purposes of said interest, or any portion thereof, and for severance and consequential damages on account thereof, including any award for any change of grade of any street affecting said interest, and also any award for any damage to said interest; and all proceeds of insurance on or in connection with the Real Property, the Personal Property, and the Improvements.

        **1.2**    **Fixtures:**  All fixtures and equipment now or hereafter affixed to the Real Property and Improvements (including, but not limited to, heating, ventilation, air conditioning, plumbing, gas and electric fixtures and equipment, engines, motors, incinerators, pumps, fire prevention equipment, floor coverings, furniture and equipment).

        **1.3**    **Improvements**:  All buildings, structures and other improvements now or hereafter constructed or located on the Real Property.

        **1.4**    **Indebtedness**:  The obligations of the Borrower to the Lender under the Notes (as defined herein) and all extensions, modifications, renewals and replacements thereof, provided, however, that the maximum principal amount secured by this Mortgage does not, and shall not under any contingency, exceed FIFTY-SIX MILLION TWO HUNDRED TWENTY-SEVEN THOUSAND EIGHT HUNDRED FORTY-ONE AND 31/100 U.S. DOLLARS ($56,227,841.31).

        **1.5**    **Loan Agreement**:  The Loan Agreement dated on or about the date hereof, between Borrower and Lender as such agreement may be amended or supplemented from time to time.

        **1.6**    **Note**:  Individually and collectively, the following notes and all extensions, modifications, renewals and replacements thereof:

        (i) that certain Note dated October 30, 2014 in the original principal amount of Sixty-Five Million Dollars ($65,000,000.00) (the "First Loan Note"), the outstanding balance of which was Fourteen Million Seven Hundred Twenty-Seven Thousand Eight Hundred Forty-One Dollars and Thirty-One Cents ($14,727,841.31) as of April 29, 2016;

        (ii) that certain 2016 Working Capital Loan Note dated May 24, 2016 in the original principal amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "2016 Working Capital Loan Note"); and

(iii) that certain Project Development and Gaming Facility Bankroll Loan Note dated May 24, 2016 in the original principal amount of Thirty-Nine Million Dollars ($39,000,000.00) (the "Project Development and Gaming Facility Bankroll Loan Note").

**1.7**    **Personal Property:**  All Fixtures now or hereafter affixed to or installed on the Real Property or the Improvements, including without limitation heating, ventilation, air conditioning, plumbing, gas and electric fixtures and equipment, engines, motors, incinerators, pumps, fire prevention equipment, floor coverings, furniture and equipment, now owned or hereafter acquired, all insurance policies covering the Premises and the proceeds thereof, all insurance, conversion and condemnation awards and the Improvements, all lease, rental and sale agreements related to the Real Property or Improvements, any security deposits, down payments and any other payments related to the Real Property, all income or profit, all contracts related to the Premises, all books and records, all options or agreements, all plans and specifications and all renewals and replacements thereof and articles in substitution therefor and all proceeds thereof.

**1.8**    **Premises:**  The Real Property, Improvements, Personal Property, Rents, Fixtures and Awards; provided, however, that in no event shall the Premises, or any part thereof, include any Excluded Assets (as defined in the Security Agreement).

**1.9**    **Real Property:**  The land described on Schedule A attached hereto; all appurtenances and all the estate and rights of Borrower thereto; all the right, title, and interest of Borrower in and to all streets, alleys, highways, public ways, and waterways adjacent thereto; and all public and private easements and rights of way now or hereafter benefiting, existing, or used or useable in connection therewith.

**1.10**    **Rents:**  All credits, cash, deposits (whether for security or otherwise), rents, advance rentals, issues, profits revenues, royalties, fees, charges, accounts, benefits and other payments and income of every nature of and from any portion of the Premises, including, without limitation, minimum rents, additional rents, termination payments, forfeited security deposits, liquidated damages following an event of default and all proceeds payable under any policy of insurance covering loss or rents resulting from untenantability due to destruction or damage to the Premises, or any part thereof, together with the immediate and continuing right to collect and receive the same, whether due or hereafter becoming due, and together with all rights and claims of any kind that Borrower may have against any tenant, lessee or licensee under the leases or against any other occupant of the Real Property or Improvements, and all rents, oil and gas or other mineral royalties, revenues, fees, charges, accounts and other payments, and bonuses, issues and profits from any portion of the Premises.

