**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Bryce L. Friedman
Sarah E. Phillips

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 286-6443
Christopher F. Graham
Sarah H. Morrissey

*Counsel for Adjusted Debtor and Plaintiff Suffolk Regional
Off-Track Betting Corporation*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUFFOLK REGIONAL OFF-TRACK<br>BETTING CORPORATION,<br><br>              Adjusted Debtor. | Chapter 9<br>Case No. 12-43503-CEC |
| SUFFOLK REGIONAL OFF-TRACK<br>BETTING CORPORATION,<br><br>*Plaintiff,*<br><br>*v.*<br><br>DELAWARE NORTH COMPANIES, INC.,<br>DELAWARE NORTH COMPANIES GAMING &<br>ENTERTAINMENT, INC., DNC GAMING<br>MANAGEMENT IN SUFFOLK, LLC, and<br>DELAWARE NORTH ISLANDIA PROPERTIES,<br>LLC,<br><br>*Defendants.* | A.P. No. 19-01133-CEC<br><br>(Jury Trial Demanded) |

**SUFFOLK REGIONAL OFF-TRACK BETTING CORPORATION'S**
<u>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ......................................................................................................................7

    I.     Suffolk OTB Relies on Delaware North's Expertise and Specialized
           Knowledge to Manage the VLT Facility at Jake's 58 ...........................................7

        A.    The Medford VLT Facility Hits Roadblocks and Delaware North
               Hatches Its Scheme ........................................................................................... 9

        B.    The DMS Agreement Confirms Delaware North's Obligations to
               Suffolk OTB.................................................................................................... 10

        C.    Suffolk OTB and Delaware North Begin Construction of the Islandia
               VLT Facility.................................................................................................... 11

    II.    Delaware North's Knowing Pattern of Enriching Itself at Suffolk OTB's
           Expense ...............................................................................................................11

        A.    Delaware North Overcharges Suffolk OTB Millions in Construction
               Costs................................................................................................................ 11

        B.    Delaware North Falsely Claims Ownership of Suffolk OTB's
               Trademarks and Service Marks ...................................................................... 13

        C.    Delaware North Overcharges Suffolk OTB for Rent and Utilities................. 13

        D.    Delaware North Takes Advantage of Suffolk OTB's Marketing
               Allowance to Enrich Itself ............................................................................. 14

        E.    Delaware North Incurs Gaming Commission Fines and Refuses to Pay
               Them ................................................................................................................ 16

    III.   Delaware North Conceals Its Self-Dealing from Suffolk OTB in Bad Faith ........17

    IV.   Delaware North Defaults on its Obligations under the DMS Agreement
           and Suffolk OTB Files This Lawsuit ...................................................................17

ARGUMENT ..........................................................................................................................18

    I.     SUFFOLK OTB HAS STATED A CLAIM FOR VIOLATIONS OF THE
           NEW YORK FALSE CLAIMS ACT, N.Y. FIN. LAW § 187, et seq.
           (FIRST CAUSE OF ACTION)...............................................................................18

A.      Suffolk OTB Has Pled Its NYFCA Claim with the Requisite Particularity ..................................................................................... 19

B.      Suffolk OTB Has Not Engaged in Impermissible "Group Pleading" ............. 23

C.      Suffolk OTB Has Adequately Pled Knowledge, Falsity and Materiality ....... 26

D.      Suffolk OTB Has Pled the Existence of Hundreds of False "Claims" as Required by the NYFCA ............................................................... 31

E.      Delaware North's Liability under Sections 189(1)(d), (g) and (h) Preclude it from Escaping Liability on Its Baseless "Claim" Argument ........ 33

II.     THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT (SECOND CAUSE OF ACTION) ................................................ 36

A.      DNC Gaming Is Liable for Delaware North's Breach of Contract ................ 36

B.      Suffolk OTB's Contract Claims Regarding Construction Costs, Trademarks and Suffolk OTB's Consent Survive as a Matter Of Law .......... 38

III.    SUFFOLK OTB HAS STATED A CLAIM FOR BREACH OF FIDUCIARY DUTY ................................................................................. 43

A.      Suffolk OTB Has Pled Delaware North Manager's Fiduciary Duty .............. 43

B.      Suffolk OTB's Breach of Fiduciary Duty Claim is Not Duplicative of Its Breach of Contract Claims ......................................................... 48

C.      The Economic Loss Doctrine Does Not Bar Suffolk OTB's Breach of Fiduciary Duty Claim at the Pleading Stage ................................... 50

D.      Suffolk OTB's Aiding and Abetting Breaches of Fiduciary Duty Claim Also Survives Dismissal ............................................................... 52

IV.     PLAINTIFF'S UNJUST ENRICHMENT CLAIM SURVIVES DISMISSAL ................................................................................... 53

V.      PLAINTIFF'S ALLEGATIONS STATE A BASIS TO PIERCE THE CORPORATE VEIL (SEVENTH CAUSE OF ACTION) ................................... 57

A.      Suffolk OTB's Veil Piercing Allegations Must Be Evaluated on the Merits ....................................................................................... 58

B.      Suffolk OTB's Veil Piercing Allegations Surpass the Plausibility Threshold and Survive Dismissal ................................................... 59

VI.     SUFFOLK OTB'S CLAIM FOR A DECLARATORY JUDGMENT ON
        TERMINATION OF THE DMS AGREEMENT IS NOT SUBJECT TO
        ANY CONDITION PRECEDENT (EIGHTH CAUSE OF ACTION).................64

VII.    PLAINTIFF'S REQUEST FOR AN ACCOUNTING IS PROPER AND
        SUFFICIENTLY PLED (NINTH CAUSE OF ACTION) ...................................66

VIII.   JUSTICE REQUIRES LEAVE TO AMEND TO ADDRESS ANY
        ACTUAL PLEADING DEFICIENCIES IDENTIFIED BY THE COURT .........69

CONCLUSION.............................................................................................................70

# **TABLE OF AUTHORITIES**

## Cases

*17 Vista Fee Assocs. V. Teachers Ins. & Annuity Assoc. of Am.*,
   259 A.D.2d 75 (N.Y. App. Div. 1999) ...................................................................... 51

*300 Broadway Realty Corp. v. Kommit*,
   235 N.Y.S.2d 205 (1962) ............................................................................................ 67

*37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs., LLC*,
   156 A.D.3d 569 (N.Y. App. Div. 2017) .................................................................. 48

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
   96 N.Y.2d 280 (2001) ................................................................................................ 50

*7-Eleven, Inc. v. Khan*,
   977 F. Supp. 2d 214 (E.D.N.Y. 2013) ............................................................. 65, 66

*A.V.E.L.A., Inc. v. The Estate of Marilyn Monroe, LLC*,
   2018 U.S. Dist. LEXIS 35536 (S.D.N.Y. Mar. 5, 2018) ...................................... 62

*Abercrombie v. Andrew Coll.*,
   438 F. Supp. 2d 243 (S.D.N.Y. 2006) ...................................................................... 47

*Alexander v. Wheeler*,
   64 A.D.2d 837 (N.Y. App. Div. 1978) ...................................................................... 36

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
   328 F. Supp. 3d 159 (S.D.N.Y. 2018) ...................................................................... 51

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 18

*Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*,
   944 F. Supp. 1169 (S.D.N.Y. 1996) ........................................................................ 48

*Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*,
   159 F. Supp. 3d 324 (E.D.N.Y. 2016) ...................................................................... 68

*Banks v. Corr. Servs. Corp.*,
   475 F. Supp. 2d 189 (E.D.N.Y. 2007) ...................................................................... 67

*Battery Assocs., Inc. v. J & B Battery Supply, Inc.*,
   944 F. Supp. 171 (E.D.N.Y. 1996) ............................................................................ 36

*Bd. of Mgrs of Fairways at N. Hills Condo. v Fairway at N. Hills*,
   193 A.D.2d 322 (N.Y. App. Div. 1993) .............................................................. 5, 45

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 18

*Blair v. Infineon Techs. AG*,
   720 F. Supp. 2d 462 (D. Del. 2010) .......................................................................... 58

*Blue Bell, Inc. v. W. Glove Works Ltd.*,
  816 F. Supp. 236 (S.D.N.Y. 1993) ...................................................................... 65

*Bridgeway Corp. v. Citibank, N.A.*,
  132 F. Supp. 2d 297 (S.D.N.Y. 2001) ................................................................. 55

*Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.*,
  655 F. App'x 9 (2d Cir. 2016) ............................................................................ 35

*Brown v. Miguens*,
  No. 02 Civ. 5278 (JSM), 2003 WL 1090304 (S.D.N.Y. Mar. 11, 2003) ................................ 37

*Bull HN Info. Sys. Inc. v. Am. Exp. Bank Ltd.*,
  No. 88 Civ. 2103 (SWK), 1990 WL 48098 (S.D.N.Y. Apr. 6, 1990) ....................................... 1

*Bullmore v. Banc of Am. Sec. LLC*,
  485 F. Supp. 2d 464 (S.D.N.Y. 2007) ................................................................. 49

*Cal Distrib., Inc. v. Cadbury Schweppes Americas Beverages, Inc.*,
  No. 06 Civ. 0496 (RMB) (JCF), 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) ............................ 55

*Carvel Corp. v. Diversified Mgmt. Group, Inc.*,
  930 F.2d 228 (2d Cir. 1991) ............................................................................... 41

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ............................................................................... 18

*Chelsea Grand LLC v. Interstate Hotels & Resorts, Inc.*,
  No. 09 Civ. 924 (PAC), 2017 WL 1214874 (S.D.N.Y. Mar. 30, 2017) .................................. 45

*Commerce & Indus. Ins. Co. v. Vulcraft, Inc.*,
  No. 97 Civ. 2578 (DAB) (MHD), 1998 WL 823055 (S.D.N.Y. Nov. 20, 1998) .................... 51

*Commerzbank AG v. U.S. Bank Nat'l Ass'n.*,
  277 F. Supp. 3d 483 (S.D.N.Y. 2017) ................................................................. 51

*Commonwealth ex rel. FX Analytics v. Bank of N.Y. Mellon*,
  84 Va. Cir. 473 (2012) ...................................................................................... 32

*Cookware Co. (USA), LLC v. Austin*,
  No. 15 CIV. 5796 (DAB), 2017 WL 5198388 (S.D.N.Y. Oct. 26, 2017) ............................... 60

*Crespo v. S.C. Johnson & Son*,
  394 F. Supp. 3d 260 (E.D.N.Y. 2019) ................................................................. 25

*Darlagiannis v. Darlagiannis*,
  48 A.D.2d 875 (N.Y. App. Div. 1975) ................................................................. 67

*DiTerlizzi v. DiTerlizzi*,
  92 A.D.2d 604 (N.Y. App. Div. 1983) ................................................................. 67

*DiVittorio v. Equidyne Extractive Indus.*,
  822 F.2d 1242 (2d Cir. 1987) ............................................................................. 24

*Don King Prods., Inc. v. Douglas*,
  742 F. Supp. 741 (S.D.N.Y. 1990) ..................................................................... 42

*Donzella v. New York State Thruway Auth.*,
　7 A.D.2d 771 (N.Y. App. Div. 1958) ................................................................ 36

*E\*Trade Fin. Corp. v. Deutsche Bank AG*,
　No. 05 Civ. 0902, 2008 WL 2428225 (S.D.N.Y. June 13, 2008) ............................ 43

*Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*,
　No. 16 Civ. 1099 (NSR), 2017 WL 1383773 (S.D.N.Y. Apr. 12, 2017) ................. 51

*Evans v. Perl*,
　862 N.Y.S.2d 814 (N.Y. Sup. Ct. 2008) ................................................................ 67

*Fantozzi v. Axsys Techs., Inc.*,
　No. 07 Civ. 02667 (LMM), 2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) ............... 43

*Fletcher v. Atex, Inc.*,
　68 F.3d 1451 (2d Cir. 1995) ................................................................................ 59

*Gao v. JPMorgan Chase & Co.*,
　No. 14 Civ. 4281 (PAC), 2015 WL 3606308 (S.D.N.Y. June 9, 2015) ................... 25

*Gen. Corp. v. Wellington Adv.*,
　82 N.Y.2d 158 (1993) ................................................................................... 46, 47

*Genovese Drug Stores, Inc. v. Connecticut Packing Co.*,
　732 F.2d 286 (2d Cir. 1984) ................................................................................ 37

*Giuffre v. Hyundai Motor Am.*,
　756 F.3d 204 (2d Cir. 2014) ................................................................................ 66

*Glidepath Holding B.V. v. Spherion Corp.*,
　590 F. Supp. 2d 435 (S.D.N.Y. 2007) .................................................................. 53

*GLM Corp. v. Klein*,
　665 F. Supp. 283 (S.D.N.Y. 1987) ....................................................................... 46

*Golden Pac. Bancorp v. F.D.I.C.*,
　273 F.3d 509 (2d Cir. 2001) ................................................................................ 54

*Grabcheski v. Am. Int'l Grp., Inc.*,
　687 F. App'x 84 (2d Cir. 2017) ............................................................................ 29

*Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*,
　808 F. Supp. 2d 552 (S.D.N.Y. 2011) ....................................................... 41, 42, 43

*Herrera v. Eastside Wok, Inc.*,
　No. 13 Civ. 9137 (JLC), 2014 WL 6678281 (S.D.N.Y. Nov. 25, 2014) ............. 36, 37

*Hochman v. LaRea*,
　14 A.D.3d 653 (N.Y. App. Div. 2005) .................................................................. 54

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*,
　227 F.3d 8 (2d Cir. 2000) .................................................................................... 51

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
　679 F. Supp. 2d 395 (S.D.N.Y. 2009) .................................................................. 67

*In re Aluminum Warehousing Antitrust Litig.*,
   2015 U.S. Dist. LEXIS 26412 (S.D.N.Y. Mar. 4, 2015) ......................................................... 26

*In re Bank of N.Y. Mellon Corp. False Claims Act Foreign Exch. Litig.*,
   851 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................ 32, 33, 34

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
   991 F. Supp. 2d 479 (S.D.N.Y. 2014) .................................................................. 32, 33, 34

*In re Best Film & Video Corp.*,
   46 B.R. 861 (Bankr. E.D.N.Y. 1985)........................................................................ 65, 66

*In re Buckhead Am. Corp.*,
   178 B.R. 956 (D. Del. 1994)........................................................................................ 58

*In re Cardiac Devices Qui Tam Litig.*,
   221 F.R.D. 318 (D. Conn. 2004) ................................................................................ 28

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
   342 F. Supp. 2d 207 (S.D.N.Y. 2004) ...................................................................... 62

*Int'l Council of Shopping Ctrs., Inc. v. Info Quarter, LLC*,
   No. 17-CV-5526 (AJN), 2018 WL 4284279 (S.D.N.Y. Sept. 7, 2018) ............................ 60, 62

*Int'l Credit Brokerage Co. v. Agapov*,
   249 A.D.2d 77 (N.Y. App. Div. 1998) ........................................................................ 58

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
   No. 08 Civ 9116 (PGG), 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) .................................... 46

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Srvs., Inc.*,
   386 F. Supp. 2d 461 (S.D.N.Y. 2005) ........................................................................ 63

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) .......................................................................................... 59

*Kane ex rel. United States v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) ................................................................ 19, 27, 35

*Kawski v. Johnson & Johnson*, No. 04-CV-6208 CJS,
   2005 WL 3555517 (W.D.N.Y. Dec. 19, 2005)............................................................ 57, 62

*Key Items, Inc. v. Ultima Diamonds, Inc.*,
   No. 09 Civ. 3729 (HBP), 2010 WL 3291582 (S.D.N.Y. Aug. 17, 2010)................................ 58

*Levine v. Prudential Bache Properties, Inc.*,
   855 F. Supp. 924 (N.D. Ill. 1994) .............................................................................. 25

*Liberty Synergistics, Inc. v. Microflo Ltd.*,
   50 F. Supp. 3d 267 (E.D.N.Y. 2014) .......................................................................... 63

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
   388 F. Supp. 2d 292 (S.D.N.Y. 2005) ........................................................................ 46

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp., LLC*,
   268 F.3d 58 (2d Cir. 2001) ........................................................................................ 59

*Mathias v. Jacobs*,
   238 F. Supp. 2d 556 (S.D.N.Y. 2002) ...................................................................... 55

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) ..................................................................... 62

*MGR Meats, Inc. v. Schweid*,
   No. 10-CV-3068 MKB, 2012 WL 6675123 (E.D.N.Y. Dec. 21, 2012).................... 56

*Mid-Hudson Catskill Migrant Ministry, Inc. v. Fine Hosp. Corp.*,
   418 F.3d 168 (2d Cir. 2005) .................................................................................... 56

*Mobil Oil Corp. v. Linear Films, Inc.*,
   718 F. Supp. 260 (D. Del. 1989)............................................................................... 64

*Monahan v. N.Y.C. Dep't of Corr.*,
   214 F.3d 275 (2d Cir. 2000) .................................................................................... 69

*Moses v. Martin*,
   360 F. Supp. 2d 533 (S.D.N.Y. 2004) ..................................................................... 62

*N. Shipping Funds I, LLC v. Icon Capital Corp.*,
   921 F. Supp. 2d 94 (S.D.N.Y. 2013) ....................................................................... 46

*N.Y.C. v. Tavern on the Green Int'l LLC*,
   351 F. Supp. 3d 680 (S.D.N.Y. 2018) ..................................................................... 66

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
   102 F.3d 660 (2d Cir. 1996) .................................................................................... 55

*Ningbo Prods. Imp. & Exp. Co. v. Eliau*,
   2011 U.S. Dist. LEXIS 125789 (S.D.N.Y. Oct. 31, 2011) ...................................... 64

*NYKCool A.B. v. Pac. Fruit, Inc.*,
   507 F. App'x 83 (2d Cir. 2013) ......................................................................... 36, 37

*Panam Mgmt. Grp., Inc. v. Peña*,
   No. 08 Civ. 2258 (JFB) (ARL), 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011) ........ 59

*Pegler v. NRG Residential Solar Sols. LLC*,
   No. 17 Civ. 4319 (LGS), 2018 WL 1033232 (S.D.N.Y. Feb. 20, 2018).................. 37

*Penato v. George*,
   52 A.D.2d 939 (N.Y. App. Div. 1976) .................................................................... 45

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   652 F. Supp. 2d 495 (S.D.N.Y. 2009) ..................................................................... 53

*People ex rel. Schneiderman v. Bank of N.Y. Mellon Corp.*,
   40 Misc. 3d 1232(A), 977 N.Y.S.2d 668 (N.Y. Sup. 2013) .................................... 32

*Picture Patents, LLC v. Aeropostale, Inc.*,
   No. 07 Civ. 5567 (JGK), 2009 WL 2569121 (S.D.N.Y. Aug. 19, 2009) ................ 55

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999) .................................................................................... 30

*Robinson Redevelopment Co. v. Anderson*,
　155 A.D.2d 755 (N.Y. App. Div. 1989) ................................................................. 52