## ARTICLE II. Grant of Mortgage

To secure the payment of the Indebtedness to Lender, Borrower hereby grants a security interest in and to, and mortgages, the Premises to Lender.

## ARTICLE III. Covenants and Representations of Borrower

Borrower covenants and agrees with, and represents to, Lender as follows:

**3.1**    **Payment of Indebtedness:**  Borrower will pay the Indebtedness when and as due.

**3.2**    Intentionally deleted.

**3.3**    Intentionally deleted.

**3.4**    **Statement of Amount Due:**  Borrower will within ten (10) days of receipt of Lender's request, furnish a written statement duly acknowledged of the amount due on this Mortgage and whether any offsets or defenses exist against the Indebtedness.

**3.5**    **Notice of Transfer or Casualty:**  Borrower will give notice to Lender (promptly after becoming aware of same) of any damage by fire or other casualty to the Premises or of any conveyance, transfer or change of ownership of the Premises or any part thereof or interest therein.

**3.6**    **Demolition or Alteration:**  Except as otherwise permitted by the Loan Agreement or any other Loan Document, Borrower will not remove, replace (except for replacements in the ordinary course of business), demolish or structurally alter any of the Improvements or Personal Property in any material respect without the prior written consent of Lender.

**3.7**    **Property Status; Right of Entry and Inspection:**  Borrower will comply with all government require-ments respecting the Premises and will not use the Premises in any way that violates any law, ordinance, rule, regulation or requirement in any material respect, or in any way that violates any enforceable restrictive covenant on the use of the Premises in any material respect.  Borrower will promptly repair or replace to the reasonable satisfaction of Lender any buildings or improvements of the Premises damaged by casualty, and will not suffer any waste in any material respect.

**3.8**    **Rents:**  Borrower will not accept prepayments of installments of rent more than one month in advance of the time when such rent is due; Borrower shall include in all future leases of any part of the Premises a provision prohibiting the prepayment of any rent without the prior written consent of Lender.  Borrower will promptly send notices of default related to any leases of the Premises to Lender.  Borrower represents that there is no pledge or assignment of any of the Rents except to Lender; and that Borrower will make no such pledge or assignment except to Lender, so long as any portion of the Indebtedness remains unpaid.

**3.9**    **Tenancies:**  Borrower will not enter into, cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases of the Premises without Lender's prior written consent, and reference is hereby made to Section 291(f) of the Real Property Law of the State of New York.

**3.10**    **Liens and Encumbrances:**  Borrower will keep the Premises free from all liens and encumbrances, except for Permitted Liens.

**3.11**    Intentionally deleted.

**3.12**    **Partial Payments:**  Borrower agrees that any payment or part payment of principal or interest or of any other sum or sums due or to become due hereunder or the doing of any act or acts under the terms hereof by any then owner of the Premises or person liable upon the Indebtedness shall for the purpose of any applicable statute of limitations be deemed to be a payment by or act of every person included in the term Borrower.

**3.13**    **Protection of Premises; Cure of Defaults:**  Borrower agrees that if, in the reasonable opinion of Lender exercised in good faith, the Premises are in danger of destruction or deterioration, Lender may enter upon the Premises and perform such acts thereon or with respect thereto as it may deem suitable for preservation or protection of the Premises, and may thereafter remove from the Premises or hold possession thereof at its option.  If an Event of Default has occurred and is continuing, Lender may also perform such acts and make such expenditures as Lender may reasonably deem appropriate or desirable to cure material defaults in any agreement affecting the Premises.

**3.14**    **Change of Law:**  Borrower agrees that in the event of the passage of any law changing in any way the laws for the taxation of mortgages or debts secured by mortgages, for state or local purposes, or the manner of collection of any such taxes, so as to affect this Mortgage, Lender shall have the right to give ninety (90) days written notice to Borrower requiring the payment of the Indebtedness or payment by Borrower of any such additional taxes imposed, at Borrower's option.  If such notice is given, the Indebtedness or such additional taxes shall become immediately due and payable at the expiration of said thirty (30) days.