*Robles v. Copstat Sec., Inc.*,
　No. 08 Civ. 9572 (SAS), 2009 WL 4403188 (S.D.N.Y. Dec. 2, 2009)...................................... 58

*Rothman v. Gregor*,
　220 F.3d 81 (2d Cir. 2000) ................................................................. 18

*S.E.C. v. Cavanagh*,
　445 F.3d 105 (2d Cir. 2006) ................................................................. 68

*Saul v. Cahan*,
　153 A.D.3d 947 (N.Y. App. Div. 2017) ................................................................. 46

*Schiavone Constr. Co. v. Mayo Corp.*,
　56 N.Y.2d 667 (1982) ................................................................. 50

*SCS Commc'ns, Inc. v. Herrick Co., Inc.*,
　360 F.3d 329 (2d Cir. 2004) ................................................................. 52

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
　234 B.R. 293 (Bankr. S.D.N.Y. 1999) ................................................................. 58

*Sentry Ins. A. Mut. Co. v. Brand Mgmt. Inc.*,
　120 F. Supp. 3d 277 (E.D.N.Y. 2015) ................................................................. 59, 63

*Sofi Classic S.A. de C.V. v. Hurowitz*,
　444 F. Supp. 2d 231 (S.D.N.Y. 2006) ................................................................. 54, 55

*Southland Corp. v. Mir*,
　748 F. Supp. 969 (E.D.N.Y. 1990) ................................................................. 65

*Space, Inc. v. Simowitz*,
　No. 08 Civ. 2854 (SAS), 2008 WL 2676359 (S.D.N.Y. July 8, 2008) ................................ 55

*St. John's Univ. v. Bolton*,
　757 F. Supp. 2d 144 (E.D.N.Y. 2010) ................................................................. 49, 52, 56

*Suffolk Laundry Servs., Inc. v. Redux Corp.*,
　238 A.D.2d 577 (N.Y. App. Div. 1997) ................................................................. 50

*Surge Licensing, Inc. v. Copyright Promotions, Ltd.*,
　258 A.D.2d 257 (N.Y. App. Div. 1999) ................................................................. 46

*Szulik v. Tagliaferri*,
　966 F. Supp. 2d 339 (S.D.N.Y. 2013) ................................................................. 53

*Threeline Imports, Inc. v. Vernikov*,
　239 F. Supp. 3d 542 (E.D.N.Y. 2017) ................................................................. 54

*U.S. ex rel. Corp. Compliance Assocs. v. N.Y. Soc'y for the Relief of the Ruptured & Crippled,
Maintaining the Hosp. for Special Surgery*,
　2014 U.S. Dist. LEXIS 109786 (S.D.N.Y. Aug. 7, 2014) ........................................... 26

*Union Carbide Corp. v. Montell N.V.*,
　944 F. Supp. 1119 (S.D.N.Y. 1996) ................................................................. 59

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp. 2d 198 (S.D.N.Y. 2002) ........................................................................ 45

*United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*,
    668 F. Supp. 2d 548 (S.D.N.Y. 2009) ........................................................................ 31

*United States ex rel. Aryai v. Skanska*,
    2019 U.S. Dist. LEXIS 45083 (S.D.N.Y. Mar. 19, 2019) ........................................ 26

*United States ex rel. Badr v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017) .................................................................................... 30

*United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017) ................................................................................ passim

*United States ex rel. Derrick v. Roche Diagnostics Corp.*,
    318 F. Supp. 3d 1106 (N.D. Ill. 2018) ...................................................................... 25

*United States ex rel. Forcier v. Comput. Scis. Corp.*,
    183 F. Supp. 3d 510 (S.D.N.Y. 2016) ................................................................. 19, 22

*United States ex rel. Gelman v. Donovan*,
    No. 12 CV 5142 (RJD), 2017 WL 4280543 (E.D.N.Y. Sept. 25, 2017) ................... 22

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) .................................................................................... 21

*United States ex rel. Heath v. AT & T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) .................................................................................. 19

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) .................................................................................. 31

*United States ex rel. Kester v. Novartis Pharm. Corp.*,
    23 F. Supp. 3d 242, 2014 WL 2324465 (S.D.N.Y. May 29, 2014) ........................... 20, 28, 31

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009) ............................................................................... 19, 22

*United States ex rel. Takemoto v. The Hartford Fin. Servs. Grp., Inc.*,
    157 F. Supp. 3d 273 (W.D.N.Y. 2016) ..................................................................... 26

*United States Printing & Lithograph Co. v. Powers*,
    233 N.Y. 143 (1922) ................................................................................................. 36

*United States v. Chang*,
    No. CV133772DMGMRWX, 2017 WL 10544289 (C.D. Cal. July 25, 2017) ........... 25

*United States v. Dynamic Visions, Inc.*,
    220 F. Supp. 3d 16 (D.D.C. 2016) ............................................................................ 63

*United States v. Luce*,
    873 F.3d 999 (7th Cir. 2017) .................................................................................... 30

*United States v. Mount Sinai Hosp.*,
    256 F. Supp. 3d 443 (S.D.N.Y. 2017) ....................................................................... 30

*United States v. N. Adult Daily Health Care Ctr.*,
205 F. Supp. 3d 276 (E.D.N.Y. 2016) ............................................................ 26

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) ..................................................................... 21

*Universal Health Servs., Inc. v. United States*,
136 S. Ct. 1989 (2016) ............................................................................... 28

*Waltree Ltd. v. Ing Furman Selz LLC*,
97 F. Supp. 2d 464 (S.D.N.Y. 2000) ............................................................ 25

*Wausau Bus. Ins. Co. v. Turner Const. Co.*,
141 F. Supp. 2d 412 (S.D.N.Y. 2001) .......................................................... 59

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990) ....................................................................... 23

*Wilde v. Wilde*,
576 F. Supp. 2d 595 (S.D.N.Y. 2008) ......................................................... 66

*Winthrop-Univ. Hosp. Ass'n v. Sterling Servs. Grp.*, L.C.,
No. 08-CV-1404(JS)(ETB), 2009 WL 10709106 (E.D.N.Y. Mar. 31, 2009) ............. 46, 48, 49

*Wm. Passalacqua Builders, Inc. v. Resnick*,
933 F.2d 131 (2d Cir. 1991) ................................................................. 60, 61

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
946 F.2d 1003 ......................................................................................... 66

*Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*,
22 A.D.3d 308 (N.Y. App. Div. 2005) .......................................................... 36

*Xpedior Creditor Tr. v. Credit Suisse First Bos.*,
341 F. Supp. 2d 258 (S.D.N.Y. 2004) .......................................................... 43

*Zimmerli Textil AG v. Kabbaz*,
No. 14-CV-1560 (JS) (AYS), 2015 WL 5821523 (E.D.N.Y. Sept. 30, 2015) ............. 56

**Statutes**

31 U.S.C. § 3729 ................................................................................. 21, 35

New York False Claims Act § 188 ........................................................... passim

New York False Claims Act § 189(1)(a) .................................................... passim

New York False Claims Act § 189(1)(b) .................................................... passim

New York False Claims Act § 189(1)(d) .............................................. 3, 18, 34, 35

New York False Claims Act § 189(1)(g) .................................................... passim

New York False Claims Act § 189(1)(h) .............................................. 3, 19, 34, 35

**Rules**

Fed. R. Civ. P. 12(b)(6).............................................................................. 18, 25, 47, 58

Fed. R. Civ. P. 15......................................................................................................... 69

Fed. R. Civ. P. 8 ................................................................................................... passim

Fed. R. Civ. P. 9(b) .............................................................................................. passim

Suffolk OTB[1] respectfully submits this memorandum in opposition to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint [Docket No. 9] (the "Motion" or "Mot.").[2]

## PRELIMINARY STATEMENT

1.      Delaware North has taken advantage of its position of trust as the manager of Jake's 58 Casino to enrich itself at the expense of New York and Suffolk County.  Delaware North's scheme is simple:  it uses Jake's 58 and the hundreds of millions of dollars a month that pass through its hands to serve its own interests, rather than those of Suffolk OTB.  Delaware North's malfeasance is detailed with particularity in the Complaint and includes hundreds of thousands of dollars for a new kitchen for Delaware North charged to Suffolk OTB; hundreds of thousands of dollars for a new HVAC system for Delaware North charged to Suffolk OTB; $1.5 million in improvements for Delaware North's valet parking business charged to Suffolk OTB; rent and utility overcharges to Suffolk OTB; and millions of dollars for unused overnight hotel stays charged to Suffolk OTB, to name a few examples.

2.      Delaware North does not (and cannot) contest the fundamental plausibility of the causes of action in the Complaint—that Delaware North, after being entrusted with managing a public entity's most valuable asset for the benefit of citizens and creditors—breached the DMS Agreement and abused that position of trust by engaging in a knowing pattern of misallocating costs to Suffolk OTB and profits to itself.  At bottom, Defendants' Motion demands more pleading detail than is required, and contends that separate, wholly independent, non-duplicative

---

[1]      Capitalized terms have the same meaning as in the Complaint, unless otherwise indicated.

[2]      The Motion does not try to dispose of the entire case or even every cause of action.  *See, e.g.*, Mot. at 4 n.2. Therefore, Defendants should have answered the claims they do not contest rather than delay the progress of the case.  *See, e.g.*, *Bull HN Info. Sys. Inc. v. Am. Exp. Bank Ltd.*, No. 88 Civ. 2103 (SWK), 1990 WL 48098, at *5 (S.D.N.Y. Apr. 6, 1990).

allegations must support each cause of action, even though the Rules require no such thing.  All causes of action are well-pled and, drawing all inferences in favor of Suffolk OTB, survive this partial Motion to Dismiss the Complaint.

3.       *First,* this is a lawsuit brought directly by a public benefit corporation (a "local government" under the New York False Claims Act ("NYFCA") § 188(6)) alleging numerous, specific violations of the NYFCA by Delaware North.  The "who," "what," "where" and "how" of Delaware North's scheme and specific false claims have been pled with the requisite particularly, showing that further judicial process is warranted.  Delaware North does not seriously contend that it has failed to receive adequate notice of its alleged wrongdoing and NYFCA violations.  By claiming that the alleged violations are "clerical errors" or "mistakes" that have been cured, Delaware North manifests its knowledge of, and ability to, respond to the alleged wrongdoing.  Instead, Delaware North makes an incorrect, technical argument that it has not submitted a "claim" to Suffolk OTB.  Delaware North is wrong, and its argument defies common sense.

4.       Delaware North is responsible for paying the "Expenses incurred in the operation of the Business."  DMS § 6.02.2; Compl. ¶ 37.  It also must deposit all the Gross Revenues of the Business into Suffolk OTB's bank account.  DMS §§ 7.01, 7.02.1, 5.02(a).  Periodically, then, Delaware North submits demands and requests for payments to Suffolk OTB for reimbursement for Expenses from Suffolk OTB's bank account.  Compl. ¶¶ 38, 63, 68.  Such demands and requests certify that the amount requested for Expenses is in compliance with the DMS Agreement (*i.e.*, are true).  Compl. ¶¶ 39, 63, 105.  These demands and requests for payment are calls on the government fisc by Delaware North and subject it to liability under Sections

189(1)(a) and (b) of the NYFCA.  This process is well-known to Delaware North because it participates in it every day, and it meets any common understanding of a "claim."

5.      Further, Sections 189(1)(d), (g) and (h) of the NYFCA prevent wrongdoers like Delaware North from escaping liability based on its "no claim" argument.  Together, these sections impose liability for so-called "reverse false claims," where a government contractor does not transmit money it owes to a government actor.  So, if Delaware North did not make false claims because, for example, on some occasion unbeknownst to Suffolk OTB it paid Expenses directly from "house money" collected from Jake's 58 before putting it in Suffolk OTB's bank account, then the reverse false claim provisions impose liability for failing to deliver and transmit the "true" amounts to Suffolk OTB.  Thus, the drafters of the statute and the allegations of the Complaint anticipated the incorrect "no claim" argument Delaware North makes by rendering it insufficient to allow it to escape liability under the NYFCA.  *See* Section I, *infra*.

6.      *Second*, Delaware North concedes that the Complaint states a claim for breach of the DMS Agreement, *see* Motion at 3, 4 n.2.[3]  Delaware North does not address *at all* the bulk of Suffolk OTB's breach allegations, including those related to (i) charging Suffolk OTB for hotel construction costs including the kitchen, air conditioning and front desk; (ii) failing to implement the marketing programs in accord with the operating budget; (iii) failing to act for Suffolk OTB's exclusive benefit; (iv) failing to manage the VLT Facility in accord with Manager Standards; (v) failing to supervise Suffolk OTB employees; (vi) refusing to grant Suffolk OTB access to business records; (vii) failing to reimburse Suffolk OTB for Gaming Commission fines; (viii)

---

[3]      The DMS Agreement and the exhibits thereto are filed in the lead bankruptcy case, *see In re Suffolk Regional Off-Track Betting Corporation*, Case No. 12-43503 (CEC) [Docket Nos. 487-488]; see also Adv. Pro. No. 19-01133 (CEC) [Docket No. 10].

charging Suffolk OTB rent for square footage it was not occupying; and (ix) overcharging

Suffolk OTB for utilities.  Instead, Delaware North nitpicks at certain other allegations of breach,

which are insufficient to permit dismissal of any or all of the breach cause of action:

- Delaware North admits that under the DMS Agreement "[e]xpenses incurred by Jake's 58 in connection with the DNC Retained Business are the responsibility of Delaware North Manager."  *See* Motion at 9.  The hotel and valet parking are DNC Retained Business.  DMS § 1.01 ("DNC Retained Business means . . . the provision of lodging and all services related to lodging [and] the provision of valet parking services.").  Yet, Delaware North charged Suffolk OTB for elevator upgrades for the hotel, and construction costs for valet parking.  Compl. ¶ 38(c), (f).  These charges for DNC Retained Businesses are plainly breaches of the DMS Agreement.  Delaware North's request to have the Court decide otherwise on this Motion must be denied. *See* Section II.B.1, *infra*.

- Evidencing Delaware North's incorrect belief that Jake's 58 operates for its benefit, Delaware North falsely claimed ownership of the Jake's 58 logo in various trademarks it registered at the United States Patent &Trademark Office ("PTO").  While Delaware North withdrew its false applications upon the filing of this suit, Delaware North claims that it did not breach the DMS Agreement because "Marks" owned by Suffolk OTB are only those "jointly determined" by Suffolk OTB and Delaware North.  However, the word "jointly" does not appear in the only section of the DMS Agreement that references the Marks.  As explained more fully in Section II.B.2, *infra*, Delaware North's contract argument is counter-textual, illogical and wholly without merit.  It certainly does not warrant dismissal of anything on this Motion.

- Delaware North asserts that the Complaint's allegations of its failure to get Suffolk OTB's consent, agreement and input required by the DMS Agreement are conclusory.  Notice pleading is all that is required and therefore the Motion should be denied.  The Complaint alleges in detail that, *inter alia*, Delaware North did not obtain prior approval before instituting certain marketing programs, *see* Compl. ¶ 79, Delaware North delivered the 2019 operating budget past the contractual deadline in order to deprive Suffolk OTB from granting its informed consent in violation of Sections 5.05.1 and 5.05.3 of the DMS Agreement, *see* Compl. ¶¶ 95–96, and how Delaware North keeps Suffolk OTB in the dark about costs for months, in violation of Sections 7.05 and 8.04 of the DMS Agreement.  *See* Compl. ¶¶ 93–94.  This is sufficient non-conclusory detail.  Delaware North's argument shows it has notice of the claims and therefore the Motion should be denied.  *See* Section II.B.3, *infra*.

- DNC Gaming's contention that it is not liable for breach of the DMS Agreement even though it signed the DMS Agreement is wrong.  Joint and several liability arises when two or more persons co-sign a contract.  DNC Gaming's reliance on a phrase in a non-operative "whereas" clause of the DMS Agreement explaining DNC Gaming's

"purpose" is insufficient at this stage to overcome the joint and several rule as a matter of law.  *See* Section II.A, *infra.*

7.      *Third*, Delaware North's argument in big bold letters that "**Delaware North Manager Owes No Fiduciary Duty to Suffolk OTB**" demonstrates exactly why this case ended up in court.  It shows that Delaware North has paid no mind to the people's interests and confirms that it acted in a hopelessly conflicted manner for its own interest.  The license to operate a VLT Facility was granted to Suffolk OTB for the benefit of New York and the citizens of Suffolk County, not for Delaware North.

8.      It is black letter law that a fiduciary is "one who transacts business, or who handles money or property, which is not his [or her] own or for his [or her] own benefit, but for the benefit of another person, as to whom he [or she] stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."[4]  Delaware North manages Suffolk OTB's Jake's 58 and handles hundreds of millions of dollars each month.  Given the history of the relationship and each party's role therein as pled in the Complaint, *see* ¶¶ 20–24, 26, 30, 35, it is hard to imagine a relationship that requires more confidence and trust in Delaware North than this one.

9.      In fact, by impugning Suffolk OTB's business acumen and experience in gaming, Delaware North has effectively conceded its special position of trust and that Suffolk OTB is reliant on Delaware North's expertise.  *See* Motion at 1 ("Suffolk OTB lacked the qualifications . . . to operate a VLT casino and needed an experienced partner to develop, finance and manage the new business venture").  A hallmark of a fiduciary relationship is the principal (Suffolk OTB) trusting the agent (Delaware North) to manage a valued asset (Jake's 58) with

---

[4]      *Bd. of Mgrs of Fairways at N. Hills Condo. v Fairway at N. Hills*, 193 A.D.2d 322, 325 (N.Y. App. Div. 1993).

specialized expertise.  That is the circumstance here and demonstrates the existence of a fiduciary duty which Delaware North has indisputably breached, because it denies it exists.  It is Delaware North's betrayal of that duty, not the breach of the DMS Agreement, that is the essence of the breach of fiduciary claim and gives rise to liability in tort.

10.     *Fourth,* Delaware North incorrectly asserts that Suffolk OTB's request for a declaratory judgment that it may terminate the DMS Agreement is not justiciable because Suffolk OTB has not adequately alleged compliance with DMS Agreement Section 12.03's "notice and cure" provisions.  On October 7, 2019, the same day the Complaint was filed, Suffolk OTB provided Delaware North with notice of events of default.  Compl. ¶ 149.  That notice triggers the start of "cure" periods.  *See* DMS §12.03(a)–(d).  Under the contract, expiration of cure periods is not a condition precedent to seeking judicial relief.  In any event, those cure periods have since expired and Delaware North has not cured and, under New York law, Delaware North's breaches cannot be "cured" due to the nature of the pervasive and persistent malfeasance alleged.  The Court can certainly grant Suffolk OTB's request for a declaratory judgment that termination of the DMS Agreement is appropriate as discussed in Section VI., *infra*.

11.     *Finally,* the bulk of Delaware North's brief argues that Suffolk OTB's non-contract causes of action (breach of fiduciary duty, unjust enrichment, piercing the corporate veil and accounting) are duplicative of its breach of contract cause.  As shown below, Suffolk OTB's non-contract claims are well-pled, not entirely duplicative, and entitle Suffolk OTB to extra-contractual recoveries.  But even if they are duplicative in whole or part, that is no ground for dismissal of anything at this stage of the case.