**3.15**    **Reimbursement of Expenses:**  To the extent required by the Loan Agreement, Borrower will pay all filing, registration, and recording fees and all expenses incident to the preparation, execution, acknowledgement, filing and recording of this Mortgage, and any financing statements, releases, continuation statements, and any instruments of further assurance, and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of this Mortgage (other than income or franchise taxes imposed on (or measured by) Lender's net income (i) by the United States, (ii) by the jurisdiction under the laws of which Lender is organized or in which its principal office is located or in which its applicable lending office is located or (iii) by any jurisdiction (or by any subdivision or taxing authority thereof) as a result of a present or former connection between such jurisdiction (or subdivision or taxing authority) and Lender (other than such connection arising solely from executing,

delivering or performing its obligations or receiving a payment under, or enforcing this Mortgage). Borrower shall further pay all reasonable costs and expenses of Lender, including, without limitation, reasonable attorneys' fees, for the release, discharge and satisfaction of this Mortgage and any other lien or encumbrance relating to this Mortgage, and the preparation of any and all documents necessary to effectuate the foregoing.

**3.16    Certain Rights and Obligations:** Lender may take, but is not obligated to take, such action as Lender deems appropriate to protect the Premises or the status or priority of the lien of this Mortgage, including, but not limited to: (a) as provided herein, entry upon the Premises to protect the Premises from deterioration or damage, or to cause the Premises to be put in compliance with any governmental, insurance rating or contract requirements; (b) payment of amounts due on liens having priority over this Mortgage; (c) payment of any tax or charge for purposes of assuring the priority or enforceability of this Mortgage; (d) obtaining insurance on the Premises to the extent Borrower's failure to obtain such insurance is an Event of Default; (e) commencement or defense of any legal action or proceeding to assert or protect the validity or priority of the lien of this Mortgage; or (f) upon the occurrence and during the continuation of an Event of Default, enforcement of this Mortgage. Within ten (10) Business Days of demand therefor, Borrower shall reimburse Lender for all such amounts spent in taking any such action, with interest, and the amount thereof shall be Indebtedness secured by this Mortgage and shall, to the extent permitted by law, be in addition to the maximum amount of the Indebtedness heretofore stated.

**3.17    Comply With Covenants:** Borrower will not use the Premises in any manner which will violate an enforceable restrictive covenant affecting the same.

**3.18**    Intentionally deleted.

**3.19    Other Acts:** At Lender's request, Borrower shall execute and deliver to Lender all further documents and perform all other acts which Lender reasonably deems necessary or appropriate to perfect or protect its security for the Indebtedness, and Borrower shall pay all reasonable costs and expenses incurred by Lender in connection therewith, including, without limitation, reasonable attorneys' fees and costs of filing or recordation.

**3.20    Real Estate Tax and Insurance Account:** Upon the occurrence and during the continuation of an Event of Default, if requested by Lender, Borrower will pay to Lender by depositing into a non-interest bearing deposit account with Lender or an escrow agent acceptable to Lender in its sole discretion ("Imposition Account") on the first day of each month during the term hereof, a sum equal to one-twelfth (1/12) of the annual aggregate amount, as estimated from time to time by Lender, of the aggregate of all taxes, assessments, casualty insurance premiums and sewer charges (collectively "Impositions") on the Real Property. If such payments shall be deemed by Lender to be insufficient to pay such Impositions, Borrower will pay the amount of such deficiency, on demand, to Lender.

Lender shall apply any sums held by Lender pursuant to this Section 3.20 to the payment of such Impositions. So long as no Event of Default shall exist and after giving written notice to Lender, Borrower may in good faith by appropriate proceedings contest any Imposition and permit such Imposition to remain unpaid during the period under any such contest provided that (a) Borrower has set aside on its books adequate reserves in accordance with GAAP and (b) such contest operates to suspend collection of the contested Imposition and enforcement of any related Lien. Upon the occurrence and during the continuation of any Event of Default or if any conditions set forth in clauses (a) or (b) of this paragraph shall fail to be satisfied, then Lender may, in its discretion but shall not be required to, pay any such contested Imposition out of the Imposition Account or otherwise even if such payment is to prejudice Borrower's ability thereafter to contest such items.