12.     The Rules of Civil Procedure permit a party to plead causes of action in the alternative (even inconsistent ones).  Alternative pleading is appropriate, where the rights and obligations of the parties under a contract are in dispute.  Indeed, Delaware North's position seems to be that Suffolk OTB has practically no contractual rights against the Defendants.  If that is the case, Suffolk OTB can recover for Delaware North's wrongdoing based on causes of action based in tort or equity.  While duplicate recovery may not be permitted, there is no bar to pleading alternative causes of action.  *See* Sections II., III. and IV., *infra*.

*     *     *

13.     The disdain for Suffolk OTB and the people of New York whom Delaware North is supposed to serve drips from every page of its brief.  The brief also displays Delaware North's attitude that any question posed is "harassment," any suggestion is "interference," and when Delaware North's malfeasance is identified, it is always just a "clerical error."  Confident that this Court will not abide Delaware North's condescension and stonewalling, Suffolk OTB filed the Complaint to carry out its duty to maximize the value of Jake's 58 for the people it serves.  Suffolk OTB is proud of Jake's 58 successes and the significant funds it has provided for the State, County and creditors.  But that does not mean that Suffolk OTB can sit back and allow Delaware North's overreach.  The Motion should be denied.

## BACKGROUND

### I.     Suffolk OTB Relies on Delaware North's Expertise and Specialized Knowledge to Manage the VLT Facility at Jake's 58

14.     Since 1975, Suffolk OTB has contributed hundreds of millions of dollars to New York State and local governments.[5]  Compl. ¶ 17.  Pursuant to the statutes governing Suffolk

---

[5]     Suffolk OTB has operated a printing press as part of its pari-mutuel business since at least 1980, pursuant to which it handled printing for itself and Nassau Regional Off-Track Betting Corporation.

OTB's operations, the bulk of Suffolk OTB's revenue is distributed to the State of New York (including for public education), Suffolk County, various other local government entities, and the State's horse racing industry.  Compl. ¶ 17.  However, due to the statutory obligations requiring distribution of much of its revenue, Suffolk OTB experienced financial hardship starting in 2006 and filed a petition for relief in this Court in 2012. Compl. ¶ 18.

15.     In 2013, the State of New York authorized Suffolk OTB to open a video lottery terminal facility.  Compl. ¶ 19.  Suffolk OTB believed the VLT Facility would allow it to satisfy its debts and further generate revenue for New York public education and the people of Suffolk County.  Compl. ¶ 19.  On August 18, 2013, Suffolk OTB issued a Request for Proposals ("RFP") for an agent that it could trust to locate, develop, and operate the VLT Facility that was to be its path to solvency and repaying its creditors, as well as the cornerstone to fulfilling its mandate to generate revenue for the benefit of State and County residents.  Compl. ¶ 19.

16.     DNC and DNC Gaming submitted a response to Suffolk OTB's RFP on September 20, 2013.  They touted their reputation and expertise as a leading regional gaming operator.  Compl. ¶ 20.  DNC and DNC Gaming also touted expertise working within public-private partnerships to drive maximum funding to public education in New York.  Compl. ¶ 20.  Suffolk OTB accepted DNC and DNC Gaming's proposal.  Compl. ¶ 22.  Suffolk OTB and Delaware North then entered into a principal-agent relationship, whereby Suffolk OTB placed Delaware North in a position of trust and confidence to develop and operate the VLT Facility.  Compl. ¶ 22.  As promised in its RFP, DNC and DNC Gaming then created their alter ego, Delaware North Manager, as the vehicle through which DNC and Delaware North Gaming

---

Delaware North's false allegations about this part of Suffolk OTB's business are nothing more than ad hominem attacks.

would "provide the benefit" of their "expertise and experience" in the gaming industry to Suffolk OTB.  Compl. ¶¶ 21, 141.

**A.      The Medford VLT Facility Hits Roadblocks and Delaware North Hatches Its Scheme**

17.      On March 7, 2014, DNC Gaming, Delaware North Manager, and Suffolk OTB entered into a Development and Management Services Agreement in order to purchase, develop and open a VLT gaming facility in Medford, New York.  Compl. ¶ 23.  However, the plan to develop the VLT Facility in Medford was hampered when Suffolk OTB experienced delays in securing a building permit.  Compl. ¶ 25.  This led Delaware North to seize the opportunity to own the property on which the VLT gaming facility would operate, and build its own separate hospitality businesses on the site to profit from the VLT facility.  Compl. ¶ 25.  DNC Gaming and Delaware North Manager created Delaware North Properties as an alter ego to purchase a location for the VLT Facility in Islandia, New York.  Compl. ¶ 26.  Suffolk OTB was then effectively forced to become Delaware North's tenant under unfavorable terms.  Compl. ¶ 26.

18.      Armed with the knowledge that Suffolk OTB wanted the opening of the VLT Facility to happen as quickly and efficiently as possible and had no other clear options to move forward, Delaware North pushed for contract terms unfavorable to Suffolk OTB and advantageous to Delaware North.  Compl. ¶ 26.  On May 24, 2016, with making payroll hanging over its head, Suffolk OTB entered into the Amended and Restated Development and Management Services Agreement with Delaware North Gaming and Delaware North Manager. Compl. ¶ 27.

19.      Under the DMS Agreement, the main floor, mezzanine and basement of the Marriott hotel in Islandia, New York were retrofitted as a VLT gaming facility now known as Jake's 58, to be managed by Delaware North.  Compl. ¶ 26.  While the VLT business at Jake's

58 belongs to Suffolk OTB, Delaware North is the sole owner of the "DNC Retained Businesses" at Jake's 58, including, *inter alia*, the hotel, food and beverage, valet parking and retail businesses.  Compl. ¶ 27; *see also* DMS § 1.01.  The DMS Agreement provides that Delaware North is responsible for all costs relating solely to the DNC Retained Businesses at Jake's 58, while Suffolk OTB is ultimately responsible for all costs relating to the VLT Facility and common areas that serve it.  Compl. ¶ 37; DMS §§ 4.02, 4.04.  Despite this arrangement, Delaware North proceeded to abuse its position of trust by charging Suffolk OTB for millions of dollars in costs related to the DNC Retained Businesses.  Compl.  ¶ 37.  Delaware North's goal was to take advantage of the VLT Facility to squeeze Suffolk OTB for every penny, at every turn.  Compl. ¶ 26.

    **B.**    **The DMS Agreement Confirms Delaware North's Obligations to Suffolk OTB**

20.    The DMS Agreement memorialized the fiduciary relationship contemplated by the parties when Suffolk OTB selected Delaware North as its agent.  Compl. ¶¶ 22, 30–32.  For instance, the DMS Agreement provides that "[i]n the performance of its duties as the manager of the Business, the Manager will act solely as the agent of Suffolk OTB" and that "[t]he performance of all activities by the Manager pursuant to this Agreement will be on behalf of Suffolk OTB and for its exclusive account and benefit[.]"  DMS §§ 5.01, 16.01; Compl. ¶ 30.

21.    In addition, the DMS Agreement provides that the Manager will agree to cooperate with Suffolk OTB in exercising its authority as Suffolk OTB's agent and act "consistent with the current Operating Budget, and also consistent with practices in gaming facilities reasonably comparable to the Gaming Facility."  DMS § 5.01; Compl. ¶ 31.

22.    Further, the DMS Agreement sets out standards for Delaware North Manager by requiring it to act consistent with its "Manager Standards," defined in the DMS Agreement as

"standards of diligence and professional management consistent with that which is customary and usual with respect to the video lottery gaming industry . . . and such other standards as are required under applicable law."  DMS §§ 1.01, 5.01; Compl. ¶ 32.

      **C.**     **Suffolk OTB and Delaware North Begin Construction of the Islandia VLT Facility**

     23.     On August 12, 2016, the Islandia Village Board approved Delaware North Properties' special permit to allow Delaware North Properties to operate the VLT Facility on the Islandia Property.  Compl. ¶ 33.  Construction on the VLT Facility began in September 2016. Compl. ¶ 33.  On December 20, 2016, as construction of the VLT Facility progressed, Suffolk OTB and Delaware North Properties executed a Lease Agreement (the "Lease Agreement") by which Suffolk OTB leased the portion of Islandia Property to be used for the VLT Facility under the terms of the DMS Agreement.  Compl. ¶ 34.

     24.     Despite the position of trust and confidence in which Suffolk OTB placed Delaware North to manage its most valued asset for Suffolk OTB's benefit, from the time construction on the VLT Facility began, through its initial opening in February 2017 with 250 VLTs, to its grand opening on June 1, 2017 with 1,000 VLTs, through to the present day, Delaware North has operated under a bad faith business plan whereby Suffolk OTB shoulders as many costs as possible while Delaware North reaps as much profit as possible, at the expense of Suffolk OTB, the State and County.  Compl. ¶ 35.

**II.**     **Delaware North's Knowing Pattern of Enriching Itself at Suffolk OTB's Expense**

     **A.**     **Delaware North Overcharges Suffolk OTB Millions in Construction Costs**

     25.     Under the DMS Agreement, Delaware North is responsible for costs related to the hotel and food and beverage business while Suffolk OTB is responsible for costs related to the VLT Facility and a portion of the common areas serving it.  Compl. ¶ 37; DMS Agreement

§§ 4.02; 4.04.  Despite this, Delaware North abused its position of trust and knowingly submitted millions of dollars' worth of false claims to Suffolk OTB for construction costs related solely to Delaware North's Retained Businesses.  Compl. ¶ 37.  These false charges included, *inter alia*, (i) a series of claims for hundreds of thousands of dollars for construction of a brand new kitchen for the purposes of serving Delaware North's hotel and restaurant business; (ii) a series of claims for hundreds of thousands of dollars to upgrade Delaware North's hotel HVAC system; (iii) a series of claims for elevator upgrades and repairs for Delaware North's hotel; (iv) a series of claims for air conditioning and security cameras on the tenth floor of Delaware North's hotel; and (v) a series of claims for construction and other costs associated with Delaware North's valet parking business.  Compl. ¶ 38.

26.     In support of these false claims, Delaware North made false records and/or statements that were material to Suffolk OTB's approval and payment of the overcharges. Compl. ¶ 39.  These false records and statements included descriptions of charges due for construction costs, change orders, vendor invoices and reconciliations of the construction expenses submitted to Suffolk OTB.  Compl. ¶ 39.  They each contained implied certifications that the various goods and services were charged to Suffolk OTB in compliance with the DMS Agreement, with Delaware North knowingly failing to disclose its material noncompliance. Compl. ¶ 39.

27.     For months, Suffolk OTB requested to see construction records revealing the basis of each claim by Delaware North for payment.  Compl. ¶ 40.  Despite the fact that Suffolk OTB is entitled to such records under the DMS Agreement, Delaware North refused to provide them.  Compl. ¶ 40.  Because of this, Suffolk OTB engaged its own auditors and a consultant to review the millions of dollars in construction costs.  Compl. ¶ 41.  They uncovered at least 92

false change orders, representing millions of dollars in overcharges Delaware North submitted to Suffolk OTB.  Compl. ¶ 42.  Every single one of the 92 change orders favored Delaware North, underscoring the knowing and/or reckless nature of its conduct.  Compl. ¶¶ 41, 43.

28.    As outlined in the Complaint, Delaware North's pattern and practice of submitting these false charges to Suffolk OTB violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriches Delaware North at the expense of Suffolk OTB and the local taxpayers.  Compl. ¶ 44.

### B.    Delaware North Falsely Claims Ownership of Suffolk OTB's Trademarks and Service Marks

29.    Section 10.02 of the DMS Agreement provides that "[o]wnership in the Marks [defined as "trade names, trademarks and service marks"] will, for all purposes, belong exclusively to Suffolk OTB."  Unbeknownst to Suffolk OTB, Delaware North applied to register, and falsely claimed ownership of, at least nine trademarks and/or service marks related to "Jake's 58" with the PTO.  Compl. ¶ 46.  Delaware North, despite being bound to act faithfully as Suffolk OTB's agent and manager, never informed Suffolk OTB that it had applied to register any of the trademarks or service marks, or that it had falsely declared Delaware North Properties the owner of such Marks to the PTO.  Compl. ¶ 49.  Delaware North's actions with Suffolk OTB's Marks constitute breaches of the DMS Agreement.  Compl. ¶ 53.

### C.    Delaware North Overcharges Suffolk OTB for Rent and Utilities

30.    Under the Lease Agreement entered into by Suffolk OTB and Delaware North, Suffolk OTB leases only the portion of the Islandia Property required to operate its VLT Facility.  Compl. ¶ 55.  Despite this, Delaware North knowingly inflated the square footage of the VLT Facility and submitted false claims for rent to Suffolk OTB based on its

miscalculations from March, 2017 to the present.  Compl. ¶¶ 59, 63.  In fact, Delaware North's

senior management acknowledged that the square footage from which it calculates Suffolk

OTB's rent is false, but it has refused to reimburse Suffolk OTB.  Compl. ¶ 60.

      31.     In addition to the false rent charges, Delaware North has made false claims to

Suffolk OTB for utilities.  Compl. ¶ 65.  In October, 2017 Delaware North apportioned Suffolk

OTB's share of the sewer charges at 13.76%.  Compl. ¶ 67.  But beginning in March, 2018,

Delaware knowingly and/or recklessly ratcheted Suffolk OTB's share of the sewage charges up

to 50% and began submitting false claims to Suffolk OTB for nearly four times Suffolk OTB's

actual share, for a year.  Compl. ¶¶ 68–69.  In support of the false rent and utility charges,

Delaware North submitted false records and/or statements in the form of monthly invoices and

reconciliations.  Compl. ¶ 69.  These false records contained implied certifications that the rent

and utility charges submitted to Suffolk OTB were in compliance with the DMS Agreement,

with Delaware North knowingly failing to disclose its material noncompliance.  Compl. ¶ 70.

      32.     As noted in the Complaint, Delaware North's pattern and practice of submitting

these false charges to Suffolk OTB violates the New York False Claims Act; is a breach of the

DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary

duties as Suffolk OTB's agent; and unjustly enriches Delaware North at the expense of Suffolk

OTB and the local taxpayers. Compl. ¶ 72.

      **D.**      **Delaware North Takes Advantage of Suffolk OTB's Marketing Allowance to Enrich Itself**

      33.     Prior to April 2019, Suffolk OTB received a Gaming Commission-approved

marketing allowance from the State of New York, intended to incentivize customers to remain at

the VLT Facility and play for an extended period of time.  Compl. ¶ 75.  Pursuant to the DMS

Agreement, Delaware North has control over the administration of this marketing allowance on

behalf of Suffolk OTB.  Compl. ¶ 75.  Unsurprisingly, over Suffolk OTB's objection, Delaware

North administers the allowance solely for its own benefit, generating millions of dollars for its

hotel business at the expense of Suffolk OTB and the State of New York.  Compl. ¶ 73.

34.    Eighty percent of Jake's 58 customers live within 20 miles of the VLT Facility

and are not interested in spending the night at Delaware North's hotel. Compl. ¶ 74.  Despite

this, Delaware North has directed an outsized portion of the marketing allowance to providing

customers with complimentary hotel rooms, for which Delaware North then "reimburses" itself

with marketing allowance funds generated each day by Suffolk OTB's VLTs.  Compl. ¶ 75.

Delaware North's practice of paying itself for empty hotel rooms has diminished funds that

would otherwise be returned to the State of New York or Suffolk OTB.  Compl. ¶ 76.  In 2018,

Delaware North received $7.3 million for these "complimentary" hotel rooms, exceeding the

original budget by $4.8 million.  Compl. ¶ 76.  Delaware North paid itself over $6 million in the

first eight months of 2019, already exceeding the 2019 budget by $1.78 million.  Compl. ¶ 76.

Because Delaware North knows that most customers do not want complimentary hotel rooms,

Delaware North offers customers free-play vouchers upon check-in and check-out, in order to

entice them to accept hotel rooms so that Delaware North can pay itself from the marketing

allowance.  Compl. ¶ 74.  This results in the spending of $250 ($100 for vouchers and $150 for

the hotel room) for the same marketing benefit the vouchers alone could have accomplished.

Compl. ¶ 78.

35.    Suffolk OTB has attempted to further analyze the efficacy of this marketing

program by demanding records and data with no help from Delaware North, who has refused to

provide any useable data related to the program.  Compl. ¶ 80.  As noted in the Complaint,

Delaware North's pattern and practice of knowingly and/or recklessly using Suffolk OTB's

marketing funds to pay itself for empty hotel rooms violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of good faith and fair dealing and Delaware North's fiduciary duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and the State of New York.  Compl. ¶ 82.

**E.    Delaware North Incurs Gaming Commission Fines and Refuses to Pay Them**

36.    Under Section 5.01 of the DMS Agreement, Delaware North Manager is required at all times to act in a manner consistent with "Manager Standards," defined as "standards of diligence and professional management consistent with that which is customary and usual with respect to the video lottery gaming industry . . . and such other standards as are required under applicable law."  Compl. ¶ 83.  In addition, the DMS Agreement provides that a "specific responsibili[ty]" of the Manager is to supervise and oversee the employees of Suffolk OTB in connection with security services.  Compl. ¶ 84; DMS §§ 5.02(a), (b).  Pursuant to these provisions, Delaware North Manager is bound to assist Suffolk OTB in preventing violations of, and complying with, any applicable legal requirements, including the Gaming Commission Rules and Regulations.  DMS §5.02(i); Compl. ¶ 84.

37.    Despite these obligations under the DMS Agreement and applicable law, Delaware North Manager's senior management team has incurred at least three underage gaming violations within a one year period and refused to indemnify Suffolk OTB for these violations as required by the Section 5.03 of the DMS Agreement.  Compl. ¶ 86.  These violations have put both Suffolk OTB and Delaware North at risk for penalties from the Gaming Commission, which could include the revocation or suspension of gaming licenses.  Compl. ¶ 88.  As outlined in the Complaint, Delaware North's pattern and practice of knowingly and/or recklessly incurring Gaming Commission fines on Suffolk OTB's behalf and refusing to indemnify Suffolk OTB violates the New York False Claims Act; is a breach of the DMS Agreement, the covenant of

good faith and fair dealing and Delaware North's duties as Suffolk OTB's agent; and unjustly enriched Delaware North at the expense of Suffolk OTB and local taxpayers.  Compl. ¶ 91.

### III.    Delaware North Conceals Its Self-Dealing from Suffolk OTB in Bad Faith

38.    Delaware North's pattern and practice of fraud and misallocation also include numerous efforts to keep Suffolk OTB in the dark, by blocking its access to records of the business that would reveal Delaware North's unlawful spending and refusing to be transparent about the daily operations of the business.  Compl. ¶ 94.