**3.21    Security Agreement/Fixture Filing:**

(a)    This Mortgage is a security agreement as defined in the New York Uniform Commercial Code (as amended from time to time, the "UCC"). Notwithstanding the filing of any financing statement covering any of the Premises in the records normally pertaining to personal property, at Lender's option, solely for purposes of perfection of Lender's Lien on the Premises, all of the Premises, for all purposes and in all proceedings, legal or equitable, shall be regarded (to the extent permitted by law) as part of the Real Property. The mention in any such financing statement of any of the Premises shall not be construed as in any way altering any of the rights of Lender or adversely affecting the priority of the Lien granted hereby or by the Loan Documents, but such mention in the financing statement is hereby declared to be for the protection of Lender in the event any court shall at any time hold that notice of Lender's priority of interest, to be effective against any third party, must be filed in the UCC records.

(b)      Borrower shall execute and deliver to Lender such documents, instruments and further assurances, in each case in form and substance reasonably satisfactory to Lender, as Lender may, from time to time, reasonably consider necessary to create, perfect and preserve Lender's security interest hereunder.  Borrower hereby irrevocably authorizes Lender to cause financing statements (and amendments and continuations thereof) and any such documents, instruments and assurances to be recorded and filed, at such times and places as may be reasonably required or permitted by law to so create, perfect and preserve such security interest, and Borrower shall pay all reasonable costs and expenses incurred by Lender in connection therewith, including, without limitation, reasonable attorneys' fees and costs of filing or recordation.

(c)      This Mortgage shall also constitute a "fixture filing" for the purposes of the UCC against all of the Premises which is or is to become Fixtures related to the Premises.  Borrower is the "Debtor" and its name and mailing address are set forth in the preamble of this Mortgage.  Lender is the "Secured Party" and its name and mailing address from which information concerning the security interest granted herein may be obtained are also set forth in the preamble of this Mortgage.  The definition of Fixtures is set forth herein.  Borrower is the record owner of the applicable fee title.

**3.22**      **Condemnation:**  Promptly after obtaining knowledge of the institution of condemnation or eminent domain proceedings on any part of the Premises, Borrower shall notify Lender.  Lender may participate in such proceedings. Any awards made for any taking by eminent domain or in any condemnation proceeding, or for consequential damages on account thereof, are hereby assigned to Lender with power to, subject to Section 2.05(c), collect, receive and apply same on the Indebtedness, whether or not then due and payable, but such application shall not affect any obligation to continue making payments in accordance with the terms of any note or other obligation evidencing the Indebtedness.

**3.23**      **Due on Sale Clause:**  Except as permitted by the Loan Agreement or any other Loan Document, Borrower shall not sell, convey or otherwise transfer any interest in the Premises (whether voluntarily or by operation of law), or agree to do so, without Lender's prior written consent, including (a) any sale, conveyance, encumbrance, assignment, or other transfer of, or the grant of a security interest in, all or any part of the legal or equitable title to the Premises, except as otherwise permitted hereunder or (b) any lease of all or any portion of the Premises.

## ARTICLE IV.  Events of Default

The occurrence of any Events of Default under the Loan Agreement shall constitute an event of default hereunder ("Event of Default").

## ARTICLE V.  Remedies

Upon the occurrence and during the continuation of an Event of Default, Lender shall have the absolute right, subject to the Final Order and Section 8.02 of the Loan Agreement, at its option and election and in its sole discretion, to exercise alternatively or cumulatively any or all of the following remedies:

**5.1**      **Accelerate Indebtedness:**  Declare the Indebtedness immediately due and payable;

**5.2**      **Foreclose Mortgage:**  Institute judicial or non-judicial proceedings to foreclose the lien of this Mortgage to the fullest extent permitted by applicable law;

**5.3**      **Take Possession of Premises:**  Enter into and take possession of all or any of the Premises (and Borrower agrees to peaceably surrender the same immediately upon receipt of Lender's demand therefor) whether in connection with a judicial or non-judicial proceeding to foreclose or not; lease and re-lease all or any of the Premises; collect the Rents and apply the same against the Indebtedness; collect reasonable rent from Borrower if Borrower remains in possession after Lender's demand to surrender; dispossess by summary proceeding any tenant (including Borrower) defaulting in the payment of rent; provided, however, that no such acts by or on behalf of Lender shall constitute Lender a "Lender in possession."  The rights enumerated herein shall inure to the benefit of any receiver appointed respecting the Premises;

**5.4**      **Receiver:**  Obtain the appointment of a receiver of rents, issues and profits without notice and whether or not in connection with an action to foreclose this Mortgage;

**5.5** **Right of Setoff:** Upon and at any time and from time to time after any occurrence or existence of any Event of Default, Lender shall have the set-off rights set forth in the Loan Agreement.