### IV.    Delaware North Defaults on its Obligations under the DMS Agreement and Suffolk OTB Files This Lawsuit

39.    Pursuant to Section 12.03 of the DMS Agreement, Suffolk OTB may terminate its obligation to retain and pay for the services of the Manager upon the occurrence of an "Event of Default."  Compl. ¶ 148.  The Manager's conduct as outlined above constitutes events of default under Sections 12.03(a) and (c) of the DMS Agreement, in that they constitute a material failure to perform and observe the DMS Agreement, and because supervisory employees of the Manager have committed fraud, malfeasance, gross negligence or material misrepresentations in connection with the operation of the VLT Facility.  Compl. ¶¶ 150–153.  On October 7, 2019, Suffolk OTB provided the Manager with notice of events of default in accord with the DMS Agreement.  Compl. ¶ 149.

40.    Also on October 7, Suffolk OTB commenced this lawsuit, in order to seek judicial intervention and protect its rights.  Suffolk OTB's Complaint asserts violations of the New York False Claims Act, breaches of the DMS Agreement, breaches of Fiduciary Duty and aiding and abetting breaches of fiduciary duty, and unjust enrichment.  Through its lawsuit, Suffolk OTB also seeks to pierce the corporate veil of the four Delaware North Defendants, obtain declaratory relief in the form of a judgment that events of default have occurred under the DMS

Agreement and Suffolk OTB may terminate its retention of the Manager, and receive an equitable accounting from Delaware North of all funds collected and expended by Delaware North Manager on its behalf with respect to the VLT Facility.

41.     On November 7, Delaware North filed the Motion addressed to some, but not all, of the claims and causes of action in the Complaint.

## ARGUMENT

42.     To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must accept the factual allegations of the complaint as true, and draw all inferences in favor of the plaintiff.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  In evaluating the complaint, the court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

I.      **SUFFOLK OTB HAS STATED A CLAIM FOR VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT, N.Y. FIN. LAW § 187, et seq. (FIRST CAUSE OF ACTION)**

43.     The Complaint includes one cause of action for violating the New York False Claims Act.  It explains how Delaware North violated Section 189(1)(a) by knowingly presenting, or causing to be presented false or fraudulent claims for payment and approval; and Section 189(1)(b) by knowingly making, using and causing to be made or used, false statements material to the false and fraudulent claims.  The Complaint also explains how, if Delaware North is right as a factual matter that it does not make "claims" but instead pays Suffolk OTB what Delaware North deems it is owed, then it has violated Section 189(1)(d) by knowingly failing to deliver that which is owed; Section 189(1)(g) by knowingly making, using and

causing to be made or used, false records and statements material to their obligation to pay or transmit money to OTB; and Section 189(1)(h) by improperly avoiding its obligation to transmit money to OTB.

### A.    Suffolk OTB Has Pled Its NYFCA Claim with the Requisite Particularity

44.    Those portions of the allegations "constituting fraud" in a NYFCA claim are generally evaluated under the heightened Rule 9(b) pleading standard.  But "Rule 9(b) does not call for plaintiffs to plead every conceivable fact about the claims they allege were fraudulent, or to prove its claims at the pleading stage."  *United States ex rel. Forcier v. Comput. Scis. Corp.*, 183 F. Supp. 3d 510, 521 (S.D.N.Y. 2016).  Rather, "the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."  *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 87 (2d Cir. 2017) ("*Chorches*") (quoting *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)).

45.    Pleading with particularity usually requires the "the who, what, when, where, and how: the first paragraph of any newspaper story."  *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009), *accord Chorches*, 865 F.3d 71 at 88 (a pleading must specify "(1) the fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.").  But, "[u]ltimately, whether a complaint satisfies Rule 9(b) is 'a fact-specific inquiry' that depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading."  *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 383 (S.D.N.Y. 2015) (quotations omitted). For this reason, Rule 9(b)

"does not impose a 'one size fits all' list of facts that must be included in every FCA complaint." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 258, 2014 WL 2324465, at *15 (S.D.N.Y. May 29, 2014).

46.     Suffolk OTB's NYFCA cause of action meets the Rule 9(b) pleading standard:

- The "what" is false claims and avoided obligations to Suffolk OTB, including construction charges for Delaware North's businesses, false rent and utility charges, diverted marketing funds to pay for empty hotel rooms, and unreimbursed Gaming Commission fines, which were supported by statements such as change orders, construction plans, accounting statements, cost reconciliations, rent and utility invoices and other records and documents that were false because they either expressly or impliedly certified compliance with the DMS Agreement.  Compl. ¶¶ 39, 63, 105.

- The "who" is DNC Gaming, Delaware North Manager and Delaware Properties, operating under the direction and control of DNC and DNC Gaming.

- The specific "when," "where" and "how much" of numerous false claims is also detailed in the Complaint.  *See, e.g*, Compl. ¶ 38 (hundreds of thousands of dollars for a new kitchen from June-September 2017; hundreds of thousands of dollars for a hotel HVAC system from April-May 2017; $1.5 million in claims for valet parking services from May 2017-August 2019); Compl. ¶¶ 59–63 (detailing precise amount of false square footage from which false rent bills were calculated from March 2017-present); Compl. ¶ 68 (monthly utility bills falsely increased from 13.76% to 50% from March 2018-March 2019); Compl. ¶ 76 (outlining specifics of Delaware North's complimentary hotel room scheme, resulting in millions of dollars in false payments for empty hotel rooms in 2018 and 2019); Compl. ¶ 87 (detailing dates and dollar amounts of Gaming Commission fines Delaware North has avoided delivering to Suffolk OTB).

- The "how" is that Delaware North Manager, intentionally abusing its position as Suffolk OTB's fiduciary, and at the direction of DNC Gaming (i) knowingly uses its access to Suffolk OTB's bank accounts to submit electronic funds transfer requests to pay itself for false overcharges, and (ii) also knowingly delivers less than it owes to Suffolk OTB from VLT revenues into Suffolk OTB's bank accounts. Compl. ¶¶ 2, 26, 35.

47.     This information identifies false claims with particularity and is also more than enough for the Court to find that the complaint adequately alleges, in detail, a fraudulent scheme supporting the strong inference that specific false claims were submitted to the government in satisfaction of Rule 9(b) and for Delaware North to understand the nature of the

claims against it.  *See Chorches*, 865 F.3d at 84 (Rule 9(b) met where allegations of Medicaid reimbursement scheme "detail specific and plausible facts from which we may easily infer, for present purposes, that [defendant] systematically falsified its records to support false claims"); *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 190 (5th Cir. 2009) ("to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."); *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (Rule 9(b) standard "does not require absolute particularity or a recital of the evidence . . . a complaint need not allege a precise time frame, describe in detail a single specific transaction[,] identify the precise method used to carry out the fraud . . . [or] identify representative examples of false claims to support every allegation.")

       **1.**      **Suffolk OTB Pleads False Claims and False Certifications with Required Specificity**

    48.    Delaware North's assertion that Suffolk OTB makes no effort to plead the nature of any false claims, including what they were for, when and how they were made or the amount of money is simply inaccurate.  Suffolk OTB has pled more than enough to provide the notice required to meet Rule 9(b).  The Complaint details the nature, time and amount of numerous claims for construction costs, rent and utility bills, marketing funds and Gaming Commission fines.  Suffolk OTB is not required to allege additional specific bill numbers, or every specific false statement, where it has already pled individual false claims, plus sufficient facts to demonstrate a scheme and the strong inference of other false claims.  *See United States ex rel. Gelman v. Donovan*, No. 12 CV 5142 (RJD), 2017 WL 4280543, at *6 (E.D.N.Y. Sept. 25,

2017) (noting that *Chorches* "essentially absolves [plaintiff] for failing to plead specific bills, provided that the filing of specific false claims is strongly and plausibly inferable from her allegations."); *Forcier*, 183 F. Supp. at 521 ("it would be impractical, if not impossible, to require that the Government plead the details of each and every false claim."); *Lusby*, 570 F.3d at 854 ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit.").  Indeed, it would not be appropriate, for example, to require Suffolk OTB to plead each expense of Delaware North's hotel business that was improperly charged to Suffolk OTB, or each Delaware North hotel room that was charged to Suffolk OTB that should not have been.

49.    This is especially the case where, by virtue of its relationship with Suffolk OTB and the nature of its scheme, Suffolk OTB has pled details of specific claims and that others are peculiarly within Delaware North's knowledge.  *See* Compl. ¶ 5 ("when [Suffolk OTB] presses Delaware North for information about its spending, Delaware North stonewalls") *Id.* ¶¶ 40–41 ("For months, Suffolk OTB requested time and again to see the construction records that would reveal the basis of Delaware North's claims for payment . . . . when Suffolk OTB engaged independent auditors and a construction consultant . . . Delaware North reluctantly granted Suffolk OTB access to *some* records of expenses."); *Id.* ¶ 80 ("When Suffolk OTB demanded records and data related to the efficacy of the "free" hotel room program, Delaware North . . . refused to provide useable requested data related to the program and its impact"); DMS § 5.01 (granting the Manager the "exclusive right to manage the day-to-day operations of the Business on behalf of Suffolk OTB").

50.    In *Chorches*, the Second Circuit said that "a complaint can satisfy Rule 9(b)'s particularity requirement by making plausible allegations creating a strong inference that

specific false claims were submitted to the government and that the information that would

permit further identification of those claims is peculiarly within the opposing party's

knowledge." 865 F.3d at 86. In this circumstance, *Chorches* held:

> An interpretation of Rule 9(b) that requires *qui tam* plaintiffs to plead billing details regarding the submission of specific false claims, even when knowledge of such details is peculiarly within the defendant's purview, would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government. Under that approach, by simply insulating its accounting department from personnel with operational knowledge, a corporate fraudster could ensure that few employee relators could successfully plead both the falsity of recorded information and the presentment of a claim containing those falsehoods. As in this case, the line workers who falsify paperwork or witness the fraud could not show that claims were in fact submitted, while the accountants who submit the claims would be unaware of the particulars of any falsification, and perhaps to the entire scheme itself. It is not the purpose of Rule 9(b), as applied to FCA *qui tam* actions, to render the FCA toothless to particularly clever fraudulent schemes.

*Id.* The pleading here easily surpasses that which was required by *Chorches*.[6] Suffolk OTB has

spelled out in detail the nature of an already-significant universe of false claims it has been able

to identify and based on those well-pled allegations demonstrated a strong inference of fraud

that meets the Rule 9(b) standard.

**B.    Suffolk OTB Has Not Engaged in Impermissible "Group Pleading"**

51.    Rule 9(b)'s general requirement that plaintiffs avoid "group pleading" when

asserting fraud-based claims against multiple defendants is designed to "inform each defendant

of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus.*,

---

[6]    Though *Chorches* involved *qui tam* plaintiffs rather than a complaint by the government itself, the nature of Delaware North's relationship with Suffolk OTB puts Suffolk OTB at the same informational deficit as a *qui tam* plaintiff. And nothing in the statute or the Rules or case law contemplates a different pleading standard depending on who the plaintiff is. Indeed, the Second Circuit has long read Rule 9(b) to allow allegations "based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

822 F.2d 1242, 1247 (2d Cir. 1987). It is not designed "to render the FCA toothless as to particularly clever fraudulent schemes" involving opaque, complex corporate structures which have been disregarded by the defendants. *Chorches*, 865 F.3d at 86. That is especially true where, as here, there can be no serious contention that any Defendant is in the dark about the nature of the claims made against it or its participation in the scheme Suffolk OTB pleads.

52.    The Complaint outlines that DNC and DNC Gaming created alter egos Delaware North Manager and Delaware North Properties as the vehicles through which they would manage Jake's 58, and that they directed and participated in Delaware North Manager and Delaware North Properties' pattern and practice of falsely overcharging Suffolk OTB and refusing to deliver to it the money it is owed. *See* Compl. ¶¶ 132, 141; *see generally* Section V., *infra*. As outlined below in Argument I.A, the relationship between Delaware North Manager and Suffolk OTB, Delaware North's overlapping personnel among its various shell entities, as well as Delaware North's persistent efforts to hide records of its wrongdoing, place Suffolk OTB at an informational disadvantage. Compl. ¶ 92. Thus, through no fault of its own, Suffolk OTB is not aware of which of the closely-held and interrelated Delaware North entities are technically responsible for the actual submission of every false claim and statement. In fact, the Delaware North entities routinely hold themselves out to the public as interchangeable, including on the Jake's 58 website where Delaware North states "[r]eferences to 'Delaware North' or we, us, and ours are used to generally describe the operations and functions of the subsidiaries and affiliates of Delaware North Companies, Incorporated."[7]

---

[7]    Specifically, the Jakes58.com website links to https://www.delawarenorth.com/corporate-structure, which states: "Corporate Structure: 'Delaware North is a reference to Delaware North Companies, Incorporated and its affiliates and subsidiaries, including without limitation Delaware North Companies, Inc. – Boston, Delaware North Companies Gaming & Entertainment, Inc., Delaware North Companies International, Ltd., Delaware North Companies Landmark Holdings, LLC, Delaware North Companies Parks & Resorts, Inc., Delaware North Companies Sportservice, Inc., Delaware North Companies Travel Hospitality Services, Inc., Delaware North Companies (UK) Limited, as well as numerous location-specific operating subsidiaries and affiliates. References to

53.     Courts have determined that "'group pleading' is permissible" in situations where, as here, "facts surrounding the corporate relationship between the [defendant] entities, as well as the precise roles those entities played in the challenged transactions, is exclusively within those entities' knowledge" and "the Complaint puts the [defendant] entities on sufficient notice regarding the charges against them." *Waltree Ltd. v. Ing Furman Selz LLC*, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000) (addressing Rule 9(b) requirements in the securities fraud context); *United States v. Chang*, No. CV133772DMGMRWX, 2017 WL 10544289, at *15 (C.D. Cal. July 25, 2017) ("Although the [complaint] does not specify which claim is directed at which defendant, the Court concludes that the claims lodged, the grounds upon which they rest, and the alleged wrongdoers are sufficiently clear to give Defendants notice of the claims against them such that the group pleading argument fails.") (citing *Gao v. JPMorgan Chase & Co.*, No. 14 Civ. 4281 (PAC), 2015 WL 3606308, at *6 (S.D.N.Y. June 9, 2015)); *United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1114 (N.D. Ill. 2018) (for FCA claim, "a plaintiff need not individualize the role of multiple defendants when the necessary information is uniquely within the defendant's knowledge. . . . [R]elator would not be expected to know the particulars of [defendants'] internal operations."); *Levine v. Prudential Bache Properties, Inc.*, 855 F. Supp. 924, 930–31 (N.D. Ill. 1994) ("Here, the plaintiffs have made particular allegations as to how the scheme worked. They have made general allegations that the [ ] defendants knowingly participated in the scheme. Rules 8 and 9(b) do not require more, and the

---

"Delaware North" or we, us, and ours are used to generally describe the operations and functions of the subsidiaries and affiliates of Delaware North Companies, Incorporated." https://www.delawarenorth.com/corporate-structure, last visited 12/11/19.  *See Crespo v. S.C. Johnson & Son*, 394 F. Supp. 3d 260, 266 (E.D.N.Y. 2019) ("Though a court considering a Rule 12(b)(6) motion ordinarily may not look outside the pleadings, the court may take judicial notice of certain matters of public record including websites.").

information that would permit a more individualized pleading would appear to lie in the exclusive possession of the defendants.").

54.     The authorities Delaware North relies on for its group pleading argument either do not involve closely interrelated defendants in the same corporate family,[8] or in one case reject group pleading "in the absence of allegations that corporate formalities have been ignored."[9]  Here, all defendants are in the same corporate family and there are well-pled allegations that corporate formalities have been ignored sufficiently to pierce the corporate veil. *See* Section V., *infra.*  Suffolk OTB has made allegations giving rise to a strong inference of fraud and given each of the Defendants notice of their participation in that fraud.  Delaware North's stonewalling and complex corporate structure based on various shell entities should not result in dismissal of Suffolk OTB's claims due to alleged "group pleading."

**C.     Suffolk OTB Has Adequately Pled Knowledge, Falsity and Materiality**

**1.     Suffolk OTB Pleads "Knowledge" Under the NYFCA**

55.     NYFCA violations require "knowing" action.  *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 287 (E.D.N.Y. 2016) ("The NYFCA . . . imposes liability for 'knowingly mak[ing] a false statement or knowingly fil[ing] a false record,'") (quoting NYFCA §§ 189(1)(a), (b)).  "Knowingly" under the NYFCA is defined to include actual knowledge, or acting in either "deliberate ignorance of" or "in reckless disregard of" the

---

[8]     *See, e.g., U.S. ex rel. Corp. Compliance Assocs. v. N.Y. Soc'y for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, 2014 U.S. Dist. LEXIS 109786, at *32 (S.D.N.Y. Aug. 7, 2014) (defendants were not interrelated affiliates*); In re Aluminum Warehousing Antitrust Litig.*, 2015 U.S. Dist. LEXIS 26412, at *21–22 (S.D.N.Y. Mar. 4, 2015) (no veil piercing allegations); *United States ex rel. Aryai v. Skanska*, 2019 U.S. Dist. LEXIS 45083, at *23-25 (S.D.N.Y. Mar. 19, 2019) (no veil piercing allegations).

[9]     *United States ex rel. Takemoto v. The Hartford Fin. Servs. Grp., Inc.*, 157 F. Supp. 3d 273, 281 (W.D.N.Y. 2016) (rejecting group pleading where there were no veil piercing allegations and plaintiff failed to state any basis for claim).

truth or falsity of the information.  NYFCA § 188(3)(a)(i)-(ii).  "[N]o proof of specific intent to

defraud" is required.  NYFCA § 188(3)(b).  Knowledge need only be pled in accordance with

Rule 8 (not Rule 9(b)).  *See, e.g.*, *Kane*, at 382–83 ("Conditions of a person's mind—such as

malice, intent or knowledge—may be alleged generally.").

56.    The Complaint alleges that Delaware North engaged in a "knowing, intentional

and bad faith pattern of enriching itself at Suffolk OTB's expense" and provides specific

examples.  Compl. ¶ 6.  With respect to construction charges, it alleges that Delaware North

submitted repeated claims for a hotel kitchen and that such claims were "not an accident."

Compl. ¶ 38.  The Complaint alleges that out of 92 erroneous change orders, "100% of the false

charges favored Delaware North."  Compl. ¶ 43.  It alleges that Delaware North overcharged

Suffolk OTB for rent despite "acknowledg[ing] that the square footage from which [it]

calculated base rent . . . was incorrect" (Compl. ¶ 60); that Delaware North, after telling Suffolk

OTB its percentage of sewage costs would be 13.76%, knowingly ratcheted that cost up to 50%

for a year (Compl. ¶¶ 68–69); that Delaware North "knows that giving away hotel rooms does

not drive increased revenue to the VLT Facility," but continues to exceed the budget for

complimentary rooms by as much as 194% (Compl. ¶¶ 76–77); that Delaware North has refused

to indemnify Suffolk OTB for Gaming Commission fines it recklessly incurred, for which it

knew it was responsible (Compl. ¶ 91); and that at every turn Delaware North has willfully

blocked Suffolk OTB's access to records of charges against it, including construction records,

information about legal bills and marketing data regarding the free rooms (Compl. ¶¶ 92, 94).