**5.6** **Sell in One or More Parcels:** In the event of a judicial or non-judicial foreclosure hereof, cause the Premises to be sold at one or more sales and in one or more parcels, any provision of law to the contrary notwithstanding;

**5.7** **Personal Property:** Lender shall have all rights and remedies contemplated hereunder, including, without limitation, the right to take possession of the Personal Property, and for this purpose, Lender, may at any time and from time to time, with or without judicial process, enter upon any premises in which any Personal Property may be located and, without resistance or interference by Borrower, take possession of the Personal Property; and/or dispose of any Personal Property on any such premises; and/or require Borrower to assemble and make available to Lender at the expense of Debtor any Personal Property at any place or time designated by Lender; and/or remove any Personal Property from any such premises for the purpose of effecting sale or other disposition thereof. Without in any way requiring notice to be given in the following manner, Borrower agrees that any notice by Lender of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to Borrower if such notice is mailed by regular mail, postage prepaid, at least ten (10) days prior to such action, to the address set forth above as the location of Borrower 's chief executive office or to any other address which Debtor has specified in writing to Lender as the address to which notices hereunder shall be given to Borrower.

**5.8** **Other:** Exercise any other remedy and obtain any other relief as may be available to Lender in law or equity.

### ARTICLE VI. Miscellaneous

**6.1** **Intentionally deleted.**

**6.2** **Releases:** Lender may, without the consent of Borrower or any other person liable for the payment of the Indebtedness, release any portion or portions of or interest or interests in the Premises from the lien of this Mortgage, either with or without consideration, and may release or discharge in whole or in part any other property which it may at any time hold as security for payment of the Indebtedness or any part thereof and may take any other bond, note or obligation as evidence of the Indebtedness, payable at such time and on such terms as Lender may approve.

**6.3** **Intentionally deleted.**

**6.4** **Notice:** All notices, elections or demands permitted or required herein shall be delivered in accordance with Section 9.01 of the Loan Agreement.

**6.5** **Termination of Agreement:** This Mortgage, and the security interest granted hereunder, shall terminate concurrently with the repayment of the Obligations in full and the termination of the Loan Agreement. Lender hereby agrees to provide to Borrower, at Borrower's expense, such releases and other documents necessary to evidence such terminations promptly upon the request of Borrower.

**6.6** **Parties:** Any reference herein to Lender shall be deemed to include and apply to every subsequent holder of this Mortgage and any reference herein to Borrower shall be deemed to include and apply to every subsequent owner of the Premises and every person liable upon the Indebtedness, unless the language or circumstances clearly requires the contrary.

**6.7** **Waiver:** No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Lender may remedy any default by Borrower to Lender or any other person, firm or corporation in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for any and all of its expenses in so remedying such default. All rights and remedies of Lender hereunder are cumulative.

**6.8**    **Property Encumbered:**  This Mortgage does not cover real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential units, each having its own separate cooking facilities.

**6.9**    **Trust Fund Provisions:**  This Mortgage is subject to the trust fund provisions of Section 13 of the Lien Law of the State of New York.

**6.10**    **Governing Law:**  This Mortgage, and the rights and obligations of the parties hereto, shall be construed and interpreted in accordance with the internal laws of the State of New York.

**6.11**    **Limitation of Liability:**  Each of the Lender and Borrower agrees, to the fullest extent permitted by applicable law, not to assert, and hereby waives, any claim against the other party hereto or any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (including, without limitation, any loss of profits or anticipated savings), as opposed to actual or direct damages, resulting from this Mortgage or any other Loan Document or arising out of such party's or such Indemnified Party's activities in connection herewith or therewith (whether before or after the Closing Date).