57.    This pattern of knowing conduct easily satisfies any requirement that knowledge

be pled to satisfy Rule 8.  Delaware North appears to contend its acts were simply "mistakes."

But, Delaware North is raising a factual dispute, and not a pleading deficiency in the Complaint.

*See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 340 (D. Conn. 2004) (determining government sufficiently pled knowledge under FCA and noting "whether the facts will show only an innocent mistake or mere negligence on the part of the defendant[] are issues that cannot be resolved on a motion to dismiss.").

### 2.    Suffolk OTB Pleads "Falsity" under the NYFCA

58.    A "false claim" is one that is "either in whole, or in part, false or fraudulent." NYFCA § 188(2).  A "claim" can be "factually" false (such as where an entity bills for something it did not actually provide), or "legally false."  *See Kester,* 23 F. Supp. at 260–61. "[A] 'legally false' claim does not misrepresent the goods and services provided.  Rather, the party submitting the claim falsely represents (or 'certifies') compliance with a statute, regulation, or contractual provision."  *Id.*   This certification of compliance can be either "express" or "implied."  *Id.*  False Claims Act liability based on an "implied certification" attaches "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a . . . contractual requirement.  In these circumstances, liability may attach if the omission renders those representations misleading."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1995 (2016).

59.    Here, falsity has been pled by reference to the contract documents and the factual allegations.  Every time Delaware North submitted a claim for payment to Suffolk OTB, those claims contained representations about the goods and services provided (such as payment codes or descriptions of charges, *see Id.* at 2000–001; Compl. ¶¶ 37, 39, 42, 105.  But Delaware North knowingly failed to disclose that those claims were not in compliance with the DMS Agreement or Lease Agreement because they were for expenses related to Delaware North's Retained Businesses, or otherwise allocated to Suffolk OTB in violation of the contracts.  Delaware

North's failure to inform Suffolk OTB that the claims were not in compliance with the DMS Agreement and Lease Agreement made those claims "legally false." Similarly, with respect to a "reverse" false claim under NYFCA Section 189(1)(g), Delaware North used false statements or records, such as descriptions of charges due for construction costs, rent bills, utility costs and statements reflecting the payment of other expenses to Delaware North, but knowingly failed to disclose that Delaware North's obligations to remit money to Suffolk OTB under the DMS Agreement went beyond the amounts reflected in the false statements or records.

### 3. Suffolk OTB Pleads "Materiality" Under the NYFCA

60.    A claim under NYFCA §§ 189(1)(b) and 189(1)(g) require that a false record or statement be "material" to a false claim or obligation to pay the government. Allegations of materiality must be plead with particularity under Rule 9(b). *See, e.g.*, *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017). "Material" under the NYFCA means "having a natural tendency to influence, or be capable of influencing the payment or receipt of money or property." NYFCA §188(5).

61.    Aside from pleading that the false claims were all "material" (*see* Compl. ¶¶ 105, 107), Suffolk OTB also alleges that, "[d]eeply concerned about the pattern of self-dealing and bad faith actions . . . Suffolk OTB demanded that Delaware North Manager cede control of the VLT Facility's accounts payable function." Compl. ¶ 98. This clearly demonstrates materiality. Further, the Complaint alleges that Suffolk OTB engaged auditors to review the construction costs after Delaware North refused numerous times to grant Suffolk OTB access to the records, and that Suffolk OTB "confronted" Delaware North about overcharges (Compl. ¶¶ 40–41, 70); that Delaware North also refused to reimburse Suffolk OTB for rent and Gaming Commission fines after Suffolk OTB raised the issue (Compl. ¶¶ 60, 90); and that Suffolk OTB "demanded records and data related to the efficacy of the 'free' hotel program" which Delaware

North "has refused to provide" (Compl. ¶ 80).  This is more than enough to demonstrate that Delaware North's false statements and records had a natural tendency to influence Suffolk OTB.  Upon learning of Delaware North's actions, Suffolk OTB confronted Delaware North to get to the bottom of the unlawful spending and put a stop to it.  This shows materiality.

62.    In addition, the fact that Suffolk OTB instituted this lawsuit also demonstrates the materiality of the false records and statements.  This is not a *qui tam* suit in which a private individual is speculating about what is material to the government.  This case is the government initiating a direct civil enforcement action alleging that it would not have paid claims or allowed Delaware North to retain money related to its private business.  Clearly, the alleged falsity is material.  *See, e.g.*, *United States v. Luce*, 873 F.3d 999, 1008 (7th Cir. 2017) (materiality requirement met where government began debarment proceedings after learning of false claim); *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 179 (4th Cir. 2017) (government's decision to "immediately intervene" indicated materiality requirement had been satisfied).  Delaware North's contention that the false claims alleged only "minor or insubstantial" noncompliance is belied by the allegations of the Complaint.  And, in any event, materiality is a quintessential issue of fact not appropriate for dismissal in these circumstances.  *See, e.g.*, *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("The determination of materiality is a mixed question of law and fact that generally should be presented to a jury."); *United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 450 (S.D.N.Y. 2017) ("Where there is a disputed issue of fact as to the materiality element under the False Claims Act, courts deny a defendant's motion[.]"); *United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, 668 F. Supp. 2d 548, 568 (S.D.N.Y.

2009) ("disputed issues of fact require that the [defendant's] motion . . . on the issue of materiality be denied.").

      **D.**      **Suffolk OTB Has Pled the Existence of Hundreds of False "Claims" as Required by the NYFCA**

            **1.**      **Hundreds of Claims Were Made by Defendants in the Form of "Requests or Demands" for Money**

    63.    Delaware North argues that because it obtained tens of millions of dollars from Suffolk OTB's bank account, Suffolk OTB's claim under NYFCA §§ 189(1)(a) and (1)(b) must be dismissed and its fraud permitted to lie. But, the dollars at issue (that Delaware North has admitted it has taken) were transmitted to Delaware North in response to a claim for payment to Suffolk OTB, within the meaning of Sections 189(1)(a) and (b).

    64.    As a practical matter, it works this way: Delaware North pays the "Expenses incurred in the operation of the Business." DMS § 6.02.2. All the Gross Revenues of the Business are supposed to be deposited into Suffolk OTB's bank account. *See* DMS §§ 7.01, 7.02.1. Then, periodically, Delaware North submits demands and requests for payments to Suffolk OTB for reimbursement of Expenses and payment of its Management Fee from Suffolk OTB's account. *See* DMS §§ 7.02.3; 8.01. Such demands and requests contain an implied false certification that the amount requested is in compliance with the DMS Agreement. *See, e.g.,. Kester* 23 F. Supp. at 261 (finding liability where "the party submitting the claim falsely represents (or 'certifies') compliance with a statute, regulation, or contractual provision."). These are "call[s] on the government fisc" by Delaware North and thus a "claim" under NYFCA § 188(1). *See, e.g.*, *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) (FCA liability must "involve an actual claim, which is to say, a call on the government fisc."). Based on the foregoing, Suffolk OTB has adequately alleged claims within the meaning of NYFCA §§ 189(1)(a) and 189(1)(b).

65.    Delaware North contends that notwithstanding the fact that it makes demands and requests for payment to Suffolk OTB, the *Bank of New York Mellon* cases absolve it from liability under Sections 189(1)(a) and (b).[10]  Delaware North is wrong.  Delaware North's "no claim" argument does not rely on the facts pled in the Complaint or that it knows exist.  Instead, it relies on the facts of the *Bank of New York Mellon* cases, which are materially different that those here.  In the *Bank of New York Mellon* cases, the government voluntarily handed over its money to Bank of New York to manage *before* any demand on the government fisc was made by Bank of New York.  That is not what happened or has been pled here.  Suffolk OTB did not turn over its money to Delaware North in advance of any claim.  The money is in Suffolk OTB's account at the Bank.  Then, it is transmitted to Delaware North based on Delaware North's claim and certification of the truth of that claim.  When those claims are false they violate Sections 189(1)(a) and (b).

66.    To the extent Delaware North is arguing that accounting statements reflecting past debits are not "claims," Suffolk OTB does not contend that they are.  Rather, statements and records of accounting activities are false statements in support of the false claims that violate Section 189(1)(b).  In the *Bank of New York Mellon* cases, plaintiffs contended that the false accounting statements were both the false claim and the false statement.  But the court found no "claim" because the government had handed their money to Bank of New York before any claim was made.  Here, Suffolk OTB did not turn over any money to Delaware North for the

---

[10]      *See In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479, 491 (S.D.N.Y. 2014); *People ex rel. Schneiderman v. Bank of N.Y. Mellon Corp.*, 40 Misc. 3d 1232(A), 977 N.Y.S.2d 668 (N.Y. Sup. 2013); *Commonwealth ex rel. FX Analytics v. Bank of N.Y. Mellon*, 84 Va. Cir. 473 (Va. Cir. Ct. 2012); *In re Bank of N.Y. Mellon Corp. False Claims Act Foreign Exch. Litig.*, 851 F. Supp. 2d 1190 (N.D. Cal. 2012).

hotel kitchen, for example, until Delaware North made a false claim for the funds. That shows there is a material, false claim here.

67. Further, the *Bank of New York Mellon* cases confirm that the law does not require plaintiffs to allege an explicit request or demand: "Surely [the statutory analogues to 189(a) and (b)] do not require a formal invoice for liability to attach; conduct amounting to an implicit request may be sufficient." *In re Bank of New York Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d at 491. Because it is common sense that money held in one bank account (Suffolk OTB's) cannot go to another bank account (Delaware North's) without a request or demand for the transfer of funds, drawing all inferences in Plaintiff's favor, Suffolk OTB has pled a "request or demand" for money.

### 2. Hundreds of False Claims were "Presented" to Officers, Employees or Agents of Suffolk OTB

68. For the same reasons articulated above, Suffolk OTB has also pled "presentment." In order for Delaware North to be paid from Suffolk OTB's bank accounts, it had to ask. As a practical matter, Delaware North presents these claims in the form of ACH electronic transfer requests to Suffolk OTB and "an agent of the . . . local government," the custodian of Suffolk OTB's funds. *See, e.g.*, Compl. ¶ 42 ("at least 92 erroneous change orders . . . representing millions of dollars in overcharges *submitted to and charged to* Suffolk OTB by Delaware North").

### E. Delaware North's Liability under Sections 189(1)(d), (g) and (h) Preclude it from Escaping Liability on Its Baseless "Claim" Argument

69. Sections 189(1)(d), (g) and (h) prevent wrongdoers like Delaware North from escaping NYFCA liability based on the argument before this Court that there is no "claim." Together, these sections impose liability for so-called "reverse false claims," where a government contractor does not transmit money it owes to a government actor. So, if Delaware

North is correct that it did not need to make false claims because it was holding Suffolk OTB's money, then these sections impose liability for failing to deliver and transmit the right amounts of that money back to Suffolk OTB.[11]

### 1. Suffolk OTB has Stated a Claim Under § 189(1)(d)

70.    Section 189(1)(d) imposes liability on any person who "has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property." Delaware North asserts that Suffolk OTB should bear the expenses of Delaware North's hotel (for example), because it is part of the Business.  Mot. at 25–26 (arguing all driveways, entrances and exits, restrooms, elevators and escalators, service corridors, alleys, sign frontage and parking areas are Common Areas serving the VLT Facility, which Suffolk OTB must pay for).  If Delaware North's hotel is part of the Business, then Delaware North should have been delivering the Gross Revenues from the hotel to Suffolk OTB.  DMS § 7.02.3(j)(iii) ("one hundred percent (100%) of the Residual Cash Flow will be paid to Suffolk OTB").  By failing to do so, Delaware North has violated Section 189(1)(d).  *See* Compl. ¶ 10 (Delaware North has "improperly diminish[ed] the net gaming revenues flowing to Suffolk OTB").  Delaware North's argument that Suffolk OTB has failed to plead "delivery" should be rejected.

---

[11]     Furthermore, if Delaware North is correct that the *Bank of New York Mellon* cases preclude Section 189(1)(a) liability here, then that same line of cases indicates that Section 189(1)(d) would apply.  More specifically, if Delaware North is right (which it is not) that its claims to Suffolk OTB's funds are not actually "claims" and instead are akin to Bank of New York's debiting of funds from an account it already holds, then its failure to deliver the right amount of money to Suffolk OTB violates Section 189(1)(d).  *See In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 991 F. Supp. 2d at 491 ("In [California's analogue to § 189(1)(d)], the legislature specifically contemplated the possibility that a defendant might be liable—even in the absence of a 'claim'—when it '[h]as possession, custody, or control of public property or money' and fails to deliver all of that property. . . .*Thus, the legislature was well aware that liability may be appropriate even in the absence of any request or demand.*") (emphasis added).

### 2.    Suffolk OTB Has Stated A Claim For Reverse False Claim Liability Under § 189(1)(g) and § 189(1)(h)

71.    Section 189(1)(g) imposes liability if Delaware North "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to" Suffolk OTB.   Section 189(1)(h)[12] imposes liability if Delaware North "improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same[.]"[13]

72.    These claims are not duplicative for the same reason Section 189(1)(d) liability is not duplicative.  If Delaware North is right and it does not actually make "claims" and instead it holds the money and does not pay Suffolk OTB the right amount, it violates the "reverse false claim" provisions of the Act.  *See, e.g.*, *Kane*, 120 F. Supp. 3d at 394 (The FCA "unequivocally provides that to retain—to not return—an overpayment constitutes a violation of the FCA."); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012) (denying motion to dismiss where defendants submitted Medicaid cost reconciliations to government but did not reveal overpayments they were required to return); *United States ex rel. Howard v. Harper Constr. Co.*, No. 7:12-CV-215-BO, 2015 WL 13271595, at *2 (E.D.N.C. Feb. 20, 2015) (plaintiff adequately alleged reverse false claim violation in connection with

---

[12]    The Complaint pleads facts sufficient to establish and provide notice of Section 189(1)(h) liability in addition to liability under Section 189(1)(g).  *See Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 F. App'x 9, 11–12 (2d Cir. 2016) (federal pleading rules call for a short and plain statement of the claim, "they do not countenance dismissal of a complaint for imperfect statement of the legal theory"); *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) ("The Supreme Court has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the factual allegations in the complaint. A complaint need not cite a specific statutory provision or articulate a perfect statement of the legal theory supporting the claim asserted.").  While it was not necessary to mention Section 189(1)(h) specifically in the Complaint, Suffolk OTB will seek leave to amend to cite Section 189(1)(h) if required.

[13]    The claim under Section 189(1)(h) that Delaware North "improperly avoided an obligation to pay or transmit money or property to the Government" is not subject to Rule 9(b).  *See Takemoto*, 157 F. Supp. 3d at 276 (addressing 31 U.S.C. § 3729(a)(1)(g), the analog to Section 189(1)(h)).

government subcontract agreement).  The false statements material to these failures to pay

Suffolk OTB are the same ones that support liability under Section 189(1)(b), including

accounting statements, reconciliations, invoices, monthly utility and rent bills, descriptions of

construction costs and expenses and other documents reflecting overcharges to Suffolk OTB.

## II.    THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT (SECOND CAUSE OF ACTION)

73.    Delaware North concedes that "[t]he Complaint really states . . . a breach of

contract case."  Mot. at 3.  It nonetheless argues that some of the various breaches asserted in

the Complaint are not, in fact, breaches.  Each of Delaware North's arguments is addressed

below.

### A.    DNC Gaming Is Liable for Delaware North's Breach of Contract

74.    As a signatory and co-promisor of the DMS Agreement, DNC Gaming is jointly

and severally liable for Delaware North Manager's breaches of contract.  *See Battery Assocs.,*

*Inc. v. J & B Battery Supply, Inc.*, 944 F. Supp. 171, 178 (E.D.N.Y. 1996) (stating "[g]enerally

joint and several liability arises when two or more persons co-sign a contract").  Under New

York law and accorded to "settled rules governing the interpretation of contracts[,] when two or

more entities take on a contractual obligation they generally do so jointly."  *NYKCool A.B. v.*

*Pac. Fruit, Inc.*, 507 F. App'x 83, 87 (2d Cir. 2013); *see also United States Printing &*

*Lithograph Co. v. Powers*, 233 N.Y. 143, 152 (1922) ("It is a general rule so well established as

not to require extended discussion, that promises by two or more persons create a joint duty");

*Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 22 A.D.3d 308, 310–11 (N.Y. App.

Div. 2005) (same); *Herrera v. Eastside Wok, Inc.*, No. 13 Civ. 9137 (JLC), 2014 WL 6678281,

at *3 (S.D.N.Y. Nov. 25, 2014) (same); *Alexander v. Wheeler*, 64 A.D.2d 837 (N.Y. App. Div.

1978) (same); *Donzella v. N.Y. State Thruway Auth.*, 7 A.D.2d 771, 772 (N.Y. App. Div. 1958)

(noting two parties entering into contract for services creates presumption of joint duty).  In

addition, it is proper to hold Defendants jointly and severally liable in a case like this one,

where DNC Gaming and Delaware North Manager communicate with Plaintiff as a single unit,

there is one single agreement governing the relationship, and Defendants responded to

Complaint in the same legal document.  *See NYKCool A.B.*, 507 F. App'x at 87.

75.    Delaware North argues that the breach of contract clause should be dismissed

against DNC Gaming because the "whereas" clause of the DMS Agreement says DNC Gaming

signed the DMS Agreement "solely" for the "purpose" of guaranteeing certain payments not at

issue in this case.  Delaware North is wrong.  DNC Gaming cannot disclaim liability for a

breach of a contract it signed based on language in a "whereas" clause.  "[S]uch recitals cannot

remove or limit rights that are plainly given by the terms of an agreement."  *Brown v. Miguens*,

No. 02 Civ. 5278 (JSM), 2003 WL 1090304, at *3 (S.D.N.Y. Mar. 11, 2003); *see also Genovese*

*Drug Stores, Inc. v. Connecticut Packing Co.*, 732 F.2d 286, 291 (2d Cir. 1984) ("an expression

of intent in a 'whereas' clause of an agreement . . . cannot create any right beyond those arising

from the operative terms of the document.").  The "whereas" clause is not sufficient to disclaim

the presumption of joint and several liability among co-promisors, as specific "words of

severance are necessary to overcome this primary presumption."  *Herrera*, 2014 WL 6678281,

at *3.

76.    At most, each of Delaware North's arguments in support of dismissing DNC

Gaming from Plaintiff's second cause of action suggest ambiguity as to the terms of the DMS

Agreement, which cannot be resolved on a motion to dismiss.  *See, e.g., Pegler v. NRG*

*Residential Solar Sols. LLC*, No. 17 Civ. 4319 (LGS), 2018 WL 1033232, at *2 (S.D.N.Y. Feb.

20, 2018) (denying motion to dismiss because "an ambiguous contract raises a question of fact

as to the parties' mutual intent, to be resolved by the trier of fact."). Therefore, the Motion should be denied.