**6.12**    **JURISDICTION:**  BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY (a) CONSENTS IN EACH ACTION AND OTHER LEGAL PROCEEDING COMMENCED BY LENDER AND ARISING OUT OF OR OTHERWISE RELATING TO THIS MORTGAGE, ANY OF THE OBLIGATIONS, OR ANY COLLATERAL TO THE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK, AND WITH RESPECT TO THE FORECLOSURE OF THIS MORTGAGE OF ANY COURT OF THE STATE OF NEW YORK SITTING IN SUFFOLK COUNTY, (b) WAIVES EACH OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING, (c) WAIVES IN EACH SUCH ACTION AND OTHER LEGAL PROCEEDING EACH RIGHT TO ASSERT ANY NONMANDATORY COUNTERCLAIM, ANY SETOFF OR ANY DEFENSE BASED UPON ANY STATUTE OF LIMITATIONS OR CLAIM OF LACHES, (d) WAIVES EACH RIGHT TO ATTACK ANY FINAL JUDGMENT THAT IS OBTAINED AS A RESULT OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING AND (e) CONSENTS TO EACH SUCH FINAL JUDGMENT BEING SUED UPON IN ANY COURT HAVING JURISDICTION WITH RESPECT THERETO AND ENFORCED IN THE JURISDICTION IN WHICH SUCH COURT IS LOCATED AS IF ISSUED BY SUCH COURT.

**6.13**    **WAIVER OF TRIAL BY JURY:**  EACH OF LENDER, BY ITS ACCEPTANCE HEREOF, AND BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO, AND IN, ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO (i) THIS MORTGAGE, ANY OF THE OBLIGATIONS, OR ANY COLLATERAL, (ii) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THIS MORTGAGE, ANY OF THE OBLIGATIONS, OR ANY COLLATERAL OR (iii) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THIS MORTGAGE, ANY OF THE OBLIGATIONS, OR ANY COLLATERAL. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY REPRESENTATIVE OF LENDER HAS REPRESENTED TO BORROWER THAT LENDER WILL NOT SEEK TO ENFORCE THE WAIVER MADE BY BORROWER IN THIS SECTION 6.13.

**6.14**    **Counterparts:**  This Mortgage may be executed in any number of counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** Borrower has duly executed this Mortgage on the date first set forth herein.

SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION

By _____

Name: Philip C. Nolan
Title: President

STATE OF NEW YORK    )
                     )    SS:
COUNTY OF Suffolk    )

On the 13 day of May _____ in the year 2016, before me, the undersigned, personally appeared Philip C. Nolan, known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PAULETTE L. MOSES
Notary Public, State of New York
No. 01MO6105879
Qualified in Suffolk County
Commission Expires 2/23/20. 20

*[SIGNATURE PAGE FOR MORTGAGE]*

## SCHEDULE A

### Property Description

**Parcel I: (For Information Only: 440 South Service Road, Medford, New York 11763)**

ALL that certain plot, piece or parcel of land, situate, lying and being at Medford, Town of Brookhaven, County of Suffolk, State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of Long Island Avenue distant 290.17 feet westerly from the corner formed by the intersection of the Notherly side of Long Island Avenue and the Westerly side of Oregon Avenue, said point also being where the division line between the lands herein described and the land nor or formerly of Guabquinto Masonry Corp. intersects the Northerly side of Long Island Avenue;

RUNNING THENCE South 82 degrees 52 minutes 01 seconds West along the Northerly side of Long Island Avenue 1233.64 feet to the lands now or formerly of the Rod Staten Corp.;

THENCE North 04 degrees 47 minutes 16 seconds West along said last mentioned land 1359.05 feet to the Southerly side of the Long Island Expressway (State Road 495) (Eastbound Service Road) said point also being where the division line of the premises herein described and the lands now or formerly of the Rod Staten Corp. intersects the Southerly side of the Long Island Expressway (State Road 495) (Eastbound Service Road);

THENCE South 82 degrees 59 minutes 39 seconds East along the Southerly side of the Long Island Expressway (State Road 495) (Eastbound Service Road) 154.30 feet to the State of New York Recharge Basin;

THENCE South 04 degrees 34 minutes 43 seconds East along the State of New York Recharge Basin 368.51 feet;

THENCE North 84 degrees 20 minutes 55 seconds East 241.87 feet;

THENCE North 07 degrees 56 minutes 09 seconds East 294.04 feet to the Southerly side of the land dedicated to the County of Suffolk in Liber 10353 page 538;

THENCE along said Southerly line South 82 degrees 59 minutes 39 seconds East 786.65 feet to the land now or formerly of John Gianquinto;

THENCE South 05 degrees 07 minutes 59 seconds East partially along the lands now or formerly of John Gianquinto, partially along the Westerly terminus of Robinson Avenue and partially along lands now or formerly of Gianquinto Masonry Corp, 1038.23 feet to the Northerly side of Long Island Avenue at the point or place of BEGINNING.