### B. Suffolk OTB's Contract Claims Regarding Construction Costs, Trademarks and Suffolk OTB's Consent Survive as a Matter Of Law

77. Suffolk OTB has asserted one cause of action for breach of contract. Delaware North argues that the pleading is "deficient." But, Delaware North does not argue that the elements have been insufficiently pled or that the cause fails as a matter of law. Instead, Delaware North quibbles with some bases of the cause of action. The issues raised by Delaware North are addressed below, but the cause of action clearly must survive because, among other things, Delaware North has not sought its dismissal.

### 1. The Complaint Pleads A Breach of Contract Based On Misallocation Of Construction Costs To Suffolk OTB

78. Under the DMS Agreement, Suffolk OTB is responsible for "Development Costs" (defined as costs to "design, construct, furnish and equip the Gaming Facility and the Common Areas *which serve the Gaming Facility*"). DMS § 1.01; Compl. ¶ 37 (emphasis added). Delaware North concedes that it is responsible for costs relating to the DNC Retained Businesses. *See* Mot. at 9 ("Expenses incurred by Jake's 58 in connection with the DNC Retained Business are the responsibility of Delaware North Manager."); *see also* Compl. ¶ 37. The Complaint alleges that Delaware North is trying to pin costs relating to its retained business on Suffolk OTB (while keeping the profits for itself). Compl. ¶¶ 3–4.

79. Suffolk OTB has pled that the elevator upgrades and valet service construction did not "serve the Gaming Facility" and are therefore not its responsibility. The Gaming Facility is only in the basement, first and mezzanine levels. Yet, the elevator upgrades serve Delaware North's hotel, a Delaware North Retained Business. Compl. ¶ 38(c). Likewise, the parking upgrades serve the valet parking business. That is also a Delaware North Retained

Business under the DMS Agreement.  *See* Compl. ¶ 38(f); DMS § 1.01 ("'DNC Retained Business' means . . . the provision of valet parking services and other parking revenue."). Delaware North's arguments that these costs to upgrade its own Retained Business facilities should be borne by Suffolk OTB are based on fact questions not to be resolved on a motion to dismiss.  The Court certainly cannot determine they are Suffolk OTB's responsibility as a matter of law.

### 2.     The Complaint Pleads A Breach of Contract Based On Misappropriation Of Marks

80.     Delaware North has admitted to breaches of the DMS Agreement regarding Suffolk OTB's intellectual property by virtue of the fact that it has abandoned applications it submitted to the PTO, in which it falsely claimed ownership of the Jake's 58 logo.[14]  Mot at 26. Now, Delaware North engages in a tortured reading of Section 10.02 of the DMS Agreement in an attempt to justify its brazen misappropriation of "Jake's 58" trademarks and trade names. Again, to the extent Delaware North's arguments to do not fail outright (which they do), at most they create factual disputes as to the meaning of the DMS Agreement.

81.     Section 10.02 of the DMS Agreement provides:

> Prior to the Commencement Date, Suffolk OTB and the Manager will determine the trade names, trademarks and service marks (the "Marks") to be used in connection with the operation of the Business (defined as the casino business) . . . . the Marks will be used in connection with the promotion and marketing of the Business . . . . Ownership of the Marks will, for all purposes, belong exclusively to Suffolk OTB.

---

[14]     Delaware North's abandonment of the Marks does not moot Suffolk OTB's breach of contract claim. Delaware North is still using the Marks in commerce on the Jake's 58 website, from which it derives advertising and other profits.  Delaware North has refused to assign the domain name for the Jake's 58 website to Suffolk OTB. Delaware North is responsible for any damages flowing to Suffolk OTB as a result of its misappropriation of the Marks.

Though a commonsense reading of the provision would dictate that "Marks" means simply "trade names, trademarks and service marks," Delaware North invents the added requirement that only marks "jointly determined" by Suffolk OTB and Delaware North are included in the definition. This reading is illogical.

82.    First, the word "jointly" does not appear in Section 10.02, the only provision about the Marks. The Manager *and* Suffolk OTB could separately determine different trade names to be used in connection with the business and they would still be "Marks" under the plain language of the contract.

83.    Second, even if a "joint" determination were required, the Complaint does not allege unilateral action by Delaware North; it simply says Delaware North wanted to name the casino after itself. Compl. ¶ 3. Indeed, if Delaware North unilaterally adopted the logo without Suffolk OTB's consent (as its Motion suggests), that in itself would constitute a breach of Section 10.02 under Delaware North's own reading, requiring "joint" action. At bottom, Delaware North's post-hoc rationalization for the blatantly false statements it made to the PTO regarding ownership of the trademarks must be rejected and Suffolk OTB's trademark-related breach claim must proceed.

### 3. The Complaint Pleads A Breach of Contract Based On Delaware North's Failure to Obtain Suffolk OTB's Consent, Agreement and Input

84.    Finally, Delaware North argues that Suffolk OTB's allegations as to Delaware North's failure to obtain its consent, agreement and input are conclusory and "need not be credited on a motion to dismiss."[15] Delaware North's argument makes no sense in light of the

---

[15]    Delaware North's argument that Suffolk OTB has failed to allege a single instance where Delaware North failed to obtain Suffolk OTB's consent, agreement or input in breach of the DMS Agreement, Mot. at 27, is hard to

Complaint's allegations.  The Complaint says, *inter alia*, that Delaware North did not obtain its prior approval before instituting marketing programs designed to facilitate Delaware North paying itself for empty hotel rooms, in breach of Section 6.02.6 of the DMS Agreement.  *See* Compl. ¶ 79.  The Complaint also alleges that Delaware North delivered the 2019 operating budget past the contractual deadline in order to deprive Suffolk OTB from granting its informed consent in violation of Section 5.05.3 of the DMS Agreement.  *See* Compl. ¶¶ 95–96.  The Complaint outlines numerous other expenses incurred in connection with the development and construction of the VLT Facility, *see* Compl. at ¶¶ 37–43, and details how Suffolk OTB was kept in the dark about these costs for months, in violation of Sections 7.05 and 8.04 of the DMS Agreement (which requires prior approval in connection with the retention of third party professionals and service providers).  *Id.*  These allegations are far from conclusory and do not support a request for dismissal of the breach of contract claim.

> **4.    The Complaint Pleads A Breach of Contract Based On Delaware North's Breach of the Implied Covenant of Good Faith and Fair Dealing That Survives Dismissal**

85.    "Every contract governed by New York law implies a covenant of good faith and fair dealing pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Hard Rock Cafe Int'l v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) (quotations omitted); *accord Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir. 1991).  "The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the

---

square with its simultaneous argument that Delaware North did not misappropriate trademarks because it unilaterally determined the Jake's 58 logo without Suffolk OTB's consent, agreement or input.

right to receive the benefits under their agreement." *Don King Prods., Inc. v. Douglas*, 742 F.

Supp. 741, 767 (S.D.N.Y. 1990). While the covenant of good faith and fair dealing does not

add obligations beyond those in the contract, "it protects a party to a contract from improper

conduct that subverts the contract itself." *Hard Rock*, 808 F. Supp. 2d at 567 (quotations

omitted). Suffolk OTB has not asserted a cause of action that rests solely on the breach of the

implied covenant of good faith and fair dealing. But, it could have. Suffolk OTB has made

distinct allegations showing that Delaware North's improper conduct subverted the purpose of

the DMS Agreement.

86.     Suffolk OTB alleges that Delaware North has engaged in at least the following

examples of bad faith conduct: "operating under a bad faith business plan whereby Suffolk OTB

shoulders as many costs as possible" as evidenced by the fact that 100% of Delaware North's

erroneous construction change orders favored itself (Compl. ¶¶ 35, 43, 115); "exercising their

discretion against the best interests of Suffolk OTB," including by refusing to relinquish control

of the accounts payable function, paying itself millions of dollars in complimentary hotel stays

when it knows it does not drive increased gaming revenue (Compl. ¶¶ 76–77); keeping Suffolk

OTB in the dark about many of its own business operations (Compl. ¶¶ 92–95); failing to

disclose to Suffolk OTB that it filed numerous trademark applications in which it falsely

claimed ownership over the marks (Compl. ¶¶ 47–51); and providing the annual operating

budget to Suffolk OTB with insufficient time to review before it was due to the Gaming

Commission in order to prevent Suffolk OTB from catching Delaware North's self-dealing

(Compl. ¶¶ 95–96).

87.     These allegations, while similar to its breach of contract allegations (as they must

be to avoid imposing extra-contractual obligations) support an inference of improper conduct

that subverts the purpose of the contract.  *See, e.g., Hard Rock*, 808 F. Supp. 2d at 567 (allowing implied covenant claim at the motion to dismiss phase where, though largely based on the same factual predicates, plaintiffs added an allegation that defendant had made improper misstatements to third parties).

88.    Additionally, even if the allegations underpinning the breach of the implied covenant claim are entirely duplicative of its breach of contract allegations:  "Alternative pleading is permitted" because "a party is only precluded from *recovering* on both theories at the same time."  *Hard Rock*, 808 F. Supp. 2d at 567; *see also Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (same).  Especially at this stage in the proceeding, where "the meaning of the parties' contract has yet to be determined, it is too soon to address whether the plaintiffs' claim of breach of the covenant of good faith and fair dealing is duplicative." *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05 Civ. 0902, 2008 WL 2428225, at *26 (S.D.N.Y. June 13, 2008) (quotations omitted); *see also Xpedior Creditor Tr. v. Credit Suisse First Bos.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("[T]he Federal Rules explicitly permit a party to plead causes of action in the alternative, regardless of consistency.") (quotations omitted).

89.    If it were the case, as Delaware North will surely argue, that its practice of overcharging Suffolk OTB at every turn, misappropriating its marketing funds and registering its trademarks without telling it is all perfectly permissible under the DMS Agreement, the implied covenant ensures that Delaware North cannot profit from such conduct.

## III.    SUFFOLK OTB HAS STATED A CLAIM FOR BREACH OF FIDUCIARY DUTY

### A.    Suffolk OTB Has Pled Delaware North Manager's Fiduciary Duty

90.    The allegations in the Complaint, which must be taken as true, describe a public benefit corporation seeking out an experienced agent through a competitive bidding process to

entrust with the development, management and operation of its most valued asset—the VLT Facility which was to be its path back to solvency.  Compl. ¶¶ 20–22.  Suffolk OTB chose Delaware North on the basis of its alleged "expertise at working in public-private partnerships." Compl. ¶ 20.  Upon accepting Delaware North's bid in 2014, Delaware North and Suffolk OTB entered into a principal-agent relationship in which Suffolk OTB "placed Delaware North in a position of trust and confidence to act faithfully on its behalf in developing and operating its VLT gaming facility."  Compl. ¶ 22.  Delaware North then promised that its "services will be performed out of a 'to be established' local unit as appropriate."  Compl. ¶ 141.  Delaware North assisted and advised Suffolk OTB from 2014-2016 to find a site for the VLT Facility, first in Medford, and then in Islandia.  Compl. ¶¶ 24–26.

91.     As promised in the RFP, years later, when the parties settled on Islandia, Suffolk OTB and Delaware North Manager entered into the DMS Agreement, which confirmed that the Manager would be the vehicle through which Delaware North Gaming would impart its "experience and expertise" to Suffolk OTB.  Compl. ¶ 141.  The DMS Agreement memorialized the terms of the fiduciary relationship the parties had contemplated and operated under since Suffolk OTB accepted Delaware North's proposal in 2014:  Suffolk OTB granted the Manager "the sole and exclusive right to manage the day-to-day operations of the Business on behalf of Suffolk OTB" and the "full scope of authority necessary to perform its obligations," including control over its accounts payable function, provided the Manager performed all activities "for the exclusive account and benefit" of Suffolk OTB."  *See* Compl. ¶¶ 98–99, 106; DMS §§ 5.01; 7.01.

92.     These allegations plead a quintessential fiduciary relationship:  Under New York law, "a fiduciary relationship is one founded upon trust or confidence reposed by one person in

the integrity and fidelity of another.  It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed."[16] *Penato v. George*, 52 A.D.2d 939, 942 (N.Y. App. Div. 1976); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (courts look to "whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge").  As here, in the context of property management, a fiduciary is "one who transacts business, or who handles money or property, which is not his [or her] own or for his [or her] own benefit, but for the benefit of another person, as to whom he [or she] stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."  *Board of Mgrs.*, 193 A.D.2d at 325.

93.    Delaware North's attempt to undercut the fiduciary duty it owes Suffolk OTB by suggesting that the parties have nothing more than an arms' length, commercial relationship as a matter of law must fail.[17]  In fact, by attempting to impugn Suffolk OTB's business acumen, Delaware North effectively concedes that Suffolk OTB placed Delaware North in a special position of trust and was reliant on Delaware North's expertise.  *See* Mot. at 1 ("Suffolk OTB lacked the qualifications . . . to operate a VLT casino and needed an experienced partner to develop, finance and manage the new business venture.").  A hallmark of a fiduciary

---

[16]    Delaware North appears to contend, based on one case, that Suffolk OTB's fiduciary duty claims must be pleaded with particularity "insofar as they sound in fraud."  Suffolk OTB's breach of fiduciary duty claims do not sound in fraud and therefore are not subject to a heightened pleading standard.  But even if they did, Suffolk OTB has met the heightened pleading standard with its detailed allegations.

[17]    Delaware North cites *Chelsea Grand LLC v. Interstate Hotels & Resorts, Inc.*, No. 09 Civ. 924 (PAC), 2017 WL 1214874 (S.D.N.Y. Mar. 30, 2017) for the proposition that a hotel management contract does not give rise to a fiduciary duty.  There, the Court was bound by a prior decision regarding the agent manager's scope of authority that did not even discuss fiduciary duty.  And in any event, the DMS Agreement, in which Delaware North is entrusted with the management of hundreds of millions of dollars on behalf of a government entity, is not akin to a hotel management agreement.

relationship is the principal (Suffolk OTB) trusting the agent (Delaware North Manager) to manage a valued asset (the VLT Facility) with specialized expertise. *See Winthrop-Univ. Hosp. Ass'n v. Sterling Servs. Grp.*, L.C., No. 08 Civ. 1404 (JS)(ETB), 2009 WL 10709106, at *5 (E.D.N.Y. Mar. 31, 2009) (finding fiduciary relationship where plaintiff hospital "placed its trust and confidence in [Defendant Manager's] superior expertise and knowledge."); *see also JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at 9 (finding fiduciary duty where plaintiff pled reliance on fiduciary's superior knowledge of the relevant marketplace).[18]

94. Delaware North's suggestion that the DMS Agreement precludes a fiduciary relationship here is simply wrong. The existence of a contract between the parties defining the contours of their relationship does not preclude a finding of a fiduciary duty. *See Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005) ("[I]f a contract establishes a relationship of trust and confidence between the parties . . . then a fiduciary duty arises from the contract which is independent of the contractual obligation.") (quoting *GLM Corp. v. Klein*, 665 F. Supp. 283, 286 (S.D.N.Y. 1987)).

95. "Where parties have entered into a contract, courts look to that agreement to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency." *Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 162

---

[18] Delaware North's cited authorities in support of disclaiming its fiduciary duty are inapposite. *See Saul v. Cahan*, 153 A.D.3d 947, 949 (N.Y. App. Div. 2017) (no fiduciary relationship based on oral agreement between sophisticated attorney and "art advisor" where attorney continued to buy paintings independent of art advisor's advice); *Gen. Corp.*, 82 N.Y.2d at 163 (no basis for fiduciary relationship apart from contract that stated arms' length relationship with no control or authority to bind principal); *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 103-04 (S.D.N.Y. 2013) (no relationship of higher trust was created between plaintiff and defendant where defendant "agent" was not acting on behalf of plaintiff but rather a separate third-party); *Surge Licensing, Inc. v. Copyright Promotions, Ltd.*, 258 A.D.2d 257, 258 (N.Y. App. Div. 1999) (simple copyright royalty agreement with no creation of trust or confidence between parties).

(N.Y. App. Div. 1993). Here, the DMS Agreement describes the extraordinary position of trust Suffolk OTB placed in the Manager with respect to both its property (the VLT Machines and its revenues and expenses) and its expertise (management the VLT Facility).

96.    The Complaint alleges that the fiduciary relationship arose out of Delaware North's selection from a competitive bidding process, after which the Manager was created for the purpose of imparting its "experience and expertise" to Suffolk OTB. The DMS Agreement confirms the terms of the fiduciary relationship. *See* DMS § 5.01 ("The performance of all activities by the Manager pursuant to this Agreement will be on behalf of Suffolk OTB and for its exclusive account and benefit."); DMS § 16.01 (requiring Manager to act "solely as the agent of Suffolk OTB.").[19] Far from relying on "fiduciary buzzwords," both the allegations in the Complaint and the terms of the DMS Agreement are emblematic of a fiduciary relationship and preclude dismissal.

97.    Delaware North has been entrusted with "the sole and exclusive right to manage the day-to-day operations of the Business" of a public entity's most valuable asset that is generating hundreds of millions of dollars. There can be no determination at the pleading stage that a fiduciary duty did not exist as a matter of law. "Because the inquiry as to whether a fiduciary relationship exists is necessarily fact-specific, a 'claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).'" *JPMorgan Chase Bank,* 2009 WL 321222, at *9 (quoting *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006)); *Cf. Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F.

---

[19]    Tellingly, Delaware North does not mention Section 5.01 at all. Further, the fact that Section 16.01 also describes the Manager as an "Independent Contractor" for Suffolk OTB does not, as Delaware North suggests, undermine the Manager's status as a fiduciary. *See Winthrop*, 2009 WL 10709106 at 6 ("It is well established that the fact that the agreement refers to [a party] as an "independent contractor" does not defeat the existence of a fiduciary relationship where one would otherwise exist.").

Supp. 1169, 1178 (S.D.N.Y. 1996) (finding no fiduciary duty as a matter of law where contract

contained express provision "clearly and unambiguously disclaim[ing] a fiduciary relationship).

**B.** **Suffolk OTB's Breach of Fiduciary Duty Claim is Not Duplicative of Its Breach of Contract Claims**

98.    Suffolk OTB's breach of fiduciary duty claim is also distinct from its breach of

contract claims.  Delaware North overstates the relevant standard, incorrectly suggesting that

*any* overlap in the conduct constituting a breach of contract and breach of a fiduciary duty

warrants dismissal of one of the claims.  This is not the case.  Rather, "it is established that the

*same conduct* which may constitute the breach of a contractual obligation may also constitute

the breach of a duty arising out of the relationship created by contract but which is independent

of the contract itself."  *Winthrop*, 2009 WL 10709106 at 6. .  As such, a breach of fiduciary duty

claim is "not subject to dismissal as duplicative" even if it "concerns some of the same

underlying conduct as the breach of contract claim" so long as "the allegations concern a breach

of a duty that is independent of the contract[.]"  *37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs.,*

*LLC*, 156 A.D.3d 569, 571 (N.Y. App. Div. 2017).