EXCEPTING THEREFROM the premises described above that certain plot, piece or parcel of land situate in the Hamlet of Medford, Town of Brookhaven, County of Suffolk, State of New York conveyed by Deed dated December 19, 2014 and recorded February 20, 2015 in Liber 12807 of Deeds at Page 643, and described as follows:

Beginning at a point on the northerly side of Long Island Avenue distant 1,513.81 feet westerly from the corner formed by the intersection of the northerly side of Long Island Avenue and the westerly side of Oregon Avenue, said point also being on the westerly line of property described in Deed Liber 9787 Page 395;

Running thence along the westerly line of property described in Deed Liber 9787 Page 395 North 04° 47' 16" West 1,359.05 feet (1,359.24 feet Deed Liber 9787 Page 395), to the southerly side of South Service Road of the Long Island Expressway;

Thence along the southerly side of the South Service Road of the Long Island Expressway South 82° 59' 39" East 51.08 feet, to a point on the southerly side of the South Service Road of the Long Island Expressway 50 feet easterly of the westerly line of said property described in Deed Liber 9787 Page 395;

Thence parallel to and 50 feet easterly of the westerly line of said property described in Deed Liber 9787 Page 395, South 04° 41'16" East 1,346.56 feet, to the northerly side of the Long Island Avenue;

Thence along the northerly side of Long Island Avenue South 82° 52' 01" West 50.04 feet, to the westerly line of property described in Deed Liber 9787 Page 395, at the Point of Beginning.

Containing within said bounds 1.553 Acres.

Parcel I is also described as:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING AT MEDFORD, TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF LONG ISLAND AVENUE DISTANT 290.17 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF LONG ISLAND AVENUE AND THE WESTERLY SIDE OF OREGON AVENUE, SAID POINT ALSO BEING WHERE THE DIVISION LINE BETWEEN THE LANDS HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU INTERSECTS THE NORTHERLY SIDE OF LONG ISLAND AVENUE;

RUNNING THENCE SOUTH 82° 51' 40" WEST ALONG THE NORTHERLY SIDE OF LONG ISLAND AVENUE, 1233.64 FEET TO THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK;
THENCE NORTH 4° 47' 37" WEST ALONG SAID LAST MENTIONED LAND 1359.24 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) SAID POINT ALSO BEING WHERE THE DIVISION LINE OF THE PREMISES HEREIN DESCRIBED AND THE LANDS NOW OR FORMERLY OF THE COUNTY OF SUFFOLK, FORMERLY OF JOHN A. BOWNAN INTERSECTS THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST ALONG THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD) 154.42 FEET TO THE STATE OF NEW YORK RECHARGE BASIN;

THENCE SOUTH 4° 35' 04" EAST ALONG THE STATE OF NEW YORK RECHARGE BASIN 368.51 FEET;

THENCE NORTH 84° 20' 34" EAST STILL ALONG THE STATE OF NEW YORK RECHARGE BASIN .02 FEET;

THENCE NORTH 84° 21' 15" EAST 241.87 FEET;

THENCE NORTH 7° 55' 35" EAST 308.09 FEET TO THE SOUTHERLY SIDE OF THE LONG ISLAND EXPRESSWAY (STATE ROAD 495) (EASTBOUND SERVICE ROAD);

THENCE SOUTH 83° 00' 00" EAST 783.30 FEET TO THE LAND NOW OR FORMERLY OF EDWARD BERNACKI, JR.;

THENCE SOUTH 5° 08' 20" EAST PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWARD BERNACKI, JR., PARTIALLY ALONG THE WESTERLY TERMINUS OF ROBINSON AVENUE AND PARTIALLY ALONG THE LANDS NOW OR FORMERLY OF EDWIN DAMRAU, 1052.74 FEET TO THE NORTHERLY SIDE OF LONG ISLAND AVENUE AT THE POINT OR PLACE OF BEGINNING.