99.    As outlined in Section III.A, Suffolk OTB has established a fiduciary duty arising

independently from the contract, having its roots in the RFP process that predates the DMS

Agreement by years.  Suffolk OTB relied upon Delaware North Manager's expertise to develop

and manage the VLT Facility in good faith, entrusting Delaware North with the authority to

manage its business and money.  Delaware North Manager then breached this independently

existing duty by "intentionally improperly perform[ing] their contract . . . to [their] own

substantial benefit."  *See 37 E. 50th St.*, 156 A.D.3d at 571.  Specifically, the Complaint alleges

that Delaware North Manager breached its fiduciary duty by, *inter alia*, failing to act for Suffolk

OTB's exclusive benefit, exercising its managerial duties to enrich itself and its affiliates at

Suffolk OTB's expense, misappropriating Suffolk OTB's intellectual property, overcharging Suffolk OTB for improvements to Delaware North's private business, using Suffolk OTB's marketing budget to enrich it and its affiliates' private hotel business, refusing to relinquish control of Suffolk OTB's accounts payable function when asked and exercising its discretion against the best interests of Suffolk OTB.  Compl. ¶ 127.

100.    While much of this conduct also constitutes breaches of the DMS Agreement, it is the underlying self-dealing and bad faith inherent in these allegations that are the *sine qua non* of a breach of fiduciary duty claim.  In other words, it is the betrayal, not the breach, that is the essence of the claim and gives rise to separate liability.  *See, e.g., Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007) (A tort claim is less likely to be deemed duplicative of a contract claim where, as here, a defendant with a fiduciary duty exercises broad discretion in its handling of a client's matters); *Winthrop,* 2009 WL 10709106 at *6–7 (breach of fiduciary duty claim not duplicative of contract claim where "Plaintiff claims that it granted broad influence and authority to Defendant, and suffered various problems . . . as a result").

101.    "At the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims."  *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010).  Plaintiff is allowed to plead in the alternative, as Rule 8 "embodies a liberal approach to pleading which favors the resolution of cases on the merits of the plaintiff's claims."  *Id.*  Suffolk OTB's breach of fiduciary duty claim, taken in the light most favorable to Plaintiff, is not impermissibly duplicative of Plaintiff's breach of contract claim.  As such, it should not be dismissed as duplicative at this juncture in the proceedings.

### C.    The Economic Loss Doctrine Does Not Bar Suffolk OTB's Breach of Fiduciary Duty Claim at the Pleading Stage

102.    Delaware North makes another version of its "duplicative" argument by contending that the "economic loss **doctrine**" requires dismissal of Suffolk OTB's breach of fiduciary duty claim because it has to allege damages flowing from the tort claims that are independent of the damages flowing from contract claims.  The "doctrine" appears to have been created by a few judges in the S.D.N.Y. in the unique situation of cases involving breach of fiduciary duty suits against residential-mortgage-backed securities ("RMBS") trustees by investors after the financial crisis.  Those cases have nothing to do with the case at bar and are not well-grounded in New York law.

103.    The "economic loss **rule**" stems from *Schiavone Constr. Co. v. Mayo Corp.*, 56 N.Y.2d 667, 669 (1982), and "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer."  *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288 (2001).  The *Schiavone* rule reflects the premise that "damages arising from the failure of the bargained-for consideration to meet the expectations of the parties are recoverable in contract, not tort, *unless a legal duty independent of the contract itself has been violated[.]*" *Suffolk Laundry Servs., Inc. v. Redux Corp.*, 238 A.D.2d 577, 578 (N.Y. App. Div. 1997) (emphasis added).  Here, Delaware North has been alleged to have violated its fiduciary duty to Suffolk OTB independent of the DMS Agreement.  *See* Section III.B, *supra*.

104.    Noting that certain S.D.N.Y. cases have taken the economic loss rule and unjustifiably extended it, other S.D.N.Y. cases in the RMBS context have said that "the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful."  *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 159,

160 (S.D.N.Y. 2018) (finding it "unlikely" that the New York Court of Appeals would apply the doctrine to a breach of fiduciary duty claim); *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16 Civ. 1099 (NSR), 2017 WL 1383773, at *4 (S.D.N.Y. Apr. 12, 2017) ("per se bar" of the economic loss rule does not apply outside of the strict products liability context); *Commerzbank AG v. U.S. Bank Nat'l Ass'n.*, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017) (economic loss rule does not bar tort damages in cases involving breach of a professional duty); *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000) (economic loss rule does not bar tort damages in cases involving professional malpractice).  Recognizing this reality of New York law and rejecting the new "*doctrine*," the court in *Ambac* said:  "Absent a pronouncement by the New York state courts to the contrary, this Court declines to require [plaintiff] to disaggregate the damages arising from its breach of contract and breach of fiduciary duty claims at this stage in the proceedings."  *Ambac*, 328 F. Supp. 3d at 160.  This Court should do the same here.

105.   Indeed, casebooks are filled with breach of fiduciary claims where the parties' relationship is governed by express contracts and only benefit of the bargain damages are sought.  *See, e.g.*, *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Assoc. of Am.*, 259 A.D.2d 75, 83, 693 (N.Y. App. Div. 1999)  ("[I]n claims against professionals, a legal duty independent of contractual obligations may be imposed by law as incident to the parties' relationship. Professionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." (internal quotation marks omitted)); *Commerce & Indus. Ins. Co. v. Vulcraft, Inc.*, No. 97 Civ. 2578 (DAB) (MHD), 1998 WL 823055, at *12 (S.D.N.Y. Nov. 20, 1998) (rejecting the application of the economic loss rule and stating that "[t]he premise for the third-party claim . . . is in substance one for professional malpractice, and

that obligation is distinct from any contract into which the parties may have entered"); *Robinson Redevelopment Co. v. Anderson*, 155 A.D.2d 755, 757 (N.Y. App. Div. 1989) ("We conclude that the contractual and professional relationship of plaintiff and defendants gave rise to two distinct wrongs, one contractual and the other grounded in professional malpractice, recoverable at law."). Suffolk OTB has alleged an extra-contractual fiduciary duty owed by the Manager, which the Manager breached, resulting in damage to Suffolk OTB. At the motion to dismiss phase, this is sufficient to proceed. *See generally St. John's*, 757 F. Supp. 2d at 184 ("Many courts dismissing tort and unjust enrichment claims as duplicative of contract claims have done so on a motion for summary judgment, with the benefit of a full factual record.").

**D.** **Suffolk OTB's Aiding and Abetting Breaches of Fiduciary Duty Claim Also Survives Dismissal**

106.  "The elements of a cause of action for participation in a breach of fiduciary duty are: breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." *SCS Commc'ns, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 342 (2d Cir. 2004). For the reasons outlined in Section III.A–C, above, Suffolk OTB's breach of fiduciary duty claim against Delaware North Manager survives dismissal, thus providing the underlying breach for an aiding and abetting claim.

107.  Suffolk OTB has also adequately alleged the "substantial assistance" and "knowing inducement" of a breach of the underlying fiduciary duty in support of its aiding and abetting claim against Defendants DNC, DNC Gaming, and Delaware North Properties. Contrary to Delaware North's assertions, the Complaint alleges each Defendant's affirmative assistance and inducement of the Manager's breaches, including, *inter alia,* participating in the RFP process that gave rise to the fiduciary relationship, including inducing Suffolk OTB to accept Delaware North's bid by "touting its expertise and desire to contribute to New York

State public education"; forming Delaware North Manager as the vehicle through which DNC and Delaware North Gaming promised to "provide the benefit" of their "expertise and experience" in the gaming industry to Suffolk OTB; falsely claiming ownership, and/or causing an affiliate to falsely claim ownership to the PTO of intellectual property belonging exclusively to Suffolk OTB and not disclosing such actions to Suffolk OTB; as to DNC Gaming: entering into the DMS Agreement, acting as Manager's guarantor under the DMS Agreement and directing every aspect of Manager's performance of its duties under the DMS Agreement; refusing to return moneys falsely debited from Suffolk OTB's bank accounts; as to Delaware North Properties:  purchasing the Islandia Property, entering into the Lease Agreement, which was the instrumentality through which Suffolk OTB was falsely charged for rent and utilities, and knowingly participating in the false calculation of square footage for purposes of charging Suffolk OTB false rent and utility charges.  *See* Compl. ¶ 132.  These allegations of "knowing inducement" and "substantial assistance" are more than enough to survive dismissal at the pleading stage on an aiding and abetting claim.  *See, e.g.*, *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 372 (S.D.N.Y. 2013) (denying motion to dismiss where defendants received misallocated funds from co-defendant's breach); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503, 511 (S.D.N.Y. 2009) ("substantial assistance" sufficiently alleged where defendants recorded false financial statements); *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 461 (S.D.N.Y. 2007) (denying motion to dismiss where defendants provided financial assistance to breaching co-defendant).

## IV.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM SURVIVES DISMISSAL

108.   To state a claim for unjust enrichment, a plaintiff must establish "(1) that the defendant was enriched; (2) that the enrichment was at plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the

money and property to the plaintiff." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001); *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 563–64 (E.D.N.Y. 2017). Suffolk OTB has met these pleading requirements by alleging in the Complaint how the Defendants were unjustly enriched through their bad faith conduct in connection with the operation of the VLT Facility, including by falsely overcharging Suffolk OTB for expenses, misappropriating trademarks and marketing funds, and refusing to reimburse Suffolk OTB for Gaming Commission fines. Compl. ¶¶ 137–139. Delaware North does not dispute that the Complaint pleads the elements of a claim for unjust enrichment.

109.    Rather, Delaware North asks this Court to dismiss Suffolk OTB's unjust enrichment claim, against all Defendants, because unjust enrichment is a quasi contract claim viable only in the absence of enforceable agreements, here the DMS and Lease Agreements. While "it is a general rule under New York law that no claim for unjust enrichment lies where the subject matter of the claim is covered by a written contract," "this rule applies only when the existence of a contract governing the transaction in question is undisputed." *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (sustaining unjust enrichment claim where parties disagreed as to whether underlying contracts were binding on Defendants); *Hochman v. LaRea*, 14 A.D.3d 653, 654–55 (N.Y. App. Div. 2005) ("where . . . there is a bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi-contract."). Thus, an unjust enrichment claim cannot be dismissed at the pleading stage where there is a dispute as to whether a contract is binding on each of the Defendants, or as to a Defendant's obligations under the contract, or as to the scope of the written agreement. *See Mathias v. Jacobs*, 238 F. Supp. 2d 556, 571

(S.D.N.Y. 2002) (unjust enrichment claim sustained where the parties disputed the validity and scope of a written agreement).

110.   Here, the parties dispute the extent to which the DMS Agreement is enforceable against DNC Gaming.  There is also a dispute as to whether the DMS Agreement is fully binding on DNC and DNC Gaming under a theory of alter ego liability.  *See* Section II.A *infra*. These disagreements preclude dismissal of the unjust enrichment claim.  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996) (claim for unjust enrichment "properly pleaded as such in the alternative to the contractual claim" where one defendant disputed being a party to the contract); *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001) ("Because there is a dispute as to defendant's obligations under the contract . . . plaintiff's unjust enrichment claim survives"); *Cal Distrib., Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06 Civ. 0496 (RMB) (JCF), 2007 WL 54534, at *10 (S.D.N.Y. Jan. 5, 2007) ("Because the parties disagree as to whether the [ ] Agreements are binding on the Defendants, the Court cannot conclude that the unjust enrichment cause of action is precluded.").  *See Sofi Classic*, 444 F. Supp. 2d at 249 ("Here, the parties disagree as to whether the Joint Venture Agreement and the Settlement Agreement are binding on the Defendants as 'alter egos' of the signatories to the Agreements.  Accordingly, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is denied."); *Picture Patents, LLC v. Aeropostale, Inc.*, No. 07 Civ. 5567 (JGK), 2009 WL 2569121, at *3 (S.D.N.Y. Aug. 19, 2009) (allowing unjust enrichment claim to proceed where parties disputed alter ego status that would bind them to contract); *Space, Inc. v. Simowitz*, No. 08 Civ. 2854 (SAS), 2008 WL 2676359, at *5 (S.D.N.Y. July 8, 2008) (denying motion to dismiss unjust enrichment claim

where parties dispute whether non-signatory defendant is individually bound by contracts under an alter ego theory).

111.   Additionally, dismissal of an unjust enrichment claim at the pleading stage against any Defendant is premature where, even as to signatories of the agreement, there may be disputes over whether the contract governs the subject matter of the dispute.  "Where [d]efendants' arguments beg the question of what performance the Agreements required of the Defendants . . . . [o]nly after determining whether, and to what extent, the Agreements governed the parties' conduct . . .can the court determine whether the [contract and unjust enrichment] claims are duplicative."  *St. John's*, 757 F. Supp. 2d at 183.  Further, should Defendants establish that "the breaches alleged by Plaintiff were not breaches of duties governed by the contracts," dismissal of the unjust enrichment claim would have been premature."  *Id.* at 184. And "[e]ven if the agreements are enforceable, the court must still interpret them to determine whether Plaintiff's unjust enrichment claims against non-signatory defendants arise out of the same subject matter."  *Id.*; *see, e.g.*, *MGR Meats, Inc. v. Schweid*, No. 10-CV-3068 MKB, 2012 WL 6675123, at *5 (E.D.N.Y. Dec. 21, 2012) (sustaining unjust enrichment claim against non-signatory to agreement because "a plaintiff may proceed on a theory of unjust enrichment despite the existence of a valid contract where the contract does not cover the dispute in issue") (quoting *Mid-Hudson Catskill Migrant Ministry, Inc. v. Fine Hosp. Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)); *see also Zimmerli Textil AG v. Kabbaz*, No. 14-CV-1560 (JS) (AYS), 2015 WL 5821523, at *6 (E.D.N.Y. Sept. 30, 2015) ("A quasi-contract claim may be pleaded in the alternative to breach of contract.") (quotations omitted).

112.   Here, the Complaint alleges (and Suffolk OTB will prove) that each of the Defendants has received ample benefits at Suffolk OTB's expense by virtue of the extensive

misallocation scheme alleged in the Complaint.  If the Court dismisses the unjust enrichment

claim before determining the extent to which the DMS Agreement binds DNC Gaming, whether

alter ego liability binds DNC and DNC Gaming to the DMS and Lease Agreements, and

whether each of the Defendants' ill-gotten gains were governed by the DMS and Lease

Agreement, dismissal of the unjust enrichment claim is premature.

## V.    PLAINTIFF'S ALLEGATIONS STATE A BASIS TO PIERCE THE CORPORATE VEIL (SEVENTH CAUSE OF ACTION)

113.    Defendants are closely-held private companies, two of which (Delaware North

Manager and Delaware North Properties) were expressly formed by the other two (DNC and

DNC Gaming) to be the vehicles through which DNC and DNC Gaming would direct, control

and capitalize upon the businesses at Jake's 58.  Compl. ¶ 141.  Delaware North makes the

baseless claim that DNC and DNC Gaming were included in this case "for harassment purposes

only," despite the fact that DNC and DNC Gaming responded together to Suffolk OTB's RFP

as "the only entities participating as key team members in connection with the RFP response."

Compl. ¶ 141(d).  The Complaint demonstrates that DNC and DNC Gaming are indeed proper

defendants to this lawsuit and Suffolk OTB's veil piercing allegations must survive past the

pleading stage.[20]

114.    At the very least, because veil piercing is a fact-intensive exercise, under both

New York and Delaware law, "a complaint seeking to pierce the corporate veil should not be

dismissed unless it 'is totally devoid of solid, nonconclusory allegations.'"  *Robles v. Copstat*

---

[20]    "[B]ecause a veil piercing claimant can prevail without proving fraud, plaintiff's alter ego allegations will not be held to the particularity requirement of Fed. R. Civ. P. 9(b). Instead, the allegations properly are judged according to the liberal 'notice pleading' standard of Fed. R. Civ. P. 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief."  *Kawski v. Johnson & Johnson*, No. 04-CV-6208 CJS, 2005 WL 3555517, at *11 (W.D.N.Y. Dec. 19, 2005).  The Complaint meets this standard.

*Sec., Inc.*, No. 08 Civ. 9572 (SAS), 2009 WL 4403188, at *2 (S.D.N.Y. Dec. 2, 2009) (quoting

*Int'l Credit Brokerage Co. v. Agapov*, 249 A.D.2d 77, 78 (N.Y. App. Div. 1998)); *Blair v.*

*Infineon Techs. AG*, 720 F. Supp. 2d 462 (D. Del. 2010) ("The nature and extent of the

dominion and control exercised by the [ ] defendants over the [ ] [s]ubsidiaries is a question of

fact, not subject to resolution on a motion to dismiss.") *see also In re Buckhead Am. Corp.*, 178

B.R. 956, 974–75 (D. Del. 1994) (same).

### A. Suffolk OTB's Veil Piercing Allegations Must Be Evaluated on the Merits

115.    In response to Suffolk OTB's well-pled allegations, Delaware North contends that

piercing the corporate veil is not a cause of action but "a procedural device through which a

plaintiff may assert facts and circumstances to persuade the court to impose the parent

corporation's obligation on the subsidiary or vice versa." *Sec. Inv'r Prot. Corp. v. Stratton*

*Oakmont, Inc.*, 234 B.R. 293, 321 (Bankr. S.D.N.Y. 1999).  Whether Delaware North labels veil

piercing a "procedural device" or "cause of action" is immaterial.  Courts routinely evaluate

corporate "alter ego" allegations and pierce the veil when appropriate.  *Key Items, Inc. v. Ultima*

*Diamonds, Inc.*, No. 09 Civ. 3729 (HBP), 2010 WL 3291582, at *10 (S.D.N.Y. Aug. 17, 2010),

cited by Delaware North, does not stand for the proposition that veil piercing "causes of action"

are dismissed automatically under Rule 12(b)(6).  To the contrary, the case notes, after a full

consideration of allegations, that a veil piercing claim (like any other claim) can be dismissed if

not adequately pled.  Here, the Complaint gives Delaware North notice of Suffolk OTB's veil

piercing request and the allegations on which the request is based are adequately pled and

sufficient to do so.

### B.    Suffolk OTB's Veil Piercing Allegations Surpass the Plausibility Threshold and Survive Dismissal

116.    Under both Delaware and New York law,[21] Suffolk OTB has pled alter ego liability of DNC and DNC Gaming.  "In order to state an alter ego claim under Delaware law, a plaintiff must plead that the parent and subsidiary 'operated as a single economic entity,' and 'must demonstrate an overall element of injustice or unfairness.'"  *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1144 (S.D.N.Y. 1996) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995) (applying Delaware law)).  "Where a subsidiary is in fact a mere instrumentality or alter ego of its owner, a court can pierce the corporate veil."  *Id.*  Under New York law, "a party seeking to pierce the corporate veil, and thereby hold another entity or individual liable, must show: (1) the alleged alter ego 'exercised complete domination over the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil.'"  *Sentry Ins. A. Mut. Co. v. Brand Mgmt. Inc.*, 120 F. Supp. 3d 277, 286 (E.D.N.Y. 2015) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp., LLC*, 268 F.3d 58, 63 (2d Cir. 2001)).  The two analyses are "substantially similar."  *Wausau Bus. Ins. Co. v. Turner Const. Co.*, 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001).