EXCEPTING THEREFROM ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK, STATE OF NEW YORK FOR HIGHWAY PURPOSES, ADJACENT TO THE SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AS SHOWN ON A MAP AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY BOUNDARY OF THE EXISTING SOUTH SERVICE ROAD OF THE LONG ISLAND EXPRESSWAY AT THE INTERSECTION OF THE SAID BOUNDARY WITH THE

DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE WEST AND THE LANDS OF EDWARD BERNACKI, JR., REPUTED OWNER ON THE EAST; THENCE SOUTH 05° 08' 20" EAST ALONG SAID DIVISION LINE 14.32 FEET TO A POINT;

THENCE NORTH 83° 00' 00" WEST THROUGH THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER, 786.54 FEET TO A POINT ON THE DIVISION LINE BETWEEN THE LANDS OF NATIONAL AMUSEMENTS, INC., REPUTED OWNER ON THE EAST AND THE LANDS OF STATE OF NEW YORK, REPUTED OWNER ON THE WEST;

THENCE NORTH 07° 55' 48" EAST ALONG SAID DIVISION LINE 14.00 FEET TO ITS INTERSECTION WITH THE SOUTHERLY BOUNDARY OF SAID EXISTING ROAD;

THENCE SOUTH 83° 00' 00" EAST ALONG THE LAST MENTIONED SOUTHERLY BOUNDARY 783.30 FEET TO THE POINT OF BEGINNING.

TOGETHER with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

EXCEPTING THEREFROM the premises described above that certain plot, piece or parcel of land situate in the Hamlet of Medford, Town of Brookhaven, County of Suffolk, State of New York conveyed by Deed dated December 19, 2014 and recorded February 20, 2015 in Liber 12807 of Deeds at Page 643, and described as follows:

Beginning at a point on the northerly side of Long Island Avenue distant 1,513.81 feet westerly from the corner formed by the intersection of the northerly side of Long Island Avenue and the westerly side of Oregon Avenue, said point also being on the westerly line of property described in Deed Liber 9787 Page 395;

Running thence along the westerly line of property described in Deed Liber 9787 Page 395 North 04° 47' 16" West 1,359.05 feet (1,359.24 feet Deed Liber 9787 Page 395), to the southerly side of South Service Road of the Long Island Expressway;

Thence along the southerly side of the South Service Road of the Long Island Expressway South 82° 59' 39" East 51.08 feet, to a point on the southerly side of the South Service Road of the Long Island Expressway 50 feet easterly of the westerly line of said property described in Deed Liber 9787 Page 395;

Thence parallel to and 50 feet easterly of the westerly line of said property described in Deed Liber 9787 Page 395, South 04° 41'16" East 1,346.56 feet, to the northerly side of the Long Island Avenue;

Thence along the northerly side of Long Island Avenue South 82° 52' 01" West 50.04 feet, to the westerly line of property described in Deed Liber 9787 Page 395, at the Point of Beginning.

Containing within said bounds 1.553 Acres.


**Parcel II: (For Information Only: 300 Knickerbocker Avenue, Bohemia, New York 11716)**

ALL that certain plot, piece or parcel of land, situate, lying and being at Bohemia, Town of Islip, County of Suffolk, State of New York being more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Knickerbocker Avenue, as widened, 1012.65 feet South of the southerly side of Veterans Memorial Highway and from said point or place of beginning;

RUNNING THENCE North 84 degrees 00 minutes 20 seconds West, 407.22 feet to a point on the East side of Map of South Bay Farms, Filed Map No. 421;

THENCE along the East side of said map, South 5 degrees 55 minutes 30 seconds West, 453.02 per deed (455.02' per survey) feet to the northerly side of McCormick Drive;

THENCE along the northerly side of McCormick Drive on a curve bearing to the left having a radius of 1000.00 and a length of 41.78 feet to a point;

THENCE along the northerly side of McCormick Drive, South 84 degrees 00 minutes 20 seconds East a distance of 58.17 feet;

THENCE North 5 degrees 59 minutes 40 seconds East a distance of 300 feet to a point;
THENCE South 84 degrees 00 minutes 20 seconds East, 306.73 feet to the west side of Knickerbocker Avenue, as widened;

THENCE North 5 degrees 59 minutes 40 seconds East, 155.89 feet along the westerly side of Knickerbocker Avenue, as widened, to the point or place of BEGINNING.