### 1.    Suffolk OTB Has Alleged "Complete Domination"

117.    The Complaint describes the "complete domination" of Delaware North Manager by DNC Gaming and DNC under New York law.  In New York, courts look to ten equitable

---

[21]    In New York, the law of the state of incorporation determines whether the corporate form will be disregarded, even in the face of a choice of law provision.  *Panam Mgmt. Grp., Inc. v. Peña*, No. 08 Civ. 2258 (JFB) (ARL), 2011 WL 3423338, at *3 (E.D.N.Y. Aug. 4, 2011) (citing *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)).  Delaware North Manager is incorporated in New York.  DNC Gaming and Delaware North Properties are incorporated in Delaware.

factors articulated in *Wm. Passalacqua Builders, Inc. v. Resnick*, 933 F.2d 131, 139 (2d Cir.

1991) in considering whether there is "complete domination" by the alleged alter ego entity[22]:

> (1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

933 F.2d at 139.  There is no prescribed formula as to which, or how many *Passalacqua* factors

must be met in order to pierce the veil.  But where a plaintiff includes specific factual

allegations going to certain of the factors, this will be sufficient to survive a motion to dismiss

and move on to discovery (which is often "squarely within the control" of the defendants), even

where the allegations are not dispositive of veil piercing.  *See Cookware Co., LLC v. Austin*, No.

15 CIV. 5796 (DAB), 2017 WL 5198388, at *3 (S.D.N.Y. Oct. 26, 2017) (permitting veil

piercing claim to proceed to discovery where Defendants used the same contact information,

guaranteed the other's obligations and used each other's property); *Int'l Council of Shopping

Ctrs., Inc. v. Info Quarter, LLC*, No. 17-CV-5526 (AJN), 2018 WL 4284279, at *4 (S.D.N.Y.

Sept. 7, 2018) (because veil piercing inquiry "unsuited for resolution on a pre-answer, pre-

discovery motion to dismiss" "setting forth some examples of alleged domination may provide

---

[22]    Similar factors are considered by Courts under Delaware's "single economic entity" test including "whether the corporation was solvent and adequately capitalized, whether corporate formalities were observed, and whether the corporation functioned in general '"as a facade for the dominant shareholder."'  *Union Carbide*, 944 F. Supp. at 1145.

sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss").

118.    Delaware North claims Suffolk OTB has alleged only "overlap in ownership" and "common office space," but in reality Suffolk OTB has alleged conduct that goes to numerous of the *Passalacqua* factors: DNC and DNC Gaming expressly created the alter ego entities purely as vehicles through which to provide their management services to Suffolk OTB and to reap profits from the VLT Facility (factors 1,7); the management of DNC and DNC Gaming regularly represent and speak for Delaware North Manager and Properties in connection with business disputes and the alter egos do not exercise independent discretion (factor 9); Delaware North Properties was created solely to purchase an alternative location for the VLT Facility so that Suffolk OTB would be forced to be Delaware North's tenant (factor 10); the Delaware North entities directed Delaware North Manager to abuse access to Suffolk OTB's accounts to claim purposefully misallocated funds (factors 6,10); and, in addition, the entities have overlapping management and addresses (factors 4,5).

119.    Further, in evaluating the *Passalacqua* factors, the *Passlacqua* court itself noted that "[a]pplying these—or any other pertinent factors—to the infinite variety of situations that might warrant disregarding the corporate form is not an easy task because disregarding corporate separateness is a remedy that "differs with the circumstances of each case." *Wm. Passalacqua Builders*, 933 F.2d at 139; *see also Union Carbide*, 944 F. Supp. at 1145 ("Defendants have cited no decision holding that the absence of allegations of specific . . . factors justifies granting a motion to dismiss where the plaintiff has made *other relevant allegations*.") (emphasis added) (applying Delaware law).

120.   The circumstances of this case, taking the allegations as true and drawing all inferences in Plaintiff's favor, warrant survival of the veil piercing claim past the pleading stage.  Analogous case law also indicates that the Complaint's allegations are sufficient to survive.  *See, e.g.*, *Kawski v. Johnson & Johnson*, No. 04-CV-6208 CJS, 2005 WL 3555517, at *11 (W.D.N.Y. Dec. 19, 2005) (denying motion to dismiss where parent corporation communicated directly with injured party regarding the disputes and injured party relied on it); *Int'l Council of Shopping Ctrs.*, 2018 WL 4284279, at *4 (denying motion to dismiss where complaint alleged intermingling of funds, inadequate capitalization, disregard of corporate formalities, and shared common office space and phone numbers); *Moses v. Martin*, 360 F. Supp. 2d 533, 540–41 (S.D.N.Y. 2004) (allegations of a lack of corporate formalities, commingling of funds, and self-dealing survive motion to dismiss); *Union Carbide*, 944 F. Supp. at 1145 (denying motion to dismiss where plaintiff alleged parent company caused or directed alter ego to breach its contractual commitments).[23]  Delaware North's authority for the proposition that DNC and DNC Gaming do not have "complete dominion or control" over Delaware North Manager and Delaware North Properties use incorrect standards and are not analogous to the facts alleged in this case.[24]

---

[23]    After discovery, Suffolk OTB expects to show that the entities have fully integrated accounting systems and that all funds are routed through DNC Gaming and/or DNC, Inc., that DNC, Inc. and DNC Gaming directed the Manager regarding the misallocation of expenses to Suffolk OTB, and that DNC Gaming's accounting department prepared and approved many of the false claims and false statements, and that DNC, Inc. and DNC Gaming personnel directed every aspect of Delaware North managers and Properties supervision of Suffolk OTB employees.

[24]    *See McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 145 (E.D.N.Y. 2009) (on a motion for *summary judgment*, entirety of proffered evidence showed defendant was a "common-place . . . corporate form"); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 342 F. Supp. 2d 207 (S.D.N.Y. 2004) (entity acquired as fully independent operation did not warrant veil piercing under Colorado law); *A.V.E.L.A., Inc. v. The Estate of Marilyn Monroe, LLC*, 2018 U.S. Dist. LEXIS 35536 (S.D.N.Y. Mar. 5, 2018) (pleading standard not met where plaintiffs alleged nothing more than shared address).

### 2. Suffolk OTB Has Alleged Fraud and Injustice Sufficient to Pierce the Veil

121.    The Complaint also alleges "the existence of a wrongful or unjust act" toward the party seeking to pierce the veil, that injured plaintiff.  *See Sentry Ins. A. Mut.*, 120 F. Supp. 3d at 286.  Here, the allegations are that Delaware North and DNC Gaming created the alter egos for the purpose of capitalizing on a knowing, intentional and bad faith pattern of enriching itself at Suffolk OTB's expense.  This easily satisfies the "fraud or injustice" prong.  *See United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16 (D.D.C. 2016) (piercing veil where alter ego submitted false claims worth hundreds of thousands of dollars in violation of FCA, transferred funds to parent entity and stonewalled detection efforts).  However, even something less than fraud will do: "This prong does not require evidence of fraud, rather a veil-piercing claimant can prevail without proving fraud if the claimant can identify some non-fraudulent wrong attributable to the defendant's complete domination of a subsidiary entity."  *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 299 (E.D.N.Y. 2014); *see also Union Carbide*, 944 F. Supp. at 1145 ("overall element of unfairness and injustice" standard under Delaware law sufficiently pled where parent entity used alter ego to achieve unlawful business interests).

122.    Delaware North's arguments do not warrant dismissal.  Again, it contends that the "injustice" is simply repackaged breaches of the DMS Agreement, ignoring Suffolk OTB's broader allegations of how DNC and DNC Gaming orchestrated a bad faith, self-enriching scheme through the alter ego entities they formed specifically as "vehicles" to carry out that purpose and give them cover to avoid liability, as they are doing now.  As such, Suffolk OTB

has also pled that the injustice at issue was sufficiently linked to Delaware North's misuse of the corporate form.[25]

## VI.    SUFFOLK OTB'S CLAIM FOR A DECLARATORY JUDGMENT ON TERMINATION OF THE DMS AGREEMENT IS NOT SUBJECT TO ANY CONDITION PRECEDENT (EIGHTH CAUSE OF ACTION)

123.    Suffolk OTB's claim for declaratory relief also survives dismissal.  The Complaint alleges the occurrence of numerous events of default based on (i) Delaware North's material failure to perform provisions of the DMS Agreement, and (ii) the commission of fraud, malfeasance, gross negligence and/or material misrepresentations by the Manager's employees in operating the business.  Delaware North does not contest that the conduct outlined in the Complaint constitutes events of default under Section 12.03, which grant Suffolk OTB the right to terminate the Manager's employment.[26]  Instead, Delaware North claims Suffolk OTB's declaratory relief claim is barred because Suffolk OTB has not alleged compliance with Section 12.03's "notice and cure" provisions.  This is not so.

124.    On October 7, 2019, Suffolk OTB provided the Manager with notice of events of default, in the form of the Complaint, in accordance with DMS § 16.14's "Notices" provision. Compl. ¶ 149.  Such notice triggers the start of various "cure" periods outlined for specific events of default.  DMS Agreement 12.03(a)–(d).  But these cure periods are not a condition

---

[25]    The cases Delaware North cites are not to the contrary.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Srvs., Inc.*, 386 F. Supp. 2d 461, 475 (S.D.N.Y. 2005) (plaintiffs met higher summary judgment standard by showing Defendants had sufficient control over entity and "ultimate authority to determine where [ ] income would go"); *Ningbo Prods. Imp. & Exp. Co. v. Eliau*, 2011 U.S. Dist. LEXIS 125789, at *9 (S.D.N.Y. Oct. 31, 2011) (dismissing claim with "threadbare" allegations of wrongdoing); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260 (D. Del. 1989) (declining to find injustice where patent infringement was taking place long before parent company was incorporated).

[26]    Delaware North points to its "hard work" and $100 million investment (for which it has realized millions of dollars in unjustified returns at Suffolk OTB's expense).  Both are irrelevant to whether the DMS Agreement can be terminated for events of default.

precedent to seeking judicial relief.  Nothing in the text of the DMS Agreement precludes

Suffolk OTB from filing a lawsuit prior to the expiration of a cure period.  Section 12.03 only

purports to prevent Suffolk OTB from actually terminating the contract before the cure period

ends, which Suffolk OTB has not done.[27]

125.    In any event, case law demonstrates that the events of default Suffolk OTB has

pled are not "curable," which excuses Suffolk OTB from observing the notice and cure

provisions.  "Under New York law . . . a contract may be terminated without notice and

opportunity to cure where there is sufficient evidence of fraud, even where contractual

provisions require such notice."  *7-Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214, 230 (E.D.N.Y.

2013); *see also Blue Bell, Inc. v. W. Glove Works Ltd.*, 816 F. Supp. 236, 243 (S.D.N.Y. 1993)

("In New York, fraud or dishonesty of a sufficient degree will "entitle one party to rescission

regardless of notice and cure.").  Where such fraud goes to "the root of the matter or essence of

the contract," termination is warranted without a right to cure, even if the contract includes

termination and cure provisions.  *See Southland Corp. v. Mir*, 748 F. Supp. 969 (E.D.N.Y.

1990).

126.    *In re Best Film & Video Corp.*, 46 B.R. 861, 874–75 (Bankr. E.D.N.Y. 1985) is

instructive.  There, the Court outlined how "fundamental dishonesty" by one party could cause

an irretrievable breakdown of the contractual relationship that excuses compliance with notice

and cure provisions:

> There was a frustration of purpose when a breach involving
> fundamental dishonesty by one party occurred, because no amount
> of payment for past thefts by [defendant] could ever restore the
> business trust and confidence which [plaintiff] wanted to have in its
> distributors. The continuing sense of reliance and security which is

---

[27]      The applicable periods have now each expired and Delaware North has failed to cure, or commence a cure with respect to each of the Events of Default identified by Suffolk OTB.

> always an important feature of the bargain had been completely destroyed, and could not possibly have been reinstated. Under the circumstances, then, [defendant's] breach was a vital breach, it would have been sufficient to allow [plaintiff] to rescind the contract even if the contract had been in terms an absolute one for a fixed term with no right of termination at all.

46 B.R. at 874.  Similarly, in *7-Eleven, Inc. v. Khan*, the Court excused the plaintiff's compliance with a notice and cure provision in the context of a franchisor/franchisee contract where the franchisee lied repeatedly about its profits and was generally deceptive toward its franchisor.  977 F. Supp. 2d at 233.  Because such conduct went to the "essence of the contract" and "served to destroy all trust between [the defendants] and 7-Eleven," "7-Eleven has been deprived of its contractual right to receive the fruits of its contract."  *Id.*; *Giuffre v. Hyundai Motor Am.*, 756 F.3d 204, 210 (2d Cir. 2014) (finding defendant's fraudulent and illegal business practices were material and not susceptible of cure); *see also N.Y.C. v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 692–93 (S.D.N.Y. 2018) (finding plaintiff was excused from 20-day cure period where defendant continued to engage in events of default after suit was commenced); *see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 ("[S]trict adherence to the . . . cure provision would have been a 'useless act' in the face of [continued breach].").

127.    The Complaint alleges fundamental defaults by Delaware North going to the essence of the contract.  This is not curable.  Suffolk OTB is therefore excused from complying with the notice and cure provisions in the DMS Agreement.

## VII.    PLAINTIFF'S REQUEST FOR AN ACCOUNTING IS PROPER AND SUFFICIENTLY PLED (NINTH CAUSE OF ACTION)

128.    "The purpose of an equitable accounting is to require a fiduciary to show what he did with the principal's property."  *Wilde v. Wilde*, 576 F. Supp. 2d 595, 607 (S.D.N.Y. 2008).  "In addition to returning the property, a fiduciary must return any profits generated by the use of

the property." *Id.* Delaware North does not deny that Suffolk OTB has pled the elements to establish a claim for equitable accounting, namely that Delaware North Manager owes Suffolk OTB a fiduciary duty, pursuant to which Suffolk OTB entrusted the Manager with the control of its money and its VLT business, thereby imposing upon Delaware North a burden of accounting; that Delaware North has unlawfully diverted Suffolk OTB's funds in violation of its fiduciary duties; and that Delaware North has refused Suffolk OTB access to books and records that would establish the extent of the unlawful diversion, leaving Suffolk OTB no other adequate remedy at law.[28]

129.    Rather, Delaware North's only basis for dismissal of the accounting claim is, once again, to proclaim it is duplicative of the breach of contract claim and its attendant legal remedy.  But where Suffolk OTB has pled breach of a fiduciary duty, as well as the elements for an accounting, it may seek both equitable and legal relief at the motion to dismiss phase.  *See DiTerlizzi v. DiTerlizzi*, 92 A.D.2d 604, 606 (N.Y. App. Div. 1983) ("Although a party may have a legal remedy, he or she is not precluded from seeking equitable relief by way of an accounting predicated on the existence of a fiduciary relationship."); *Darlagiannis v. Darlagiannis*, 48 A.D.2d 875, 875 (N.Y. App. Div. 1975) (same); *see also Evans v. Perl*, 862 N.Y.S.2d 814 (N.Y. Sup. Ct. 2008) ("It is also well recognized that alternative pleadings that include both legal and equitable relief withstand [p]re-answer dismissal.").

130.    Each of the cases Delaware North relies on involve instances where the Court determined from the pleadings, as a matter of law, that no fiduciary duty existed, permitting it to

---

[28]    *See 300 Broadway Realty Corp. v. Kommit*, 235 N.Y.S.2d 205, 206 (1962) (elements of an accounting claim under New York law are "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal").

dispense with equitable relief at the outset of the case.[29]  Here, Suffolk OTB has pled not only

the existence and breach of a fiduciary duty, but distinct injuries arising from those breaches

warranting an accounting—namely that Delaware North, abusing its position of trust, has kept

Suffolk OTB in the dark as to its dealings with Suffolk OTB's money, and has enriched itself in

ways currently unknown to Suffolk OTB without an accounting.  *See* Compl. ¶ 4 ("[A] full

accounting will prove the existence of additional unlawfully diverted funds and misconduct.").

131.    Compensatory breach-of-contract damages alone do not remediate the wrong

here, because Suffolk OTB, especially as a steward of public funds, is entitled to know the full

universe of Delaware North's self-dealing.  The self-dealing may well go beyond breach of

express provisions of the DMS Agreement, which are "the tip of the iceberg."  Compl. ¶ 43.

Under these circumstances, equity requires that Suffolk OTB's accounting claim survive

dismissal at the pleading stage, because Suffolk OTB is entitled to an accounting of how

Delaware North has spent Suffolk OTB (and taxpayer) funds, and the profits it has realized from

its self-dealing at Suffolk OTB's expense.  *See, e.g.*, *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d

Cir. 2006) ("a disgorgement remedy . . . sometimes called an accounting . . . . [u]nlike damages

is a method of forcing a defendant to give up the amount by which he was unjustly enriched.

The emphasis on public protection, as opposed to simple compensatory relief, illustrates the

equitable nature of the remedy.").

---

[29]        *See IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (refusing
to sustain accounting claim in absence of fiduciary relationship); *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189,
202 (E.D.N.Y. 2007) (accounting claim unnecessary where plaintiff has not alleged that defendant was his fiduciary
and where damages could be ascertained through discovery); *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg.
LLC*, 159 F. Supp. 3d 324, 340 (E.D.N.Y. 2016) (same).

## VIII.   JUSTICE REQUIRES LEAVE TO AMEND TO ADDRESS ANY ACTUAL PLEADING DEFICIENCIES IDENTIFIED BY THE COURT

132.     At bottom, Defendants' Motion demands more detail or additional allegations where none are required.  Should the Court nonetheless determine that any of the claims are inadequately pled or fail to state a claim, justice requires that Suffolk OTB be granted an opportunity to seek leave to amend the Complaint to correct any pleading deficiencies perceived by the Court.  *See* Fed. R. Civ. P. 15(a)(2)) (The Court should freely give leave when justice so requires").  Rule 15 reflects the principle that "'mere technicalities' should not prevent cases from being decided on the merits."  *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000).  This is clearly a case where the merits should be addressed.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order denying the Motion to Dismiss the Complaint.

Dated: December 11, 2019

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: /s/ *Bryce L. Friedman*

  Bryce L. Friedman
  Sarah E. Phillips

425 Lexington Avenue
New York, New York 10017
Tel:  (212) 455-2000
E-mail:  bfriedman@stblaw.com
   sarah.phillips@stblaw.com

ECKERT SEAMANS CHERIN &
MELLOTT, LLC

By:  /s/ *Christopher F. Graham*

  Christopher F. Graham
  Sarah H. Morrissey

10 Bank Street, Suite 700
White Plains, NY 10606
Telephone: (914) 286-6443
E-mail:  cgraham@eckertseamans.com
   smorrissey@eckertseamans.com

*Attorneys for Plaintiff*
*Suffolk Regional Off-Track Betting*
*Corporation*